Daniel J. Anderson (IA Bar No. 20215)
  danderson@wertzlaw.com
WERTZ & DAKE
1500 Center St. NE #101
Cedar Rapids, IA 52402-5500
Telephone:     319.861.3001
Facsimile:     319.861.3007

Daniel H. Lutz (WA Bar No. 45708)
  dlutz@aldf.org
Jessica L. Blome (MO Bar No. 59710)
  jblome@aldf.org
*Pro Hac Vice pending*
ANIMAL LEGAL DEFENSE FUND
170 E. Cotati Avenue
Cotati, CA 94931
Telephone:     707.795.2533
Facsimile:     707.795.7280

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| TRACEY K. KUEHL, an individual; LISA K. KUEHL, an individual; KRIS A. BELL, an individual; NANCY A. HARVEY, an individual; JOHN T. BRAUMANN, an individual, and; ANIMAL LEGAL DEFENSE FUND, a non-profit corporation,<br><br>              Plaintiffs,<br>    v.<br><br>PAMELA SELLNER, an individual; TOM SELLNER, an individual; and CRICKET HOLLOW ZOO, a non-profit corporation,<br><br>              Defendants. | Case No. C14-2034-LRR<br><br>Assigned to: LRR<br><br>Referred to: JSS<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## STATEMENT OF THE CASE

1.      This case, brought under the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544, challenges Pamela and Tom Sellner's unlawful "take" – *e.g.*, killing, wounding, harming, injuring and harassment – of federally listed and specially protected species at Cricket Hollow Zoo (the "Zoo"), a self-described "exotic animals walk-through zoo" and unaccredited roadside menagerie owned and operated by Pamela and Tom Sellner.

2.      The Sellners' operation and management of the Zoo is taking the lemurs, tigers, gray wolves, serval and lions at the facility, in violation of the ESA and its implementing regulations. Extensive photographic and video evidence, visitor observations and expert analyses indicate that members of the ESA-listed species physically and mentally suffer in their cramped and deprived conditions of confinement at the Zoo.

3.      Specifically, the Sellners confine two lemurs to barren, dimly lit and deteriorating cages, which significantly disrupt and impair the lemurs' normal and essential behavior patterns.

4.      In addition, the Sellners confine tigers and lions in small, barren cages, which also disrupt and impair the large cats' normal and essential behavior patterns. At least one tiger has been declawed, a process that can cause ongoing pain, discomfort, and other pathological conditions in animals. The lions are similarly mistreated: visitors have observed a female lion throwing up; flies swarm other lions, especially around the lions' noses and ears; and one lion disappeared over the 2012-2013 winter.

5.      Gray wolves and a serval are among the other animals that suffer in their enclosure conditions at the Zoo. The Sellners consistently allow feces and other animal waste to pile up inside the small wolf and serval enclosures, the size of which represent a miniscule portion of the territory that the animals traverse in the wild. Moreover, like many other animals at the Zoo, the Sellners provide the wolves with an inadequate diet of fly-laden meat, rotting

food and a dog food-like substance that Zoo visitors can pay for and feed to the wolves and other animals through a tube in uncontrolled public feeding.

6.      The inhumane conditions amount to unlawful take of the ESA-listed species. Plaintiffs also bring suit against the Sellners for possessing unlawfully taken ESA-listed animals, as well as for the Sellners' practice of acquiring and / or disposing of ESA-listed animals in interstate or foreign commerce in the course of commercial activity.

7.      Take of these species is an ongoing, immediate concern. In October 2013, Plaintiffs discovered animals lying dead in their enclosure because of Defendants' neglect in operating the Zoo. Most recently, in December 2013, federal inspectors from the U.S. Department of Agriculture (USDA) visited the Zoo and found that the Sellners failed to adequately protect animals from weather elements, that enclosure structures were in such disrepair as to pose injury and disease hazards to the animals, and that the Sellners had deprived animals of water to drink. These conditions highlight the continued health and welfare risks to all animals confined at the Zoo, including the members of endangered species.

## PARTIES

### Plaintiffs

8.      TRACEY K. KUEHL is fifty-eight years old and a lifetime resident of Iowa. She has spent the majority of her life in Davenport, where, for the last twenty years, she worked for a children's museum. From her earliest memories of caring for cows and hogs on her family's farm, she has felt a connection of respect, stewardship and love for animals.

9.      Tracey Kuehl derives personal, recreational, educational and aesthetic benefits from being in the presence of animals and observing animals in humane conditions. She has visited nearly every zoo within 300 miles of the Quad Cities because of her personal, recreational, educational and aesthetic interest in observing animals that she knows she will

never get to see in the wild, and because she believes zoos are fun places to go with her friends. She has also visited zoos for events put on by the professional museum organizations of which she was a member. During the zoo visits she learned the importance of a safe and clean zoo experience for both the captive animals and human visitors. She has visited the Blank Park Zoo in Des Moines several times, the Niabi Zoo in Coal Valley more times than she can count, the St. Louis Zoo, Zoo Atlanta, and the Lincoln Park and Brookfield Zoos in Chicago. Tracey Kuehl suffers personal distress when she witnesses animals in conditions that physically or psychologically harm the animals or are otherwise inhumane.

