**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| TRACEY K. KUEHL, et al., | ) Case No. C14-02034-LRR |
| | ) |
| Plaintiffs, | ) **PLAINTIFFS' MEMORANDUM** |
| v. | ) **IN SUPPORT MOTION FOR** |
| | ) **SUMMARY JUDGMENT** |
| PAMELA SELLNER, et al., | ) |
| | ) **Judge: Hon. Jon Stuart Scoles** |
| Defendants. | ) **Trial Date: October 5-9, 2015** |
| | ) |

## Table of Contents

**Legal Framework**

I.      Procedural History ……………………………………………………….......      02

II.     Endangered Species Act …………………………………………………….      02

    A.      Section 9 "Take" of Endangered Species ………………………………..      03

        1.      Harass in the context of captive endangered species …………….......      03

        2.      Harm in the context of captive endangered species ………………..      05

    B.      Unlawful Trafficking of Endangered Species…………………………….      06

**Argument**

I.      Plaintiffs Have Standing …………………………………………………..      06

II.     The Zoo's Tigers, Lions, Lemurs and Wolves are Threatened or
    Endangered Species ………………………………………………………      08

III.    Defendants "Harass" Their Lemurs, Tigers & Lions,
    and Wolves, and "Harm" Their Tigers & Lions, and Lemurs ………………………      09

    A.      Defendants Harass and Harm Their Lemurs ………………………….......      10

    B.      "Big Cats" Are Harmed and Harassed ……………………………………      14

    C.      Wolves are Harassed …………………………………………………….......      17

IV.    Cage Sizes Harass Endangered Species …………………………………………..   19

V.    Defendants' Poor Management, Operational and Financial Functions
Harass Its Endangered Species, Creating a Likelihood of Injury ……………………   21

    A.    Inadequate Human Resources at Defendants' Zoo …………………………..   21

    B.    Unstable and Inadequate Financial Posture …………………………………   23

    C.    Shortcomings at the Entire Facility …………………………………………   25

    D.    Choice of Veterinarian ………………………………………………………   26

VI.    Defendants Unlawfully Traffic Endangered Species of Lemurs,
Tigers & Lions, and Wolves …………………………………………………………   28

**Conclusion**

## <u>Table of Authorities</u>

### Cases

*Animal Legal Def. Fund v. Glickman*, 154 F.3d 426, 432 (D.C. Cir. 1998) ………………........6

*Animal Welfare Institute v. Martin*, 588 F.Supp.2d 70 (D. Me. 2008) …………………………5

*Babbitt v. Sweet Home Chapter, Communities for Greater Or.*, 515 U.S. 687 (1995) ……..4, 21

*Bensman v. U.S. Forest Serv.*, 984 F. Supp. 1242 (W.D. Mo. 1997) …………………………,….5

*Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386 (11th Cir. 1994) …..,…..5

*Defenders of Wildlife v. Adm'r of EPA*, 882 F.2d 1294, 1300 (8th Cir. 1989) ……………..,…3

*Elephant Justice Project v. Woodland Park Zoological Society*,
   No. 2:15-cv-000451-JCC (W.D. Wash. Apr. 7, 2015) …………………………..6, 28, 29

*Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781 (9th Cir. 1995) ……………3

*Friends of the Earth v. Laidlaw Envt. Serv. (TOC), Inc.*, 528 U.S. 167 (2000) ………………6, 8

*Humane Soc'y of the U.S. v. Babbitt*, 46 F.3d 93 (D.C. Cir. 1995) …………………………10, 32

*Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221 (1986) ……………6, 7

*Loggerhead Turtle v. Co. Council of Volusia Co.*, 148 F.3d 1231 (11th Cir. 1998) …………5, 10

*Loggerhead Turtle v. Volusia Co. Council*, 896 F.Supp. 1170 (M.D. Fla. 1995) ……………..4, 5

*Nat'l Wildlife Fed. v. Burlington N. R.R.*, 23 F.3d 1508 (9th Cir. 1994) …………………………5

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) …………………………………………..…6

*Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997) ……………………………………………...…5

*Strahan v. Linnon*, 967 F. Supp. 581 (D. Mass. 1997) ………………………………………..4

*U.S. v. Kapp*, 2003 U.S. Dist. Lexis 21169 (N.D. Ill. Nov. 4, 2003) …………………………9

## Statutes and Regulations

Animal Welfare Act, 7 U.S.C. § 2131 (2008) *et seq.* …………………………………..*en passim*

Endangered Species Act, 16 U.S.C. § 1531 (1978) *et seq.* …………………………..*en passim*

50 C.F.R. § 17.3 ……………………..…………………………………………………*en passim*

9 C.F.R. § 2 …………………………………………………………………..*en passim*

9 C.F.R. § 3 …………………………………………………………………..*en passim*

## Other

63 Fed. Reg. 48634, 48635 (Sep. 11, 1998) ……………………………………………….2

79 Fed. Reg. 37578, 37597 (July 1, 2014) ……………………………………………….3

80 Fed. Reg. 7380, 7399 (Feb. 10, 2015) ………………………………………………..3

S. Rep. No. 307, 93d Cong., 1st Sess. (1973), *reprinted* in 1973 U.S.C.C.A.N. 2989, 2995 …...3

H.R. Rep. No. 93-412 at 11 (1973)………………………………………………. 21

## INTRODUCTION

Plaintiffs respectfully submit herewith their Memorandum in support of their Motion for Summary Judgment. Pamela Sellner, Tom Sellner and Cricket Hollow Zoo (collectively Defendants) own a private zoo containing 300 animals, several of which are amongst the world's most endangered creatures. As repeatedly documented by the U.S. Department of Agriculture (USDA) over the last decade, Defendants have had "chronic management problems" and been in "chronic non-compliance" with the federal laws designed to protect these endangered species from injury, harm, and death. Defendants manage and operate the Cricket Hollow Zoo (the Zoo) in a manner that disrupts the instinctual behaviors, threatens the physical well-being, and has actually injured or killed endangered species. At each USDA inspection of the Zoo, the agency has identified a litany of violations that compromise the zoo animals' health. Indeed, Defendant Pamela Sellner has even admitted to not following federal requirements at the Zoo, and that meeting them "most of the time" was sufficient by her standards. Additionally, Defendants build their zoo animal collection by illegally trafficking endangered species in interstate commerce. Defendants have admitted they trade in protected species. Because these shortcomings fall far below federal requirements, Defendants have "taken" endangered species in violation of the Endangered Species Act, 16 U.S.C. § 1538. These undisputed facts, in addition to the evidence discussed herein, enable the Court to enter summary judgment for the Plaintiffs that under the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, Defendants have (1) impermissibly harassed the endangered species in their possession, including five tigers, three lions, two lemurs, and two gray wolves,[1] constituting an illegal "take", (2) actually injured or killed endangered species in Defendants' care, and (3) violated anti-trafficking laws.

---

[1] Plaintiffs reserve for trial the issue of whether Defendants' serval is an endangered *Barbary serval*, or whether it is "just the regular, common, African serval". Ex. 7 0401 (Tr. P. Sellner 58:12).

# LEGAL FRAMEWORK[2]

## I.      Procedural History

Plaintiffs served a 60-day notice of intent to sue letter (NOI) on March 4, 2014, and filed the Complaint on June 11, 2014.  ECF No. 2; Ex. 1 at 0001–0006, 0053.  The NOI contained a declaration from Plaintiffs' lemur expert, Peter H. Klopfer, Ph.D..  Ex. 1 at 0007–0014. Defendants answered.  ECF No. 6.  Defendants deposed none of Plaintiffs' experts but deposed each individual plaintiff and conducted written discovery.  Plaintiffs conducted written discovery and deposed Defendants and Defendants' expert witnesses.  No expert reports were exchanged.

