(29.5 °C) or higher. The relative humidity maintained must be at a level that ensures the health and well-being of the species housed, as directed by the attending veterinarian, in accordance with generally accepted professional and husbandry practices.

(c) *Lighting.* The sheltered part of sheltered housing facilities must be lighted well enough to permit routine inspection and cleaning of the facility, and observation of the nonhuman primates. Animal areas must be provided a regular diurnal lighting cycle of either natural or artificial light. Lighting must be uniformly diffused throughout animal facilities and provide sufficient illumination to aid in maintaining good housekeeping practices, adequate cleaning, adequate inspection of animals, and for the well-being of the animals. Primary enclosures must be placed in the housing facility so as to protect the nonhuman primates from excessive light.

(d) *Shelter from the elements.* Sheltered housing facilities for nonhuman primates must provide adequate shelter from the elements at all times. They must provide protection from the sun, rain, snow, wind, and cold, and from any weather conditions that may occur.

(e) *Capacity: multiple shelters.* Both the sheltered part of sheltered housing facilities and any other necessary shelter from the elements must be sufficiently large to provide protection comfortably to each nonhuman primate housed in the facility. If aggressive or dominant animals are housed in the facility with other animals, there must be multiple shelters or other means to ensure that each nonhuman primate has access to shelter.

(f) *Perimeter fence.* On and after February 15, 1994, the outdoor area of a sheltered housing facility must be enclosed by a fence that is of sufficient height to keep unwanted species out. Fences less than 6 feet high must be approved by the Administrator. The fence must be constructed so that it protects nonhuman primates by restricting unauthorized humans, and animals the size of dogs, skunks, and raccoons from going through it or under it and having contact with the nonhuman primates. It must be of sufficient distance from the outside wall or fence of the primary enclosure to prevent physical contact between animals inside the enclosure and outside the perimeter fence. Such fences less than 3 feet in distance from the primary enclosure must be approved by the Administrator. A perimeter fence is not required if:

(1) The outside walls of the primary enclosure are made of a sturdy, durable material such as concrete, wood, plastic, metal, or glass, and are high enough and constructed in a manner that restricts contact with or entry by humans and animals that are outside the sheltered housing facility; or

(2) The housing facility is surrounded by a natural barrier that restricts the nonhuman primates to the housing facility and protects them from contact with unauthorized humans and animals that are outside the sheltered housing facility, and the Administrator gives written permission

(g) *Public barriers.* Fixed public exhibits housing nonhuman primates, such as zoos, must have a barrier between the primary enclosure and the public at any time the public is present, that restricts physical contact between the public and the nonhuman primates. Nonhuman primates used in trained animal acts or in uncaged public exhibits must be under the direct control and supervision of an experienced handler or trainer at all times when the public is present. Trained nonhuman primates may be permitted physical contact with the public, as allowed under § 2.131, but only if they are under the direct control and supervision of an experienced handler or trainer at all times during the contact.

(Approved by the Office of Management and Budget under control number 0579–0093)

## § 3.78   Outdoor housing facilities.

(a) *Acclimation.* Only nonhuman primates that are acclimated, as determined by the attending veterinarian, to the prevailing temperature and humidity at the outdoor housing facility during the time of year they are at the facility, and that can tolerate the range of temperatures and climatic conditions known to occur at the facility at that time of year without stress

Case 6:14-cv-02034-JSS   Document 20-22   Filed 06/01/15   Page 1 of 26        Ex. 9-0690

or discomfort, may be kept in outdoor facilities.

(b) *Shelter from the elements.* Outdoor housing facilities for nonhuman primates must provide adequate shelter from the elements at all times. It must provide protection from the sun, rain, snow, wind, and cold, and from any weather conditions that may occur. The shelter must safely provide heat to the nonhuman primates to prevent the ambient temperature from falling below 45 °F (7.2 °C), except as directed by the attending veterinarian and in accordance with generally accepted professional and husbandry practices.

(c) *Capacity: multiple shelters.* The shelter must be sufficiently large to comfortably provide protection for each nonhuman primate housed in the facility. If aggressive or dominant animals are housed in the facility with other animals there must be multiple shelters, or other means to ensure protection for each nonhuman primate housed in the facility.

(d) *Perimeter fence.* On and after February 15, 1994, an outdoor housing facility must be enclosed by a fence that is of sufficient height to keep unwanted species out. Fences less than 6 feet high must be approved by the Administrator. The fence must be constructed so that it protects nonhuman primates by restricting unauthorized humans, and animals the size of dogs, skunks, and raccoons from going through it or under it and having contact with the nonhuman primates. It must be of sufficient distance from the outside wall or fence of the primary enclosure to prevent physical contact between animals inside the enclosure and outside the perimeter fence. Such fences less than 3 feet in distance from the primary enclosure must be approved by the Administrator. A perimeter fence is not required if:

(1) The outside walls of the primary enclosure are made of a sturdy, durable material such as concrete, wood, plastic, metal, or glass, and are high enough and constructed in a manner that restricts contact with or entry by humans and animals that are outside the housing facility; or

(2) The housing facility is surrounded by a natural barrier that restricts the nonhuman primates to the housing fa-

cility and protects them from contact with unauthorized humans and animals that are outside the housing facility, and the Administrator gives written permission.

(e) *Public barriers.* Fixed public exhibits housing nonhuman primates, such as zoos, must have a barrier between the primary enclosure and the public at any time the public is present, in order to restrict physical contact between the public and the nonhuman primates. Nonhuman primates used in trained animal acts or in uncaged public exhibits must be under the direct control and supervision of an experienced handler or trainer at all times when the public is present. Trained nonhuman primates may be allowed physical contact with the public, but only if they are under the direct control and supervision of an experienced handler or trainer at all times during the contact.

(Approved by the Office of Management and Budget under control number 0579–0093)

§3.79 **Mobile or traveling housing facilities.**

(a) *Heating, cooling, and temperature.* Mobile or traveling housing facilities must be sufficiently heated and cooled when necessary to protect nonhuman primates from temperature extremes and to provide for their health and well-being. The ambient temperature in the traveling housing facility must not fall below 45 °F (7.2 °C) for more than 4 consecutive hours when nonhuman primates are present, and must not rise above 85 °F (29.5 °C) for more than 4 consecutive hours when nonhuman primates are present. The ambient temperature must be maintained at a level that ensures the health and well-being of the species housed, as directed by the attending veterinarian, and in accordance with generally accepted professional and husbandry practices.

(b) *Ventilation.* Traveling housing facilities must be sufficiently ventilated at all times when nonhuman primates are present to provide for the health and well-being of nonhuman primates and to minimize odors, drafts, ammonia levels, moisture condensation, and exhaust fumes. Ventilation must be provided by means of windows, doors,

83

Case 6:14-cv-02034-JSS Document 20-22 Filed 06/01/15 Page 2 of 26 Ex. 9-0691

vents, fans, or air conditioning. Auxiliary ventilation, such as fans, blowers, or air conditioning, must be provided when the ambient temperature in the traveling housing facility is 85 °F (29.5 °C) or higher.

(c) *Lighting.* Mobile or traveling housing facilities must be lighted well enough to permit routine inspection and cleaning of the facility, and observation of the nonhuman primates. Animal areas must be provided a regular diurnal lighting cycle of either natural or artificial light. Lighting must be uniformly diffused throughout animal facilities and provide sufficient illumination to aid in maintaining good housekeeping practices, adequate cleaning, adequate inspection of animals, and for the well-being of the animals. Primary enclosures must be placed in the housing facility so as to protect the nonhuman primates from excessive light.

(d) *Public barriers.* There must be a barrier between a mobile or traveling housing facility and the public at any time the public is present, in order to restrict physical contact between the nonhuman primates and the public. Nonhuman primates used in traveling exhibits, trained animal acts, or in uncaged public exhibits must be under the direct control and supervision of an experienced handler or trainer at all times when the public is present. Trained nonhuman primates may be allowed physical contact with the public, but only if they are under the direct control and supervision of an experienced handler or trainer at all times during the contact.

### §3.80  Primary enclosures.

Primary enclosures for nonhuman primates must meet the following minimum requirements:

(a) *General requirements.* (1) Primary enclosures must be designed and constructed of suitable materials so that they are structurally sound for the species of nonhuman primates contained in them. They must be kept in good repair.

(2) Primary enclosures must be constructed and maintained so that they:

(i) Have no sharp points or edges that could injure the nonhuman primates;

(ii) Protect the nonhuman primates from injury;

(iii) Contain the nonhuman primates securely and prevent accidental opening of the enclosure, including opening by the animal;

(iv) Keep other unwanted animals from entering the enclosure or having physical contact with the nonhuman primates;

(v) Enable the nonhuman primates to remain dry and clean;

(vi) Provide shelter and protection from extreme temperatures and weather conditions that may be uncomfortable or hazardous to the species of nonhuman primate contained;

(vii) Provide sufficient shade to shelter all the nonhuman primates housed in the primary enclosure at one time;

(viii) Provide the nonhuman primates with easy and convenient access to clean food and water;

(ix) Enable all surfaces in contact with nonhuman primates to be readily cleaned and sanitized in accordance with §3.84(b)(3) of this subpart, or replaced when worn or soiled;

(x) Have floors that are constructed in a manner that protects the nonhuman primates from injuring themselves; and

(xi) Provide sufficient space for the nonhuman primates to make normal postural adjustments with freedom of movement.

(b) *Minimum space requirements.* Primary enclosures must meet the minimum space requirements provided in this subpart. These minimum space requirements must be met even if perches, ledges, swings, or other suspended fixtures are placed in the enclosure. Low perches and ledges that do not allow the space underneath them to be comfortably occupied by the animal will be counted as part of the floor space.

(1) Prior to February 15, 1994:

(i) Primary enclosures must be constructed and maintained so as to provide sufficient space to allow each nonhuman primate to make normal postural adjustments with adequate freedom of movement; and

(ii) Each nonhuman primate housed in a primary enclosure must be provided with a minimum floor space equal to an area at least three times

Case 6:14-cv-02034-JSS   Document 20-22   Filed 06/01/15   Page 3 of 26        Ex. 9-0692

the area occupied by the primate when standing on four feet.

(2) On and after February 15, 1994:

(i) The minimum space that must be provided to *each* nonhuman primate, whether housed individually or with other nonhuman primates, will be determined by the typical weight of animals of its species, except for brachiating species and great apes[3] and will be calculated by using the following table:[4]

| Group | Weight | | Floor area/animal | | Height | |
|---|---|---|---|---|---|---|
| | lbs. | (kg.) | ft.² | (m²) | in. | (cm.) |
| 1 | under 2.2 | (under 1) | 1.6 | (0.15) | 20 | (50.8) |
| 2 | 2.2–6.6 | (1–3) | 3.0 | (0.28) | 30 | (76.2) |
| 3 | 6.6–22.0 | (3–10) | 4.3 | (0.40) | 30 | (76.2) |
| 4 | 22.0–33.0 | (10–15) | 6.0 | (0.56) | 32 | (81.28) |
| 5 | 33.0–55.0 | (15–25) | 8.0 | (0.74) | 36 | (91.44) |
| 6 | over 55.0 | (over 25) | 25.1 | (2.33) | 84 | (213.36) |

(ii) Dealers, exhibitors, and research facilities, including Federal research facilities, must provide great apes weighing over 110 lbs. (50 kg) an additional volume of space in excess of that required for Group 6 animals as set forth in paragraph (b)(2)(i) of this section, to allow for normal postural adjustments.

(iii) In the case of research facilities, any exemption from these standards must be required by a research proposal or in the judgment of the attending veterinarian and must be approved by the Committee. In the case of dealers and exhibitors, any exemption from these standards must be required in the judgment of the attending veterinarian and approved by the Administrator.

(iv) When more than one nonhuman primate is housed in a primary enclosure, the minimum space requirement for the enclosure is the sum of the minimum floor area space required for each individual nonhuman primate in the table in paragraph (b)(2)(i) of this section, and the minimum height requirement for the largest nonhuman primate housed in the enclosure. Provided however, that mothers with infants less than 6 months of age may be maintained together in primary enclosures that meet the floor area space and height requirements of the mother.

(c) Innovative primary enclosures not precisely meeting the floor area and height requirements provided in paragraphs (b)(1) and (b)(2) of this section, but that do provide nonhuman primates with a sufficient volume of space and the opportunity to express species-

---

[3]The different species of nonhuman primates are divided into six weight groups for determining minimum space requirements, except that all brachiating species of any weight are grouped together since they require additional space to engage in species-typical behavior. The grouping provided is based upon the typical weight for various species and not on changes associated with obesity, aging, or pregnancy. These conditions will not be considered in determining a nonhuman primate's weight group unless the animal is obviously unable to make normal postural adjustments and movements within the primary enclosure. Different species of prosimians vary in weight and should be grouped with their appropriate weight group. They have not been included in the weight table since different species typically fall into different weight groups. Infants and juveniles of certain species are substantially lower in weight than adults of those species and require the minimum space requirements of lighter weight species, unless the animal is obviously unable to make normal postural adjustments and movements within the primary enclosure.

[4]Examples of the kinds of nonhuman primates typically included in each age group are:

Group 1—marmosets, tamarins, and infants (less than 6 months of age) of various species.

