IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| TRACEY K. KUEHL, et al., <br><br> Plaintiffs, <br> v. <br><br> PAMELA SELLNER, et al., <br><br> Defendants. | Case No. C14-02034-JSS <br><br> **AFFIDAVIT OF DAVID ALLEN IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

**Affidavit of David Allen in Support of Plaintiffs' Motion for Summary Judgment**

I, David Allen, declare that if called as a witness in this action I would competently testify of my own personal knowledge as follows:

1. I am over the age of 18, of sound mind, and have freely given the testimony set forth in this Affidavit in support of the Plaintiffs' Motion for Summary Judgment against the Cricket Hollow Zoo in Manchester, Iowa. I currently reside in Des Moines, Iowa. Because it is imperative that endangered animals such as the tigers, lions, lemurs, and gray wolves at the Cricket Hollow Zoo in Manchester, Iowa, are well cared for in captivity, I have agreed to participate as an expert in this case, though I have never participated as an expert witness in litigation before.

**Education and Background**

2. I graduated from the University of Texas with a Bachelor's Degree in Business Administration and minors in Biology and Chemistry in 1965. From 1965 to 1973, I worked for the Kansas City Zoo in Kansas City, Missouri, first as a municipal management intern in the Animal Care Division and then as a full-time Animal Caretaker with curatorial duties. I also

1

began my career as a trainer of African Elephants while working at the Kansas City Zoo. In 1973, I took a position with the Cheyenne Mountain Zoo in Colorado Springs, as assistant director. I was later promoted to associate director and finally executive director. At the Cheyenne Mountain Zoo, I was responsible for all aspects of zoological park management, including planning, setting, and implementing goals and objectives; animal husbandry and veterinary services; public education and conservation programs; finance; and staff supervision. In 1988, I left the Cheyenne Mountain Zoo to become Zoo Director for the Blank Park Zoo in Des Moines. As Zoo Director, I was responsible for the overall management of all aspects of zoo administration.

3. Comparatively, the Kansas City Zoo, the Cheyenne Mountain, and Blank Park Zoos are much larger than the Cricket Hollow Zoo that is the subject of this Affidavit. However, I have tailored my testimony so that all observations and opinions apply to a zoo of the size (approximately 300 animals) and type (a non-accredited roadside zoo under private ownership) as the Cricket Hollow Zoo based on my knowledge, education, and experience. I also provide an example of a fully accredited, Animal Welfare Act compliant zoo that is the same size as the Cricket Hollow Zoo, located in Manhattan, Kansas, because I think the Kansas zoo's success is instructive.

4. At the Blank Park Zoo, I initially worked for the Des Moines Parks and Recreation Department because the City owned the Zoo, but during my tenure, I helped develop the Blank Park Zoo Foundation. The Blank Park Zoo Foundation is a nonprofit, private foundation sustained by member contributions that provided financial support to the Zoo. I retired from the Blank Park Zoo in 2007 but currently sit on the Foundation's Board of Directors.

Since becoming a member of the Board, the Board has assumed total ownership and managerial responsibilities for the Zoo, so I once again have zoo administration responsibilities.

5. Before I retired, I was a Professional Fellow with the Association of Zoos and Aquariums (AZA). Founded in 1924, the AZA is a national nonprofit organization that accredits zoos and aquariums that have met rigorous standards for governance, administration, finance, education and conservation programs, visitor services, public, animal and staff safety, and animal care and veterinary services. AZA accreditation is the establishment and maintenance of professional standards and the qualitative evaluation of organizations in the light of those standards. Through this process, a zoo is judged based on criteria selected by its own members, rather than an outside agency. In developing its accreditation program, the AZA has been especially concerned with the need for assuring the highest standards of animal management and husbandry, while also focusing on animal management for conservation, education, scientific studies, and recreational purposes. The Kansas City Zoo, Cheyenne Mountain Zoo, and Blank Park Zoo are all accredited by the AZA. In fact, prior to my arrival at the Cheyenne Mountain Zoo, the AZA had threatened revocation of its AZA accreditation due to poor zoo management, but I was able to turn the zoo around and maintain its accreditation.

