IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| TRACEY K. KUEHL, et al., | Case No. C14-02034-JSS |
| Plaintiffs, | **PLAINTIFFS' TRIAL BRIEF** |
| v. | |
| PAMELA SELLNER, et al., | **Judge: Hon. Jon Stuart Scoles**<br>**Trial Date: October 5-8, 2015** |
| Defendants. | |

## INTRODUCTION

Plaintiffs respectfully submit herewith their Trial Brief. Pamela Sellner, Tom Sellner and the Cricket Hollow Zoo (Defendants) own a private zoo containing approximately 300 animals, several of which are endangered. The evidence will show that the Defendants have suffered "chronic management problems" and have been in "chronic non-compliance" with federal animal husbandry laws; the Endangered Species Act, 16 U.S.C. § 1531, *et seq*. (ESA), turns in part to these same laws to protect captive endangered species from annoyance, injury, and death. Throughout the past decade, the U.S. Department of Agriculture (USDA) has repeatedly documented the Defendants' shortcomings. The facts will show that Defendants' management and operation of the Cricket Hollow Zoo (Zoo) disrupts the endangered animals' instinctual behaviors, threatens their physical wellbeing, and has actually injured and killed endangered species. Indeed, no fewer than three tigers have died since Plaintiffs' June 2014 complaint, including one on July 1, 2015, during the pendency of Plaintiffs' Motion for Summary Judgment.[1] Additionally, on July 30, 2015, USDA initiated enforcement proceedings against

---

[1] Plaintiffs believe approximately 15 endangered animals have died since 2005 (*see* Aff. J. Blome ¶ 5 and Attachment 2 "Animal Deaths as Reported by Defendants' Own Disclosures"). The past deaths of endangered

1

Defendants for their inability or refusal to comply with federal law. Defendants declined to disclose either fact to the Court and to Plaintiffs at the August 6, 2015, summary judgment hearing.

The facts will show that Plaintiffs' request for relief is well supported by the evidence. Plaintiffs will prove at trial that by a preponderance of the evidence that under the ESA, Defendants have (1) actually injured or killed endangered species in their possession, (2) impermissibly harassed endangered species in their possession, and (3) violated the ESA's trafficking prohibitions.

## STATEMENT OF FACTS

**Plaintiffs' Standing.** In summary, the evidence will show that (a) Plaintiffs are private individuals and a nonprofit organization with interests in protecting animals and observing them in humane conditions; (b) all Plaintiffs have been injured by and are adversely affected by the Defendants' activities toward the endangered species at the Cricket Hollow Zoo; (c) the individual plaintiffs have visited the Zoo and developed aesthetic, emotional, spiritual, and cultural connections with the animals; (d) Defendants' failure to adhere to generally accepted and minimally required animal husbandry practices has caused the Plaintiffs to experience suffering in their own right and intense pain on the animals' behalf; and (e) the Plaintiffs' injuries will be redressed by the relief sought. *See, e.g.,* Trial Exhibits ("Ex.") 1, 59-63.

**Defendants.** In summary, the evidence will show that (a) the Zoo is a nonprofit Iowa corporation; (b) Defendants possesses a Class C Exhibitor's license from APHIS, and that APHIS recently filed a complaint to assess penalties, issue injunctive relief, or revoke Defendants' license; (c) Defendant Zoo is not accredited by any organization; (d) Defendants

---

animals are admissible to prove Defendants' liability. *See, e.g., Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997); *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508 (9th Cir. 1994).

own approximately 300 animals; (e) the Zoo is located nearby the Defendants' dairy barn and residence; (f) Defendants have two employees and a limited number of volunteers; (g) Defendants have limited financial resources at their disposal for proper animal husbandry practices and for veterinary care; (h) Defendants have inadequate training and education to properly care for the number and kind of animals at the Zoo; (i) Defendants have made management choices that compromise the animals' health, safety, and wellbeing; and (j) Defendants are liable under the Endangered Species Act for "taking" endangered animals and for trafficking in endangered animals. *See, e.g.,* Ex. 37, 38, 50-58, 68-71.