10.     When traveling in northeast Iowa in early 2012, Tracey Kuehl saw an advertisement for the Zoo in a local newspaper. Around the same time, she also heard about the Zoo from her sister, Lisa Kuehl. Because of her interest in observing animals, she visited the Zoo in June 2012. The first thing that struck her when arriving at the Zoo was the stench, which she thought was worse than any hog farm she had smelled. The enclosures and pens containing animals were filled with standing water and accumulating excrement, and there were flies everywhere. Garbage bins were open and garbage was strewn about. Walking through the Zoo, she observed animals who exhibited signs of physical and psychological suffering and who were held in inhumane conditions. She observed bears confined in a small corncrib enclosure that was sloppy and filled with standing water and feces. She further observed the white tiger in similar conditions, inside a nearly barren cage with standing water and lots of feces lying around; she noted that the enclosure was in major disrepair. Tracey Kuehl also observed a small wire cage containing an albino raccoon draped over a bucket attempting to drink water, with lots of feces accumulating in the corner of the other cage. She also noticed open sores on the face of a ram. As she was visiting other animals, she heard a big ruckus at the lion enclosure. She looked to see the source of the noise and saw a group of older teenagers jumping away from the enclosure

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

as a lion was repeatedly ramming herself into the cage fencing. Tracey Kuehl did not observe any Zoo staff assisting the distressed lion. Tracey Kuehl experienced distress and anguish as a result of the trip to the Zoo and her observations of animals held in unnatural, inhumane and harmful conditions who engaged in abnormal behaviors that indicated psychological distress. The conditions under which the animals were kept at the Zoo seriously impaired her aesthetic enjoyment of the animals.

11.     Worried about the animals at the Zoo and hoping that she had simply visited the Zoo on an "off week," Tracey Kuehl decided to return to the Zoo on July 6, 2012. She saw more of the same conditions—standing water remained and the excrement was similarly piled up in many of the enclosures.

12.     Because she cared about the animals she observed at the Zoo and was concerned about their conditions, health and welfare, Tracey Kuehl began spending significant time trying to improve their situation. She wrote letters of concern to the Iowa Department of Agriculture and Land Stewardship (IDALS) and the USDA. She spoke with two of the Delaware County Supervisors about the conditions of the animals' enclosures. She left messages with the Delaware County sheriff when the weather reached extremes – cold temperatures during the winter and hot temperatures during the summer – asking for welfare checks on the Zoo animals. In early September 2012, she met with Iowa Secretary of Agriculture Bill Northey, and told him her belief that the Zoo is not the type of "agriculture" that Iowa should be promoting. She also has spoken with Iowa state senators and representatives about Iowa's dangerous wild animal law and its broad exemption for USDA-licensed facilities like Cricket Hollow Zoo.

13.     On June 26, 2013, Tracey Kuehl visited the Zoo to check on the condition of the animals and to see if any changes had been made in the year since her previous visit. She bought what appeared to be dog food at the admission booth and fed the food to a gray wolf through a

chute in the fence. She spent time watching the young baboon, the lemurs and the serval, and saw the enclosure conditions were either the same or had worsened. All the enclosures she observed were still filthy and full of water and excrement. She noted that none of the physical objects in the enclosures for the animals to play with – including logs in the lemur, serval and tiger enclosures – had been moved, replaced, or supplemented. In addition, Tracey Kuehl observed that the Meishan pigs did not have easy access to water in their pen. She also looked at the fencing around the enclosures and saw sharp edges, which she feared would hurt either the animals or the visitors. The conditions under which Tracey Kuehl observed the animals impaired her aesthetic enjoyment of the animals.

14.    In October 2013, after learning that three Meishan piglets had died in their enclosure and had not been removed before the facility opened up to the public, Tracey Kuehl wrote letters to the USDA and IDALS asking for investigation into the Zoo. Along with Lisa Kuehl and the Animal Legal Defense Fund, Tracey Kuehl sent a letter of concern to the Delaware County Sheriff and County Attorney.

15.    Because she appreciates and is attached to the particular animals at the Zoo and is concerned about their welfare, Tracey Kuehl wishes to see the animals in humane conditions and to avoid seeing them in inhumane, harmful conditions. Defendants' confinement and exhibition of the animals in inhumane conditions harms Tracey Kuehl's aesthetic, recreational, educational and personal interest in enjoying seeing the animals in humane, safe and psychologically enriching conditions. She is disturbed by Defendants' enclosures and lack of care for the animals at the Zoo. In addition, based on her experience as director of a children's museum and her observations at the Zoo, Tracey Kuehl is concerned about both the animal and human injury and illness, *i.e.* visitor public safety risks from the excessive feces, inadequate enclosure fencing, and uncontrolled public interaction between humans and the animals.

16.     Tracey Kuehl would like to observe and visit the animals currently at the Zoo, including the tigers, wolves, lemurs, serval and lions, and others, living in humane conditions. If the animals were transferred to a sanctuary or other place where they were no longer mistreated and where they lived in humane conditions, Tracey Kuehl would visit them.

17.     LISA K. KUEHL is fifty-five years old and lives just north of Des Moines. Based upon her youngest memories of growing up on her family's farm, she has felt a connection of respect, stewardship and love for animals.

18.     In April 2012, Lisa Kuehl was flying in a plane in eastern Iowa and saw the Zoo from the air. Because of her interest in animals, she decided to visit the zoo in June 2012. Lisa Kuehl experienced distress and anguish from the conditions that she found at the Zoo. She observed Angora rabbits living in chicken coop enclosures with six to eight inches of feces piling up underneath. She saw clumps of black and moldy hay everywhere, and it appeared that Defendants were feeding the hay to the animals. She also observed the lions and wolves covered with flies; looking closely, she saw that flies filled up the interior of the animals' ears. She noted the lions had bite marks from insects, with drops of blood on the lions' faces. The conditions under which Lisa Kuehl observed the animals impaired her aesthetic enjoyment of the animals at the Zoo.

19.     Because she cared about the animals she had observed at the Zoo and was concerned about their conditions, health and welfare, Lisa Kuehl began spending significant time trying to improve their situation. She met with many public officials and organizations to discuss her concerns with the the Zoo, including IDALS, Iowa State Veterinarians David Schmitt and Randy Wheeler, and staffers from Blank Park Zoo and the Animal Rescue League of Iowa.