## II.     Endangered Species Act

Congress passed the ESA in recognition that species in danger or threatened with extinction "are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people."  16 U.S.C. § 1531(a)(3).  The ESA defines an "endangered species" as "any species which is in danger of extinction" and "threatened species" as a species which is likely to become endangered within the foreseeable future . . ."  *Id*. § 1532(6), (20).  The plain language of the statute clearly affords ESA protections to all members of endangered and threatened species, whether captive or wild and whether bred in captivity or captured from the wild.  *See, e.g.*, 16 U.S.C. § 1538(b)(1) (exempting from the "take" prohibition only those fish or wildlife held in captivity prior to the enactment of the ESA on Dec. 28, 1973).  The U.S. Fish & Wildlife Service (FWS) has long implemented this clear intent of Congress through its enforcement, listing decisions, and promulgated regulations.  *See, e.g.*, 63 Fed. Reg. 48634,

---

2 Per the Court's "Personal Preferences # 9" on its website (http://www.iand.uscourts.gov/e-web/home.nsf/65944fcb56773c56862573a30055c4f3/3e4c188afed94871862573a7005c9893?OpenDocument), Plaintiffs do not cite to the summary judgment standards of Fed. R. Civ. P. 56, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

48635 (Sep. 11, 1998) ("Since 1976, the Service has been striving to achieve an appropriate degree of control over prohibited activities involving living wildlife of non-native species born in captivity in the United States."); 79 Fed. Reg. 37578, 37597 (July 1, 2014) ("Captive members have the same legal status as the species as a whole."); 80 Fed. Reg. 7380, 7399 (Feb. 10, 2015) ("On its face the ESA does not treat captives differently. . . Section 9(a)(1)(A)–(G) of the ESA [prohibiting take] applies to endangered species regardless of their captive status.").

### A. Section 9 "Take" of Endangered Species

It is unlawful for any person to "take" any listed endangered species of fish or wildlife. 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). Congress has stated that "'take' is to be defined in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." S. Rep. No. 307, 93d Cong., 1st Sess. (1973), *reprinted* in 1973 U.S.C.C.A.N. 2989, 2995; *see also Defenders of Wildlife v. Adm'r of EPA*, 882 F.2d 1294, 1300 (8th Cir. 1989). Moreover, it is "clearly conceivable that one can inflict great harm on a protected species by creating an imminent threat of harm to that species. Such a threat therefore falls easily within the broad scope of Congress' definition of 'take.'" *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784 (9th Cir. 1995).

### 1. Harass in the context of captive endangered species

The FWS regulations define "harass" for ESA purposes as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. When applied to captive endangered

species, "harass" means to fail to provide "animal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act." 50 C.F.R. § 17.3. The goal of the Animal Welfare Act (AWA) is "to insure that animals intended . . . for exhibition purposes or for use as pets are provided humane care and treatment." 7 U.S.C. § 2131(1). To fulfill its purpose, the AWA and its implementing regulations set forth "minimum standards" of care for the "handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperatures, adequate veterinary care, and separation by species where . . . necessary for humane handling, care or treatment of animals[.]" 7 U.S.C. § 2143(a)(2)(A). Persons, like Defendants, who exhibit animals to the public must obtain a Class C Exhibitor License from USDA's Animal and Plant Health Inspection Service ("APHIS") pursuant to 7 U.S.C. § 2133 of the AWA. Once licensed, APHIS inspectors visit a licensee's facility at least annually and sometimes more often where necessary to follow up on documented violations of the AWA and implementing regulations. 9 C.F.R. § 2.126.

While no court has yet decided whether "harassing" captive endangered species constitutes a "take" under the ESA, case law shows the scope of "harass" is broad.[3] In the wild, several useful examples of acts or omissions addressing the "harassment" of wildlife are instructive. *See, e.g., Strahan v. Linnon*, 967 F.Supp. 581, 630 (D. Mass. 1997) (noting evidence suggesting that "harassment occur[ed] when Coast Guard vessels approach[ed] Right whales too closely"); *Babbitt v. Sweet Home Chapter, Communities for Greater Or.*, 515 U.S. 687, 704–705 (1995) (regulation of endangered and threatened species causing economic injury to companies and families depending on forest products a "take"); *Loggerhead Turtle v. Volusia Co. Council*,

---

3 *Cf. ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 17 (D.C. 2011) (court did not reach merits of whether use of bullhooks and chains on circus elephants is "harasses, harms, or wounds); *ASPCA v. Ringling Bros. & Barnum & Bailey Circus*, 502 F.Supp.2d 103, 110, 112-113 (D.C. 2007) (defendants elephant owners' summary judgment denied as to acts that did not constitute "takes" because of disputed facts and captive-bred wildlife permit exemption, which is inapplicable here).

896 F.Supp. 1170, 1174–1175 (M.D. Fla. 1995) (artificial lights from beach-driving harasses sea turtles during nesting); *National Wildlife Federation v. Burlington Northern Railroad, Inc.*, 23 F.3d 1508 (9th Cir. 1994) (corn spilt along Montana railroad tracks modified grizzly bear eating habits and resulted in train strikes killing seven grizzlies not harassment and a "taking" because spilt corn removed). Proof of a "take" only requires proximate causation. *See Babbitt*, 515 U.S. 687 at 700, n. 13; *Loggerhead Turtle v. Co. Council of Volusia Co.*, 148 F.3d 1231, 1251, n. 23 (11th Cir. 1998), citing *Cox v. Administrator United States Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994).

      **2.**       <u>Harm in the context of captive endangered species</u>

FWS regulations define "harm" in the definition of take as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral pattern, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. Similar to "harass," Plaintiffs believe no court has yet reached the merits of when captive endangered species are "harmed." In the wild, examples of "harm" notable here include *Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997) (harm demonstrated but for Coast Guard's new Whale Protection Program); *Bensman v. U.S. Forest Serv.*, 984 F. Supp. 1242 (W.D. Mo. 1997) (removal of dead trees used by Indiana bat for habitat and hibernation may constitute a taking); *Loggerhead Turtle v. Co. Council of Volusia Co.*, 148 F.3d 1231 (11th Cir. 1998) (beach lights harm nesting turtles); *see also Animal Welfare Institute v. Martin*, 588 F.Supp.2d 70 (D. Me. 2008) (observing that harm "is best assessed when it is tangible, rather than theoretical.").

Case 6:14-cv-02034-JSS   Document 20-2   Filed 06/01/15   Page 9 of 35

**B.     Unlawful Trafficking of Endangered Species**

The Endangered Species Act also makes it unlawful to "possess, sell, deliver, carry, transport, or ship" any endangered or threatened species that has been unlawfully taken in violation of Section 9(a)(1)(B).  16 U.S.C. § 1538(a)(1)(D).  In addition, it is unlawful to "deliver, receive, carry, transport, or ship in interstate or foreign commerce . . . in the course of commercial activity" any endangered or threatened species, regardless of whether the species was taken.  *Id*. § 1538(a)(1)(E).  The transaction in commerce need not involve money or change of ownership. *Elephant Justice Project v. Woodland Park Zoological Society*, No. 2:15-cv-000451-JCC at 5–6 (W.D. Wash. Apr. 7, 2015); *Humane Soc'y of the U.S. v. Babbitt*, 46 F.3d 93 (D.C. Cir. 1995).