Group 2—capuchins, squirrel monkeys and similar size species, and juveniles (6 months to 3 years of age) of various species.

Group 3—macaques and African species.

Group 4—male macaques and large African species.

Group 5—baboons and nonbrachiating species larger than 33.0 lbs. (15 kg.).

Group 6—great apes over 55.0 lbs. (25 kg.), except as provided in paragraph (b)(2)(ii) of this section, and brachiating species.

Case 6:14-cv-02034-JSS    Document 20-22    Filed 06/01/15    Page 4 of 26          Ex. 9-0693

typical behavior, may be used at research facilities when approved by the Committee, and by dealers and exhibitors when approved by the Administrator.

(Approved by the Office of Management and Budget under control number 0579–0093)

### § 3.81 Environment enhancement to promote psychological well-being.

Dealers, exhibitors, and research facilities must develop, document, and follow an appropriate plan for environment enhancement adequate to promote the psychological well-being of nonhuman primates. The plan must be in accordance with the currently accepted professional standards as cited in appropriate professional journals or reference guides, and as directed by the attending veterinarian. This plan must be made available to APHIS upon request, and, in the case of research facilities, to officials of any pertinent funding agency. The plan, at a minimum, must address each of the following:

(a) *Social grouping.* The environment enhancement plan must include specific provisions to address the social needs of nonhuman primates of species known to exist in social groups in nature. Such specific provisions must be in accordance with currently accepted professional standards, as cited in appropriate professional journals or reference guides, and as directed by the attending veterinarian. The plan may provide for the following exceptions:

(1) If a nonhuman primate exhibits vicious or overly aggressive behavior, or is debilitated as a result of age or other conditions (e.g., arthritis), it should be housed separately;

(2) Nonhuman primates that have or are suspected of having a contagious disease must be isolated from healthy animals in the colony as directed by the attending veterinarian. When an entire group or room of nonhuman primates is known to have or believed to be exposed to an infectious agent, the group may be kept intact during the process of diagnosis, treatment, and control.

(3) Nonhuman primates may not be housed with other species of primates or animals unless they are compatible, do not prevent access to food, water, or shelter by individual animals. and are not known to be hazardous to the health and well-being of each other. Compatibility of nonhuman primates must be determined in accordance with generally accepted professional practices and actual observations, as directed by the attending veterinarian, to ensure that the nonhuman primates are in fact compatible. Individually housed nonhuman primates must be able to see and hear nonhuman primates of their own or compatible species unless the attending veterinarian determines that it would endanger their health, safety, or well-being.

(b) *Environmental enrichment.* The physical environment in the primary enclosures must be enriched by providing means of expressing noninjurious species-typical activities. Species differences should be considered when determining the type or methods of enrichment. Examples of environmental enrichments include providing perches, swings, mirrors, and other increased cage complexities; providing objects to manipulate; varied food items; using foraging or task-oriented feeding methods; and providing interaction with the care giver or other familiar and knowledgeable person consistent with personnel safety precautions.

(c) *Special considerations.* Certain nonhuman primates must be provided special attention regarding enhancement of their environment, based on the needs of the individual species and in accordance with the instructions of the attending veterinarian. Nonhuman primates requiring special attention are the following:

(1) Infants and young juveniles;

(2) Those that show signs of being in psychological distress through behavior or appearance;

(3) Those used in research for which the Committee-approved protocol requires restricted activity;

(4) Individually housed nonhuman primates that are unable to see and hear nonhuman primates of their own or compatible species; and

(5) Great apes weighing over 110 lbs. (50 kg). Dealers, exhibitors, and research facilities must include in the environment enhancement plan special provisions for great apes weighing over

Case 6:14-cv-02034-JSS   Document 20-22   Filed 06/01/15   Page 5 of 26       Ex. 9-0694

110 lbs. (50 kg), including additional opportunities to express species-typical behavior.

(d) *Restraint devices.* Nonhuman primates must not be maintained in restraint devices unless required for health reasons as determined by the attending veterinarian or by a research proposal approved by the Committee at research facilities. Maintenance under such restraint must be for the shortest period possible. In instances where long-term (more than 12 hours) restraint is required, the nonhuman primate must be provided the opportunity daily for unrestrained activity for at least one continuous hour during the period of restraint, unless continuous restraint is required by the research proposal approved by the Committee at research facilities.

(e) *Exemptions.* (1) The attending veterinarian may exempt an individual nonhuman primate from participation in the environment enhancement plan because of its health or condition, or in consideration of its well-being. The basis of the exemption must be recorded by the attending veterinarian for each exempted nonhuman primate. Unless the basis for the exemption is a permanent condition, the exemption must be reviewed at least every 30 days by the attending veterinarian.

(2) For a research facility, the Committee may exempt an individual nonhuman primate from participation in some or all of the otherwise required environment enhancement plans for scientific reasons set forth in the research proposal. The basis of the exemption shall be documented in the approved proposal and must be reviewed at appropriate intervals as determined by the Committee, but not less than annually.

(3) Records of any exemptions must be maintained by the dealer, exhibitor, or research facility and must be made available to USDA officials or officials of any pertinent funding Federal agency upon request.

(Approved by the Office of Management and Budget under control number 0579–0093)

ANIMAL HEALTH AND HUSBANDRY STANDARDS

§ 3.82  Feeding.

(a) The diet for nonhuman primates must be appropriate for the species, size, age, and condition of the animal, and for the conditions in which the nonhuman primate is maintained, according to generally accepted professional and husbandry practices and nutritional standards. The food must be clean, wholesome, and palatable to the animals. It must be of sufficient quantity and have sufficient nutritive value to maintain a healthful condition and weight range of the animal and to meet its normal daily nutritional requirements.

(b) Nonhuman primates must be fed at least once each day except as otherwise might be required to provide adequate veterinary care. Infant and juvenile nonhuman primates must be fed as often as necessary in accordance with generally accepted professional and husbandry practices and nutritional standards, based upon the animals' age and condition.

(c) Food and food receptacles, if used, must be readily accessible to all the nonhuman primates being fed. If members of dominant nonhuman primate or other species are fed together with other nonhuman primates, multiple feeding sites must be provided. The animals must be observed to determine that all receive a sufficient quantity of food.

(d) Food and food receptacles, if used, must be located so as to minimize any risk of contamination by excreta and pests. Food receptacles must be kept clean and must be sanitized in accordance with the procedures listed in §3.84(b)(3) of this subpart at least once every 2 weeks. Used food receptacles must be sanitized before they can be used to provide food to a different nonhuman primate or social grouping of nonhuman primates. Measures must be taken to ensure there is no molding, deterioration, contamination, or caking or wetting of food placed in self-feeders.

§ 3.83  Watering.

Potable water must be provided in sufficient quantity to every nonhuman

Case 6:14-cv-02034-JSS    Document 20-22    Filed 06/01/15    Page 6 of 26    Ex. 9-0695

110 lbs. (50 kg), including additional opportunities to express species-typical behavior.

(d) *Restraint devices.* Nonhuman primates must not be maintained in restraint devices unless required for health reasons as determined by the attending veterinarian or by a research proposal approved by the Committee at research facilities. Maintenance under such restraint must be for the shortest period possible. In instances where long-term (more than 12 hours) restraint is required, the nonhuman primate must be provided the opportunity daily for unrestrained activity for at least one continuous hour during the period of restraint, unless continuous restraint is required by the research proposal approved by the Committee at research facilities.

(e) *Exemptions.* (1) The attending veterinarian may exempt an individual nonhuman primate from participation in the environment enhancement plan because of its health or condition, or in consideration of its well-being. The basis of the exemption must be recorded by the attending veterinarian for each exempted nonhuman primate. Unless the basis for the exemption is a permanent condition, the exemption must be reviewed at least every 30 days by the attending veterinarian.

(2) For a research facility, the Committee may exempt an individual nonhuman primate from participation in some or all of the otherwise required environment enhancement plans for scientific reasons set forth in the research proposal. The basis of the exemption shall be documented in the approved proposal and must be reviewed at appropriate intervals as determined by the Committee, but not less than annually.

(3) Records of any exemptions must be maintained by the dealer, exhibitor, or research facility and must be made available to USDA officials or officials of any pertinent funding Federal agency upon request.

(Approved by the Office of Management and Budget under control number 0579–0093)

ANIMAL HEALTH AND HUSBANDRY STANDARDS

**§3.82 Feeding.**

(a) The diet for nonhuman primates must be appropriate for the species, size, age, and condition of the animal, and for the conditions in which the nonhuman primate is maintained, according to generally accepted professional and husbandry practices and nutritional standards. The food must be clean, wholesome, and palatable to the animals. It must be of sufficient quantity and have sufficient nutritive value to maintain a healthful condition and weight range of the animal and to meet its normal daily nutritional requirements.

(b) Nonhuman primates must be fed at least once each day except as otherwise might be required to provide adequate veterinary care. Infant and juvenile nonhuman primates must be fed as often as necessary in accordance with generally accepted professional and husbandry practices and nutritional standards, based upon the animals' age and condition.

(c) Food and food receptacles, if used, must be readily accessible to all the nonhuman primates being fed. If members of dominant nonhuman primate or other species are fed together with other nonhuman primates, multiple feeding sites must be provided. The animals must be observed to determine that all receive a sufficient quantity of food.

(d) Food and food receptacles, if used, must be located so as to minimize any risk of contamination by excreta and pests. Food receptacles must be kept clean and must be sanitized in accordance with the procedures listed in §3.84(b)(3) of this subpart at least once every 2 weeks. Used food receptacles must be sanitized before they can be used to provide food to a different nonhuman primate or social grouping of nonhuman primates. Measures must be taken to ensure there is no molding, deterioration, contamination, or caking or wetting of food placed in self-feeders.

**§3.83 Watering.**

Potable water must be provided in sufficient quantity to every nonhuman

Case 6:14-cv-02034-JSS Document 20-22 Filed 06/01/15 Page 7 of 26 Ex. 9-0696

primate housed at the facility. If potable water is not continually available to the nonhuman primates, it must be offered to them as often as necessary to ensure their health and well-being, but no less than twice daily for at least 1 hour each time, unless otherwise required by the attending veterinarian, or as required by the research proposal approved by the Committee at research facilities. Water receptacles must be kept clean and sanitized in accordance with methods provided in §3.84(b)(3) of this subpart at least once every 2 weeks or as often as necessary to keep them clean and free from contamination. Used water receptacles must be sanitized before they can be used to provide water to a different nonhuman primate or social grouping of nonhuman primates.

(Approved by the Office of Management and Budget under control number 0579–0093)

### § 3.84 Cleaning, sanitization, housekeeping, and pest control.

(a) *Cleaning of primary enclosures.* Excreta and food waste must be removed from inside each indoor primary enclosure daily and from underneath them as often as necessary to prevent an excessive accumulation of feces and food waste, to prevent the nonhuman primates from becoming soiled, and to reduce disease hazards, insects, pests, and odors. Dirt floors, floors with absorbent bedding, and planted areas in primary enclosures must be spot-cleaned with sufficient frequency to ensure all animals the freedom to avoid contact with excreta, or as often as necessary to reduce disease hazards, insects, pests, and odors. When steam or water is used to clean the primary enclosure, whether by hosing, flushing, or other methods, nonhuman primates must be removed, unless the enclosure is large enough to ensure the animals will not be harmed, wetted, or distressed in the process. Perches, bars, and shelves must be kept clean and replaced when worn. If the species of the nonhuman primates housed in the primary enclosure engages in scent marking, hard surfaces in the primary enclosure must be spot-cleaned daily.

(b) *Sanitization of primary enclosures and food and water receptacles.* (1) A used primary enclosure must be sanitized in accordance with this section before it can be used to house another nonhuman primate or group of nonhuman primates.

(2) Indoor primary enclosures must be sanitized at least once every 2 weeks and as often as necessary to prevent an excessive accumulation of dirt, debris, waste, food waste, excreta, or disease hazard, using one of the methods prescribed in paragraph (b)(3) of this section. However, if the species of nonhuman primates housed in the primary enclosure engages in scent marking, the primary enclosure must be sanitized at regular intervals determined in accordance with generally accepted professional and husbandry practices.

(3) Hard surfaces of primary enclosures and food and water receptacles must be sanitized using one of the following methods:

(i) Live steam under pressure;

(ii) Washing with hot water (at least 180 °F (82.2 °C)) and soap or detergent, such as in a mechanical cage washer;

(iii) Washing all soiled surfaces with appropriate detergent solutions or disinfectants, or by using a combination detergent/disinfectant product that accomplishes the same purpose, with a thorough cleaning of the surfaces to remove organic material, so as to remove all organic material and mineral build-up, and to provide sanitization followed by a clean water rinse.

(4) Primary enclosures containing material that cannot be sanitized using the methods provided in paragraph (b)(3) of this section, such as sand, gravel, dirt, absorbent bedding, grass, or planted areas, must be sanitized by removing the contaminated material as necessary to prevent odors, diseases, pests, insects, and vermin infestation.