6. I was intensely involved in the AZA throughout my professional career and even served as Vice Chair of the Wildlife Conservation and Management Committee (the Committee) for two years. The Committee supports the development, promotion, evaluation, and management of the AZA's cooperative Animal Programs, including 46 Taxon Advisory Groups (TAGs) and more than 450 Species Survival Plan Programs (SSPs), which support the propagation of endangered species by ensuring genetic purity in breeding pairs. The Committee ensures superior animal care, management, and sustainability within AZA's Animal Programs,

and collaborates with other AZA Committees and global zoological associations to achieve these goals.

7. While involved with the AZA, I also served as a member and Chair of several Accreditation Visiting Committees, which purport to be the "eyes and ears of the Accreditation Commission." The Accreditation Visiting Committee conducts on-site reviews of zoos applying for accreditation with the AZA and makes recommendations to the Commission. During the late 1980s, I visited five Midwestern zoos, including the Sunset Zoo in Manhattan, Kansas in order to assess its readiness for AZA accreditation. The Sunset Zoo is a municipally owned zoo with approximately 300 animals. The Sunset Zoo met all of the criteria for accreditation, despite its modest size and limited financial resources, simply because it is well managed. The Sunset Zoo attained AZA accreditation in 1989 and has continued to meet the rigorous standards for conservation, public education, animal husbandry, and veterinary care required of AZA-accredited zoos.

**The Cricket Hollow Zoo**

8. In formulating my opinions about referenced deficiencies in zoo administration at the Cricket Hollow Zoo, I evaluated the Zoo against the minimum standards of the Federal Animal Welfare Act; the Zoo's animal care and husbandry programs; and adequacy of veterinary staff, facility maintenance, and financial resources. I reviewed the following materials in preparing my opinion:

a. Reports and accompanying photographs taken by inspectors and veterinarians for the United States Department of Agriculture (USDA) Animal and Plant Health Inspection Service (APHIS) documenting compliance with the federal Animal Welfare Act;

b. Photographs and video taken by plaintiffs and a private investigator;

4

c. The defendants' initial production of documents, including materials related to the acquisition and breeding of endangered animals, veterinary records, and photographs;

d. The defendants' responses to plaintiffs' interrogatories, including materials related to staffing decisions, financial solvency, daily care programs, and veterinary care programs, etc.;

e. The defendants' responses to plaintiffs' request for documents; and

f. Deposition transcripts of the defendants, their veterinarian Dr. John Pries, and their nutritionist Dr. Gary Pusillo.

9. On the basis of my review of these materials, I conclude that the defendants are currently managing Cricket Hollow Zoo in a manner that creates a substantial likelihood of injury to the animals residing there. Moreover, defendants are incapable of ever managing the Cricket Hollow Zoo in compliance with the Animal Welfare Act or the Endangered Species Act due to lack of education, training, staff help, financial resources, and facilities. I make the following observations about the financial management and available capital, veterinary care and staffing, as well as emergency planning in support of my conclusions.

**Financial Management and Available Capital**

10. In order to be successful and ensure the proper and adequate treatment of animals confined at zoos, the zoo owners must be capable of managing the zoo's finances. At a minimum, a zoo should maintain profit and loss statements, balance sheets, emergency capital accounts, and annual budgets, yet the records do not show a single representative financial planning instrument for the defendants' zoo other than annual Federal Income Tax Returns. Such poor financial planning for a venture that requires serious capital to operate and manage is astonishing. Indeed, defendants'

failure to properly ensure adequate resource availability for animals in their care is irresponsible, borders on inhumane, and certainly represents a stark danger to public safety and public health.

      11.     In order to informally assess the Cricket Hollow Zoo's solvency, I had to cobble together information from various hand written notes, income tax return statements, hand written attendance records, a single veterinary expense report, and myriad financial instruments for personal and real property secured by defendants in their individual capacity, revealing the following information:

- The Cricket Hollow Zoo, while housing the animal collection year-round, is open from 10:00 am to 6:00 pm daily for public visitation from Memorial Day through Labor Day, and weekends in the Fall through mid-October.