**Endangered Animals.** In summary, the evidence will show that (a) Defendants currently own endangered tigers, lemurs, and gray wolves; (b) by Defendants' own admission, at least 15 endangered animals have died in the Defendants' care since 2005 (*see* Aff. J. Blome ¶ 5 and Attachment 2); (c) the animals have a variety of husbandry needs, including but not limited to food and water, veterinary care, pest control, psychological / emotional care, exercise, sanitation, control of fecal matter, ventilation and drainage, cage enclosure size and quality, and handling; (d) the animals' needs are not satisfied by the Defendants' plans or programs for their care, nor by the implementation of such plans or programs (*see* Aff. J. Blome ¶ 6 and Attachment 3); (e) endangered animals have died of preventable and treatable causes as a result of Defendants' veterinary neglect; and (f) the endangered animals in Defendants' possession have suffered from a lack of proper animal husbandry care, resulting in the animals being "harmed" and "harassed" by the Defendants. At trial, Plaintiffs will show specific instances of harm and harassment as to different endangered species at the Zoo since 2005. *See, e.g.,* Ex. 2-37, 40-49; *see also* Aff. J. Blome ¶ 4 and Attachment 1.

**Inspections.** In summary, the evidence will show that (a) APHIS inspected the Zoo at least 25 times between July 2010 and June 2015, and on many occasions identified violations of the Animal Welfare Act, 7 U.S.C. § 2131, *et seq*., (AWA) applicable to Defendants' endangered species, other animals, and to the Zoo as a whole; and (b) repeat APHIS inspections identified "chronic" management problems at the Zoo. *See, e.g.,* Ex. 2-38, 72-76; Aff. J. Blome ¶ 6 and Attachment 3.

**Trafficking.** In summary, the evidence will show that (a) Defendants have acquired "donated" endangered animals; (b) Defendants have "donated" endangered animals; (c) the Defendants intentionally "donate" animals to transfer animals outside of the protections of the ESA; and (d) endangered animals, particularly large carnivore exhibits, drive the majority of visitors to the Zoo. *See, e.g.,* Ex. 40, 48-49.

## LEGAL FRAMEWORK

I. **ALL PLAINTIFFS HAVE STANDING.**

To establish Article III standing, a plaintiff must show a cognizable "injury" that is "fairly traceable" to the defendants' conduct and that would likely be "redressed" by a favorable decision. *Friends of the Earth v. Laidlaw Envt. Serv. (TOC), Inc.*, 528 U.S. 167, 180-181 (2000). The Supreme Court has "repeatedly made clear that injury to an aesthetic interest in the observation of animals is sufficient to satisfy the demands of Article III standing." *Animal Legal Def. Fund v. Glickman*, 154 F.3d 426, 432 (D.C. Cir. 1998) (*en banc*) (cert den.). The court in *Glickman* observed a bedrock foundation of standing that dates back at least four decades, *Sierra Club v. Morton*, 405 U.S. 702 (1972), and which remains undisturbed, black letter law. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-563 (1992) ("the desire to use or observe an animal species, even for purely aesthetic purposes, is *undeniably* a cognizable interest for purpose of

standing.") (emphasis added). An aesthetic interest may be indicated, among other things, by a spiritual and cultural connection with animals, by a strong personal and emotional attachment to animals, or by a desire to see animals living in humane conditions. *See Hill v. Coggins*, 2014 U.S. Dist. LEXIS 82257 * 9 (W.D.N.C., May 27, 2014) (denying defendants' motion to dismiss and observing that "[s]uch factual allegations are sufficient to allege an injury for purposes of Article III standing.").

In *Glickman*, plaintiffs sued the USDA pursuant to the Administrative Procedure Act to compel the agency to promulgate regulations for the humane care of captive nonhuman primates as required by the Animal Welfare Act (AWA). *Glickman*, 154 F.3d at 428. An *en banc* panel of the D.C. Circuit found that at least one plaintiff, Marc Jurnove, had standing to sue on the basis that the agency's unlawful failure to protect captive nonhuman primates harmed his aesthetic interest in viewing primates living in humane conditions. The panel based that finding on the fact that Mr. Jurnove had many times visited a zoo where he observed macaques and chimpanzees living in isolation and without adequate environmental enrichment, as well as squirrel monkeys living in view of adult bears, *id.* at 429-430, and that what he observed on those visits "was an assault on [his] senses and greatly impaired [his] ability to observe and enjoy" the very captive animals to which he had formed an aesthetic attachment, *id.* at 432. The court reasoned that lawfully promulgated and properly enforced regulations would have protected Mr. Jurnove from the "direct, concrete, and particularized injury to this aesthetic interest in observing animals living under humane conditions." *Id.* at 431. The court found that "Mr. Jurnove ha[d] made clear that he has an aesthetic interest in seeing exotic animals living in a nurturing habitat, and that he has attempted to exercise this interest by repeatedly visiting a particular animal exhibition to observe particular animals there." *Id.* at 432.