20.     Concerned about the animals, Lisa Kuehl returned in August 2012 to the Zoo. She was upset to discover that the conditions at the zoo were the same as her first visit. She noted that the primates' enclosures were filthy and covered in excrement. She also observed that the primate enclosures, as well as many other cages and enclosures, had very little vegetation or other objects with which the animals could interact or play.

21.     In July 2013, Lisa Kuehl again returned to the Zoo to visit the animals. She found that conditions had not changed from the previous year, with cages in disrepair, food rotting in the heat and obvious presence of rodents and insects. The only difference was that instead of the baby baboon greeting her as she entered the Zoo – the baboon had been moved to live by himself in isolation, next to the isolated lemurs – she observed a raccoon in the entrance area.

22.     Because she appreciates and is attached to the particular animals at the Zoo and is concerned about their welfare, Lisa Kuehl wishes to see the animals in humane conditions and to avoid seeing them in inhumane, harmful conditions. Defendants' confinement and exhibition of the animals in inhumane conditions harms her aesthetic, recreational, educational and personal interest in enjoying seeing the animals in humane, safe and psychologically enriching conditions. She is disturbed by Defendants' enclosures and lack of care for the animals at the Zoo.

23.     Lisa Kuehl would like to observe and visit the animals currently at the Zoo, including the tigers, wolves, lemurs, serval and lions, and others, living in humane conditions. If the animals were transferred to a sanctuary or other place where they were no longer mistreated and where they lived in humane conditions, she would visit them.

24.     KRIS A. BELL is fifty-seven years old and a lifetime resident of Iowa. She lives in Ames, where she works for Iowa State University. Bell grew up on a farm in central Iowa and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

has established a strong connection with animals since her childhood. She kept cats, dogs and horses and other farmed animals.

25.     Based on her interest in and love for animals, Bell visited the Zoo with Plaintiffs Lisa Kuehl and Nancy Harvey in June 2012. She observed animals living in what she perceived to be generally filthy conditions, with open piles of garbage and enclosures and cages caked with feces. For example, Bell observed people buying what looked like dog food to feed to the bears; she noted that when people dropped food through a tube in the bear enclosure, the bears would paw at the food with disinterest. She observed a female lion with flies crawling all over her. As Bell visited the lioness, the animal started throwing up. Bell also observed Scottish cattle, who were crying out to the human visitors. She noted that the cattle did not have any available drinking water and was distressed to interpret the cries to be the animals' expression of their thirst. The conditions under which the animals were kept at the Zoo seriously impaired her aesthetic enjoyment of the animals.

26.     Because she cares about the animals that she visited at the Zoo and was concerned about their captivity conditions, as well as their health and welfare, Bell wrote a complaint to the USDA in late June 2012.

27.     Bell appreciates and is attached to the particular animals she visited at the Zoo and is concerned about their welfare. Defendants' confinement and exhibition of the animals in inhumane conditions harms her aesthetic, recreational, educational and personal interest in enjoying seeing the animals in humane, safe and psychologically enriching conditions. She is upset by the enclosure conditions and lack of care for the animals at the Zoo.

28.     Bell would like to observe and visit the animals currently at the Zoo living in humane conditions. If the animals suffering at the Zoo were relocated to a more humane and

natural setting, such as a reputable sanctuary where they would receive humane treatment, Bell would no longer suffer impaired aesthetic enjoyment, and would visit the animals again.

29.     NANCY A. HARVEY is sixty-one years old and from Ankeny, Iowa. She works as a life insurance underwriter. She and her husband moved to Iowa in 1989 and have lived in the state ever since. She often visits her son in the Quad Cities. Ever since she was a child, Harvey has felt a deep connection to animals, particularly as their caretaker. She believes that the connection is reciprocated because all of her pets – two dogs, two cats and one bird – follow her from room to room throughout her house. Based on her connection to animals, she has visited Blank Park Zoo multiple times.

30.     Because of her interest in observing animals Harvey visited the Zoo with Plaintiffs Lisa Kuehl and Kris Bell in June 2012. While at the Zoo, Harvey was shocked to see the conditions in which the animals lived. Harvey visited the "reptile house" where she observed flies everywhere and a uniform lack of drinking water for most of the animals. What water she saw was filthy, especially for the birds and the chinchillas. Harvey also observed rabbits kept in a small hutch outside and panting in the heat; she used to have rabbits as pets and knows how they suffer in hot temperatures. She noted that the rabbits had matted fur and were soiled with accumulated feces. She observed llamas standing in their own excrement. She saw coyotes pacing back and forth in their enclosure, which to her was abnormal, derived from an apparent lack of stimulation and is a sign of poor welfare. Harvey also observed dogs kept in an enclosure with no water and "food" that was multi-colored, surrounded by flies and did not look edible. She also noted that the hay for the goats and cows was dark and moldy. Most notably, Harvey observed a very thin female lion that appeared sick. As Harvey watched, the lion began to retch and vomit. The lion's eyes looked withdrawn. Harvey was extremely upset watching the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

lion throw up. She brought the lion's health to the attention of Defendant Pamela Sellner, who told Harvey that the lion was just old.

31.     During the visit, Harvey approached Defendant Pamela Sellner and complained that many animals did not have enough water. Harvey urged Sellner to fill the cows' tank with water, and helped Sellner carry a bucket of water to the dogs' enclosure.