<u>ARGUMENT</u>

**I.      Plaintiffs Have Standing**

Plaintiffs have standing where they demonstrate a cognizable "injury" that is "fairly traceable" to the defendants' conduct and that would likely be "redressed" by a favorable decision.  *Friends of the Earth v. Laidlaw Envt. Serv. (TOC), Inc.*, 528 U.S. 167, 180–181 (2000).  The Supreme Court has repeatedly made clear that injury to an aesthetic interest in the observation of animals is sufficient to satisfy the demands of Article III standing. As *Defenders of Wildlife* states explicitly, "the desire to use *or observe* an animal species, *even for purely esthetic purposes,* is undeniably a cognizable interest for purpose of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–563 (1992) (emphasis added); *see also Animal Legal Def. Fund v. Glickman*, 154 F.3d 426, 432 (D.C. Cir. 1998) (en banc) (individual who has formed an emotional bond with particular animals has standing to challenge regulations allowing those animals to be kept in inhumane conditions).  Similarly, in *Japan Whaling Association v.*

*American Cetacean Society*, 478 U.S. 221 (1986), the Court found that the plaintiffs had "undoubtedly ... alleged a sufficient 'injury in fact' in that the whalewatching and studying of their members will be adversely affected by continued whale harvesting," *Id.* at 231 n. 4.

Individual Plaintiffs were deeply affected by the conditions and treatment of animals at the Zoo. (PSF 5); Braumann Decl. ¶24 (left frustrated and angry); L. Kuehl Decl. ¶11 (felt a level of compassion she had never felt before); Bell Decl. ¶6 (lion's condition "very upsetting"); Braumann Decl. ¶32 (watching baby baboon suffer was "emotionally and physically draining"); T. Kuehl Decl. ¶4 (tiger's "sadness spoke to me and I could hardly stand to view him[.]"),¶8 (tiger repeatedly rammed its head into an enclosure and Plaintiff left out of fear for her own safety.). Plaintiffs continued to carry the Zoo's animals in their thoughts even after leaving. *See* (PSF 6) Bell Decl. ¶6, 8; Braumann Decl. ¶32; T. Kuehl Decl. ¶¶15, 30; L. Kuehl Decl. ¶12. Plaintiffs felt a spiritual and cultural connection with the animals, and developed strong personal attachments to them. *See* (PSF 7); T. Kuehl Decl. ¶30 (shocked and saddened by the news of two Big Cats' deaths); L. Kuehl Decl. ¶¶12, 14 (felt emotionally connected to the animals that deepened after a second visit.); Braumann Decl. ¶23 (felt an emotional connection and couldn't stand to witness their suffering anymore); Bell Decl. ¶¶6, 8 (very concerned about the animals' health and welfare). All of the Individual Plaintiffs felt that the Defendants' inhumane treatment of the zoo animals left them with the Hobson's choice of continuing to subject themselves to injury by visiting the animals and knowing that they had abandoned animals with whom they had developed strong personal attachments. (PSF 8); T. Kuehl Decl. ¶¶10, 12, 25; L. Kuehl Decl. ¶23; Bell Decl ¶¶6, 8; Harvey Decl. ¶14; Braumann Decl. ¶17-18. Defendants' mistreatment of the animals at the Cricket Hollow Zoo has injured Individual Plaintiffs' aesthetic interests.

An organizational plaintiff like the Animal Legal Defense Fund (ALDF) has standing

where it can show one of its "members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Laidlaw*, 528 U.S. at 180–181 (citation omitted). Here, Individual Plaintiffs' are ALDF members, and they have standing to sue in their own right—indeed, they have done so. Moreover, as demonstrated by Executive Director Stephen Wells, the interests at stake in this lawsuit are germane to ALDF's mission to advance the interests of lives through effective use of the legal system. Wells Decl. ¶¶2, 4. Finally, neither the claim asserted nor the relief requested will require any participation of an individual member, as Plaintiffs only seek injunctive relief against Defendants.

## II.     The Zoo's Tigers, Lions, Lemurs and Wolves are Threatened or Endangered

Plaintiffs have brought a claim for violations of the ESA on behalf of five listed species kept by Defendants at the Zoo: the tiger, *Panthera tigris*; the lion, *Panthera leo persica* (Asiatic) and *Panthera leo* (African) (listing pending, *see infra*); the red ruffed lemur, *Vareciea variagatus*; the ring-tailed lemur, *Lemur catta*; and gray wolves, *Canis lupus*. 50 C.F.R. § 17.11. Defendants claim that neither the lions nor the gray wolves are listed endangered species because they are "African" lions and "hybrid" wolves, but even assuming Defendants' representations are true, the lions and wolves are still subject to the ESA. *See* ECF No. 6 at ¶63; (PSF 23–31).

According to Defendant Pamela Sellner, all of the lions kept at the Zoo are "African" Lions. ECF No. 6 at 63; (PSF 25). Ms. Sellner presumably makes this self-serving statement because "African" lions are not currently listed as endangered or threatened species by the FWS. However, on November 27, 2012, the FWS issued a 90-day finding that "substantial scientific or commercial information indicat[es] that listing [the African lion] may be warranted." (PSF 24).

The FWS then opened up a proposed rule to list the African lion as threatened on January 27, 2014. The comment period for the proposed rule has since closed on January 27, 2015, and the public is now simply waiting for the FWS to finalize and issue its rule listing the African lion as a threatened species. Plaintiffs have proceeded through discovery as though the African lion would be listed in time for trial. In the interests of judicial economy, Defendants' lions should be treated here a threatened or endangered species under ESA jurisdiction. (PSF 24).

The gray wolf is listed at the species level, or *Canis lupus*. 50 C.F.R. § 17.11. Sub-species or intra-species hybrids are necessarily protected whenever an animal is listed at the species level in order to prevent the incentivizing of hybridization of protected species. *See U.S. v. Kapp*, 2003 U.S. Dist. Lexis 21169 * 15 (N.D. Ill. Nov. 4, 2003) ("Under the ESA and its regulations, all sub- (or intra-) species hybrids of an animal are protected where the animal is protected at the species level, as with tigers and leopards."). Again, Defendants assert self-serving statements that their wolves are "hybrids" gray wolf/dogs and not endangered species. *See* (PSF 29). The only discovery Defendants produced regarding the alleged "hybrid" nature of the wolves is a document with the self-serving statement, "75% wolf" handwritten at the top. (PSF 29). But the common dog *is* a sub-species of *Canis lups,* or *Canis lupus familiaris,* and so hybridized wolf/dogs are also protected. (PSF 28). Moreover, Defendants claims their wolves are "hybrids" while simultaneously housing the wolves in an enclosure with a sign that says "endangered Timber Wolf." (PSF 30). Defendants' assertions are of no factual import on summary judgment because the law protects the *entire* species of gray wolf, even "hybrids." Plaintiffs request that the Court treat Defendants' wolves as endangered species.

### III. Defendants "Harass" Their Lemurs, Tigers & Lions, and Wolves, and "Harm" Their Tigers & Lions, and Lemurs

Under 50 C.F.R. § 17.3 "harm" and "harass" have different definitions, but the same

evidence may be used to analyze both forms of a "taking." *See Loggerhead Turtle v. Volusia Co. Council*, 148 F.3d 1231, n. 5 (11th Cir. 1998). Plaintiffs need not prove intent to harass, however, as harass can be demonstrated through negligent acts or omissions. 50 C.F.R. § 17.3. In other words, a "take" may result from accidental harassment of endangered animals. *Nat'l Wildlife Fed. v. Burlington N. R.R.*, 23 F.3d 1508, 1509 (9th Cir. 1994) (finding that spilt corn from a train derailment harassed grizzly bears because the corn altered the bear's feeding habits). Defendants have, whether purposefully or negligently, harassed or harmed the endangered animals residing at the Zoo through mismanagement and woefully deficient zoo administration, veterinary care, animal husbandry, and cage enclosures. To be sure, Defendants' failure to provide the basic aspects of care significantly disrupts the endangered species' normal behavioral patterns and basic healthy functions such as eating, drinking, defecating, and sleeping.  At one point USDA even observed "chronic management problem[s] at the facility, and, for whatever reason, the Sellners either do not understand the regulations, are not willing to comply, or are not able to comply." (PSF 15); Ex. 2 at 0054.  Moreover, despite the availability of information on other industry-developed standards, Ms. Sellner admitted that she is "not interested" in learning about them. (PSF 19).  The facts supporting USDA's decade-long litany of violations leave no dispute that the Defendants have harassed and harmed these endangered species.