(c) *Housekeeping for premises.* Premises where housing facilities are located, including buildings and surrounding grounds, must be kept clean and in good repair in order to protect the nonhuman primates from injury, to facilitate the husbandry practices required in this subpart, and to reduce or eliminate breeding and living areas for rodents, pests, and vermin. Premises must be kept free of accumulations of trash, junk, waste, and discarded matter. Weeds, grass, and bushes must be

Case 6:14-cv-02034-JSS   Document 20-22   Filed 06/01/15   Page 8 of 26        Ex. 9-0697

controlled so as to facilitate cleaning of the premises and pest control.

(d) *Pest control.* An effective program for control of insects, external parasites affecting nonhuman primates, and birds and mammals that are pests, must be established and maintained so as to promote the health and well-being of the animals and reduce contamination by pests in animal areas.

### §3.85 Employees.

Every person subject to the Animal Welfare regulations (9 CFR parts 1, 2, and 3) maintaining nonhuman primates must have enough employees to carry out the level of husbandry practices and care required in this subpart. The employees who provide husbandry practices and care, or handle nonhuman primates, must be trained and supervised by an individual who has the knowledge, background, and experience in proper husbandry and care of nonhuman primates to supervise others. The employer must be certain that the supervisor can perform to these standards.

TRANSPORTATION STANDARDS

### §3.86 Consignments to carriers and intermediate handlers.

(a) Carriers and intermediate handlers must not accept a nonhuman primate for transport in commerce more than 4 hours before the scheduled departure time of the primary conveyance on which the animal is to be transported. However, a carrier or intermediate handler may agree with anyone consigning a nonhuman primate to extend this time by up to 2 hours.

(b) Carriers and intermediate handlers must not accept a nonhuman primate for transport in commerce unless they are provided with the name, address, telephone number, and telex number, if applicable, of the consignee.

(c) Carriers and intermediate handlers must not accept a nonhuman primate for transport in commerce unless the consignor certifies in writing to the carrier or intermediate handler that the nonhuman primate was offered food and water during the 4 hours before delivery to the carrier or inter-mediate handler. The certification must be securely attached to the outside of the primary enclosure in a manner that makes it easily noticed and read. Instructions for no food or water are not acceptable unless directed by the attending veterinarian. Instructions must be in compliance with §3.89 of this subpart. The certification must include the following information for each nonhuman primate:

(1) The consignor's name and address;

(2) The species of nonhuman primate;

(3) The time and date the animal was last fed and watered and the specific instructions for the next feeding(s) and watering(s) for a 24-hour period; and

(4) The consignor's signature and the date and time the certification was signed.

(d) Carriers and intermediate handlers must not accept a nonhuman primate for transport in commerce unless the primary enclosure meets the requirements of §3.87 of this subpart. A carrier or intermediate handler must not accept a nonhuman primate for transport if the primary enclosure is obviously defective or damaged and cannot reasonably be expected to safely and comfortably contain the nonhuman primate without suffering or injury.

(e) Carriers and intermediate handlers must not accept a nonhuman primate for transport in commerce unless their animal holding area facilities meet the minimum temperature requirements provided in §§3.91 and 3.92 of this subpart, or unless the consignor provides them with a certificate signed by a veterinarian and dated no more than 10 days before delivery of the animal to the carrier or intermediate handler for transport in commerce, certifying that the animal is acclimated to temperatures lower than those that are required in §§3.91 and 3.92 of this subpart. Even if the carrier or intermediate handler receives this certification, the temperatures the nonhuman primate is exposed to while in the carrier's or intermediate handler's custody must not be lower than the minimum temperature specified by the veterinarian in accordance with paragraph (e)(4) of this section, and

89

Case 6:14-cv-02034-JSS   Document 20-22   Filed 06/01/15   Page 9 of 26      Ex. 9-0698

FACILITIES AND OPERATING STANDARDS

### §3.125  Facilities, general.

(a) *Structural strength.* The facility must be constructed of such material and of such strength as appropriate for the animals involved. The indoor and outdoor housing facilities shall be structurally sound and shall be maintained in good repair to protect the animals from injury and to contain the animals.

(b) *Water and power.* Reliable and adequate electric power, if required to comply with other provisions of this subpart, and adequate potable water shall be available on the premises.

(c) *Storage.* Supplies of food and bedding shall be stored in facilities which adequately protect such supplies against deterioration, molding, or contamination by vermin. Refrigeration shall be provided for supplies of perishable food.

(d) *Waste disposal.* Provision shall be made for the removal and disposal of animal and food wastes, bedding, dead animals, trash and debris. Disposal facilities shall be so provided and operated as to minimize vermin infestation, odors, and disease hazards. The disposal facilities and any disposal of animal and food wastes, bedding, dead animals, trash, and debris shall comply with applicable Federal, State, and local laws and regulations relating to pollution control or the protection of the environment.

(e) *Washroom and sinks.* Facilities, such as washrooms, basins, showers, or sinks, shall be provided to maintain cleanliness among animal caretakers.

[36 FR 24925, Dec. 24, 1971. Redesignated at 44 FR 36874, June 22, 1979, and amended at 44 FR 63492, Nov. 2, 1979]

### §3.126  Facilities, indoor.

(a) *Ambient temperatures.* Temperature in indoor housing facilities shall be sufficiently regulated by heating or cooling to protect the animals from the extremes of temperature, to provide for their health and to prevent their discomfort. The ambient temperature shall not be allowed to fall below nor rise above temperatures compatible with the health and comfort of the animal.

(b) *Ventilation.* Indoor housing facilities shall be adequately ventilated by natural or mechanical means to provide for the health and to prevent discomfort of the animals at all times. Such facilities shall be provided with fresh air either by means of windows, doors, vents, fans, or air-conditioning and shall be ventilated so as to minimize drafts, odors, and moisture condensation.

(c) *Lighting.* Indoor housing facilities shall have ample lighting, by natural or artificial means, or both, of good quality, distribution, and duration as appropriate for the species involved. Such lighting shall be uniformly distributed and of sufficient intensity to permit routine inspection and cleaning. Lighting of primary enclosures shall be designed to protect the animals from excessive illumination.

(d) *Drainage.* A suitable sanitary method shall be provided to eliminate rapidly, excess water from indoor housing facilities. If drains are used, they shall be properly constructed and kept in good repair to avoid foul odors and installed so as to prevent any backup of sewage. The method of drainage shall comply with applicable Federal, State, and local laws and regulations relating to pollution control or the protection of the environment.

### §3.127  Facilities, outdoor.

(a) *Shelter from sunlight.* When sunlight is likely to cause overheating or discomfort of the animals, sufficient shade by natural or artificial means shall be provided to allow all animals kept outdoors to protect themselves from direct sunlight.

(b) *Shelter from inclement weather.* Natural or artificial shelter appropriate to the local climatic conditions for the species concerned shall be provided for all animals kept outdoors to afford them protection and to prevent discomfort to such animals. Individual animals shall be acclimated before they are exposed to the extremes of the individual climate.

(c) *Drainage.* A suitable method shall be provided to rapidly eliminate excess water. The method of drainage shall comply with applicable Federal, State, and local laws and regulations relating

119

to pollution control or the protection of the environment.

(d) *Perimeter fence.* On or after May 17, 2000, all outdoor housing facilities (*i.e.,* facilities not entirely indoors) must be enclosed by a perimeter fence that is of sufficient height to keep animals and unauthorized persons out. Fences less than 8 feet high for potentially dangerous animals, such as, but not limited to, large felines (e.g., lions, tigers, leopards, cougars, etc.), bears, wolves, rhinoceros, and elephants, or less than 6 feet high for other animals must be approved in writing by the Administrator. The fence must be constructed so that it protects the animals in the facility by restricting animals and unauthorized persons from going through it or under it and having contact with the animals in the facility, and so that it can function as a secondary containment system for the animals in the facility. It must be of sufficient distance from the outside of the primary enclosure to prevent physical contact between animals inside the enclosure and animals or persons outside the perimeter fence. Such fences less than 3 feet in distance from the primary enclosure must be approved in writing by the Administrator. A perimeter fence is not required:

(1) Where the outside walls of the primary enclosure are made of sturdy, durable material, which may include certain types of concrete, wood, plastic, metal, or glass, and are high enough and constructed in a manner that restricts entry by animals and unauthorized persons and the Administrator gives written approval; or

(2) Where the outdoor housing facility is protected by an effective natural barrier that restricts the animals to the facility and restricts entry by animals and unauthorized persons and the Administrator gives written approval; or

(3) Where appropriate alternative security measures are employed and the Administrator gives written approval; or

(4) For traveling facilities where appropriate alternative security measures are employed; or

(5) Where the outdoor housing facility houses only farm animals, such as,

but not limited to, cows, sheep, goats, pigs, horses (for regulated purposes), or donkeys, and the facility has in place effective and customary containment and security measures.

[36 FR 24925, Dec. 24, 1971. Redesignated at 44 FR 36874, July 22, 1979, as amended at 64 FR 56147, Oct. 18, 1999; 65 FR 70770, Nov. 28, 2000]

## § 3.128  Space requirements.

Enclosures shall be constructed and maintained so as to provide sufficient space to allow each animal to make normal postural and social adjustments with adequate freedom of movement. Inadequate space may be indicated by evidence of malnutrition, poor condition, debility, stress, or abnormal behavior patterns.

ANIMAL HEALTH AND HUSBANDRY STANDARDS

## § 3.129  Feeding.

(a) The food shall be wholesome, palatable, and free from contamination and of sufficient quantity and nutritive value to maintain all animals in good health. The diet shall be prepared with consideration for the age, species, condition, size, and type of the animal. Animals shall be fed at least once a day except as dictated by hibernation, veterinary treatment, normal fasts, or other professionally accepted practices.

(b) Food, and food receptacles, if used, shall be sufficient in quantity and located so as to be accessible to all animals in the enclosure and shall be placed so as to minimize contamination. Food receptacles shall be kept clean and sanitary at all times. If self-feeders are used, adequate measures shall be taken to prevent molding, contamination, and deterioration or caking of food.

## § 3.130  Watering.

If potable water is not accessible to the animals at all times, it must be provided as often as necessary for the health and comfort of the animal. Frequency of watering shall consider age, species, condition, size, and type of the animal. All water receptacles shall be kept clean and sanitary.

Case 6:14-cv-02034-JSS   Document 20-22   Filed 06/01/15   Page 11 of 26      Ex. 9-0700

## §3.131 Sanitation.

(a) *Cleaning of enclosures.* Excreta shall be removed from primary enclosures as often as necessary to prevent contamination of the animals contained therein and to minimize disease hazards and to reduce odors. When enclosures are cleaned by hosing or flushing, adequate measures shall be taken to protect the animals confined in such enclosures from being directly sprayed with the stream of water or wetted involuntarily.

(b) *Sanitation of enclosures.* Subsequent to the presence of an animal with an infectious or transmissible disease, cages, rooms, and hard-surfaced pens or runs shall be sanitized either by washing them with hot water (180 F. at source) and soap or detergent, as in a mechanical washer, or by washing all soiled surfaces with a detergent solution followed by a safe and effective disinfectant, or by cleaning all soiled surfaces with saturated live steam under pressure. Pens or runs using gravel, sand, or dirt, shall be sanitized when necessary as directed by the attending veterinarian.

(c) *Housekeeping.* Premises (buildings and grounds) shall be kept clean and in good repair in order to protect the animals from injury and to facilitate the prescribed husbandry practices set forth in this subpart. Accumulations of trash shall be placed in designated areas and cleared as necessary to protect the health of the animals.

(d) *Pest control.* A safe and effective program for the control of insects, ectoparasites, and avian and mammalian pests shall be established and maintained.

## §3.132 Employees.

A sufficient number of adequately trained employees shall be utilized to maintain the professionally acceptable level of husbandry practices set forth in this subpart. Such practices shall be under a supervisor who has a background in animal care.

## §3.133 Separation.

Animals housed in the same primary enclosure must be compatible. Animals shall not be housed near animals that interfere with their health or cause them discomfort.

## §§3.134–3.135 [Reserved]

### TRANSPORTATION STANDARDS

SOURCE: Sections 3.136 through 3.142 appear at 42 FR 31569, June 21, 1977, unless otherwise noted. Redesignated at 44 FR 36874, July 22, 1979.

## §3.136 Consignments to carriers and intermediate handlers.

(a) Carriers and intermediate handlers shall not accept any live animals presented by any dealer, research facility, exhibitor, operator of an auction sale, or other person, or any department, agency, or instrumentality of the United States or any State or local government for shipment, in commerce, more than 4 hours prior to the scheduled departure of the primary conveyance on which it is to be transported: *Provided, however,* That the carrier or intermediate handler and any dealer, research facility, exhibitor, operator of an auction sale, or other person, or any department, agency, or instrumentality of the United States or any State or local government may mutually agree to extend the time of acceptance to not more than 6 hours if specific prior scheduling of the animal shipment to destination has been made.