- For the years 2002 to 2014, annual seasonal attendance averaged 3,261, with a low of 994 in 2002, and a high of 4,752 in 2009. Attendance for 2014 was 2,430. (Ex. 6 at 0386).

- Total Revenue from admissions and donations, Mobile Zoos, feed and souvenir sales for the years 2006 through 2014 averaged $16,639 per year, with a low of $11,639 in 2006 and a high of $20,047 in 2013. Revenue for 2014 was $14,274. (Ex. 3 at 0281).

- Total Annual Operating Expenses for the years 2008 through 2014 averaged $18,470. With a low of $14,641 in 2009, and a high of $25,441 in 2014. Expenses for the years 2006 and 2007 were not available. (Ex. 3 at 0281).

This demonstrates an average annual Operating Loss of -$1,831.The largest positive Operating Net was in 2009 of $5,400, and the largest Operating Net Loss was in 2014 of -$11,167. Moreover,

- According to the Cricket Hollow Zoo's profit or loss disclosures to the Internal Revenue Service on its Form 1040, the Cricket hollow Zoo had profits of $1,269 in 2009 and $1,015 in 2010, with losses in 2008 of -$8,663, 2011 of -5,897, 2012 of -$761 and 2013 of -$651. (Ex. 6 at 0372–0383).

- According to Pamela and Tom Sellners' Individual Income Tax Disclosures to the Internal Revenue Service on their Form 1040, Adjusted Gross Income for the years 2010 through 2014 were all negative, ranging from -$7,686 in 2010 to -$39,392 in 2012. (Ex. 6 at 0363–0371).

6

- According to the Balance Sheet provided by Ms. Sellner in response to the Plaintiffs' second request for production of documents, in 2014, Mr. and Ms. Sellners' most current assets total $11,766, and her liabilities total $44,289. (Ex. 6 at 0350–0354).

12. Finally, according to defendants' affirmative disclosures in their response to Plaintiffs' interrogatories, the Cricket Hollow Zoo earns an average of $10,000 each year from admissions ticket sales and $5,000 each year from donations, mobile zoo profits, and feed sales. (Ex. 3 at 0281). In addition, Pamela and Tom Sellner make personal contributions in an unknown amount of hay and forage, propane, electricity, and labor. According to Federal Income Tax returns filed by Ms. Sellner for the Cricket Hollow Zoo, the Zoo had a mere $26,493.00 in expenses in 2008; $18,772 in 2009; $16,987 in 2010; $23,192 in 2011; $19,144.00 in 2012; and $20,698 in 2013. (Ex. 6 at 0363–0371). Despite admitting responsibility for approximately 300 animals, defendants report that they pay an average of $700 each year in total for veterinary services, a mere $9,000 each year for food costs, and nothing for contract labor or wages or facility maintenance and repair. (Ex. 6 at 0355). Considering the financial information that defendants supplied in support of their zoo operation, the Cricket Hollow Zoo does not have the annual income or working capital to support its animal collection of approximately 300 animals to meet minimum requirements for animal husbandry, veterinary care, and facility maintenance.

13. By way of comparison, the Blank Park Zoo, which is responsible for the humane care and treatment of more than 1,200 animals, spent a total of $1,536,000 in fiscal 2014 for direct animal collection care expenses, for an annual cost of $1,280 per animal, compared to the $90 per animal the Cricket Hollow Zoo spends to maintain its collection. I don't mean to imply that Cricket Hollow Zoo must expend as much money each year as the Blank Park Zoo in order to be successful, but if scaled to the needs of a zoo the size of Cricket Hollow Zoo, one can see that Cricket Hollow is

woefully deficient. Based on my knowledge, experience, and education, in my opinion the Cricket Hollow Zoo is incapable of providing the care necessary to ensure the health, welfare, and humane treatment of animals living at the Zoo.