Although Mr. Jurnove continued to visit the primates at the zoo despite the ongoing injury that caused him, the law is clear that a plaintiff need not continually visit the object of his or her aesthetic interest to establish standing. In *Laidlaw*, plaintiffs brought a Clean Water Act citizen suit against a defendant who was discharging toxins into the local river. Plaintiffs alleged their aesthetic interest in enjoying the river—including, for example, a desire "to fish, camp, swim, and picnic in and near the river"—had been frustrated by the defendant's alleged pollution. *Laidlaw,* 528 U.S. at 181-82. The Supreme Court found that plaintiffs' very inability to exercise their aesthetic interest was an injury in its own right, and that plaintiffs had standing on the basis of conditional statements they offered that they would use the nearby river if not for the defendant's unlawful discharge of pollutants into the river. *Id.* at 184. The Court distinguished that finding from the denial of standing in *Lujan*, explaining that plaintiffs' conditional statement could not be equated with "the speculative '"some day" intentions' to visit endangered species halfway around the world that we held insufficient to show injury in fact" in *Lujan*. *Id.*

Relying on this distinction, the court in *Coggins* similarly found plaintiffs had standing. There, plaintiffs sued an unaccredited roadside bear attraction pursuant to the ESA alleging that defendant's confinement of grizzly bears in concrete "bear pits" harmed and harassed the bears. *Coggins*, 2014 U.S. Dist. LEXIS 82257 * 13. Even though the plaintiffs had visited the bears only one single time, the court found that the plaintiffs in *Coggins*, like those in *Laidlaw*, had standing based on their allegations "that they want to visit the bears again but are *unable to do so* while the bears are kept at the Zoo in their current condition because of the additional injury Plaintiffs would suffer from witnessing the bears in these conditions. Such conditional statements that Plaintiffs would return to visit the bears but for the complained of conditions is

sufficient to satisfy the pleading requirements for Article III standing." *Id.* at * 10 (emphasis added).

The individual Plaintiffs will show at trial at that Defendants' conduct has injured their aesthetic interest in observing endangered animals at the Zoo and that a favorable decision by this Court would redress Plaintiffs' injuries. Organizational Plaintiff ALDF will show at trial that its members would otherwise have standing to sue in their own right, that those interests are germane to ALDF's purpose, and that neither the claim asserted nor the relief requested requires the participation of the individual members. *Laidlaw*, 528 U.S. at 180–181 (citation omitted). Nevertheless, some of the individual Plaintiffs are also ALDF members.

## II. THE ENDANGERED SPECIES ACT APPLIES AND DEFENDANTS VIOLATE ITS "TAKE" AND TRAFFICKING PROVISIONS.

Plaintiffs bring this action pursuant to the ESA, 16 U.S.C. § 1531 *et seq.* Congress passed the ESA in recognition that species in danger or threatened with extinction "are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). Enforcement of the ESA therefore advances numerous national values, just as violation of the ESA undermines those values. Among those values is the humane treatment of special animals, whether in the wild or in captivity.

### A. Congress intended that private citizens would enforce the ESA and provided a private cause of action for that purpose.

To bolster the protection of endangered species and the vindication of those several national values, Congress created a dual enforcement mechanism by which both the U.S. Fish and Wildlife Service (FWS) and private citizens can enforce the ESA. The Act empowers "any person" to commence a civil suit to enjoin alleged violations of the ESA, and grants jurisdiction to the district courts to hear such suits irrespective of the citizenship of the parties or the amount

7

in controversy. 16 U.S.C. § 1540. Plaintiffs have fulfilled the ESA citizen suit notice requirements, namely by serving a 60-day notice of intent to sue letter before filing their complaint, and are thus properly before this Court. Defendants have stipulated to no shortcoming in Plaintiffs' fulfillment of ESA notice requirements.

### B. The protections of the ESA apply to captive animals.

The plain language of the statute clearly affords ESA protections to all members of endangered and threatened species, whether captive or wild and whether bred in captivity or captured from the wild. *See, e.g.*, 16 U.S.C. § 1538(b)(1) (exempting from the "take" prohibition *only* those fish or wildlife held in captivity prior to the enactment of the ESA on Dec. 28, 1973, i.e. "Pre-Act wildlife"). The FWS has long implemented this clear intent of Congress through its enforcement, listing decisions, and regulations. *See, e.g.*, 79 Fed. Reg. 37578, 37597 (July 1, 2014) ("Captive members have the same legal status as the species as a whole."); 80 Fed. Reg. 7380, 7399 (Feb. 10, 2015) ("On its face the ESA does not treat captives differently. . . Section 9[] of the ESA [prohibiting take] applies to endangered species regardless of their captive status.").