32.     Because she cares about the animals that she visited at the Zoo and was very concerned about their conditions, health and welfare, Harvey dedicated time to try to improve their situation. She wrote a letter of concern to the USDA on June 27, 2012. Along with Lisa Kuehl, she also met with Iowa State Veterinarians to express her dismay about the conditions. Harvey also contacted Des Moines news station WHO TV13 to visit the Zoo and heighten public awareness about the animals suffering at the zoo.

33.     Because she appreciates and is attached to the particular animals at the Zoo and is concerned about their welfare, Defendants' confinement and exhibition of the animals in inhumane conditions harms Harvey's aesthetic, recreational, educational and personal interest in enjoying seeing the animals in humane, safe and psychologically enriching conditions. She is disturbed by Defendants' enclosures and lack of care for the animals at the Zoo.

34.     Harvey was so bothered by what she observed at the Zoo that she emotionally shut down and could hardly function immediately after observing the particular animals at the Zoo. She has since refrained from continuing to visit the animals at the Zoo for fear of again becoming depressed and upset by viewing the animals in their living conditions. If the endangered animals at the Zoo were relocated to a more humane and natural setting, such as a reputable sanctuary where they would be allowed to live in a species-appropriate environment and receive humane treatment, Harvey would visit the animals again.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

35.     JOHN T. BRAUMANN is fifty-two years old and Iowa native. He returned to Marion, Iowa in 2001, where he still lives. He lives about half an hour from the Zoo. Braumann has a deep respect for animals. In 2003 he became a vegetarian because he could not justify killing animals for his own food consumption.

36.     Braumann visited the Zoo in October 2012 and was appalled and disgusted by the inhumane conditions in which the animals lived at the zoo, especially the endangered animals. He noted that flies were everywhere, most enclosures had accumulations of old, dried feces and there were hardly any environmental enhancements in the enclosures. He observed that the tiger enclosure was barren besides one log and a small sleeping area. Upon entering the facility, he met Defendant Pamela Sellner playing with a young baboon, who was in a soiled diaper. Braumann also observed a baby tiger cub, where for twenty dollars the public could pet and play with the cub. He watched a young girl pay for time with the tiger; once she paid, Defendant Sellner left the girl unattended to return to the Zoo's front desk. He also visited the gray wolves and was upset to observe that the wolves had no dry ground in their enclosure; their fur was wet up to their knees, as they had nowhere to avoid the wet, muddy conditions. In addition, Braumann noted that many of the hoofed animals suffered from overgrown hooves, which he knows to be a painful condition.

37.     On July 13, 2013, Braumann visited the Zoo with Lisa Kuehl and found that the conditions of the enclosures had not changed. Flies were everywhere, there continued to be a lack of water and he saw excessive algae in water bowls and debris in food bowls. He noted the baboon, named Obi, was no longer at the Zoo front office, but had been moved to an isolated enclosure next to the isolated lemurs. He also observed a bear in a corncrib enclosure chewing for a very long time on metal stairs.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

38. Braumann has since refrained from continuing to visit the animals at the Zoo for fear of again becoming depressed and upset by viewing the animals in their living conditions. His eleven-year-old daughter asked to visit the Zoo with him, but he does not want to expose himself or his family to the conditions of the animals, out of concern of upsetting them. If the endangered animals at the Zoo were relocated to a more humane and natural setting, such as a reputable sanctuary where they would be allowed to live in an appropriate environment and receive humane treatment, Braumann would visit the animals again. In particular, he would like to see the primates removed from isolation and placed in appropriate social conditions.

39. ANIMAL LEGAL DEFENSE FUND (ALDF) is a national non-profit organization headquartered in Cotati, California with over 100,000 members. ALDF pursues its purpose of safeguarding animal welfare by persistently advocating for the protection of animals used and sold in commercial enterprises. ALDF frequently focuses on animal husbandry practices and the confinement of animals used for entertainment and exhibition purposes. ALDF has expended significant organizational resources on advocacy and public education efforts to improve the welfare of animals–particularly members of threatened and endangered species–that are held in captivity.

40. ALDF brings this action on behalf of its members, including Plaintiffs Tracey Kuehl, Lisa Kuehl, Bell and Harvey. ALDF's members' interests in observing and otherwise enjoying animals at the Zoo have been, and will continue to be, harmed by Defendants' take of the endangered animals through their operation and management of the Zoo.

**Defendants**

41. CRICKET HOLLOW ZOO, INC. is an Iowa non-profit corporation that operates Cricket Hollow Zoo, a roadside menagerie located at 1512 210th Street, in Manchester, Iowa.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

42. PAMELA and TOM SELLNER are, upon information and belief, citizens and residents of Delaware County, Iowa. The Sellners are officers of Cricket Hollow Zoo, Inc., and own and operate Cricket Hollow Zoo.

## JURISDICTION AND VENUE

43. The Court has jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs allege violations of federal law.

44. Pursuant to 28 U.S.C. §§ 2201-2202, the Court is authorized to provide declaratory and injunctive relief. The ESA's citizen suit provision further authorizes the Court to enjoin violations of the ESA and its implementing regulations. *See* 16 U.S.C. § 1540.

45. Plaintiffs provided notice of their intent to sue Defendants on March 4, 2014, at least sixty days in advance of this Complaint, as required by the ESA. *See id*. § 1540(g)(2)(A). Defendants have not remedied the violations set out in the 60-day notice. On information and belief, Defendants have not applied for any permit to lawfully take the members of federally listed species at the Zoo.

46. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(e), because Plaintiffs reside in this judicial district and no real property is involved. In addition, Plaintiffs may bring suit in this judicial district because violations of the ESA occur in the district. *See* 16 U.S.C. § 1540(g)(3)(A).

## STATUTORY AND REGULATORY FRAMEWORK

47. Congress passed the ESA in recognition that species in danger or threatened with extinction "are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," and that the United States has pledged to the international community "to conserve to the extent practicable various species of fish or wildlife and plants facing extinction." 16 U.S.C. § 1531(a)(3)-(4).