A. **Defendants Harass and Harm Their Lemurs**

The facts demonstrate that Defendants' animal husbandry practices for lemurs interfere with the species' instinctual behaviors and needs. Since 2005, Defendants have owned at least 10 lemurs at the Cricket Hollow Zoo; though only two remain because most have died.  (PSF 32). Defendants' lemurs are housed, fed, and maintained in a manner that not only significantly disrupts their natural behaviors and belies basic minimum animal husbandry standards, but also

harasses or harms the animals' physiology and psychology. (PSF 47); Klopfer Aff. ¶11(d).

The Animal Welfare Act requires nonhuman primate animals to be housed socially. *See* 9 C.F.R. § 3.81(a); Klopfer Aff. ¶6. Red ruffed lemurs and ring-tailed lemurs, like those housed at the Cricket Hollow Zoo, are highly social animals. (PSF 33); Klopfer Aff. ¶6. In the wild they live in large troops eight-to-twenty large, spread over many hectares, and spend significant time grooming each other as a form of social interaction. (PSF 33); Klopfer Aff. ¶6. Defendants admit they currently house both of their lemurs individually because "they don't get along housed together." (PSF 34). To be sure, Lucy, Defendants' red ruffed lemur has never been housed with a mate. Plaintiffs' expert observed that gender differences likely account for the lack of harmony, but Defendants have failed to appreciate this in their lemur housing arrangements. (PSF 35); Klopfer Aff. ¶7. Both ring-tailed and red ruffed lemurs have highly developed cognitive abilities and under certain conditions, such as a lifetime of living in isolation, can undergo significant psychological stress levels. (PSF 33); Klopfer Aff. ¶6. Upset lemurs show increased heart rate, electroencephalography distortions, and increased steroid levels. (PSF 33); Klopfer Aff. ¶6.

In addition to social housing, the Animal Welfare Act mandates that all animals shall not be housed near animals that interfere with their health or cause them discomfort. 9 C.F.R. § 3.133; Klopfer Aff. ¶9. To escape the cold, the Zoo's lemurs must access indoor shelter located inside the Zoo's "Reptile House," where they can see an alligator, a monitor lizard, and snakes (including a boa constrictor). (PSF 34); Klopfer Aff. ¶9. According to Plaintiffs' expert, to share an indoor space with reptiles disturbs the lemurs, since in the wild they are preyed upon by crocodiles and snakes. (PSF 34); Klopfer Aff. ¶9. To require a lemur to choose between suffering inclement conditions and the anxiety that accompanies such inappropriate cross-species

encounters significantly disrupts their normal behavioral patterns and creates a likelihood of injury to them, and fails to meet the minimum humane care and treatment standards. Klopfer Aff. ¶9.

The Animal Welfare Act requires zoo exhibitors to develop and implement a program of veterinary care that provides for the health and wellbeing of the animals. 9 C.F.R. § 2.40. Defendants planned and actual implementation of their program of veterinary care for the animals is so deficient as to constitute inhumane and cruel treatment. In fact, Defendants' program of veterinary care does not contain any provisions specific to lemurs. (PSF 41). Veterinary records show from April 23, 2007 to February 5, 2015 no veterinary care was provided to the zoo's lemurs. (PSF 40). The Zoo's veterinarian admitted he has no experience with lemurs, has only seen them on *National Geographic*, has never consulted lemur professional standards or publications, does not recall treating the Zoo's lemurs despite two dying during his tenure as attending veterinarian, and knows nothing about lemur enrichment because "I'm not a big monkey person." (PSF 40). Necropsies are not routinely performed when an animal dies, which indicates that Defendants cannot possibly know the cause of an animal's death and thus cannot be prepared to prevent or treat recurrent diseases. Klopfer Aff. ¶11(b). Shockingly, Defendants attribute encephalitis as least one lemur's cause of death as well as the suspected cause of death for a second lemur, though the underlying cause of encephalitis was never investigated. (PSF 41). Plaintiffs' expert stated that in most cases, encephalitis is likely preventable and treatable. Klopfer Aff. ¶11(b). Defendants obtained a necropsy for only one of the lemurs suspected of dying from encephalitis. (PSF 41);

Under the Animal Welfare Act, exhibitors must follow environmental enhancement plans that are adequate to promote psychological well-being of nonhuman primates. 9 C.F.R. § 3.81

For captive lemurs, a regular variety of changing play and enrichment objects as well as sufficiently large cages are required to keep the animals occupied. (PSF 36); Klopfer Aff. ¶8. Plaintiffs' expert recommends changing lemurs' entire enrichment every few days. (PSF 36); Klopfer Aff. ¶8. In addition, in order to account for lemurs' different natural behaviors (red ruffed lemurs prefer to be high in the canopy and ring-tailed lemurs spend up to one-third of their time on the ground), Plaintiffs' expert recommends constructing species-specific cage enclosures. (PSF 36); Klopfer Aff. at ¶6. Defendants' daily care program does not include any lemur-specific actions, and Defendant Pamela Sellner testified she has no schedule for changing the lemurs' enrichment and might do so "every couple *months*." (PSF 37). The Zoo's lemur enrichment consists of stoic and secured perches and branches, which USDA documented as filthy with feces. (PSF 37). The facts confirm that lemur cages at the Zoo hinder, not help lemurs' natural behaviors.

Broadly and uniformly, the Animal Welfare Act requires exhibitors to ensure safe and sanitary living conditions for animals. The USDA has cited the Zoo on several occasions for serious animal husbandry concerns, noting that as a result of some of these failures the lemurs are at risk of disease and illness. For example, in 2011, 2012, and 2013, USDA inspectors cited Defendants for failing to provide for both of their lemurs' well-being by failing to provide clean enclosures with a natural diurnal light cycle, as required by 9 C.F.R. § 3.77(c). (PSF 45). To be sure, Plaintiffs were unable to see the lemurs during several of their visits as a result of the darkness of the enclosures. (PSF 39); Decl. T. Kuehl ¶6–7; Decl. J. Braumann ¶5; Decl. L. Kuehl ¶13. In addition, USDA has cited Defendants for large buildups of dirt, grime, and scent marks in the lemur enclosures. (PSF 42). Sanitation in lemur enclosures is particularly important because of their natural scent-marking behavior. (PSF 42). Failure to maintain sanitary housing

interferes with lemurs' ability to act on their natural behaviors.

The Animal Welfare Act and regulations require excessive waste must be removed *daily* from inside enclosures to prevent lemurs from becoming "soiled, and to reduce disease hazards, insects, pests, and odors." 9 C.F.R. § 3.84(a). USDA has *repeatedly* cited the Zoo for the lemurs' pens and housing areas having "large accumulations" of excrement, waste, dirt, flies, rodent holes in walls and ceilings, cobwebs, grime, and rust; these conditions are harbors for disease, health hazards, pests, odors and compromise animal health, well-being, and animal husbandry practices. (PSF 44). For example, on August 17, 2011, USDA cited defendants for "excessive waste on lemur perch," "mouse feces on lemur perch," and "excessive presence of flies and fly residue in lemur area." (PSF45). Plaintiffs horrific housekeeping practices have likely contributed to lemurs deaths at the facility, including those attributed to "encephalitis" and "trichinosis." (PSF 46); Klopfer Aff. ¶11(d).

Tragically, at least one lemur has presumably died since Plaintiffs filed suit. Defendants apparently acquired a new ring-tailed lemur sometime prior to March 20, 2015, bringing their total number of lemurs to three. Ex. 7 at 0422 (Tr. P. Sellner 41). However, by March 5, 2015, USDA documents two lemurs. (PSF 32); Ex. 2 at 0266. Despite inquiries of opposing counsel, Plaintiffs have been unable to confirm exactly what caused Zaboo's presumed death. (PSF 32). Plaintiffs ask the court to enter summary judgment against Defendants finding that Defendants have unlawfully taken lemurs by harassing and harming them.