(b) Any carrier or intermediate handler shall only accept for transportation or transport, in commerce, any live animal in a primary enclosure which conforms to the requirements set forth in §3.137 of the standards: *Provided, however,* That any carrier or intermediate handler may accept for transportation or transport, in commerce, any live animal consigned by any department, agency, or instrumentality of the United States having laboratory animal facilities or exhibiting animals or any licensed or registered dealer, research facility, exhibitor, or operator of an auction sale if the consignor furnishes to the carrier or intermediate handler a certificate, signed by the consignor, stating that the primary enclosure complies with §3.137 of the standards, unless such primary enclosure is obviously defective or damaged and it is apparent that it cannot reasonably be expected to contain the live animal without causing suffering or injury to such live animal. A copy of

Case 6:14-cv-02034-JSS   Document 20-22   Filed 06/01/15   Page 12 of 26      Ex. 9-0701

section. Each registrant must maintain documentation of their annual reviews, including documenting any amendments or changes made to their plan since the previous year's review, such as changes made as a result of recently predicted, but historically unforeseen, circumstances (e.g., weather extremes). Contingency plans, as well as all annual review documentation and training records, must be made available to APHIS and any funding Federal agency representatives upon request. Facilities maintaining or otherwise handling marine mammals in captivity must also comply with the requirements of § 3.101(b) of this subchapter.

(3) The facility must provide and document participation in and successful completion of training for its personnel regarding their roles and responsibilities as outlined in the plan. For current registrants, training of facility personnel must be completed by September 27, 2013; for research facilities registered after July 29, 2013, training of facility personnel must be completed within 60 days of the facility putting its contingency plan in place. Employees hired 30 days or more before the contingency plan is put in place must also be trained by that date. For employees hired less than 30 days before that date or after that date, training must be conducted within 30 days of their start date. Any changes to the plan as a result of the annual review must be communicated to employees through training which must be conducted within 30 days of making the changes.

[54 FR 36147, Aug. 31, 1989, as amended at 58 FR 39129, July 22, 1993; 59 FR 67612, Dec. 30, 1994; 60 FR 13895, Mar. 15, 1995; 63 FR 62926, Nov. 10, 1998; 69 FR 42101, July 14, 2004; 77 FR 76823, Dec. 31, 2012]

EFFECTIVE DATE NOTE: At 78 FR 46255, July 31, 2013, in § 2.38, paragraph (l) was stayed indefinitely, effective July 31, 2013.

## Subpart D—Attending Veterinarian and Adequate Veterinary Care

### § 2.40 Attending veterinarian and adequate veterinary care (dealers and exhibitors).

(a) Each dealer or exhibitor shall have an attending veterinarian who shall provide adequate veterinary care to its animals in compliance with this section.

(1) Each dealer and exhibitor shall employ an attending veterinarian under formal arrangements. In the case of a part-time attending veterinarian or consultant arrangements, the formal arrangements shall include a written program of veterinary care and regularly scheduled visits to the premises of the dealer or exhibitor; and

(2) Each dealer and exhibitor shall assure that the attending veterinarian has appropriate authority to ensure the provision of adequate veterinary care and to oversee the adequacy of other aspects of animal care and use.

(b) Each dealer or exhibitor shall establish and maintain programs of adequate veterinary care that include:

(1) The availability of appropriate facilities, personnel, equipment, and services to comply with the provisions of this subchapter;

(2) The use of appropriate methods to prevent, control, diagnose, and treat diseases and injuries, and the availability of emergency, weekend, and holiday care;

(3) Daily observation of all animals to assess their health and well-being; *Provided, however,* That daily observation of animals may be accomplished by someone other than the attending veterinarian; and *Provided, further,* That a mechanism of direct and frequent communication is required so that timely and accurate information on problems of animal health, behavior, and well-being is conveyed to the attending veterinarian;

(4) Adequate guidance to personnel involved in the care and use of animals regarding handling, immobilization, anesthesia, analgesia, tranquilization, and euthanasia; and

(5) Adequate pre-procedural and post-procedural care in accordance with established veterinary medical and nursing procedures.

## Subpart E—Identification of Animals

### § 2.50 Time and method of identification.

(a) A class "A" dealer (breeder) shall identify all live dogs and cats on the premises as follows:

Case 6:14-cv-02034-JSS   Document 20-22   Filed 06/01/15   Page 13 of 26      Ex. 9-0702

(c) Confiscated animals may be placed, by sale or donation, with other licensees or registrants which comply with the standards and regulations and can provide proper care, or they may be euthanized. The dealer, exhibitor, intermediate handler, or carrier from whom the animals were confiscated shall bear all costs incurred in performing the placement or euthanasia activities authorized by this section.

### §2.130  Minimum age requirements.

No dog or cat shall be delivered by any person to any carrier or intermediate handler for transportation, in commerce, or shall be transported in commerce by any person, except to a registered research facility, unless such dog or cat is at least eight (8) weeks of age and has been weaned.

### §2.131  Handling of animals.

(a)(1) Handling of all animals shall be done as expeditiously and carefully as possible in a manner that does not cause trauma, overheating, excessive cooling, behavioral stress, physical harm, or unnecessary discomfort.

(2)(i) Physical abuse shall not be used to train, work, or otherwise handle animals.

(ii) Deprivation of food or water shall not be used to train, work, or otherwise handle animals; *Provided, however,* That the short-term withholding of food or water from animals by exhibitors is allowed by these regulations as long as each of the animals affected receives its full dietary and nutrition requirements each day.

(b)(1) During public exhibition, any animal must be handled so there is minimal risk of harm to the animal and to the public, with sufficient distance and/or barriers between the animal and the general viewing public so as to assure the safety of animals and the public.

(2) Performing animals shall be allowed a rest period between performances at least equal to the time for one performance.

(3) Young or immature animals shall not be exposed to rough or excessive public handling or exhibited for periods of time which would be detrimental to their health or well-being.

(4) Drugs, such as tranquilizers, shall not be used to facilitate, allow, or provide for public handling of the animals.

(c)(1) Animals shall be exhibited only for periods of time and under conditions consistent with their good health and well-being.

(2) A responsible, knowledgeable, and readily identifiable employee or attendant must be present at all times during periods of public contact.

(3) During public exhibition, dangerous animals such as lions, tigers, wolves, bears, or elephants must be under the direct control and supervision of a knowledgeable and experienced animal handler.

(4) If public feeding of animals is allowed, the food must be provided by the animal facility and shall be appropriate to the type of animal and its nutritional needs and diet.

(d) When climatic conditions present a threat to an animal's health or well-being, appropriate measures must be taken to alleviate the impact of those conditions. An animal may never be subjected to any combination of temperature, humidity, and time that is detrimental to the animal's health or well-being, taking into consideration such factors as the animal's age, species, breed, overall health status, and acclimation.

[54 FR 36147, Aug. 31, 1989, as amended at 63 FR 10498, Mar. 4, 1998]

### §2.132  Procurement of random source dogs and cats, dealers.

(a) A class "B" dealer may obtain live random source dogs and cats only from:

(1) Other dealers who are licensed under the Act and in accordance with the regulations in part 2;

(2) State, county, or city owned and operated animal pounds or shelters; and

(3) A legal entity organized and operated under the laws of the State in which it is located as an animal pound or shelter, such as a humane shelter or contract pound.

(b) A class "B" dealer shall not obtain live random source dogs and cats from individuals who have not bred and raised the dogs and cats on their own premises.

Case 6:14-cv-02034-JSS   Document 20-22   Filed 06/01/15   Page 14 of 26          Ex. 9-0703

and must attach that certification (including any previously attached certification) to the certification which he or she provides pursuant to paragraph (b) of this section (a photocopy of the original certification will be deemed a duplicate original if the dealer does not dispose of all of the dogs or cats in a single transaction).

(e) A dealer who completes, provides, or receives a certification required under paragraph (b) of this section shall keep, maintain, and make available for APHIS inspection a copy of the certification for at least 1 year following disposition.

(f) A research facility which acquires any live random source dog or cat from a dealer must obtain the certification required under paragraph (b) of this section and shall keep, maintain, and make available for APHIS inspection the original for at least 3 years following disposition.

(g) In instances where a research facility transfers ownership of a live random source dog or cat acquired from a dealer to another research facility, a copy of the certification required by paragraph (b) of this section must accompany the dog or cat transferred. The research facility to which the dog or cat is transferred shall keep, maintain, and make available for APHIS inspection the copy of the certification for at least 3 years following disposition.

[58 FR 39129, July 22, 1993]

§2.134  **Contingency planning.**

(a) Dealers, exhibitors, intermediate handlers, and carriers must develop, document, and follow an appropriate plan to provide for the humane handling, treatment, transportation, housing, and care of their animals in the event of an emergency or disaster (one which could reasonably be anticipated and expected to be detrimental to the good health and well-being of the animals in their possession). Such contingency plans must:

(1) Identify situations the licensee or registrant might experience that would trigger the need for the measures identified in a contingency plan to be put into action including, but not limited to, emergencies such as electrical outages, faulty HVAC systems, fires, mechanical breakdowns, and animal escapes, as well as natural disasters most likely to be experienced;

(2) Outline specific tasks required to be carried out in response to the identified emergencies or disasters including, but not limited to, detailed animal evacuation instructions or shelter-in-place instructions and provisions for providing backup sources of food and water as well as sanitation, ventilation, bedding, veterinary care, etc.;

(3) Identify a chain of command and who (by name or by position title) will be responsible for fulfilling these tasks; and

(4) Address how response and recovery will be handled in terms of materials, resources, and training needed.

(b) For current licensees and registrants, the contingency plan must be in place by July 29, 2013. For new dealers, exhibitors, intermediate handlers, and carriers licensed or registered after this date, the contingency plan must be in place prior to conducting regulated activities. The plan must be reviewed by the dealer, exhibitor, intermediate handler, or carrier on at least an annual basis to ensure that it adequately addresses the criteria listed in paragraph (a) of this section. Each licensee and registrant must maintain documentation of their annual reviews, including documenting any amendments or changes made to their plan since the previous year's review, such as changes made as a result of recently predicted, but historically unforeseen, circumstances (e.g., weather extremes). Contingency plans, as well as annual review documentation and training records, must be made available to APHIS upon request. Traveling entities must carry a copy of their contingency plan with them at all times and make it available for APHIS inspection while in travel status. Dealers, exhibitors, intermediate handlers, and carriers maintaining or otherwise handling marine mammals in captivity must also comply with the requirements of §3.101(b) of this subchapter.

(c) Dealers, exhibitors, intermediate handlers, and carriers must provide and document participation in and successful completion of training for personnel regarding their roles and responsibilities as outlined in the plan.

45

For current licensees and registrants, training of dealer, exhibitor, intermediate handler, and carrier personnel must be completed by September 27, 2013. For new dealers, exhibitors, intermediate handlers, or carriers licensed or registered after July 29, 2013, training of personnel must be completed within 60 days of the dealer, exhibitor, intermediate handler, or carrier putting their contingency plan in place. Employees hired 30 days or more before their contingency plan is put in place must also be trained by that date. For employees hired less than 30 days before that date or after that date, training must be conducted within 30 days of their start date. Any changes to the plan as a result of the annual review must be communicated to employees through training which must be conducted within 30 days of making the changes.

[77 FR 76823, Dec. 31, 2012]

EFFECTIVE DATE NOTE: At 78 FR 46255, July 31, 2013, §2.134 was stayed indefinitely, effective July 31, 2013.

# PART 3—STANDARDS

## Subpart A—Specifications for the Humane Handling, Care, Treatment, and Transportation of Dogs and Cats

### FACILITIES AND OPERATING STANDARDS

Sec.
3.1  Housing facilities, general.
3.2  Indoor housing facilities.
3.3  Sheltered housing facilities.
3.4  Outdoor housing facilities.
3.5  Mobile or traveling housing facilities.
3.6  Primary enclosures.

### ANIMAL HEALTH AND HUSBANDRY STANDARDS

3.7  Compatible grouping.
3.8  Exercise for dogs.
3.9  Feeding.
3.10  Watering.
3.11  Cleaning, sanitization, housekeeping, and pest control.
3.12  Employees.

### TRANSPORTATION STANDARDS

3.13  Consignments to carriers and intermediate handlers.
3.14  Primary enclosures used to transport live dogs and cats.
3.15  Primary conveyances (motor vehicle, rail, air, and marine).
3.16  Food and water requirements.
3.17  Care in transit.
3.18  Terminal facilities.
3.19  Handling.

## Subpart B—Specifications for the Humane Handling, Care, Treatment, and Transportation of Guinea Pigs and Hamsters

### FACILITIES AND OPERATING STANDARDS

3.25  Facilities, general.
3.26  Facilities, indoor.
3.27  Facilities, outdoor.
3.28  Primary enclosures.

### ANIMAL HEALTH AND HUSBANDRY STANDARDS

3.29  Feeding.
3.30  Watering.
3.31  Sanitation.
3.32  Employees.
3.33  Classification and separation.
3.34  [Reserved]

### TRANSPORTATION STANDARDS

3.35  Consignments to carriers and intermediate handlers.
3.36  Primary enclosures used to transport live guinea pigs and hamsters.
3.37  Primary conveyances (motor vehicle, rail, air, and marine).
3.38  Food and water requirements.
3.39  Care in transit.
3.40  Terminal facilities.
3.41  Handling.