**Veterinary Care**

14. One of the myriad ways defendants fail to provide minimum levels of care for their animals is in their wholly deficient procurement of veterinary services from a contract veterinarian. To be sure, Cricket Hollow Zoo could employ a contract veterinarian successfully, but it would need to develop a program of veterinary care that accounted for routine site visits, resources for emergency veterinarian calls, at least one full-time veterinary technician on staff, and a well-defined program of care. To the contrary, despite owning five tigers and three lions, the Cricket Hollow Zoo spent $714 in 2014 on veterinary care—in total—and procures the services of a veterinarian's clinical staff that reside more than one-hour away from the Zoo. (*See* Ex. 6 at 0355 (reporting veterinary expenditures in 2010 as $899, in 2011 as $498, in 2012 as $641, in 2013 $588, and in 2014 as $714)). Without an attending veterinarian who is well-trained in the needs of exotic felines, nonhuman primates, and wild mammals, it's difficult to imagine that a Zoo could ever adequately care for its animals.

15. In addition to its lack of full-time veterinary staff, the Cricket Hollow Zoo has failed to provide basic veterinary care for its exotic animals. At a minimum, zoos must perform annual well animal physical exams for its captive exotic animals in order to ensure the animals are receiving adequate care and veterinary treatment. Annual physical exams cost anywhere from $250 (lemurs) to $1,000 (tigers) and are necessary proactive, preventative veterinary care to ensure the longevity of exotic animals living in captivity. The records indicate that defendants do not pay for

annual well animal physicals for any of the animals at the Cricket Hollow Zoo, even after it suffered the deaths of several tigers, lions, and lemurs over the years. (Ex. 3 at 0272); (Ex. 6 at 0355).

16. Indeed, just in November 2014, two tigers died from what appear to have been preventable illnesses. (Ex. 3 at 0272). Since 2005, the Cricket Hollow Zoo has reported six tiger deaths where the causes of death were documented as old age (3), pneumonia (2), and *E-coli*. (1); one lion where the cause of death is reported speculatively as pancreatitis (Dr. Pries, the veterinarian, had no memory of the lioness's death); five lemur deaths where the causes of death were documented as old age (2), encephalitis (2), and unknown (1). (Ex. 3 at 0272). The Zoo failed to perform a necropsy on any of the animals except for one of the lemurs, which demonstrates a lack of care or concern for preventing illness in the remaining animals at the Cricket Hollow Zoo. In addition, the failure to perform necropsies leaves an information gap that significantly impacts my opinion of the veterinary care at the Zoo. For example, old age is not a medical cause of death. Based on my knowledge, experience, and education, only a truly negligent zookeeper would refrain from having necropsies performed on animals who die under their care, especially where treatable infections such as pneumonia and E-coli are suspected causes of death. (Ex. 3 at 0272); (Ex. 7 at 0429–0430 (Tr. P. Sellner 171–75)). In my opinion, the Cricket Hollow Zoo does not have the financial resources to cover the average annual costs of necessary veterinary care for their five tigers, three lions, two gray wolves, and two lemurs.

17. In addition to inadequate daily and preventive veterinary care, the defendants do not appear to have any money available to them for anticipated major veterinary care or unanticipated illness. The Cricket Hollow Zoo simply must have available capital to hire expert veterinarians if necessary to avoid creating the likelihood of injury to the animals. For example, the Blank Park Zoo spent $125,000 on veterinary care for Fiscal Year 2014, for a per animal cost of $104, compared to

9

Cricket Hollow Zoo's expenditure of $714, for a per animal cost of $2.40. At the Cricket Hollow Zoo, it appears that each time an animal falls ill, it eventually dies from medical neglect.

18. Finally, on numerous occasions, the defendants have reported that tigers, lions, servals, and lemurs have died from "old age." According to standard zoo practices, allowing a tiger or lion to die of "old age" is inhumane. At the Blank Park Zoo, when an animal nears the end of its life (due to age or critically ill health), it is put on a Quality of Life Watch, and its mobility, interest in the environment, appetite, participation in its own health care, and body score are judged each day. When an animal appears to suffer greatly, it is humanely euthanized. The Cricket Hollow Zoo has inhumanely allowed at least three tigers and two lemurs to die of "old age." Because the defendants failed to conduct a necropsy or investigate the deaths of these animals in any way, we may never know if their illnesses were treatable. But to be sure, animals who die due to lack of attention or lack of veterinary care have suffered needlessly. Whether intentionally or negligently, the Cricket Hollow Zoo is incapable of ensuring that its animals do not suffer and die from treatable illnesses due to inadequate veterinary support and lack of resources to hire adequate veterinary support.