### C. A citizen suit to enforce ESA protections for captive animals is its own cause of action, not an attempt to enforce the AWA or the USDA permitting scheme.

Because Congress provided a private cause of action in the ESA, a civil suit brought pursuant thereto and against an exhibitor will lie. The Plaintiffs' suit is not, as Defendants allege, a misapplied attempt to enforce the AWA, nor an attempt to usurp the jurisdiction of the USDA. These arguments have been rejected by at least one other court. *See Coggins*, 2014 U.S. Dist. LEXIS 82257, \* 15. In *Coggins*, the court refused to grant the defendant's Rule 12(b)(6) motion for failure to state a claim, noting that plaintiffs were not seeking to enforce a permit:

Case 6:14-cv-02034-JSS   Document 48   Filed 09/04/15   Page 8 of 20

> Despite Defendants' best efforts to re-characterize the allegations in the Complaint, a review of the Complaint demonstrates that Plaintiffs are asserting claims pursuant to the ESA for the unlawful take of grizzly bears based on the alleged harm and/or harassment of the bears. Plaintiffs allege specific violations of the ESA and the pertinent regulations, as opposed to violations of the terms of any permits issued to Defendants. Such claims by Plaintiffs are proper under the ESA.

*Id.* at * 15. Thus, contrary to Defendants' unfounded assertions, the holder of a USDA Class C exhibitor's license is not exempted from the ESA. The USDA lacks jurisdiction over the ESA, since Congress granted jurisdiction exclusively to the FWS (in conjunction with private enforcement pursuant to the citizen suit provision). Therefore, *no* USDA license, whatever the class or category, could exempt the holder from liability under the ESA.[2] Only a Section 10 "take" permit issued by FWS—which can be issued only in very limited circumstances—can exempt a party from liability. 16 U.S.C. § 1539. Defendants do not possess such a permit. The evidence in Plaintiffs' case here will show that they squarely satisfy the standing requirements, and will establish the Defendants' violation of the ESA's "take" provisions by a preponderance of the evidence.

### D.  This Court has jurisdiction over Defendants' tigers, lemurs and wolves.

Defendants have conceded that tigers and lemurs are listed as endangered. As a matter of law, the ESA protections also reach Defendants' wolves (or "hybrid" wolves).

#### 1.  Gray Wolves are protected throughout *all* of Iowa.

---

[2] The ESA provides one limited exception *not* to facilities holding USDA exhibitor's licenses but *specifically and only* to those animals held in captivity before December 28, 1973 (i.e. "Pre-Act wildlife"). *See* 16 U.S.C. § 1538(b)(1). Moreover, even Pre-Act wildlife—irrespective of USDA licensing status—enjoy the protections of the Section 9 "take" prohibitions, since the exception covers *only* those prohibitions enumerated in subsections (a)(1)(A) (concerning imports and exports) and (a)(1)(G) (primarily concerning listing decisions). *See ASPCA v. Ringling Bros. and Barnum & Bailey Circus*, 502 F. Supp. 2d 103 (D.D.C. 2007) (dismissed on procedural grounds but applying the familiar two-step *Chevron* analysis to conclude that the ESA protects captive wildlife and that Congress clearly intended that the Pre-Act exemption would apply only to subsections (a)(1)(A) and (a)(1)(G)).

Contrary to Defendants' representations, gray wolves are protected throughout most of the lower 48 states, including *all* of Iowa. 50 C.F.R. § 17.11(h) (noting the gray wolf, or *canis lupus*, is protected in "All of …IA.."). In December 2014, a federal judge vacated FWS' unlawful attempt to simultaneously designate and delist certain wolf populations—including those in "north of I80" in Iowa—as "distinct population segments." *Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 138-39 (D.D.C. 2014). The protections for gray wolves that existed prior to the agency's unlawful attempt to delist them were therefore reinstated, and gray wolves are protected in *all* of Iowa. The location of Defendants' Zoo is therefore irrelevant to this Court's jurisdiction over Defendants' wolves.

### 2. The protections of the ESA apply to certain hybridized captive animals, including hybridized wolves.

As a matter of law, the protections of the ESA reach hybridized animals wherever the "listing of a particular taxon [e.g. species] includes all lower taxonomic units [e.g. subspecies]." 50 C.F.R. § 17.11(g). The application of the ESA to hybridized animals fulfills the Act's core purpose of providing the broadest possible protections to endangered animals and undercuts the perverse incentive to escape liability merely by crossing different subspecies. For example, the tiger *(Panthera tigris)* is protected at the species level, so that crossing a tiger subspecies like the Bengal tiger (*Panthera tigris tigris*) with another tiger subspecies like the Siberian tiger (*Panthera tigris altaica*) produces protected offspring; in addition, crossing a general member of a protected species taxon (*Canis lupus* – the gray wolf) with a specific subspecies thereof (*Canis lupus familiaris* – the domesticated dog), produces protected offspring.