48. The ESA defines an "endangered species" as "any species which is in danger of extinction." *Id.* § 1532(6). A "threatened species" is any species likely to become endangered in the foreseeable future. *Id.* § 1532(20).

49. The prohibitions of the ESA apply to endangered or threatened animals bred or kept in captivity as well as those in the wild. *See, e.g.*, Proposed Rule, 79 Fed. Reg. 4313, 4317 (proposed Jan. 27, 2014) ("On its face the ESA does not treat captives differently . . . . Section 9(a)(1)(A)-(G) of the ESA applies to endangered species regardless of their captive status."); 50 C.F.R. § 17.3 (defining the "take" definition's term "harass" in the context of captive animals).

50. Section 9 of the ESA makes it unlawful for any person to "take" any endangered species of fish or wildlife listed under the Act. *Id.* § 1538(a)(1)(B). Pursuant to the Congressional command that implementing agencies promulgate regulations they deem "necessary and advisable to provide for the conservation of [threatened] species," *id.* § 1533(d), the U.S. Fish and Wildlife Service (FWS) also prohibits the take of species listed as threatened under the ESA. *See* 50 C.F.R. § 17.31(a).

51. The ESA defines "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The Eighth Circuit has observed that Congress intended for "take" to be defined "in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." *Defenders of Wildlife v. Adm'r of EPA*, 882 F.2d 1294, 1300 (8th Cir. 1989).

52. Section 9 also makes it unlawful to "possess, sell, deliver, carry, transport, or ship" any endangered or threatened species that has been unlawfully taken in violation of Section 9(a)(1)(B). 16 U.S.C. § 1538(a)(1)(D). In addition, Section 9 makes it unlawful to "deliver, receive, carry, transport, or ship in interstate or foreign commerce . . . in the course of

commercial activity" any endangered or threatened species, regardless of whether the species was taken. *Id*. § 1538(a)(1)(E).

**FACTS GIVING RISE TO THE COMPLAINT**

**The Cricket Hollow Zoo**

53.     Cricket Hollow Zoo is an unaccredited roadside menagerie at 1512 210th Street in Manchester, Iowa. At the Zoo, Defendants confine and exhibit many species of wildlife, including endangered species.

54.     Defendants charge the public a fee to view wildlife at the Zoo, and an additional fee to buy what appears to be dog food to feed to the bears, wolves and primates.

55.     Over the past decade, the USDA has issued numerous citations and multiple official warnings to the Zoo for violations of the Animal Welfare Act, 7 U.S.C. § 2131 *et seq*. ("AWA"). The agency has twice fined the Zoo several thousand dollars for AWA violations. According to the USDA, the Zoo is in "chronic non-compliance" with the AWA.

56.     Many of the AWA violations concern inadequate structural housing for the animals, including housing for the big cats and wolves. The inadequate housing of dangerous wild animals threatens the safety of the Zoo's employees, visitors and neighbors. For example, at a menagerie in Ohio in 2011, the owner released tigers, lions and bears into the surrounding neighborhood; the sheriff's department had to kill forty-nine animals. *See* Christina Caron, *Zanesville Animal Massacre Included 18 Rare Bengal Tigers*, available at http://abcnews.go.com/US/zanesville-animal-massacre-included-18-rare-bengal-tigers/story?id=14767017.

57.     Defendants do not have the staffing resources to provide for even minimal ongoing care for the animals at the Zoo. In August 2011, inspectors from the USDA inspected

the Zoo under the authority of the AWA and found many instances of animal suffering. Noting the 161 animals counted at the Zoo, the inspectors wrote:

> Giving consideration to the demands on the facility owners, the number of animals, the species of animals, and inspection history; it is apparent that there is not a sufficient number of employees at this facility. This does not provide for the health and well-being of the animals. The staffing level must be increased to include adequately trained employees or the facility shall decrease the number of animals until such point the present staff can accommodate the needs of the animals.

58. Four months later, in December 2011, USDA inspectors returned and discovered that, despite the Zoo's inability to adequately care for animals, Defendants had actually increased the number of animals at the facility to 179 animals.

59. The animal health and welfare impacts at the Zoo led the USDA to fine the Zoo over $6,000 in April 2013 for Defendants' numerous, repeated violations of the AWA.

60. Even after repeated warnings and a hefty fine, in July 2013 the USDA again expressed concern for the understaffing at the Zoo. A USDA inspector wrote:

> There are not an adequate number of employees at the zoo. The current and past inspection reports demonstrate that the work load exceeds the staffing level. There are not enough attendants present when the public has access to the animals, and there are not enough employees to clean to meet appropriate husbandry standards. This does not provide for the health and well-being of the animals. The staffing level must be increased to include additional adequately trained employees or the numbers of animals must be decreased to the point so the present staff can accommodate the needs of the animals and meet the requirements of the Animal Welfare Act.

61. Only months after the USDA's fine and repeated warning about inadequate care resulting from understaffing, in October 2013, a private investigator visited the Zoo on ALDF's behalf and discovered three dead piglets in the Meishan pig enclosure. Defendant Pam Sellner told both the ALDF investigator and subsequent USDA inspectors that she knew the female pig

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

would soon give birth, but the Defendants did not move the pig into a warm barn before farrowing.

62.     In December 2013, performing its most recent full inspection of the Zoo, the USDA noted a "Direct Non-Compliance Issue" for Defendants' failure to provide water to three chinchillas.[1]

63.     Defendants keep numerous individuals of endangered species at the Zoo, including lemurs, tigers, gray wolves and a serval. Defendants also keep lions. Asian lions are listed as endangered, and African lions are in the midst of the FWS listing process.