**B. "Big Cats" Are Harmed and Harassed**

Defendants possess five endangered tigers and three lions, which are either endangered Asiatic lions or soon to be listed as threatened African lions (collectively big cats). (PSF 49). The USDA requires exhibitors to establish and maintain programs of "adequate" veterinary care

that include the use of "appropriate methods" to prevent diseases and injuries. 9 C.F.R. §

2.40(b)(2). Moreover, as discussed in section III(A), *infra*, the USDA requires every exhibitor to

"establish and maintain programs of adequate veterinary care" that include the use of

"appropriate methods" to diagnose diseases and injuries. 9 C.F.R. § 2.40(b). Contrary to this

requirement, Defendants' program of veterinary care is woefully inadequate and does not include

appropriate methods for diagnosis. Conrad Aff. ¶¶5, 14, 28. Moreover, Defendants lack the

experience and expertise to diagnose their big cats in time to afford them appropriate veterinary

care. Conrad Aff. ¶10.

   In the short time since this lawsuit was filed in June 2014, two of the Defendants' tigers

and one of the Defendants' lions have died. (PSF 50). Even more alarmingly, those three cats

all died within a month of each other. (PSF 50). Six big cats have died in the last three years, on

average two cats every year. (PSF 50). In the face of this torrent of mortality, Defendants have

unfailingly declined to necropsy their big cats. (PSF 54). According to Plaintiffs' experts, it is

industry standard and a generally accepted practice that preventing disease requires necropsying

animals who have died. Conrad Aff. ¶14. Since Defendants have never examined the causes of

death at their facility, they cannot understand what environmental factors and husbandry or

veterinary practices have contributed to such astonishing mortality. At the same time, the causes

of animal disease, injury and death at the Cricket Hollow Zoo are not difficult to ascertain. A

cursory review of the record yields the inescapable conclusion that Defendants provide

veterinary care that falls unlawfully short of federal requirements and inhumanely short of

generally accepted practices. For example, Defendants and their experts have testified that many

of their animals die suddenly, without warning, and of causes neither preventable nor treatable.

(PSF 51). Contrary to Defendants' self-serving claims, Defendants' animals have died of both

preventable and treatable causes. Conrad Aff. ¶¶15, 18–19, 21; Klopfer Aff. ¶11. As a result, Defendants cannot offer their surviving endangered cats any assurance of a life free from harassment nor a death free from indignity and needless suffering. Conrad Aff. ¶15; Allen Aff. ¶18. Defendants' approach to veterinary care has created not merely likelihood but indeed a high probability of injury and death to their big cats.

Even if Defendants could themselves diagnose veterinary issues in time, Defendants lack the financial resources to provide appropriate veterinary care to their animals. Allen Aff. ¶16–17. The USDA requires exhibitors to maintain "direct and frequent communication" with their veterinarian "so that timely and accurate information on problems of animal health, behavior, and well-being is conveyed to the attending veterinarian." 9 C.F.R. § 2.40(b). Instead of this direct and frequent communication, Defendants routinely refrain from involving their veterinarian at every cost, even the cost of their animals' welfare and lives. Conrad Aff. ¶¶6, 10. In an egregious example, on at least one occasion, Plaintiffs Nancy Harvey and Kris Bell observed a thin and malnourished lion vomiting in its enclosure. (PSF 98); Decl. Harvey ¶9; Decl. Bell ¶6. In response to Plaintiff Harvey's inquiry about the lion, Defendant Pamela Sellner dismissed Harvey's concerns, explaining that the lion is "old" and had already been seen by a vet. Decl. Harvey ¶9; Decl. Bell ¶6. Plaintiff Lisa Kuehl took a photograph of the lion with flies swarming its head as it languished in the excessive heat. Decl. L. Kuehl ¶22. Plaintiffs' believe this lion was Kamarah, a lion who eventually died in November 2014, allegedly of "pancreatitis," though Defendants did not perform a necropsy. Dr. Pries has no memory regarding Kamarah's death. Ex. 7 at 0548 (Tr. Pries 144:12–14).

Moreover, Defendants' veterinarian himself lacks the experience and expertise necessary to care for big cats. The USDA requires every exhibitor to "have an attending veterinarian who

shall provide *adequate* veterinary care to its animals." 9 C.F.R. § 2.40(a) (emphasis added). Having considered the qualifications and admissions of Defendants' attending veterinarian, Plaintiffs' experts concluded that he is neither qualified to fulfill nor committed to fulfilling the responsibilities the USDA requires of him. Conrad Aff. ¶¶21, 24; Klopfer Aff. ¶11(a). Defendants' failure to enlist an appropriately trained and competent veterinarian harms and harasses their big cats.

In addition to veterinary care issues, the USDA requires exhibitors to "remov[e] and dispos[e] of animal and food wastes, bedding, dead animals, trash and debris" and remove "excreta" "from primary enclosures as often as necessary to prevent contamination of the animals contained therein and to minimize disease hazards and to reduce odors." 9 C.F.R. §§ 3.125(d), 3.131(a). The USDA has cited Defendants for failing to comply with 9 C.F.R. §§ 3.125(d), 3.131(a) at the Zoo, including with respect to Defendants' big cat enclosures. (PSF 58). See (Ex. 1 at 0024–0029); (Ex 1 at 0041) (large piles of feces in corners and smaller piles scattered throughout each enclosure,); (Ex. 2 at 0093) (large numbers of flies near the animals' food source ); (Ex. 1 at 0028) (tiger enclosure has an "excessive accumulation" of animal waste which can increase disease risks, odor levels, and pest levels."). The USDA has observed that failure to maintain sanitation increases disease risks, odor levels, and the presence of pests, which creates a likelihood of injury and annoyance to the animals. Defendants' failure to provide safe and habitable enclosures and to maintain hygiene at the Zoo harms and harasses their big cats.

## C.     <u>Wolves are Harassed</u>

Until recently, Defendants possessed four endangered wolves. (PSF 64). One wolf pup died three months after arriving at the Zoo in 2010 and the "old female" died in 2013. (PSF 64).

Defendants' veterinarian only treated the wolves in passing with various dewormers; rabies, distemper, or other essential vaccines were never administered to the Zoo's wolves. (PSF 65). Indeed, according to Dr. Pries, the defendants' attending veterinarian, wolf treatments must be "extrapolated" from treatments he knows for dogs. (PSF 66). Plaintiffs' experts concluded that inadequate veterinary care for the wolves contributes to the risks they are exposed to. Conrad Aff. ¶28.

The facts demonstrate that due to the conditions the wolves live in at the Zoo, veterinary care is paramount to prevent the likelihood of injury. USDA inspectors have repeatedly identified Defendants' wolves as living in enclosures with impermissible "large accumulations of feces," with large piles in the corners and smaller piles scattered throughout the enclosure contrary to 9 C.F.R. § 3.131(a). (PSF 69). Later reports documented a "build-up of old feces and food waste" in the wolf enclosure. (PSF 69). Failure to clean wolf enclosures can lead to health and disease hazards, pests, odors. (PSF 70). Moreover, during her June 2013 visit to the Cricket Hollow Zoo, Plaintiff Tracey Kuehl observed that the wolves seemed a little too eager for food, were wet, muddy and caked in feces, and exhibited signs of extreme annoyance from fly bites, including red sore ears. (PSF 72); Kuehl Decl. ¶26. Similarly, Plaintiff Braumann noted that the wolves at the Zoo during his October 2012 visit were living in muddy, feces-ridden enclosures. (PSF 72). Mr. Braumann took photos of the standing water in the wolf enclosures and observed that the wolves were wet and muddy halfway up their mid-sections. There can be no factual question that the conditions at the Zoo harass the wolves.