## Subpart C—Specifications for the Humane Handling, Care, Treatment and Transportation of Rabbits

### FACILITIES AND OPERATING STANDARDS

3.50  Facilities, general.
3.51  Facilities, indoor.
3.52  Facilities, outdoor.
3.53  Primary enclosures.

### ANIMAL HEALTH AND HUSBANDRY STANDARDS

3.54  Feeding.
3.55  Watering.
3.56  Sanitation.
3.57  Employees.
3.58  Classification and separation.
3.59  [Reserved]

### TRANSPORTATION STANDARDS

3.60  Consignments to carriers and intermediate handlers.
3.61  Primary enclosures used to transport live rabbits.
3.62  Primary conveyances (motor vehicle, rail, air, and marine).
3.63  Food and water requirements.
3.64  Care in transit.
3.65  Terminal facilities.

Case 6:14-cv-02034-JSS   Document 20-22   Filed 06/01/15   Page 16 of 26       Ex. 9-0705

allow them to remain dry during rain or snow.

(3) *Shelter from cold weather.* Transporting devices shall be covered to provide protection for live rabbits when the outdoor air temperature falls below 10 °C. (50 °F.), and such live rabbits shall not be subjected to surrounding air temperatures which fall below 7.2 °C. (45 °F.), and which shall be measured and read in the manner prescribed in § 3.65 of this part, for a period of more than 45 minutes unless such rabbits are accompanied by a certificate of acclimation to lower temperatures as prescribed in § 3.60(c).

(b) Care shall be exercised to avoid handling of the primary enclosure in such a manner that may cause physical or emotional trauma to the live rabbit contained therein.

(c) Primary enclosures used to transport any live rabbit shall not be tossed, dropped, or needlessly tilted and shall not be stacked in a manner which may reasonably be expected to result in their falling.

[43 FR 21164, May 16, 1978, as amended at 43 FR 56216, Dec. 1, 1978; 55 FR 28883, July 16, 1990]

## Subpart D—Specifications for the Humane Handling, Care, Treatment, and Transportation of Nonhuman Primates[2]

SOURCE: 56 FR 6495, Feb. 15, 1991, unless otherwise noted.

FACILITIES AND OPERATING STANDARDS

### § 3.75  Housing facilities, general.

(a) *Structure:* construction. Housing facilities for nonhuman primates must be designed and constructed so that they are structurally sound for the species of nonhuman primates housed in them. They must be kept in good repair, and they must protect the animals from injury, contain the animals securely, and restrict other animals from entering.

(b) *Condition and site.* Housing facilities and areas used for storing animal food or bedding must be free of any accumulation of trash, waste material, junk, weeds, and other discarded materials. Animal areas inside of housing facilities must be kept neat and free of clutter, including equipment, furniture, or stored material, but may contain materials actually used and necessary for cleaning the area, and fixtures and equipment necessary for proper husbandry practices and research needs. Housing facilities other than those maintained by research facilities and Federal research facilities must be physically separated from any other businesses. If a housing facility is located on the same premises as any other businesses, it must be physically separated from the other businesses so that animals the size of dogs, skunks, and raccoons, are prevented from entering it.

(c) *Surfaces*—(1) *General requirements.* The surfaces of housing facilities—including perches, shelves, swings, boxes, houses, dens, and other furniture-type fixtures or objects within the facility—must be constructed in a manner and made of materials that allow them to be readily cleaned and sanitized, or removed or replaced when worn or soiled. Furniture-type fixtures or objects must be sturdily constructed and must be strong enough to provide for the safe activity and welfare of nonhuman primates. Floors may be made of dirt, absorbent bedding, sand, gravel, grass, or other similar material that can be readily cleaned, or can be removed or replaced whenever cleaning does not

---

[2] Nonhuman primates include a great diversity of forms, ranging from the marmoset weighing only a few ounces, to the adult gorilla weighing hundreds of pounds, and include more than 240 species. They come from Asia, Africa, and Central and South America, and they live in different habitats in nature. Some have been transported to the United States from their natural habitats and some have been raised in captivity in the United States. Their nutritional and activity requirements differ, as do their social and environmental requirements. As a result, the conditions appropriate for one species do not necessarily apply to another. Accordingly, these minimum specifications must be applied in accordance with the customary and generally accepted professional and husbandry practices considered appropriate for each species, and necessary to promote their psychological well-being.

These minimum standards apply only to live nonhuman primates, unless stated otherwise.

Case 6:14-cv-02034-JSS  Document 20-22  Filed 06/01/15  Page 17 of 26  Ex. 9-0706

eliminate odors, diseases, pests, insects, or vermin. Any surfaces that come in contact with nonhuman primates must:

(i) Be free of excessive rust that prevents the required cleaning and sanitization, or that affects the structural strength of the surface; and

(ii) Be free of jagged edges or sharp points that might injure the animals.

(2) *Maintenance and replacement of surfaces.* All surfaces must be maintained on a regular basis. Surfaces of housing facilities—including houses, dens, and other furniture-type fixtures and objects within the facility—that cannot be readily cleaned and sanitized, must be replaced when worn or soiled.

(3) *Cleaning.* Hard surfaces with which nonhuman primates come in contact must be spot-cleaned daily and sanitized in accordance with § 3.84 of this subpart to prevent accumulation of excreta or disease hazards. If the species scent mark, the surfaces must be sanitized or replaced at regular intervals as determined by the attending veterinarian in accordance with generally accepted professional and husbandry practices. Floors made of dirt, absorbent bedding, sand, gravel, grass, or other similar material, and planted enclosures must be raked or spot-cleaned with sufficient frequency to ensure all animals the freedom to avoid contact with excreta. Contaminated material must be removed or replaced whenever raking and spot cleaning does not eliminate odors, diseases, insects, pests, or vermin infestation. All other surfaces of housing facilities must be cleaned and sanitized when necessary to satisfy generally accepted husbandry standards and practices. Sanitization may be done by any of the methods provided in § 3.84(b)(3) of this subpart for primary enclosures.

(d) *Water and electric power.* The housing facility must have reliable electric power adequate for heating, cooling, ventilation, and lighting, and for carrying out other husbandry requirements in accordance with the regulations in this subpart. The housing facility must provide running potable water for the nonhuman primates' drinking needs. It must be adequate for cleaning and for carrying out other husbandry requirements.

(e) *Storage.* Supplies of food and bedding must be stored in a manner that protects the supplies from spoilage, contamination, and vermin infestation. The supplies must be stored off the floor and away from the walls, to allow cleaning underneath and around the supplies. Food requiring refrigeration must be stored accordingly, and all food must be stored in a manner that prevents contamination and deterioration of its nutritive value. Only the food and bedding currently being used may be kept in animal areas, and when not in actual use, open food and bedding supplies must be kept in leakproof containers with tightly fitting lids to prevent spoilage and contamination. Substances that are toxic to the nonhuman primates but that are required for normal husbandry practices must not be stored in food storage and preparation areas, but may be stored in cabinets in the animal areas.

(f) *Drainage and waste disposal.* Housing facility operators must provide for regular and frequent collection, removal, and disposal of animal and food wastes, bedding, dead animals, debris, garbage, water, and any other fluids and wastes, in a manner that minimizes contamination and disease risk. Housing facilities must be equipped with disposal facilities and drainage systems that are constructed and operated so that animal wastes and water are rapidly eliminated and the animals stay dry. Disposal and drainage systems must minimize vermin and pest infestation, insects, odors, and disease hazards. All drains must be properly constructed, installed, and maintained. If closed drainage systems are used, they must be equipped with traps and prevent the backflow of gases and the backup of sewage onto the floor. If the facility uses sump ponds, settlement ponds, or other similar systems for drainage and animal waste disposal, the system must be located far enough away from the animal area of the housing facility to prevent odors, diseases, insects, pests, and vermin infestation. If drip or constant flow watering devices are used to provide water to the animals, excess water must be rapidly

drained out of the animal areas by gutters or pipes so that the animals stay dry. Standing puddles of water in animal areas must be mopped up or drained so that the animals remain dry. Trash containers in housing facilities and in food storage and food preparation areas must be leakproof and must have tightly fitted lids on them at all times. Dead animals, animal parts, and animal waste must not be kept in food storage or food preparation areas, food freezers, food refrigerators, and animal areas.

(g) *Washrooms and sinks.* Washing facilities, such as washrooms, basins, sinks, or showers must be provided for animal caretakers and must be readily accessible.

### § 3.76  Indoor housing facilities.

(a) *Heating, cooling, and temperature.* Indoor housing facilities must be sufficiently heated and cooled when necessary to protect nonhuman primates from temperature extremes and to provide for their health and well-being. The ambient temperature in the facility must not fall below 45 °F (7.2 °C) for more than 4 consecutive hours when nonhuman primates are present, and must not rise above 85 °F (29.5 °C) for more than 4 consecutive hours when nonhuman primates are present. The ambient temperature must be maintained at a level that ensures the health and well-being of the species housed, as directed by the attending veterinarian, in accordance with generally accepted professional and husbandry practices.

(b) *Ventilation.* Indoor housing facilities must be sufficiently ventilated at all times when nonhuman primates are present to provide for their health and well-being and to minimize odors, drafts, ammonia levels, and moisture condensation. Ventilation must be provided by windows, doors, vents, fans, or air conditioning. Auxiliary ventilation, such as fans, blowers, or air conditioning, must be provided when the ambient temperature is 85 °F (29.5 °C) or higher. The relative humidity maintained must be at a level that ensures the health and well-being of the animals housed, as directed by the attending veterinarian, in accordance with

generally accepted professional and husbandry practices.

(c) *Lighting.* Indoor housing facilities must be lighted well enough to permit routine inspection and cleaning of the facility, and observation of the nonhuman primates. Animal areas must be provided a regular diurnal lighting cycle of either natural or artificial light. Lighting must be uniformly diffused throughout animal facilities and provide sufficient illumination to aid in maintaining good housekeeping practices, adequate cleaning, adequate inspection of animals, and for the well-being of the animals. Primary enclosures must be placed in the housing facility so as to protect the nonhuman primates from excessive light.

### § 3.77  Sheltered housing facilities.

(a) *Heating, cooling, and temperature.* The sheltered part of sheltered housing facilities must be sufficiently heated and cooled when necessary to protect the nonhuman primates from temperature extremes, and to provide for their health and well-being. The ambient temperature in the sheltered part of the facility must not fall below 45 °F (7.2 °C) for more than 4 consecutive hours when nonhuman primates are present, and must not rise above 85 °F (29.5 °C) for more than 4 consecutive hours when nonhuman primates are present, unless temperatures above 85 °F (29.5 °C) are approved by the attending veterinarian, in accordance with generally accepted husbandry practices. The ambient temperature must be maintained at a level that ensures the health and well-being of the species housed, as directed by the attending veterinarian, in accordance with generally accepted professional and husbandry practices.

(b) *Ventilation.* The sheltered part of sheltered animal facilities must be sufficiently ventilated at all times to provide for the health and well-being of nonhuman primates and to minimize odors, drafts, ammonia levels, and moisture condensation. Ventilation must be provided by windows, doors, vents, fans, or air conditioning. Auxiliary ventilation, such as fans, blowers, or air conditioning, must be provided when the ambient temperature is 85 °F

Case 6:14-cv-02034-JSS   Document 20-22   Filed 06/01/15   Page 19 of 26      Ex. 9-0708

**Potential Long-Term Effect**

When foreign countries apply for equivalence of their meat, poultry, or egg product inspection systems, FSIS determines whether their inspection systems are equivalent to the system maintained by the United States. FSIS does not make equivalence determinations on the basis of particular products; rather, the equivalence decision is based on the evaluation of the foreign countries' inspection systems.

Although Korea indicates that it intends to export two types of ginseng chicken stew products for now, it would not be precluded from exporting other poultry products in the future if the products meet all Animal and Plant Health Inspection Service (APHIS) requirements and any applicable FSIS regulations for those products. Therefore, the long-term economic impact could be larger and more complex than can be assessed now.

**Executive Order 12988**

This proposed rule has been reviewed under Executive Order 12988, Civil Justice Reform. If this proposed rule is adopted:

(1) All State and local laws and regulations that are inconsistent with this rule will be preempted;

(2) no retroactive effect will be given to this rule; and

(3) administrative proceedings will not be required before parties may file suit in court challenging this rule.

**Paperwork Reduction Act**

No new paperwork requirements are associated with this proposed rule. Foreign countries wanting to export poultry and poultry products to the United States are required to provide information to FSIS certifying that their inspection system provides standards equivalent to those of the United States, and that the legal authority for the system and their implementing regulations are equivalent to those of the United States. FSIS provided Korea with questionnaires asking for detailed information about the country's inspection practices and procedures to assist that country in organizing its materials. This information collection was approved under OMB number 0583–0094. The proposed rule contains no other paperwork requirements.

**E-Government Act**

FSIS and the U.S. Department of Agriculture (USDA) are committed to achieving the purposes of the E-Government Act (44 U.S.C. 3601, *et seq.*) by, among other things, promoting the use of the Internet and other information technologies and providing increased opportunities for citizen access to Government information and services, and for other purposes.