**Staffing**

19. Defendants represent that they maintain the Cricket Hollow Zoo and its approximately 300 animals by themselves and occasionally with the assistance of a patchwork of untrained volunteers. The USDA has cited the defendants for inadequate staffing on multiple occasions, but the defendants appear never to have ever corrected the violation. (Ex. 1 at 0015–0021, 0024–0029); (Ex. 2 at 0094–0100, 0247–0255). The defendants have identified a handful of zoo volunteers, but these volunteers work different hours each week, when available, with only general job responsibilities indicated. If these volunteers had consistently scheduled work hours,

10

combined average hours per week would equal approximately 1.5 Full Time Employees to care for 300 animals. Nonetheless, the volunteers that allegedly work at the Zoo are not trained in animal care protocols, and the defendants fail to adequately schedule or staff the Zoo at any giving time. Indeed the record is devoid of any information regarding animal care protocols, scheduling, training or supervision. (Ex. 3 at 0273).

20. One included major source of volunteers is an agency, Services Unlimited, that supplies from 7 to 10 volunteers once or twice a week to work with reptiles, birds and small mammals (comprising approximately 164 animals). These volunteers have "various handicaps." (Ex. 7 at 0414 (Tr. P. Sellner 109:11)). I acknowledge that care for zoo animals can provide these persons with an enriching experience, but relying on this organization for volunteer work is totally inadequate to meet primary animal care responsibilities. Yet shockingly, Ms. Sellner stated that she was satisfied overall with the level of care and help she is getting at the Zoo. (Ex. 7 at 0413–0414 (Tr. P. Sellner 108–112)).

21. Other than this hodgepodge of volunteers, defendant Tom Sellner wakes up each day before the Zoo opens and cleans the animal enclosures. (Ex. 7 at 0488 (Tr. T. Sellner 18–20)). Later, Pamela Sellner wakes up to tend to her dairy cattle and then feed and water the animals at the Zoo. (Ex. 7 at 0412 (Tr. P. Sellner 101–102)). The Zoo is open from 10:00 a.m. to 6:00 p.m.in the summer time, during which time Ms. Sellner takes admissions fees from zoo visitors and interacts with the public. Mr. Sellner works a second job. (Ex. 7 at 0490 (Tr. T. Sellner 25:5–12)). After the Zoo closes, the Sellners may or may not continue working at the Zoo, but they always cease Zoo maintenance activities by dark. (Ex. 7 at 0489 (Tr. T. Sellner 23:20–25)). Two people cannot possibly attend to 300 animals on a daily basis and meet the minimum requirements of the Animal Welfare Act, much less the animals' behavioral and social needs. Moreover, Ms. Sellner states that

she undertakes no evaluation before acquiring new animals for the Zoo other than her desire to purchase the animal. (Ex. 7 at 0434 (Tr. P. Sellner 192:4–19)). She does not consider whether she has the expertise, staffing, or financial resources to take on the animal, but rather simply purchases the animal if she thinks it's something the children would like to see. (Ex. 7 at 0434 (Tr. P. Sellner 191–192)).

22. By way of comparison, at the Blank Park Zoo, where two tigers, two lions, two snow leopards, two gibbons, and three lemurs, among many other animals, are cared for, a dedicated team of zoo keepers are staffed to observe and care for the animals seven days a week. Of the 24 full-time and six seasonal zoo keepers employed by the Blank Park Zoo, five full-time zoo keepers are dedicated to its large mammals; four full-time keepers for its cats and primates; four full-time keepers for its small mammals; six full-time keepers for its birds and reptiles; and five full-time keepers for aquatic animals. This level of animal care staffing equates to about one full time keeper per 50 animals. In addition, the Zoo employs a full-time animal curator to handle transportation, acquisitions, and scheduling; and an operations director to handle day-to-day logistics. Finally, the Zoo employs a veterinary support team with one full-time vet and two veterinary technicians. Ultimately, the total number of animal care staff required would also depend on additional factors such as size and type of enclosures and the type and number of animals housed in the enclosures, but at a minimum, to be successful and humanely care for approximately 300 animals, the Cricket Hollow Zoo would need to employ about one zoo keeper for every fifty animals it has, or at least five full-time zoo keepers, one full-time veterinary technician, and at least a contract veterinarian. In addition, the defendants must refrain from additional animals to their collection until they have their management issues under control. Based on the facts, my knowledge, experience, and education, because the Cricket Hollow Zoo currently retains zero