*U.S. v. Kapp* clarified this construction of the ESA, by enshrining the FWS' *own interpretation* of the Act. 2003 U.S. Dist. Lexis 21169 (N.D. Ill. Nov. 4, 2003). In *Kapp*, the defendant was convicted of violating the Lacey Act for trafficking in violation of the ESA,

namely by killing, skinning, and butchering endangered tigers and leopards and selling their hides and meat. Mr. Kapp sought to escape liability by arguing that a FWS Fact Sheet "led him to believe that the animals he participated in killing, processing, and selling were not protected by the ESA because they were hybrids" (i.e. crosses between two different tiger subspecies and crosses between two different leopard subspecies). *Id.* \* 14. The court found that "even if Kapp's reading of the FWS Fact Sheet was correct [it was not], it is not the law." *Id.* \* 30-31.

> The *ESA* as implemented through the Code of Federal Regulations clearly and unambiguously protects all sub-taxonomic branches of protected taxa. The Government presented abundant testimony by USFWS agents and other evidence at trial confirming this interpretation of the law. *Under the law, the only circumstance under which a hybrid of two subspecies would not be protected would be if one or both of the subspecies were not protected.*

*Id.* \* 31 (emphasis added). Therefore, according to FWS, even if the wolves in Defendants' possession are "75% hybrids," they result not from an inter-species hybridization (unprotected) nor from the crossing of one protected subspecies with an unprotected subspecies (unprotected) but from crossing a protected species with a subspecies (protected). Pursuant to the FWS' construction of the ESA, any time one of the parents in the wolf hybridization is pure wolf (i.e. a member of the protected species) and the other is a domesticated dog, the offspring are entitled to the protections of the ESA. Here, it is a biological and genetic impossibility for Defendants' wolves to be 75% wolf unless at least one of the parents was pure wolf. Thus, the evidence will show that the Defendants' wolves are protected.

### E. The ESA prohibits the "take" of endangered species, a concept broadly defined in the statute and broadly interpreted in the case law.

The ESA prohibits any person from "taking" any listed species. 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19).

11

Congress desired that "take" "be defined in the broadest possible manner to include *every conceivable way* in which a person can 'take' or attempt to 'take' any fish or wildlife." S. Rep. No. 307, 93d Cong., 1st Sess. (1973), *reprinted* in 1973 U.S.C.C.A.N. 2989, 2995 (emphasis added). Proof of "take" requires only a showing of proximate causation, for which indirect and accidental acts will suffice, meaning that "take" does not require a showing of intent. *See Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 700, n. 13 (1995) (upholding FWS definition of harm and observing that "ordinary requirements of proximate causation and foreseeability" apply in analyzing liability); *Bensman v. U.S. Forest Serv.*, 984 F. Supp. 1242 (W.D. Mo. 1997) (finding that logging of "salvaged timber" in the Mark Twain Forest of Missouri would harm endangered Indiana bats by destroying habitat and by disturbing hibernating bats, even though defendants undertook no acts directly against the bats).

Because Congress drafted the meaning of "take" so broadly, overlap among the forms of take—including harm and harass—is to be expected. While "harm" and "harass" have separate regulatory definitions (*see* 50 C.F.R. § 17.3), Courts have found both harm and harassment on the same set of facts. *See also* Aff. J. Blome ¶ 4 and Attachment 1 (Plaintiffs' chart of caselaw demonstrating how these concepts support a finding of "take"). For example, in *Loggerhead Turtle v. County Council of Volusia County*, 896 F. Supp. 1170 (M.D. Fla. 1995), the court found defendant County Council liable for both harm and harassment when its beachfront lighting ordinance failed to protect endangered sea turtles, since artificial lighting confused the turtles' sense of direction, making females less likely to nest there (disrupting their breeding behavior) and preventing hatchlings from finding their way to the ocean (subjecting them to increased mortality via predation and crushing under vehicles). Similarly, in *Defenders of*