64.     Defendants do not possess a permit from FWS to "take" any of the members of endangered species that are kept at the Zoo.

### The Lemurs

65.     The family *Lemuridae* is listed as endangered under the ESA. *See* 50 C.F.R. § 17.11. Both the red ruffed lemur and the ring-tailed lemur are species within the family *Lemuridae*.

66.     Both species are endemic to Madagascar, an island off the eastern coast of Africa that allowed lemurs to evolve and adapt into a high level of species diversity.

67.     Red ruffed lemurs, *Vareciea variagatus,* and ring-tailed lemurs, *Lemur catta*, are both extremely social species that live in large troops in the wild.

68.     Ring-tailed lemurs live in troops with an average troop size of just under twenty. Dominant females lead each troop. Ring-tailed lemurs have powerful scent glands that play a central role in their lives; each individual uses his or her unique odor as a communication tool.

---

[1] The USDA defines a "direct violation" as "one that has a high potential for adversely affecting the health of an animal." USDA Office of Inspector General, Audit Report 33002-4-SF, APHIS Animal Care Program – Inspections of Problematic Dealers 8 (May 2010).

69.     Red ruffed lemurs similarly live in troops from around eight to twenty individuals. Red ruffed lemurs spend much of their time grooming each other as a form of social interaction, and in fact have developed incisors that grow forward to form a "toothcomb" for grooming each other's hair.

70.     Troop movements for both species of lemur range over many hectares, and the individuals require a variety of regularly changing play and "enrichment" objects.[2]

71.     Defendants keep one red ruffed lemur and one ring-tailed lemur at the Zoo, each housed individually in separate, small enclosures. The enclosures are extremely cramped with minimal lighting and limited enrichment and psychological enhancement objects. *See* Exhibit A, attached.

72.     On information and belief, Defendants keep each lemur in enclosures susceptible to the Iowa winter, with temperatures well below what lemurs experience in the wild. Notably, according to the National Oceanic and Atmospheric Administration, ambient air temperatures from December 2013 to February 2014 were the coldest on record in Iowa's history.

73.     USDA inspectors have also found the enclosure structures themselves problematic. In August 2011, a USDA inspector observed the ring-tailed lemur housed alone with inadequate lighting, writing that the conditions "do[] not facilitate good husbandry practices nor provide lighting sufficient for [the lemur's] well-being."

74.     The August 2011 inspector also reported excessive flies around open boxes of rotten and moldy fruit and produce. During a follow-up site visit in December 2011, a USDA inspector again observed moldy and rotten food for the lemurs.

---

[2] "Enrichment" is a term used in the captive animal profession to refer to measures intended to give animals the opportunity to engage in their natural behaviors, such as searching for food or exploring new objects.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

75. Animal waste also adds to the harmful lemur confinement. In August 2012, after generally noting the excessive presence of animal waste in the primate building, a USDA inspector wrote, "There is approximately two weeks of animal waste collected in one spot under the branch in the outdoor run of the ring tailed lemur enclosure." Excessive amounts of excreta increase the risk of disease and other hazards.

76. In February 2013, a USDA inspector reiterated the agency's concerns with the lemur enclosures' structures, writing, "The ceiling tiles within the lemur enclosures . . . . [are] severely worn and cannot be readily cleaned and sanitized which can lead to disease hazards for the animals." In July and again in September 2013, inspectors noted cobwebs and even more buildup of fecal waste in the lemur enclosures.

77. State officials similarly have expressed concerns for the lemurs' welfare upon inspection of the Zoo. In September 2013, an inspector from the Iowa Department of Agriculture and Land Stewardship expressed concern for the primates' welfare. According to the state agency inspector, "There was some over-grooming resulting in hair loss due to lack of enrichment, which was discussed at length with the owner, Ms. Sellner."

78. The solitary housing conditions, coupled with improper food provisions and care, mean that the lemurs at the Zoo are highly stressed, certain to be psychologically impaired and very susceptible to disease.

### The Tigers

79. FWS lists the tiger, *Panthera tigris*, as endangered under the ESA.

80. Tigers originally ranged from eastern Turkey to southeastern Siberia and the Malay Peninsula, Sumatra, Java and Bali. The current geographic distribution is greatly reduced, and tigers have disappeared from most of their former geographic range. Currently, tiger populations are smaller, increasingly more isolated and progressively more fragmented

than ever before. There are more tigers kept in captivity in the United States than remain in the wild. *See* World Wildlife Fund, *More Tigers in American Backyards than in the Wild*, Oct. 18, 2012*, available at* http://worldwildlife.org/stories/more-tigers-in-american-backyards-than-in-the-wild.

81.     In the wild, female tigers maintain a range of around seven square miles, while males may cover a range up to forty square miles. Tigers require large, environmentally rich, natural spaces that allow them to express a wide range of movements and behaviors, such as seeking food and escaping competition and confrontation.

82.     As of December 2013, Defendants kept six tigers at the Zoo. However, in March 2014, Defendant Pamela Sellner indicated that only five tigers remain at the Zoo. *See* Ben Jacobson, *UPDATE: Manchester zoo's owner denies claims of national animal group,* Dubuque Telegraph Herald, Mar. 6, 2014.

83.     Like the lemur enclosures, the tiger enclosures at the Zoo are undersized, without enrichment and poorly maintained. The tiger enclosures at the Zoo present a stark contrast to a tiger's natural environment. The enclosures are small cages, each with a packed dirt surface, usually laden with feces but no vegetation. *See* Exhibit B, attached.