The facts demonstrate that Defendants simply cannot meet their wolves' physical needs. In developing a veterinarian-approved exercise plan for wolves, Defendants "should consider providing positive physical contact with humans that encourages exercise through play or similar

activities." 9 C.F.R. § 3.9(a)(2). Defendants "exercise plan" is completely blank, other than a citation to the preceding regulatory requirement. (PSF 73). Moreover, Defendants admitted that their daily care program does not even address wolves. (PSF 73). The absence of a meaningful exercise program notwithstanding, the Zoo's gray wolf enclosures contain barely any enrichment objects, and those that are provided are rarely—if ever—changed. (PSF 74); Decl. T. Kuehl ¶27 (noting that the environmental enrichment for the wolves had not changed in nine months). Finally, visitors are not only allowed but encouraged to feed the wolves through a tube that connects visitors to the inside of the wolf enclosure. (PSF 74); Braumann Decl. ¶12. This practice could disrupt the wolf's natural feeding habits and could potentially injure the wolves through uncontrolled amounts of feeding.

Additionally, similar to the problems with the Big Cat enclosures, USDA inspectors identified multiple problems with wolf enclosure perimeters, creating risks to the animals, the public, and not functioning as a proper containment system. For example, in July 2013, a USDA inspector noted that contrary to 9 C.F.R. § 3.127(d), the perimeter fence surrounding the big cats, bears and wolves was inadequately short, with gaps that would allow animals to enter or exit the enclosures; one month later, USDA inspectors again found that "the perimeter fence surrounding the big cats, bears and wolves has a section of fence that has become detached from the fence post and is sagging out from the facility." (PSF 71). Because the Defendants' acts create a likelihood of injury, the Court should find the Defendants liable for harassing the wolves.

### D. Cage Sizes Harass Endangered Species

The ESA itself does not set standards for captive endangered species' cage sizes. But according to regulation 9 C.F.R. § 3.128, animal enclosures "shall be constructed and maintained so as to provide sufficient space to allow each animal to make normal postural and social

adjustments with adequate freedom of movement.  Inadequate space may be indicated by evidence of malnutrition, poor condition, debility, stress, or abnormal behavior patterns." Perhaps unsurprisingly, on August 29, 2013, USDA, APHIS Western Region Director Robert Gibbens confirmed that *full compliance* with the Animal Welfare Act is expected and advised defendants that though facilities need not be perfect, most regulated facilities are able to exceed the minimum standards.  (PSF 17).  Ex. 2 at 0102. The facts confirm that defendants fall far short of even the minimum standards with respect to their enclosures. To be sure, Plaintiffs and USDA inspectors have, without exception, observed feces or compacted feces in Defendants' animal enclosures during every one of their visits. These feces-filled cages in effect *shrink* an "acceptable"[4] cage size under the regulations to unusable, unlivable, and unhealthy cages.  A feces-filled cage seriously compromises the space available to the animal and forces it to lie in its own excreta. (PSF 77). Ex. 8 at 0585, 0623, 0576. The Zoo's lack of animal husbandry practices thus impede the cages' ability to function as the regulations intend and certainly causes harassment and injury to the endangered animals residing at the Zoo.

Moreover, Plaintiffs have observed disturbing behaviors in the caged animals, possibly indicating psychological distress due to cage size and lack of enrichment.  *See* 9 C.F.R. § 3.128. For example, Mr. Braumann observed a tiger obsessively pacing back and forth, a baboon shaking the sides of his cage, and a wolf hovering over a food pipe. *See* Braumann Decl. ¶¶7, 12, 22.  In addition, Mr. Braumann observed that the cage enclosures at the Zoo were wet, muddy, and filled with feces so many of the animals could only lie down in a small area inside their enclosures.  *See* Braumann Decl. ¶10–12.  Lastly, Ms. Harvey observed coyotes pacing back and

---

[4] Plaintiffs in no way agree that the regulations "minimum standards" are acceptable standards. Plaintiffs also note that the primary purpose behind the AWA was to address laboratory dogs and cats, and "puppy mills"; endangered species are not intended to used as laboratory animals as ESA § 10 "take" permits do not contemplate laboratory use.

forth, back and forth, back and forth—showing clear signs of discontent. Harvey Decl. ¶9.

Because so few of the other animal husbandry practices are satisfied at the Zoo, the facts allow

the Court to conclude that Defendants' cage sizes harass their endangered species.

## V.  Defendants' Poor Management, Operational and Financial Functions Harass Its Endangered Species, Creating a Likelihood of Injury

Harassment need not be a "direct application" of force; it can occur before an animal is

touched.  *See Babbitt v. Sweet Home*, 515 U.S. 687 at 720 (dissent of Scalia, J.).  From an

organizational perspective, the Zoo's management, operational and financial status harasses its

endangered species every day.  It is obvious that even trying to meet the "minimum standards" is

and has been a struggle for the Defendants. (PSF 17, 18, 19). When Ms. Sellner complained

about repeatedly being found in violation and asked USDA "how good is good enough?" she

was informed that "[m]ost regulated facilities exceed those [AWA] standards, but that is not

required.  However, full compliance with the minimum standards is required and is expected."

(PSF 17).  Since that time, violations continue to accrue.  The facts confirm that Defendants have

been on notice for years that *something* must change at the Zoo, but they have failed to make the

necessary changes.  The result constitutes harassment.  *See also* H.R. Rep. No. 93–412 at 11

(1973) (long-term effects on wildlife "harass" wildlife, citing the example of allowing

prohibition of bird watchers where activities might disturb the birds and make it difficult for

them to hatch or raise their young.)  Whether these management, operational, and financial

failures are either from their own negligence, or an intentional disregard for the requirements, it

is clear that the Defendants are creating a likelihood of injury to the endangered animals living at

the Zoo.

### A.  Inadequate Human Resources at Defendants' Zoo

Defendants lack the human resources necessary to comply with the ESA.  Defendants'

property contains approximately 300 zoo animals, plus an operating dairy farm, both solely maintained by Defendants Pamela and Tom Sellner. (PSF 83). This human-to-animal ratio is insufficient for adequate animal care and creates a likelihood of injury because Defendants cannot meet their endangered species' basic needs. The Cricket Hollow Zoo is open from 10 a.m. to 6 p.m. daily during operating season, and during operating hours, Ms. Sellner serves as the Zoo's lone employee. (PSF 13, 85). At all times while the Zoo is open, Ms. Sellner accepts admissions money from zoo patrons near the entrance, introduces zoo patrons to an "ambassador animal," or sells food or souvenirs to zoo patrons.

According to the Animal Welfare Act and regulations, "a sufficient number of adequately trained employees shall be utilized to maintain the professionally acceptable level of husbandry practices set forth in the Act." 9 C.F.R. §§ 3.132, 3.85. Nearly four years ago USDA recommended the Zoo decrease the number of animals as "the work load exceeds the staffing level" and ordered that the staffing level "must be increased to include additional adequately trained employees or the numbers of the animals shall be decreased until such point the present staff can accommodate the needs of the animals." (PSF 84). Three months later, USDA again observed inadequate staffing "does not provide for the health and well-being of the animals," and ordered "the staffing level [to] be increased to include additional adequately trained employees/volunteers or the numbers of the animals shall be decreased until such point the present staff can accommodate the needs of the animals." (PSF 84). Defendants responded by acquiring more animals. (PSF 84). In fact, Defendants confess that they have no decision making process for acquiring additional animals, other than a desire to bring animals to the Zoo that children "might like to see." (PSF 84); Ex. 7 at 0434 (Tr. P. Sellner 192–193).