**Additional Public Notification**

FSIS will officially notify the World Trade Organization's Committee on Sanitary and Phytosanitary Measures (WTO/SPS Committee) in Geneva, Switzerland, of this proposal and will announce it on-line through the FSIS Web page located at: *http:// www.fsis.usda.gov/regulations _&_policies/Proposed_Rules/index.asp.*

FSIS also will make copies of this **Federal Register** publication available through the FSIS Constituent Update, which is used to provide information regarding FSIS policies, procedures, regulations, **Federal Register** notices, FSIS public meetings, and other types of information that could affect or would be of interest to our constituents and stakeholders. The Update is communicated via Listserv, a free email subscription service consisting of industry, trade, and farm groups, consumer interest groups, allied health professionals, scientific professionals, and other individuals who have requested to be included. The Update also is available on the FSIS Web page. Through Listserv and the Web page, FSIS is able to provide information to a much broader, more diverse audience. In addition, FSIS offers an email subscription service which provides automatic and customized access to selected food safety news and information. This service is available at *http://www.fsis.usda.gov/ News_&_Events/Email_Subscription/.* Options range from recalls, export information, regulations, directives, and notices. Customers can add or delete subscriptions themselves, and have the option to password protect their accounts.

**USDA Nondiscrimination Statement**

USDA prohibits discrimination in all its programs and activities on the basis of race, color, national origin, gender, religion, age, disability, political beliefs, sexual orientation, and marital or family status. (Not all prohibited bases apply to all programs.) Persons with disabilities who require alternative means for communication of program information (Braille, large print, audiotape, etc.) should contact USDA's Target Center at 202–720–2600 (voice and TTY).

To file a written complaint of discrimination, write USDA, Office of the Assistant Secretary for Civil Rights, 1400 Independence Avenue SW., Washington, DC 20250–9410 or call 202–720–5964 (voice and TTY). USDA is an equal opportunity provider and employer.

**List of Subjects in 9 CFR Part 381**

Imported products.

For the reasons set out in the preamble, FSIS is proposing to amend 9 CFR part 381 as follows:

**PART 381—POULTRY PRODUCTS INSPECTION REGULATIONS**

1. The authority citation for part 381 continues to read as follows:

**Authority:** 7 U.S.C. 138f, 450; 21 U.S.C. 451–470; 7 CFR 2.7, 2.18, 2.53.

**§ 381.196 [Amended]**

2. Section 381.196 is amended in paragraph (b) by adding ''Republic of Korea'' in alphabetical order to the list of countries.

Done at Washington, DC, on: November 21, 2012.

**Alfred V. Almanza,**
*Administrator.*

[FR Doc. 2012–28746 Filed 11–26–12; 8:45 am]

**BILLING CODE 3410–DM–P**

---

**DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Part 17**

[Docket No. FWS–R9–ES–2012–0025; 450 003 0115]

**Endangered and Threatened Wildlife and Plants; 90-Day Finding on a Petition to List the African Lion Subspecies as Endangered**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Notice of petition finding and initiation of status review.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), announce a 90-day finding on a petition to list the African lion (*Panthera leo leo*) as endangered under the Endangered Species Act of 1973, as amended (Act). Based on our review, we find that the petition presents substantial scientific or commercial information indicating that listing this subspecies may be warranted. Therefore, with the publication of this notice, we are initiating a review of the status of the subspecies to determine if listing the African lion is warranted. To ensure that this status review is comprehensive, we are requesting scientific and commercial data and other information regarding this subspecies. Based on the status review, we will issue a 12-month finding on the

petition, which will address whether the petitioned action is warranted, as provided in section 4(b)(3)(B) of the Act.

**DATES:** To allow us adequate time to conduct this review, we request that we receive information on or before January 28, 2013. The deadline for submitting an electronic comment using the Federal eRulemaking Portal (see **ADDRESSES** section, below) is 11:59 p.m. Eastern Time on this date. After January 28, 2013, you must submit information directly to the Branch of Foreign Species (see **FOR FURTHER INFORMATION CONTACT** section, below). Please note that we might not be able to address or incorporate information that we receive after the above requested date.

**ADDRESSES:** You may submit information by one of the following methods:

• Electronically: Go to the Federal eRulemaking Portal: *http:// www.regulations.gov.* In the Search field, enter Docket No. FWS–R9–ES– 2012–0025, which is the docket number for this action. Then click on the Search button. You may submit a comment by clicking on "Comment Now!" If your comments will fit in the provided comment box, please use this feature of *http://www.regulations.gov,* as it is most compatible with our comment review procedures. If you attach your comments as a separate document, our preferred file format is Microsoft Word. If you attach multiple comments (such as form letters), our preferred format is a spreadsheet in Microsoft Excel.

• By hard copy: U.S. mail or hand-delivery: Public Comments Processing, Attn: FWS–R9–ES–2012–0025, Division of Policy and Directives Management; U.S. Fish and Wildlife Service; 4401 N. Fairfax Drive, MS 2042–PDM; Arlington, VA 22203.

We will not accept comments by email or fax. We will post all comments on *http://www.regulations.gov.* This generally means that we will post any personal information you provide us (see the Information Requested section, below, for more information).

**FOR FURTHER INFORMATION CONTACT:** Chief, Branch of Foreign Species, Endangered Species Program, U.S. Fish and Wildlife Service, 4401 North Fairfax Drive, Room 420, Arlington, VA 22203; telephone 703–358–2171. If you use a telecommunications device for the deaf (TDD), call the Federal Information Relay Service (FIRS) at 800–877–8339.

**SUPPLEMENTARY INFORMATION:**

**Information Requested**

When we make a finding that a petition presents substantial information indicating that listing a species may be warranted, we are required to promptly review the status of the species (conduct a status review). For the status review (also called a "12-month finding") to be complete, and based on the best available scientific and commercial information, we request information on the African lion from governmental agencies, the scientific community, industry, and any other interested parties. We seek information on:

(1) The species' biology, range, and population trends, including:

(a) Habitat requirements for feeding, breeding, and sheltering;

(b) Genetics and taxonomy;

(c) Historical and current range, including distribution patterns;

(d) Historical and current population levels, and current and projected trends; and

(e) Past and ongoing conservation measures for the species and its habitat.

(2) The factors that are the basis for making a listing determination for a species under section 4(a)(1) of the Act (16 U.S.C. 1531 *et seq.*), which are:

(a) The present or threatened destruction, modification, or curtailment of its habitat or range;

(b) Overutilization for commercial, recreational, scientific, or educational purposes;

(c) Disease or predation;

(d) The inadequacy of existing regulatory mechanisms; and

(e) Other natural or manmade factors affecting its continued existence.

(3) Data that support or refute:

(a) Panmixia (having one, well-mixed breeding population), including evidence of genetic differentiation that may result in traits such as selective growth, sex ratios, increased vulnerability to threats, or habitat preferences;

(b) Existence of population structure to the degree that a threat could have differentiating effects on portions of the population and not on the whole species; and

(c) Statistically significant long-term African lion population declines.

(4) Information on the correlation between climate change and African lion population dynamics, including, but not limited to:

(a) Climate change predictions as they relate to drought, desertification, and African lion food availability, either directly or indirectly through changes in regional climate; and

(b) Quantitative research on the relationship of food availability to the survival of the species.

Please include sufficient information with your submission (such as scientific journal articles or other publications) to allow us to verify any scientific or commercial information you include. Submissions merely stating support for or opposition to the action under consideration without providing supporting information, although noted, will not be considered in making a determination. Section 4(b)(1)(A) of the Act directs that determinations as to whether any species is an endangered or threatened species must be made "solely on the basis of the best scientific and commercial data available."

You may submit your information concerning this status review by one of the methods listed in **ADDRESSES.** If you submit information via *http:// www.regulations.gov,* your entire submission—including any personal identifying information—will be posted on the Web site. If your submission is made via a hardcopy that includes personal identifying information, you may request at the top of your document that we withhold this personal identifying information from public review. However, we cannot guarantee that we will be able to do so. We will post all hardcopy submissions on *http://www.regulations.gov.*

Information and supporting documentation that we received and used in preparing this finding is available for you to review at *http:// www.regulations.gov,* or by appointment during normal business hours at the U.S. Fish and Wildlife Service, Branch of Foreign Species, Endangered Species Program, Arlington, VA (see **FOR FURTHER INFORMATION CONTACT**).

**Evaluation of Information for a 90-Day Finding on a Petition**

Section 4 of the Act (16 U.S.C. 1533) and its implementing regulations at 50 CFR part 424 set forth the procedures for adding a species to, or removing a species from, the Federal Lists of Endangered and Threatened Wildlife and Plants. A species may be determined to be an endangered or threatened species due to one or more of the five factors described in section 4(a)(1) of the Act:

(A) The present or threatened destruction, modification, or curtailment of its habitat or range;

(B) Overutilization for commercial, recreational, scientific, or educational purposes;

(C) Disease or predation;

(D) The inadequacy of existing regulatory mechanisms; or

(E) Other natural or manmade factors affecting its continued existence.

In making this 90-day finding, we evaluated whether information regarding threats to the African lion, as presented in the petition and other

information available in our files, is substantial, thereby indicating that the petitioned action may be warranted. Our evaluation of this information is presented below.

**Background**

Section 4(b)(3)(A) of the Act requires that we make a finding on whether a petition to list, delist, or reclassify a species presents substantial scientific or commercial information indicating that the petitioned action may be warranted. We are to base this finding on information provided in the petition, supporting information submitted with the petition, and information otherwise available in our files. To the maximum extent practicable, we are to make this finding within 90 days of our receipt of the petition and publish our notice of the finding promptly in the **Federal Register**.

Our standard for substantial scientific or commercial information within the Code of Federal Regulations (CFR) with regard to a 90-day petition finding is "that amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted" (50 CFR 424.14(b)). If we find that substantial scientific or commercial information was presented, we are required to promptly initiate a species status review, which we subsequently summarize in our 12-month finding.

*Petition History*

On March 1, 2011, we received a petition dated March 1, 2011, from the International Fund for Animal Welfare, the Humane Society of the United States, Humane Society International, the Born Free Foundation/Born Free USA, Defenders of Wildlife, and the Fund for Animals, requesting that the African lion subspecies be listed as endangered under the Act. The petition clearly identified itself as such, and included the requisite identification information, as required by 50 CFR 424.14(a). We acknowledged receipt of the petition in a letter to Mr. Jeff Flocken dated July 17, 2011. This finding addresses the petition.

**Previous Federal Action(s)**

Although the Asiatic lion (*Panthera leo persica*) has been listed as endangered under the Act since 1970, the African lion (*Panthera leo leo*), is not listed as either endangered or threatened under the Act. The African lion is listed in Appendix II of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). A discussion of its listing with respect to CITES can be found

under the Conservation Status section below.

*Species Information*

The African lion belongs to the class Mammalia in the family Felidae. There are two recognized subspecies of lion: Asiatic lion (*Panthera leo persica*) (Meyer 1826) and the African lion (*P. leo leo*) (Linnaeus 1758).

The African lion subspecies is a habitat generalist, which historically excluded it only from areas such as rainforest and the arid interior of the Sahara (Ray *et al.* 2005, p. 66; Nowell and Jackson 1996, p. 19). They live in groups called prides, which usually contain between 5 and 9 adult females (Petition, p. 17). This species inhabits arid habitats such as the Kalahari Desert and the Kunene region of northwest Namibia; however pride sizes are typically smaller in arid regions (Stander & Hannsen 2001 in Ray *et al.* 2005, p. 66; Haas *et al.* 2005, p. 5). Lions typically hunt in groups, are opportunistic carnivores, and are primarily active at night (Haas *et al.* 2005, p. 5).

Lions are sexually dimorphic (differences in size, coloration, or body structure between the sexes); males weigh between 20 and 27 percent more than females (Petition, p. 17). Adult males have been observed to weigh an average of 181 kilograms (kg) (399 pounds), and adult females were observed to weigh an average of 126 kg (278 pounds) (Smuts 1976 in Nowell and Jackson 1996, p. 17). Researchers observed females eating an average of 8.7 kg (19.2 pounds) per day during the dry season, and 14 kg (31 pounds) per day in the wet season (Haas *et al.* 2005, p. 5). Males were observed to eat up to twice as much as females.

Lions have no fixed breeding season, and they give birth to between 1 and 4 cubs (Petition, p. 17). Females may give birth beginning at 4 years of age (Petition, p. 17), and female reproduction begins to decline between 11 and 15 years of age (Nowell and Jackson 1996, p. 19). Often the females in the pride give birth at the same time, which may add to the reproductive success of the pride as a whole (Nowell and Jackson 1996, p. 18). Each pride requires a home range of between 20 and 500 square kilometers (km²) (8 and 193 square miles (mi²)). In the wild, males live between 12 and 16 years but have been reported to live up to 30 years (Shoemaker and Pfaff 1997 in Haas *et al.* 2005, p. 5; Guggisberg 1975 in Nowell and Jackson 1996, p. 19).