employees and a handful of unreliably scheduled volunteers, its management of the Zoo in total creates a substantial likelihood of injury or death for the animals residing at the Zoo.

**Emergency Planning**

23. In my expert opinion, the defendants do not adequately plan for emergencies, including animal escapes, financial insolvency, succession, veterinary care, or extreme weather events. The only emergency planning in place takes the form of a three-page "Contingency Plan" produced by the defendants in discovery. (Ex. 4 at 0304–0309). According to the hand-written "Contingency Plan," in the case of fire, the zoo owners should call 911 and evacuate the animals, but the plan does not contain any information about where and how a lion or tiger should be safely evacuated. (Ex. 4 at 0304). In the event of an "intentional attack," zoo owners should simply call 911 to "have sheriff sent out." (Ex. 4 at 0304). In the event of an animal escape, the animal may be destroyed or darted, "depending on the animal." (Ex. 4 at 0305). Tigers are to be "locked in their dens" during a tornado. (Ex. 4 at 0305). If one escapes, the sheriff should be called to protect the public. (Ex. 4 at 0305). In other words, the Cricket Hollow Zoo's safety plan rests on the ability of local law enforcement to trap, destroy, transport, or otherwise dispose of extremely dangerous wild animals. In my opinion, and based on the facts, the defendants should not be allowed to have wild animals at all, in order to protect the public from their dangerously irresponsible zoo management.

**Conclusion**

24. As the zoo administrator for three zoos that each held a Class C Exhibitor license from the United States Department of Agriculture, I am familiar with the Department's inspection and citation protocols. As part of my review in preparing for this Declaration, I read all of the USDA's inspection reports for the Cricket Hollow Zoo from 2010 to present. I noted

repeated citations for basic animal husbandry and zoo administration, including inadequate staffing concerns, sanitation, structural integrity of animal enclosures, animal and veterinary care, and facilities maintenance. Perhaps more compelling than the descriptions contained in these USDA reports, however, are the photographs taken by USDA inspectors during their visits. I formally incorporate those photographs into this Declaration in support of my findings and ask the Court to pay careful attention to those photographs. (Ex. 2 at 0110–0244).

24. Based on the facts, my knowledge, experience, and education, I find USDA inspectors to be reliable observers of systemic problems at zoo facilities. In my expert opinion, zoos must go above and beyond the minimum requirements for animal husbandry set forth in the Animal Welfare Act, but the Cricket Hollow Zoo fails to meet even those minimum requirements and apparently does not care if they ever meet them. Indeed, I was troubled by Pamela Sellners' confession in her deposition transcript that she believes USDA inspectors are too "nitpicky" about dirt, grime, and feces in the animal enclosures, (Ex. 7 at 0391 (Tr. P. Sellner 17: 4–17)), and that the inspectors have "insect phobias," (Ex. 7 at 0390 (Tr. P. Sellner 16:16–21)). Moreover, Ms. Sellner apparently believes that inspectors who have never farmed are incapable of evaluating her zoo for compliance with the Animal Welfare Act. (Ex. 7 at 0390 (Tr. P. Sellner 16:3–21)). I found Ms. Sellner's apathy to the requirements of the Animal Welfare Act and complaints lodged against her facility by numerous zoo patrons to be extremely concerning. I can only characterize her management of the Cricket Hollow Zoo as creating a tragic fate for the zoo animals.

Pursuant to 28 U.S.C. 1746, I certify under penalty of perjury that the preceding is true and correct. I authorize electronic signature of this declaration and provide Plaintiffs' counsel with my original signature page.

/s/ David Allen<br>David Allen

Executed on this 31st day of May, 2015.