*Wildlife v. Martin*, 454 F. Supp. 2d 1085 (E.D. Wash. 2006), the court found that snowmobiling in a designated caribou recovery area both harmed and harassed endangered caribou, because snowmobiling displaced caribou to a less preferred habitat, precluded their use of travel corridors, and increased the likelihood of mortality by enabling predators to access caribou habitat more easily. Finally, in *Strahan v. Linnon*, the Court found that the plaintiff had submitted evidence that, when viewed in the light most favorable to his claims, suggested both harm and harassment occurred when Coast Guard vessels approached Right whales too closely. 967 F. Supp. 581 (D. Mass. 1997) (but declining to issue preliminary injunction until after the Coast Guard had completed its formal consultation process); *aff'd*, 187 F.3d 623 (1st Cir. 1998). Despite this frequent overlap, courts have traditionally understood harm in terms of actual injury or death to wildlife, and harassment in terms of annoying wildlife, involving disruptions to behavioral patterns that result in a likelihood of injury to wildlife. Plaintiffs will show at trial that Defendants have violated the ESA by "taking" endangered tigers, lemurs, and wolves, specifically by "harming" and "harassing" them.

### 1. "Harm" means actually killing or injuring wildlife.

Plaintiffs will show at trial that Defendants' endangered animals have died and have been injured from both preventable and treatable causes, harming Defendants' animals in violation of the ESA.

FWS regulations define "harm" in the definition of take as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. This definition allows no exceptions. Therefore, a defendant could simultaneously possess a USDA exhibitor's license,

comply with the minimum standards of the AWA, and nonetheless "harm" their animals by injuring or killing them in violation of the ESA. In refusing to dismiss the plaintiffs' complaint, the court in *Coggins*, for example, noted that it could find, at trial, that the conditions of confinement indeed harmed (and harassed) the defendant's endangered grizzlies, 2014 U.S. Dist. LEXIS 82257 * 13-16, despite the fact that the USDA had not cited the defendants for a single AWA violation in the preceding three years.

No court has yet reached the merits regarding harm of captive endangered species.[3] Examples of harm to animals in the wild are nonetheless illustrative, and fully support a finding of "harm" in this case. While there are numerous cases demonstrating "harm" of endangered species in the wild, Plaintiffs discuss only a few in this brief and refer the Court to their Attachment 1, attached to the Aff. J. Blome, for a summary of activities other courts found to constitute "harm."

For example, in *Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997), the plaintiff conservationist sued the Commonwealth of Massachusetts for violating the ESA on the basis that the Commonwealth's issuing licenses and permits for gillnet and lobster pot fishing led inevitably to the taking of Northern Right whales, whose entanglement in commercial fishing gear was a recognized source of human-caused injury and death to the endangered whale population. The district court found "harm" in that at least nine of these endangered whales had

---

[3] As noted, the plaintiffs in *Hill v. Coggins* won against a motion to dismiss and against Defendants' motion for summary judgment, in which Defendants argued that plaintiffs lacked standing, that Defendants' bears are not "grizzly bears" subject to the ESA, that the ESA citizen suit mechanism was inapplicable, and that Defendants had not "taken" endangered species. *Coggins*, Case No. 2:13-cv-00047-MR-DLH (text only order) (W.D. N.C. Aug. 13, 2015). The case is scheduled to begin trial on September 14, 2015. Other cases alleging "harm" or "harass" to captive endangered animals were resolved without addressing the merits. *See, e.g., ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 17 (D.C. 2011) (court did not reach merits of whether use of bullhooks and chains on circus elephants "harasses, harms, or wounds"); *ASPCA v. Ringling Bros. & Barnum & Bailey Circus*, 502 F.Supp.2d 103, 110, 112-13 (D.C. 2007) (defendants elephant owners' summary judgment denied as to acts that did not constitute "takes" because of disputed facts and captive-bred wildlife permit exemption, which is inapplicable here, and defendant's treatment of its "'pre-Act' elephants" not subject to any Section 10 take permits).

become entangled in Massachusetts coastal waters, and that one was likely to die from its injuries, *Coxe*, 127 F.3d at 159, and that "at least fifty-seven percent of all Northern right whales have scars indicating prior entanglement with fishing gear and noted that, *even where the whale survives*, the entanglement still wounds the whale," *id.* at 165. The First Circuit upheld both the trial court's factual finding as sufficient for harm and the preliminary injunction against the commercial fishing regulatory scheme, finding that the scheme was the "indirect cause" of the takings since, "but for" the permitting process, third parties could not have injured the whales. *Id.* at 163-64. *See also Greenpeace v. Nat'l Marine Fisheries Serv.*, 106 F. Supp. 2d 1066 (W.D. Wash. 2000) (finding threat of future harm to Western Steller sea lion in continued trawl fishing since the practice depletes prey animals and reduces sea lions' ability to forage); *Animal Welfare Inst. v. Beech Ridge Energy LLC*, 675 F. Supp. 2d 540 (D. Md. 2009) (finding that endangered Indiana bats would be harmed by wind turbines since turbines cause injury and death when the bats collide with them). Plaintiffs' evidence in this case will provide the court with more than sufficient evidence to conclude that Defendants' activities "harm" the endangered species at the Zoo.