84.     In December 2011, USDA inspectors found that the enclosure housing two tigers had excessive accumulation of animal waste. More than a year later the problem not only continued, but also expanded. In February 2013, inspectors described "large accumulations of feces in three of the tiger enclosures." Excessive amounts of excreta increase the risk of disease and other hazards.

85.     More recently, in December 2013 a USDA inspector found that the fence of the enclosure housing two tigers is curled up from the bottom. According to the inspector, such

fencing must be repaired so it does not continue to pose a physical hazard to the animals, and it must be regularly maintained.

86.     On information and belief, Defendants engage in the commercial trade of big cats, including tigers. For example, through February 2013 USDA inspectors counted seven tigers at the Zoo. Yet in June 2013, inspectors only observed six tigers living at the Zoo. Defendant Pamela Sellner now indicates that Defendants keep only five tigers at the Zoo.

87.     On information and belief, Defendants declaw the big cats at the Zoo, including the tigers.

88.     During the summer of 2011, Defendant Tom Sellner told the Associated Press that one of the "big males" at the Zoo was declawed. *See* Assoc. Press, *'Big, Bloody Mistake' Led to Tiger Attack*, Aug. 5, 2011.

89.     Declawing wild or exotic carnivores is not considered appropriate veterinary care and "can cause ongoing pain, discomfort, or other pathological conditions in animals." *See* USDA Animal and Plant Health Inspection Service August 2006 Policy #3 Veterinary Care (issued Aug. 18, 2006).

### The Gray Wolves

90.     The gray wolf, *Canis lupus*, is listed as endangered under the ESA in much of the United States. *See* 50 C.F.R. § 17.11.

91.     In the wild, gray wolves live, travel and hunt in social groups called "packs" that average four to seven individuals. The species requires large, environmentally complex spaces that allow the packs to express a wide range of natural movements and behaviors, from choosing den sites to hunting to avoiding competition and confrontation. Wolf packs cover territories ranging in size from fifty to 1,000 square miles, and will travel as far as thirty miles in one day to hunt.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

92. As of December 2013, Defendants keep four gray wolves at the Zoo.

93. The gray wolf enclosures at the Zoo are extremely undersized with barely any enrichment objects. *See* Exhibit C, attached.

94. In addition, the enclosures are poorly maintained. Feces constantly piles up in the enclosures. In February 2013, a USDA inspector observed "large accumulations of feces in . . . the primary enclosure of one wolf." Excessive amounts of excreta increase the risk of disease and other hazards.

95. Inspectors have recently identified multiple problems with the fencing around the wolf enclosures. In August 2013, a USDA inspector explained that the perimeter fence surrounding the big cats, bears and wolves was inadequately short, with gaps that would allow animals to enter or exit the enclosures. One month later, USDA inspectors again found that "the perimeter fence surrounding the big cats, bears and wolves has a section of fence that has become detached from the fence post and is sagging out from the facility."

96. Gray wolves are carnivorous and prefer to eat large hoofed mammals such as deer, elk, bison and moose. Wolves also eat smaller mammals, including beavers and rodents.

97. Defendants provide neither appropriate nor adequate diets for the gray wolves at the Zoo. In fact, Defendants encourage Zoo visitors to additionally purchase what appears to be dog food, then allow visitors to pour the food through a tube into the gray wolf enclosure, in what amounts to uncontrolled public feeding.

## The Serval

98. The subspecies of serval called the Barbary serval, *Leptailurus serval constantina*, is listed as endangered under the ESA. *See* 50 C.F.R. § 17.11.

99.     In August 2009, under the authority of the ESA, Defendants sought and received a Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) permit for the export of a six-month old serval born in captivity.

100.     As of December 2013, Defendants keep one serval at the Zoo.

101.     In June 2013, a USDA inspector observed a buildup of dust, dirt and cobwebs in an enclosure containing the serval, and wrote that "[a]nimal enclosures must be cleaned routinely in order to provide for appropriate husbandry standards, to reduce disease transmission, and to prevent the animals from becoming contaminated or soiled."

102.     Upon returning in September 2013, a USDA inspector again found, "There is a build-up of a yellow-brown substance located on the walls of the serval enclosure (both inside and outside). The litter box within the serval enclosure has a layer of dust, dirt, debris or grime." Excessive amounts of animal waste increase the risk of disease and other hazards.

103.     During the September 2013 inspection, the USDA also observed that the enclosure continued to contain cobwebs.

### The Lions

104.     Asian lions are listed as endangered under the ESA. *See* 50 C.F.R. § 17.11.

105.     The FWS is currently evaluating a petition to list the African lion as endangered. On November 27, 2012, the FWS issued a 90-day finding that "substantial scientific or commercial information indicat[es] that listing this subspecies may be warranted," and announced that it would commence a 12-month finding determining whether listing truly is warranted. Eighteen months have elapsed since the 90-day finding, and FWS should soon release its African lion listing determination.

106.     As of December 2013, Defendants keep three lions at the Zoo, which are either Asian or African lions.

107.    In June 2012, Plaintiffs were shocked to observe an emaciated female lion vomiting in her enclosure.

108.    During the same visit, Plaintiffs also observed many enclosures strewn with fly laden meat and other food scraps. In later visits, Plaintiffs observed that flies had moved beyond food and animal waste to feast on the ears and noses of the Zoo's lions and wolves. *See* Exhibit D, attached.

109.    At least one of the Zoo's lions has not remained at the Zoo through Iowa's harsh winters. In October 2012, a visitor observed that one of the lions at the Zoo had severely protruding hip and spinal bones. At that point in time, the Zoo kept four lions. By the following 2013 summer, only three lions continued to live at the Zoo.