Defendants claim they rely on occasional and untrained volunteers to meet the zoo's

staffing needs, but this practice ultimately poses risks to the public, the animals, and the volunteers. Allen Aff. ¶19–20. Plaintiffs' expert analyzed the Defendants' discovery regarding the staffing and volunteer at the Zoo, and he concluded that it is inadequate to meet the primary responsibilities necessary to provide for the animals' basic care, much less the animals' behavioral and social needs. Allen Aff. ¶21; (PSF 84). Based on the facts, Plaintiff's expert estimated that the Zoo would need at least five full-time zookeepers, one full time veterinary technician, and at least a contract veterinarian to be successful and humanely care for 300 animals. (PSF 84); Allen Aff. ¶22. Moreover, as Ms. Sellner cannot be all places at all times (she sits on her "throne" during the daytime), and Mr. Sellner works away from the Zoo during zoo operating hours, Defendants allow for impermissible, unsupervised public contact with animals. (PSF 86); Braumann ¶¶15, 23 (unsupervised "tiger time" at the Zoo and ostrich nipping at visitors) and Ex. 8 at 0689; Ex. 8 at 0629 (visitors allowed to handle raccoon's face and mouth).

Finally, Ms. Sellner's own qualifications to provide for endangered species in a zoo setting are based on piecemeal, self-taught information. (PSF 87). Indeed, Ms. Sellner cites a single eight-hour certification course in exotic feline husbandry and her background in "4H" and Future Farmers of America as the source of her "expertise" in animal husbandry. (PSF 87). While Ms. Sellner's dedication to learning is commendable, she lacks the training and knowledge sufficient to maintain compliance with either the Endangered Species Act or Animal Welfare Act and therefore serves to create a likelihood of injury to the endangered species living at the Zoo.

**B.    Unstable and Inadequate Financial Posture**

Defendants' financial records confirm that Defendants lack the financial resources

necessary to maintain the animals' basic nutritional, veterinary, and housing needs—including those specific to tigers, lions, lemurs, and gray wolves—and to operate a facility that can safely open to the public. To operate a zoo requires adequate funding, and humane endangered species care "is an extremely expensive financial undertaking." Allen Aff. ¶10; Conrad Aff. ¶6. But once again, Defendants fall short. From 2008 to 2013, the Zoo netted approximately $10,000 per year from ticket sales and $5,000 per year from donations, mobile zoo profits, and feed sales. (PSF 89). Considering the Zoo's 300 animals, that means the Sellners' netted $50 per animal per year for necessary veterinary care, feed, sheltering, and husbandry costs. (PSF 89). During that same time frame, the Zoo's annual expenses ranged between $16,987 and $26,493, or between $56.62 and $88.31 per animal per year. (PSF 90). Perhaps most shockingly, six months ago, the Zoo had access to a mere $4,373 in emergency funds, and no line credit. (PSF 91). (admitting $5,000 reserve is the maximum for the Zoo, and there is no line of credit.). After thoroughly reviewing Plaintiffs' financial documentation, Plaintiffs' experts concluded that the Cricket Hollow Zoo's income is insufficient to provide for the veterinary, feed, enrichment, enclosures, and basic animal husbandry needs of the Zoo. *See* Allen Aff. ¶10; Conrad Aff. ¶4.

Additionally, Defendants' expenses are excessively low to realistically provide even a "minimum" level of generally accepted animal husbandry needs. For all of the Zoo's animals, Defendants spent less than $700 per year *total* on veterinary care in 2014. (PSF 93). This amounts to $2.33 per animal. Defendants' feed and environmental enhancement costs are also low, between $5,328 and $7,750 (between $17.76 and $25.80 per animal). (PSF 94). Plaintiffs' expert concluded that most of the Defendants' animals, including the endangered species, are getting "zero" veterinary diagnostic work and no preventative exams. Conrad Aff. ¶7 (estimating *minimum basic* annual veterinary needs at least $250 for wolves and $300 for tigers

and lions ("big cats")); Decl. Allen ¶15 (estimating basic veterinary needs at $250 for lemurs and $1,000 for tigers).

Lastly, the Defendants Tom and Pamela Sellners' personal financial situation is of no help to their animals. The Sellners' tax returns show 2010-2014 income of less than approximately $60,000 per year (which has included up to $25,000 of IRA income). (PSF 96). The Sellners' personal assets are approximately $673,403, but these assets are predominantly locked up in land, buildings, animals, and machinery. As of September 2014, the Sellners only had $966 in cash. (PSF 96). Sellners' liabilities are, at last estimate, approximately $175,000. (PSF 96). Without the financial ability to satisfy these basic needs, and protect their endangered species, Defendants have created a likelihood of injury to wildlife.

### C. <u>Shortcomings at the Entire Facility</u>

For all the different animals at the Zoo, USDA has persistently documented a consistent pattern of animal husbandry violations, which pose risks to all the animals at the Zoo. The categories for these violations include excessive excreta in cages; no drinking water for animals, dirty drinking receptacles, algae in drinking water and in enrichment pools (including at least one pool containing a dead rat); dirty food bowls, dirty rotten food and fruit (unhealthy feed can cause illness); excessively damp and poorly-drained corrals (which can cause hoof rot, or when frozen provide no place to lie down); trash and poor housekeeping present near animal enclosures (unsanitary housekeeping); soiled bedding (unsanitary husbandry); and poorly maintained enclosures that pose risks to the animals and to the public (risks of injury and escape). (PSF 99). For example, on December 8, 2011, and July 13, 2013, the USDA cited Defendants for failing to provide potable water in at least five enclosures. (PSF 99). Also, on May 6, 2012, the USDA cited Defendants for failing to clean up trash, soiled, bedding, and

animal waste in food containers. (PSF 99). The overall condition of the Zoo is a factor that creates a likelihood of injury for the Zoo's endangered species.

### D. Choice of Veterinarian

The USDA requires every exhibitor to employ an attending veterinarian who "shall provide adequate veterinary care." 9 C.F.R. § 2.40(a). Defendants selected Dr. John Pries of the Elkader Veterinary Clinic as their attending veterinarian based purely on his physical proximity to the Zoo and his willingness to treat their zoo animals, in contrast to the refusal of every other veterinarian in the area. (PSF 100); Ex. 7 at 0440 (Tr. P. Sellner 214:4–15). Defendants did not select Dr. Pries for his expertise in treating endangered animals or captive wildlife. Defendants could not have done so, since Dr. Pries lacks such expertise. (PSF 100). Regarding lemurs, Dr. Pries testified that "[o]ther than seeing them on National Geographic, I've never been around lemurs[],"and his experience treating lemurs is "[n]one that I know of." (PSF 107); Ex. 7 at 0540–0541 (Tr. Pries 112:10–11; 114:1). The only tigers Dr. Pries has observed have been in zoos and circuses, (Ex. 7 at 0542 (Tr. Pries 120:2–15)), and he has observed lions only on television, (Ex. 7 at 0548 (Tr. Pries 142:18–20)).