*Population Estimates*

The most quantitative estimate of the historic size of the African lion population resulted from a modeling exercise by Bauer *et al.* (2008) that predicted there were 75,800 African lions in 1980 (Bauer *et al.* 2008, p. 1). As of 2008, the International Union for Conservation of Nature (IUCN) estimated that the population declined 30 percent over the past 20 years (Petition, p. 6). Currently African lion experts estimate that the population size is fewer than 40,000, with an estimated population between 23,000 and 39,000 individuals (Petition, p. 6; Bauer *et al.* 2008, p. 1). This is based on the results of two separate assessments. Bauer and Van Der Merwe estimated the African lion population is between 16,500 and 30,000 individuals (2004, p. 26); Chardonnet (2002, Chapter 2, p. 32) estimated the population is between 28,854 and 47,132 individuals. In 2004, the estimate for West and Central Africa combined was 1,800 individuals, with all populations being small and fragmented (Bauer and Van Der Merwe 2004, p. 27). The petition notes that although subpopulations of interbreeding lions in West Africa have been grouped differently (Bauer and Nowell 2004; Chardonnet 2002), there is acknowledgment that the overall population is likely small and declining.

Various researchers and entities, such as the African Lion Working Group (ALWG), describe groups of lions as being organized into subpopulations, and the degree to which these groups interbreed is unclear (Bauer and Van Der Merwe 2004, pp. 27–30). In research conducted by Chardonnet *et al.*, three subpopulations were described as consisting of 18 groups, between which there may be some interchange of individuals, although the amount of interchange is unknown. The size of the largest population in West Africa is also unclear. For example, the ALWG, an organization dedicated to the conservation, research, and management of free-ranging lion populations in Africa, estimates there are 100 lions in Burkina Faso's Arly-Singou ecosystem (Bauer and Van Der Merwe 2004, p. 28), while Chardonnet (2002) estimates 404 individuals in the same area (Chapter 2, Table 12, p. 39). However, both surveys found that only 5 percent of West African lion population estimates met scientific statistical standards. The remainder of the estimates was believed to be less reliable (Bauer and Nowell 2004, p. 2).

*Range*

Researchers believe that the African lion now occupies a range of less than 4,500,000 km² (1,737,460 mi²), which is 22 percent of the subspecies' historic distribution (Bauer *et al.* 2008, pp. 1–2). One-half of the total African lion population now likely exists in Tanzania, while smaller populations remain in Kenya, South Africa, Mozambique, Botswana, Zimbabwe, Zambia, and Namibia (Frank *et al.* 2006, p. 1). The population estimate for East Africa was 11,000 individuals as of 2004 (Bauer and Van Der Merwe 2004, p. 27). These authors noted that the two largest populations were in the Serengeti and Selous ecosystems of Tanzania (Bauer and Van Der Merwe 2004, p. 27). For southern Africa, the population estimate was 10,000 individuals, with the majority being in Botswana and South Africa (p. 27). Most lions in the Central African region are found in the Sahel savannah belt (Bauer and Van Der Merwe 2004, p. 30). The petition indicates that viable populations of African lions existing in protected areas occur in only about 5 percent of the subspecies' currently occupied range, and 1 percent of the subspecies' historical continent-wide range.

The petitioners indicate that since 2002, several African lion populations that have been studied have either declined or disappeared altogether (Henschel *et al.* 2010, pp. 34, 39). The petitioners assert that the latest available information suggests the African lion exists in 27 countries (Petition, p. 7; Henschel *et al.* 2010, p. 34), which is a rapid decrease from its reported existence in 30 countries in 2008 (Bauer *et al.* 2008, p. 1). This subspecies may no longer exist in Congo, Côte d'Ivoire, or Ghana (Henschel *et al.* 2010, p. 34).

*Conservation Status*

The petition indicates that in the 2008 IUCN Red List of Threatened Species, the IUCN classified the African lion as "Vulnerable" with a declining population trend, which means it is considered to be facing a high risk of extinction in the wild (Bauer *et al.* 2008, p. 1). This classification is based on a suspected reduction in population of approximately 30 percent over the past two decades (Bauer *et al.* 2008, p. 1). Because there are believed to be fewer than 1,500 lions remaining in West Africa, lion populations in this region as of 2005 were classified by the IUCN as "Regionally Endangered" (Petition, p. 11; Bauer and Nowell 2004, p. 35). Bauer and Nowell indicated that the

lion population of West Africa is geographically isolated from the lion populations in Central Africa, and there is little to no exchange of breeding individuals (Bauer and Van Der Merwe 2004; Chardonnet 2002). However, it should be noted that IUCN rankings do not confer any actual protection or management.

**CITES**

The African lion is listed in Appendix II of CITES. CITES is a multinational agreement through which countries work together to ensure that international trade in CITES-listed species is legal and not detrimental to the survival of the species. There are currently 175 CITES Parties (CITES signatory countries), including the United States. To ensure sustainable use, Parties regulate and monitor international trade in CITES-listed species—that is, their import, export, and re-export—through a system of permits and certificates. CITES lists species in one of three appendices— Appendix I, II, or III. Species such as the African lion that are listed in Appendix II of CITES may be commercially traded. CITES Appendix II includes species that "although not necessarily now threatened with extinction may become so, unless trade in specimens of such species is subject to strict regulation in order to avoid utilization incompatible with their survival." The status of the African lion with respect to CITES and how it is affected by trade is discussed below under the Evaluation of Factors section.

**CITES Periodic Review of Felidae**

Although we are not considering this information in this 90-day finding in accordance with section 4(b)(3)(A) of the Act, the African lion is currently under a periodic review of the CITES Appendices being conducted by the CITES Animals Committee, led by two range countries for the African lion, Kenya and Namibia. This periodic review is based on a recommendation by a Working Group at the 25th meeting of the CITES Animals Committee (AC25) held in July 2011, which recommended that the African lion be considered for inclusion in the Periodic Review of *Felidae*, as part of the Periodic Review of the Appendices (AC25 Doc. 15.2.1). The Animals Committee adopted this recommendation at AC25. The decisions and working documents can be located on the CITES Web site at *http://www.cites.org/eng/com/ac/index.php*. Our status review under the Act will consider the results of the review being conducted through the CITES process.

During the status review, the Branch of Foreign Species will consult with the U.S. Division of Scientific Authority, an office within the Fish and Wildlife Service that is directly involved in the work of the CITES Animals Committee, including the Periodic Review of the African lion. Additional information about CITES may be found on the CITES Web site at *http://www.cites.org.*

**Evaluation of Petition**

*A. The Present or Threatened Destruction, Modification, or Curtailment of Its Habitat or Range*

The petition (p. 7) asserts that the African lion now occupies less than an estimated 4,500,000 km² (1,737,460 mi²), which is only 22 percent of the subspecies' historic distribution (Bauer *et al.* 2008, p. 1). Recent research suggests the African lion exists in 27 countries (Henschel *et al.* 2010, p. 34), while just a few years ago in 2008, it was believed to exist in approximately 30 countries (IUCN 2008, Bauer *et al.* 2008, p. 4), indicating that the populations of the African lion continue to decline.

The petitioner states that the loss of habitat and corresponding loss of prey are serious threats to the survival of the African lion (Ray *et al.* 2005, pp. 66–67). The petition points to a study (Ray *et al.* 2005), led by the Wildlife Conservation Society (WCS), that indicates habitat loss is principally driven by the conversion of lion habitat to agriculture and grazing as well as human settlement (Ray *et al.* 2005, pp. 66–67); however, desertification is also indicated to be a factor (Petition, p. 21; United Nations Economic Commission for Africa [UN ECA] 2008, pp. 4–5; Bied-Charreton 2008, p. 1). Desertification, defined as a process of land degradation in arid, semi-arid, and dry, sub-humid areas, is also affecting this species' habitat (UN ECA 2008, p. 3). Ray *et al.* note that where "protection [for the lion] is poor, particularly outside protected areas, range loss and population decreases can be significant." Researchers further note that African lion population declines have been the most severe in West and Central Africa, with only small, isolated populations remaining scattered chiefly through the Sahel area. Lions are declining even in some protected areas and, with the exception of southern Chad and northern Central African Republic, are virtually absent from unprotected areas (Ray *et al.* 2005, p. 67; Bauer 2003, p. S113).

The 2005 WCS study found that most lion populations in protected areas of East and southern Africa have been essentially stable over the last three

Case 6:14-cv-02034-JSS   Document 20-22   Filed 06/01/15   Page 23 of 26   Ex. 9-0712

decades (Ray *et al.* 2005, pp. 67, 69). However, sub-Saharan Africa experienced a 25 percent increase in the amount of land allocated to agriculture between 1970 and 2000 (Chardonnet *et al.* 2010, p. 24). The significance of the increase in the land being used for agriculture is that there is a higher human population density, and there is a negative correlation between lion density and human density (Chardonnet *et al.* 2002 in Chardonnet *et al.* 2010, p. 24). This species' habitat has decreased in part due to the conversion of wild habitats into areas suitable for livestock farming, which causes environmental degradation and the loss of plant and animal biodiversity (Chardonnet *et al.* 2010, p. 25). Ray *et al.* note that although the African lion has a wide tolerance, African lions are sensitive to loss of cover or prey, and the African lion's way of life and habitat needs are generally incompatible with human activities. Habitat conversion, especially for agriculture, has encroached heavily upon lion habitat throughout the species' range (Ray *et al.* 2005, p. 69). This has resulted in widespread extirpation, fragmentation, and reduced densities of lion populations (Bauer & Van der Merwe 2004 in Ray *et al.* 2005, p. 69; Nowell & Jackson 1996). The increase in conflict is primarily due to the intense persecution of lions in areas as a result of depredation on livestock (Ray *et al.* 2005, p. 68). The petition provides additional citations and information about historical and current impacts to habitat from current or future threats due to these practices within the subspecies' range as supporting information (Petition, pp. 21–22). In summary, we find that the information presented in the petition, as well as the information available in our files, indicates that the African lion may be impacted by the present or threatened destruction, modification, or curtailment of its habitat or range.

## B. Overutilization for Commercial, Recreational, Scientific, or Educational Purposes

The petition asserts that the African lion is overutilized to a great extent for trophy hunting (Petition, pp. 22–23; Packer *et al.* 2009, p. 2). The overall effect of trophy hunting on African lion populations is currently unclear. Submitted with the petition, a report prepared by WCS in 2005, noted that Creel and Creel (1997) found little evidence that the decrease in populations due to hunting altered the density of lions in Selous Game Reserve, Tanzania (Ray *et al.* 2005, p. 70). The petition asserts that between 1999 and 2008, 21,914 African lion specimens

(lions, dead or alive, and their parts and derivatives), representing a minimum of 7,445 lions, were traded internationally for all purposes (pp. 7, 23; Appendix A). It should be noted that a specimen could be a whole animal, or multiple products made from one animal. The World Conservation Monitoring Centre of the United Nations Environment Programme (UNEP–WCMC) maintains a database on international trade of wildlife taxa that are included in the CITES appendices on behalf of the CITES Secretariat. This trade database, referenced in Appendix A of the Petition, is based on trade reports from the CITES Parties and is available to the public at *http://www.unep-wcmc.org/citestrade.* Each Party to CITES is responsible for compiling and submitting annual reports to the CITES Secretariat regarding their country's international trade in species protected under CITES. Of the trade described in the petition, the United States reportedly imported 13,484 lion specimens coded as being from a wild source between 1999 and 2008 (62 percent of the total). The petition also notes (p. 23) that the number of trophies traded internationally in 2008 (1,140) was larger than any other year in the decade studied and more than twice the number in 1999, which was 518 trophies.

In addition to the trade described above, the petition (pp. 24–25) indicates that, between 1999 and 2008, 3,102 lion specimens, equivalent to likely at least 1,328 lions (which includes trophies, skins, live animals, and bodies), were traded internationally via CITES permits for commercial purposes (Petition, Appendix A).

The petition reports that, for commercial purposes, the most common lion specimens traded were claws (number = 764), trophies (508), skins (442), live animals (3,208), skulls (144), and bodies (58). The petition also indicates that, of this trade, 1,846 lion specimens were imported into the United States, and suggests this may be equivalent to at least 401 lions. The petition notes that other significant importers other than the United States were South Africa, Spain, France, and Germany (Petition, p. 23). The petition also notes that the primary exporting countries of lion parts for commercial purposes were Zimbabwe (914 specimens), South Africa (867), and Botswana (816) (Petition, Appendix A). The petition concludes that these three countries accounted for 83.7 percent of all specimens in commercial trade (Petition, pp. 24–25, Table A9).

Hunting of lions for trophies does occur regularly and provides revenue

for many countries in the African lion's range. This practice allows for conservation measures to be implemented for this subspecies. Some countries have implemented measures to mitigate the decrease in lion population numbers based on the effects of trophy hunting on African lion populations (Packer *et al.* 2009, p. 2). Countries have instituted moratoriums on hunting lions for trophies (Botswana in 2001–2004, Zambia in 2000–2001, and western Zimbabwe in 2005–2008), and have implemented measures such as banning the hunting of female lions from the hunting quota (for example in Zimbabwe, starting in 2005) (Packer *et al.* 2009, p. 2). However, lion populations appear to continue to decline (see discussion under *Population Estimates,* above). Additionally, the petition claims that, in some cases, lions are being killed by bushmeat poachers to ensure easier hunting and less competition for bushmeat species because lions compete for species favored by bushmeat hunters (Joubert and Joubert, pers. comm. 2010 in Petition, p. 21).