### 2. "Harass" means annoying wildlife to such an extent that it disrupts normal behavioral patterns and creates a likelihood of injury.

Plaintiffs will also show at trial that Defendants' substandard care annoys their endangered animals, disrupts the animals' normal behavioral patterns, and creates a likelihood of injury to those animals in violation of the ESA. Plaintiffs will also show at trial that Defendants' animal care and zoo management does not constitute generally accepted animal husbandry practices nor meet (let alone exceed) the minimum requirements of the AWA, and thus violates the ESA.

FWS regulations define "harass" for ESA purposes as "an intentional *or negligent* act *or*

15

*omission* which creates the *likelihood* of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3 (emphasis added). When applied to captive endangered animals, a defendant may avoid liability where he or she has undertaken "generally accepted animal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act."[4] *Id*. Therefore, unlike harm, this definition allows a narrow exception. That exception is not, as Defendants argue, for holders of USDA licenses but for those exhibitors (and only those exhibitors) who meet or exceed industry standards and federal requirements.[5] The evidence will show that Defendants do not meet or exceed this standard and therefore do not enjoy the narrow exception to the harassment of captive endangered species.

As with harm, while no court has yet decided whether "harassing" captive endangered species constitutes a "take" under the ESA,[6] case law proves the scope of "harass" is broad. While there are numerous cases demonstrating "harassment" of endangered species in the wild, Plaintiffs only discuss a few in this brief and refer the Court to their Exhibit 2 attached hereto for a summary of activities other courts found to constitute "harassment". *See also supra* n. 2.

For example, in *Strahan v. Linnon*, the plaintiff conservationist sued to enjoin the Coast Guard from violating the Endangered Species Act and the Marine Mammal Protection Act, including by disturbing and injuring Northern Right whales when undertaking its marine operations like rescues at sea, navigation assistance, and drug enforcement. 967 F. Supp. 581 (D.

---

[4] The goal of the AWA is "to insure that animals intended . . . for exhibition purposes or for use as pets are provided humane care and treatment." 7 U.S.C. § 2131(1). To fulfill its purpose, the AWA and its implementing regulations set forth "minimum standards" of care for the "handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperatures, adequate veterinary care, and separation by species where . . . necessary for humane handling, care or treatment of animals[.]" 7 U.S.C. § 2143(a)(2)(A).

[5] The obvious purpose of such an exception is to clarify that although captivity might intrinsically "annoy" wildlife and "disrupt normal behavioral patterns," possession alone does not constitute *per se* harassment. The evidence here will demonstrate that the Defendants have so clearly failed to meet these standards that, in this case, Defendants' possession of endangered species is in fact *per se* harassment.

[6] *See supra* n. 2.

16
Case 6:14-cv-02034-JSS   Document 48   Filed 09/04/15   Page 16 of 20

Mass. 1995). The court observed that "Strahan has submitted evidence that, when viewed in the light most favorable to his claims, suggests 'actual harm' and 'harassment' occurs when Coast Guard vessels approach Right whales too closely." *Id.* at 631. Despite the evidence of harassment, the court declined to issue a preliminary injunction on the basis that the Coast Guard had "substantially increased efforts to avoid Right whales as part of its new Whale Protection Program" such that *ongoing* taking of whales in the foreseeable future may prove to have been mitigated. *See also Loggerhead Turtle v. Volusia Co. Council*, 896 F. Supp. 1170 (M.D. Fla. 1995) (finding that artificial light from those driving on beach harasses sea turtles by disrupting nesting behavior). Plaintiffs' evidence in this case will provide the court with more than sufficient evidence to conclude that Defendants' activities "harass" the endangered species at the Zoo.

**F. Defendants have unlawfully trafficked in endangered species across state lines.**

Finally, Plaintiffs will show at trial that Defendants acquire and dispose of endangered animals in violation of the ESA's trafficking prohibition.