110.    On information and belief, the lion did not survive the harsh climate while living in the Zoo's inadequate enclosures. According to a recent article on the Zoo, Defendant Pamela Sellner admitted that she "did briefly possess a sick lion, who ultimately died." Jacobson, *UPDATE: Manchester zoo's owner denies claims of national animal group,* Dubuque Telegraph Herald, Mar. 6, 2014.

## CLAIMS FOR RELIEF

### Violations of the Endangered Species Act

### Count I—Unlawful "Take" of Protected Species

111.    Each and every allegation set forth above is incorporated herein by reference.

112.    The Endangered Species Act, 16 U.S.C. § 1538(a)(1)(B), prohibits the "take" of "any such species" within the United States or the territorial sea of the United States without a permit, where "such species" include endangered species of fish or wildlife listed pursuant to § 1533.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

113.    Defendants have violated and continue to violate the ESA and its implementing regulations by taking lemurs, tigers, wolves, lions and serval within the meaning of 16 U.S.C. § 1538(a)(1)(B), without a permit at Cricket Hollow Zoo.

114.    This Court has the authority to issue an injunction prohibiting Defendants from committing further violations of the ESA and to compel Defendants to remedy current violations of the ESA. 16 U.S.C. § 1540(g)(1)(a). Moreover, this Court has the authority to award the costs of litigation, including reasonable attorney and expert witness fees, to any party whenever the court determines such award is appropriate. 16 U.S.C. § 1540(g)(4).

### Count II—Unlawful Possession of Protected Species

115.    Each and every allegation set forth above is incorporated herein by reference.

116.    The Endangered Species Act, 16 U.S.C. § 1538(a)(1)(D), prohibits the possession, by any means whatsoever, of any species taken in violation of § 1538(a)(1)(B) and(C).

117.    Defendants have violated and continue to violate the ESA and its implementing regulations by possessing and continuing to possess unlawfully taken species, including lemurs, tigers, wolves, lions and serval at the Cricket Hollow Zoo, within the meaning of 16 U.S.C. § 1538(a)(1)(D).

118.    This Court has the authority to issue an injunction prohibiting Defendants from committing further violations of the ESA and to compel Defendants to remedy current violations of the ESA. 16 U.S.C. § 1540(g)(1)(a). Moreover, this Court has the authority to award the costs of litigation, including reasonable attorney and expert witness fees, to any party whenever the court determines such award is appropriate. 16 U.S.C. § 1540(g)(4).

### Count III—Unlawful Trafficking of Protected Species in Commerce

119.    Each and every allegation set forth above is incorporated herein by reference.

120.    The Endangered Species Act, 16 U.S.C. § 1538(a)(1)(E), prohibits the delivery, receipt, carry, transport, or shipment in interstate or foreign commerce by any means whatsoever and in the course of commercial activity of any listed endangered or threatened species.

121.    Defendants have violated and continue to violate the ESA and its implementing regulations acquiring or disposing of listed endangered species, including tigers and wolves, in interstate or foreign commerce and in the course of a commercial activity at the Cricket Hollow Zoo, within the meaning of 16 U.S.C. § 1538(a)(1)(E).

122.    This Court has the authority to issue an injunction prohibiting Defendants from committing further violations of the ESA and to compel Defendants to remedy current violations of the ESA. 16 U.S.C. § 1540(g)(1)(a). Moreover, this Court has the authority to award the costs of litigation, including reasonable attorney and expert witness fees, to any party whenever the court determines such award is appropriate.  16 U.S.C. § 1540(g)(4).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that Defendants are violating the ESA by illegally taking the endangered lemur, tiger, wolf, serval and lion without a permit;

B.    Declare that Defendants are violating the ESA by possessing individuals of endangered species that have been illegally taken;

C.    Declare that Defendants' past and ongoing practice of acquiring and / or disposing of individuals of endangered species in interstate or foreign commerce in the course of a commercial activity violates the ESA;

D.    Enjoin Defendants from engaging in operations and activities that cause take of the lemurs, tigers, wolves, lions and serval at Cricket Hollow Zoo;

E.       Enjoin Defendants from possessing, at Cricket Hollow Zoo, endangered species that have been illegally taken;

F.       Enjoin Defendants from acquiring and / or disposing of endangered or threatened animals in interstate and / or foreign commerce;

G.      Award Plaintiffs their reasonable attorney fees and litigation costs in this action, and;

H.      Grant Plaintiffs such other and further relief the Court may deem just and proper.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Dated: June 11, 2014                         Respectfully submitted,

_/s/ Daniel J. Anderson_
Daniel J. Anderson (IA Bar No. 20215)
WERTZ & DAKE
1500 Center St. NE #101
Cedar Rapids, IA 52402-5500
Telephone:  (319) 861-3001
Fax:  (319) 861-3007
E-mail:  danderson@wertzlaw.com


/s/ _Daniel Lutz_
Daniel Lutz (_pro hac vice pending_)
ANIMAL LEGAL DEFENSE FUND
170 E. Cotati Avenue
Cotati, CA 94931
Telephone:  (707) 795-2533
Fax:  (707) 795-7280
E-mail:  dlutz@aldf.org


/s/ _Jessica Blome_
Jessica Blome (_pro hac vice pending_)
ANIMAL LEGAL DEFENSE FUND
170 E. Cotati Avenue
Cotati, CA 94931
Telephone:  (707) 795-2533
Fax:  (707) 795-7280
E-mail:  jblome@aldf.org


Attorneys for Plaintiffs
TRACEY KUEHL, LISA KUEHL, KRIS
BELL, NANCY HARVEY, JOHN
BRAUMANN, and ANIMAL LEGAL
DEFENSE FUND

**EXHIBIT A**



**EXHIBIT B**



CFR 3.131 (a)

**EXHIBIT C**



**EXHIBIT D**