An arrangement with a vet who is attending veterinarian in name only violates the USDA's requirement that an exhibitor "shall assure that the attending veterinarian has **appropriate authority to ensure the provision** of adequate veterinary care and to **oversee the adequacy** of other aspects of animal care and use." 9 C.F.R. § 2.40(a)(2) (emphasis added). Dr. Pries evidently denies that his role with the Zoo is that of attending veterinarian since Ms. Sellner "uses whoever she wants to." Ex. 7 at 0551 (Tr. Pries 155:22). Moreover, Dr. Pries is apparently unaware of all veterinary treatments or treating veterinarians who may become involved with Defendants' zoo animals, as he allows his staff to work on zoo animals if they

"like" to, whether they have experience with species-specific care or not. (PSF 105); Ex. 7 at 0525 (Tr. Pries 50–51). Plaintiffs' experts have testified that the failure to hire adequate veterinary support causes or may cause animals to suffer needlessly, (Allen Aff. ¶18), in part because veterinarians undertrained in exotic animal care do not adequately recognize medical issues in captive wildlife, (Conrad Aff. ¶6). He disagrees that the attending veterinarian for the Zoo must address environmental enrichment or nutritional concerns, even though he certified in his program of veterinary care that he reviewed and approved Defendant's "Primate Enrichment Program." (PSF 105); (Tr. Pries 7 at 0359 107:14) (testifying "that's not my role as veterinarian")). Ms. Sellner testified that Dr. Pries "checks boxes" in preparing the Program of Veterinary Care. (PSF 106). Dr. Pries does not recall going over the information represented in the PVC with the Zoo owners. (PSF 106). Dr. Pries testified that he usually conducts one walk-through of the Zoo annually, he goes to the Zoo "maybe three times a year," and he is "not there that long." (PSF 106). In Plaintiffs' expert opinion, for an exhibitor to fail to adhere to this requirement of the Animal Welfare Act harms and harasses captive wildlife and constitutes an "intentional or negligent act or omission which creates the likelihood of injury to wildlife" and is not a generally accepted animal husbandry practice. Conrad Aff. ¶6, 14.

Dr. Pries' eight years of involvement with the Zoo's approximately 300 animals is documented by a total of three (3) pages of veterinary treatment records, none of which indicate treatment dates or the animal treated. (PSF 107). According to those records, from April 23, 2007, to February 5, 2015, Defendants paid a total of $6,363.7 for the treatment of zoo animals by Dr. Pries and his clinic staff. (PSF 107). There is no doubt that Dr. Pries' lack of involvement with *any* of the Zoo's animals, and Defendants' continued decision to engage Dr. Pries, has caused continued harassment of Defendants' tigers, lions, lemurs, and gray wolves.

**VI. Defendants Unlawfully Traffic Endangered Species of Lemurs, Tigers & Lions, and Wolves**

The ESA is designed to regulate a wide range of activities affecting plants and animals designated as endangered or threatened. With some exceptions, the ESA prohibits activities affecting these protected species and their habitats unless authorized by a permit from the FWS. For example, under the ESA, it is unlawful for any person to "deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any [endangered species]" absent a permit. 16 U.S.C. § 1538(a)(1). The ESA defines "commercial activity" as "all activities of industry and trade, including, *but not limited to*, the buying or selling of commodities and activities conducted for the purpose of facilitating such buying and selling . . . ." 16 U.S.C. § 1532(2) (emphasis added). The FWS further defines industry or trade in the definition of "commercial activity" as "the actual or intended transfer of wildlife or plants from one person to another person in pursuit of gain or profit." 50 C.F.R. § 17.3. The FWS has interpreted "commercial activity" to include "the transportation of an endangered species across state or national borders" where there is a change in "ownership or control of the animal." *Humane Soc'y of the U.S. v. Babbitt*, 46 F.3d 93 (D.C. Cir. 1995) (vacated on other grounds). Here, there is no factual question whether the Defendants retain or relinquish ownership of endangered animals whenever they acquire or dispense with them, so the primary inquiry is whether Defendants are transferring ownership in the "pursuit of gain or profit."

A federal district court in Washington recently had an opportunity to examine whether the Woodland Park Zoo's decision to loan two Asian elephants to the Oklahoma City Zoo was in the "pursuit of gain or profit." (Ex. 10 (*See Elephant Justice Project v. Woodland Park Zoological Society, Inc.*, No. C15-0451-JCC at 5-6 (W.D. Wash. Apr. 7, 2015) (Coughenour,

28

J.)).  The court found that the exhibition of elephants, which "drive zoo revenues," in conjunction with profits the receiving zoo would make using the elephants in its breeding program, would result in gain or profit for the defendant zoos.  *Id.* at 6.  Ultimately, even though the elephant transfer in *Woodland Park Zoo* did not involve the sale of an animal, the transfer constituted commercial activity within the meaning of the ESA.  *Id*.

Like the *Woodland Park Zoo* defendants, the facts here confirm that the Cricket Hollow Zoo traffics in captive wildlife without exchanging money.  Indeed, the Defendants testified that they participate in a relatively simple interstate trafficking scheme on the advice of a friend who was once convicted for illegally trafficking wildlife in interstate commerce.  (PSF 113). According to Ms. Sellner her friend Jim Reno, whom she considers to be an expert in brokering animals, "knows USDA law firsthand" because "he got in trouble for signing a paper wrong and he did federal time."  (Tr. P. Sellner 7 at 0410 95:14–17).  Ms. Sellner testified that the paper Mr. Reno "incorrectly" filled out was for "USDA transfers or something."  So on her acquisition and disposition records, Ms. Sellner marks that endangered animals she acquires or transports across state lines are "donated" to her or "donated" by her, rather than sold.  (PSF 114); (Ex. 7 at 0402 (and noting that when Ms. Sellner transfers animals within Iowa, she marks them as "sold")). Ms. Sellner readily acknowledges that her decision to "donate" endangered animals is in contemplation of usurping the ESA's prohibition on interstate wildlife trafficking and agrees that she makes an intentional decision to "donate" endangered animals that would otherwise be covered by the ESA.  (PSF 115).

In total, the Defendants' own records show that they have accepted the "donation" of one adult female tiger (11/15/2003); one adult male white tiger and one adult female yellow tiger (7/10/2014); two adult tigers and one female tiger (donated 4/25/2004); two ringtail lemurs

(9/8/2010); three "hybrid" wolves (7/22/2009); and two "hybrid" wolf pups (3/16/2010) across state lines. (PSF 111). In addition, Defendants themselves have "donated" two tiger cubs across state lines. (PSF 1112). The facts confirm Defendants are actively engaged in "donation" transactions of endangered species.

Like the defendant zoos in *Woodland Park Zoo*, the Defendants here use acquired animals in their breeding program, which they then place on exhibit at their Zoo, sell to another zoo, or donate to another zoo. (PSF 116); (Ex. 7 at 0422 (Tr. P. Sellner 141-144)). In addition, according to Ms. Sellner, large carnivore exhibits, including the tigers and lions, drive the majority of zoo visitors to her zoo. (PSF 117). (Indeed, she believes her Zoo would have a lot less traffic if the tigers were no longer at the Zoo. (PSF 117). When the facts are considered in their totality, the Zoo is engaging in interstate trafficking of wildlife by "donating" endangered animals across state lines without an interstate commerce permit from the FWS. Defendants have violated 16 U.S.C. § 1538(a)(1)(E), and Plaintiffs seek summary judgment in their favor.

## CONCLUSION

Plaintiffs respectfully requests that the Court grant summary judgment in their favor finding:

1. That Pamela Sellner, Tom Sellner, and the Cricket Hollow Zoo, Inc. have violated and continue to violate the Endangered Species Act, 16 U.S.C. § 1538(9)(B), by unlawfully taking the following federally listed threatened or endangered species under 50 CFR § 17.11(h);

2. That Pamela Sellner, Tom Sellner, and the Cricket Hollow Zoo, Inc. have violated and continue to violate the Endangered Species Act, 16 U.S.C. § 1538(a)(1)(E), by acquiring or disposing of federally listed endangered species in interstate or foreign commerce.

Respectfully submitted this 1ˢᵗ day of June, 2015.

Respectfully submitted,


/s *Daniel J. Anderson*
Daniel J. Anderson (IA Bar No. 20215)
danderson@wertzlaw.com
WERTZ & DAKE
1500 Center St. NE #101
Cedar Rapids, IA 52402-5500
Telephone:     319.861.3001
Facsimile:     319.861.3007


*/s Jessica L. Blome*
Jessica L. Blome (MO Bar No. 59710)
jblome@aldf.org
Animal Legal Defense Fund
170 E. Cotati Ave.
Cotati, CA  94931
Telephone:  641.431.0478
Facsimile:  707.795.7280

*Attorneys for Plaintiffs Tracey Kuehl, et al*.

31