In addition to the removal of lions from the population due to trophy hunting, there is concern that the use of lion body parts is contributing to the decline in African lion populations. Lion bones are being exported to Asia for use in traditional Chinese medicine, in part as a replacement for tiger parts, which have been more strictly regulated within the recent past (Nowell and Ling 2007, pp. 30–32). Body parts from the African lion are also used for traditional purposes in Africa as well as in Asia. For example, body parts of lions, including fat, skin, organs, and hair, are highly valued for treatment of a variety of different ailments in Nigeria, with lion fat being the most highly valued (Morris undated [n.d.], pp. 1–2). A household questionnaire distributed in rural communities within the range of the African lion found that 62 percent of respondents reported using lion fat in medicine, with just over half of those respondents reporting to have used it in the last 3 years (Morris, n.d., p. 6). The putative medicinal benefits are the healing of fractured and broken bones, and the alleviation of back pain and rheumatism (Morris, n.d., pp. 5–7). The petition claims that, in some African countries such as Guinea-Bissau and parts of Guinea, hunting African lions for their skins for use in traditional ceremonies is considered to be the primary threat to lions, and cited Brugiere *et al.* 2005. The use of lions in traditional African medicine also occurs in East Africa, although it is not well

Case 6:14-cv-02034-JSS   Document 20-22   Filed 06/01/15   Page 24 of 26                Ex. 9-0713

documented in this region. For example, in May 2010, it was reported that five lions killed close to Queen Elizabeth National Park in Uganda were poisoned for their skin and medicinal value (Karugaba 2010, p. 1). Lion fat is also used in traditional medicine in Tanzania (Petition, p. 41; Baldus 2004, p. 15).

In summary, we find that the information presented in the petition and in our files indicates that overutilization may be occurring with respect to the African lion.

### C. Disease or Predation

The petition (p. 9) states that diseases such as canine distemper virus (CDV), feline immunodeficiency virus (FIV), and bovine tuberculosis are viewed by experts as threats to the African lion (Roelke *et al.* 2009, pp. 1–4; Cleaveland *et al.* 2007, p. 613; Michel *et al.* 2006, p. 92). In addition to long-standing ambient diseases that occur in the African lion subspecies, the growth and expansion of the human population may be exposing African lions to new diseases (IUCN Species Survival Commission Cat Specialist Group, 2006b, p. 19) to which African lions may have little or no immunity. For example, CDV, which is normally associated with domesticated dogs, has affected some lion populations (Cleaveland *et al.* 2007, p. 613). In 1994, the Serengeti lion population experienced a 30 percent mortality rate due to a CDV epidemic (Roelke-Parker *et al.* 1996 in Roelke *et al.* 2009, p. 8). In 2001, in Tanzania, mortality occurred in approximately one third of the Ngorongoro Crater lion population, also primarily due to CDV (Munson *et al.* 2008, p. e2545). With respect to FIV, there are several strains which apparently are highly divergent. However, the extent to which FIV negatively affects the African lion in the wild is unclear (Packer pers. comm. in Baldus 2004, p. 58).

Bovine tuberculosis (bTB) is a disease believed to have been caused by the importation of cattle from Europe (Michel *et al.* 2006, p. 92) and is caused by the bacterium *Mycobacterium bovis.* This is significant because in many areas, buffalo are the primary prey of lions. The petition indicates that during one study conducted in Kruger National Park in South Africa, more than 80 percent of lions were found to be infected with bTB and cites Renwick *et al.* 2007. Lions affected with this bacterium experienced respiratory problems, emaciation, lameness, and blindness (Petition, p. 44; Renwick *et al.* 2007, p. 533). Another study found that approximately 20 percent of infected lions did not show evidence of the disease, and 80 percent became infectious (i.e., diseased and contagious) within a 5-year period (Keet *et al.* 2009, pp. 5, 13, 34). However, despite the high prevalence of lions infected with this bacterium, the Kruger lion population has remained stable during the past 20 years (Ferreira and Funston 2010, p. 195).

Given the high level of mortality due to diseases that occur in African lions, particularly newly introduced diseases and the potential pathways for exposure, we find that the information provided in the petition indicates that the African lion may be impacted by disease.

The petition does not present information to indicate that listing the African lion may be warranted due to predation, nor do we have information in our files suggesting that predation to African lions impacts the subspecies, although infanticide is discussed under Factor E, below.

### D. The Inadequacy of Existing Regulatory Mechanisms

The petition asserts that there are several existing regulatory mechanisms that are inadequate with respect to the African lion (Petition, pp. 45–53). Some of the regulatory mechanisms cited by the petitioners as being inadequate include: The Rotterdam Convention; the African Union Conventions (Petition, pp. 47–48); the Southern African Development Community (SADC) Protocol on Wildlife Conservation and Law Enforcement; the Lusaka Agreement; the U.S. Endangered Species Act (Act); the U.S. Lacey Act (Petition, pp. 49–50); the U.S. Federal Insecticide, Fungicide and Rodenticide Act (FIFRA); and domestic laws within the African lion's range countries (Petition, pp. 51–52). Some of the impacts that may occur due to inadequate existing regulatory mechanisms are discussed in the other factors, such as the loss of habitat (Factor A), overutilization for the international wildlife trade (Factor B), and effects of inappropriate use of pesticides (Factor E) (Petition, p. 7). Due to the numerous regulatory mechanisms involved, in part because the African lion's range spans approximately 30 countries, we will not evaluate this factor in depth at this 90-day finding stage. We acknowledge that information regarding this factor was submitted with the petition. Based on the interrelationship between regulatory mechanisms and the other factors, we find that the information provided in the petition and in our files indicates that existing regulatory mechanisms may be inadequate in reducing or removing effects associated with certain factors identified in the Petition.

### E. Other Natural or Manmade Factors Affecting Its Continued Existence

Other Sources of African Lion Mortality

#### Infanticide

The petition asserts that a secondary, related effect of removing lions through trophy hunting on the African lion occurs due to the behavior of infanticide by adult male lions (Petition, pp. 23–24; Davidson *et al.* 2011, p. 114). When male lions take over a pride, they often kill the lion cubs. The petition asserts that this is significant because trophy hunters preferentially seek adult male lions, which has cascading effects on a pride. When an adult male lion associated with a pride is killed by a trophy hunter, surviving males who form the pride's coalition may become vulnerable to takeover by other male coalitions, and this often results in injury or death to the defeated males within the pride. Replacement males that take over a pride will also usually kill all cubs that are less than 9 months of age in the pride (Whitman *et al.* 2004, p. 175; Nowell and Jackson 1996, p. 18). This practice of killing lion cubs sired by other males is common in this species (Nowell and Jackson 1996, p. 18). Because this behavior is common, the removal of the dominant males in prides through trophy hunting has the effect of not only removing one or two older males, but rather several individuals including the younger cubs from the pride.

#### Human-Lion Conflict

Retaliatory killing, even with respect to other predatory species, affects lions (Petition, p. 53). Killing of lions because the lions kill livestock has been indicated to be the most serious threat to these large carnivores (Chardonnet *et al.* 2010, p. 11; Baldus 2004, p. 59). Local communities often retaliate against livestock-killing lions (Petition, pp. 53–54; Packer *et al.* 2011, p. 150; Chardonnet *et al.* 2010, p. 11; Kissui 2008, p. 422). WCS found that between 1997 and 2001, approximately 3 percent (number = 93) of the lion population was killed on farm land adjacent to the Kgalagadi Transfrontier Park, Botswana (Frank *et al.* 2006, p. 1; Castley *et al.* 2002 in Ray *et al.* 2005, p. 68). Lions in Amboseli National Park were exterminated in the early 1990s, and three-fourths of the lions in Nairobi Park were speared by local tribesmen within the period of a year (Packer pers comm. in Baldus 2004, p. 59). Because humans are now moving into land formerly

Case 6:14-cv-02034-JSS   Document 20-22   Filed 06/01/15   Page 25 of 26   Ex. 9-0714

dominated by wildlife, there is more conflict between predators such as lions and humans. Adding to the potential incidences in human-lion conflict, the human population is expected to increase significantly in the next 40 years, particularly in the range of the lion (Petition, p. 20; United Nations, Department of Economic and Social Affairs [UN DESA] 2009, unpaginated). In addition to deliberate killing of lions, lions are killed inadvertently. For example, in northern Serengeti National Park, lions were almost entirely extirpated in the 1980s by poachers setting snares for herbivores (Packer *et al.* 2011, p. 149; Sinclair *et al.* 2003, p. 289).

*Compromised [Genetic] Viability*

The petition indicates that the African lion is increasingly restricted to small and disconnected populations, which may increase the threat of inbreeding (Petition, p. 54). The petition claims that large lion populations with 50 to 100 prides are necessary to avoid the negative consequences of inbreeding and cites Bjorklund 2003, pp. 515–523. The petition avers that population connectivity is essential in order to allow males to travel to other areas in order to preserve genetic variation. The petition suggests that the lions in Ngorongoro Crater, Tanzania, may be inbred, and subsequently their vulnerability to disease may be increased. Compared with many other mammal species, the population resilience of the lion is high (Chardonnet *et al.* 2010, p. 10). The African lion is capable of producing many young each year, and its reproductive cycle is not limited to a particular season, so the species is able to rapidly recover from losses to its population (Chardonnet *et al.* 2010, p. 10).

The information contained in the petition and in our files indicates that there are several other natural or manmade factors such as human-lion conflict and infanticide by African lions that may result in negative impacts on the African lion.

**Finding**

On the basis of our review under section 4(b)(3)(A) of the Act, we determine that the petition presents substantial scientific or commercial information indicating that listing the African lion as endangered throughout its range may be warranted. This finding is based on information provided under the present or threatened destruction, modification, or curtailment of its habitat or range (Factor A); overutilization for commercial, recreational, scientific, or educational purposes (Factor B); disease (Factor C); the inadequacy of existing regulatory mechanisms (Factor D); and other natural or manmade factors affecting the subspecies' continued existence (Factor E). The petition does not present substantial information to indicate that listing the African lion may be warranted due to predation, nor do we have information in our files suggesting that predation to African lions impacts the subspecies. The African lion's range spans approximately 30 countries and the factors affecting this species are complex and interrelated. The petition asserts that the subspecies no longer exists in 78 percent of its historic distribution (Bauer *et al.* 2008). Although there is insufficient information in the petition to substantiate that lions may warrant listing as endangered due to compromised genetic viability, we will evaluate this factor in conjunction with other potential threats during the status review. Because we have found that the petition presents substantial information indicating that listing the African lion may be warranted, we are initiating a status review to determine whether listing the African lion under the Act as endangered is warranted.

The ''substantial information'' standard for a 90-day finding differs from the Act's ''best scientific and commercial data'' standard that applies to a status review to determine whether a petitioned action is warranted. A 90-day finding does not constitute a status review under the Act. In a 12-month finding, we will determine whether a petitioned action is warranted after we have completed a thorough status review of the species, which is conducted following a substantial 90-day finding. Because the Act's standards for 90-day and 12-month findings are different, as described above, a substantial 90-day finding does not mean that the 12-month finding will result in a warranted finding.

**References Cited**

A complete list of all references cited in this 90-day finding is available on the Internet at *http://www.regulations.gov* or upon request from the Branch of Foreign Species, Endangered Species Program, U.S. Fish and Wildlife Service (see **FOR FURTHER INFORMATION CONTACT**).

**Author**

The primary author of this finding is Amy Brisendine, Branch of Foreign Species, Endangered Species Program, U.S. Fish and Wildlife Service.

**Authority**

The authority for this action is the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*).

Dated: August 23, 2012.

**Dan Ashe,**

*Director, U.S. Fish and Wildlife Service.*

[FR Doc. 2012–28310 Filed 11–26–12; 8:45 am]

**BILLING CODE 4310–55–P**

---

# DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

### 50 CFR Part 224

**[Docket No. 121025586–2603–01]**

**RIN 0648–XC326**

### Listing Endangered or Threatened Species: 90-Day Finding on a Petition To Delist the Southern Resident Killer Whale; Request for Information

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Notice of finding; request for information.

---

**SUMMARY:** We, the National Marine Fisheries Service (NMFS), announce a 90-day finding on a petition to delist the Southern Resident killer whale (*Orcinus orca*) Distinct Population Segment (DPS) under the Endangered Species Act (ESA). The Southern Resident killer whale DPS was listed as endangered under the ESA in 2005. We find that the petition viewed in the context of information readily available in our files presents substantial scientific information indicating the petitioned action may be warranted. We are hereby initiating a status review of Southern Resident killer whales to determine whether the petitioned action is warranted and to examine the application of the DPS policy. To ensure the status review is comprehensive, we are soliciting scientific and commercial information pertaining to this species.

**DATES:** Scientific and commercial information pertinent to the petitioned action and DPS review must be received by January 28, 2013.

**ADDRESSES:** You may submit information or data by any of the following methods. Electronic Submissions: Submit all electronic information via the Federal eRulemaking Portal *http://www.regulations.gov*. To submit information via the e-Rulemaking Portal, first click the ''submit a

Case 6:14-cv-02034-JSS   Document 20-22   Filed 06/01/15   Page 26 of 26