Under the ESA, it is unlawful to "deliver, receive, carry, transport, or ship in interstate or foreign commerce . . . in the course of commercial activity" any endangered or threatened species absent a permit. 16 U.S.C. § 1538(a)(1)(E). Commercial activity need not involve money or even change of ownership. For example, in *Elephant Justice Project v. Woodland Park Zoological Society*, the one case Plaintiffs are aware of to reach the merits of this issue, Judge Coughenhour found that commercial activity under the ESA can include transportation of animals in service of exhibition, even if the exhibitor is a nonprofit entity, no money changes hands, and no transfer of ownership occurs. No. 2:15-cv-000451-JCC at 5–6 (W.D. Wash. Apr. 7, 2015) (concluding that the loan of two Asian elephants from one zoo to another constituted

commercial activity since the exhibition of elephants—and therefore the transportation that leads to exhibition—generates zoo revenue and "can be said to be undertaken for gain or profit . . . within the meaning of the ESA").

### III. THIS COURT HAS AUTHORITY TO ISSUE RELIEF

At trial, Plaintiffs will show that there exists a potential for irreparable harm if Defendants are allowed to continue harming and harassing their endangered animals and contravening interstate trafficking rules in violation of the ESA. *See Strahan v. Holmes*, 595 F. Supp. 2d 161, 165 (D. Mass. 2009) (citing *A.W. Chesterton Co. v. Chesterton,* 128 F.3d 1, 5 (1st Cir.1997) (listing the criteria for injunctive relief in an ESA "take" case"). Plaintiffs will demonstrate moreover that such harm outweighs Defendants' interest in continuing to harass, harm, and illegally traffic endangered wildlife in violation of the public interest. *Id.* Should this Court issue injunctive relief, Plaintiffs' aesthetic interests in observing these animals in humane conditions will be vindicated, since Defendants will no longer treat these animals contrary to the ESA and Plaintiffs can once again observe and enjoy the animals with whom they have developed an aesthetic attachment. Accordingly, upon making a finding of liability, the ESA, 16 U.S.C. § 1540(g)(1), empowers this Court to enjoin Defendants' illegal conduct as follows:

- Ordering Defendants to surrender their tigers, lemurs, and wolves or wolf hybrids to a reputable facility licensed by the USDA under the Animal Welfare Act that meets or exceeds the minimum requirements for animal husbandry, animal care, management, facilities, handling, and veterinary care therein;

- Prohibiting Defendants from ever acquiring animals listed by the FWS as threatened or endangered, including animals that were hybridized with

threatened or endangered species;

- Enjoining Defendants to surrender, within 30 days of a new listing determination by FWS, newly listed animals already in Defendants' possession to a reputable facility licensed by the USDA under the Animal Welfare Act that meets or exceeds the minimum requirements for animal husbandry, animal care, management, facilities, handling, and veterinary care therein;

- Enjoining Defendants to comply with the ESA, including Sections 9, 10, and 11, at all times in the future, which includes refraining from donating or accepting donations of endangered animals across state lines where ownership or control changes hands without an interstate commerce permit from the FWS;

- Awarding Plaintiffs costs of litigation (including reasonable attorney and expert witness fees) in accord with 16 U.S.C. § 1540(g)(4).

## CONCLUSION

In sum, Plaintiffs will prove at trial that Defendants' mismanagement of their Zoo has both harmed and harassed the endangered species in their care, constituting multiple "takings" under the ESA, and that Defendants' unpermitted transfer and receipt of endangered animals across state lines has violated the ESA's prohibition on trafficking in endangered species. Plaintiffs respectfully request the Court find liability against Defendants for violating the ESA, grant Plaintiffs the relief contained in their Proposed Order, and provide to Plaintiffs such other relief as is necessary to protect Defendants' endangered animals from any further harm or harassment they suffer while in Defendants' possession.

Respectfully submitted this 4th day of September, 2015.

/s/ *Jeffrey D. Pierce*
Jeffrey D. Pierce (CA Bar No. 293085)
jpierce@aldf.org

Jessica L. Blome (MO Bar No. 59710)
jblome@aldf.org
Animal Legal Defense Fund
170 E. Cotati Ave.
Cotati, CA 94931
Telephone: 641.431.0478
Facsimile: 707.795.7280

/s/ *Daniel J. Anderson*
Daniel J. Anderson (IA Bar No. 20215)
danderson@wertzlaw.com
WERTZ & DAKE
1500 Center St. NE #101
Cedar Rapids, IA 52402-5500
Telephone: 319.861.3001
Facsimile: 319.861.3007

/s/ *Elisabeth Holmes*
Elisabeth Holmes (Oregon Bar No. 120254)
eli.blueriverlaw@gmail.com
Blue River Law, P.C.
P.O. Box 293
Eugene, OR 97440
Telephone: 541.870.7722

*Attorneys for Plaintiffs Tracey Kuehl, et al.*