**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

|  |  |  |
|---|---|---|
| TRACEY K. KUEHL, et al., | ) | Case No. C14-02034-JSS |
|  | ) |  |
| Plaintiffs, | ) |  |
| v. | ) |  |
|  | ) | **Judge: Hon. Jon Stuart Scoles** |
| PAMELA SELLNER, et al., | ) | **Trial Date: October 5-8, 2015** |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |

**PLAINTIFFS' POST-TRIAL BRIEF**

i

<u>**TABLE OF CONTENTS**</u>

TABLE OF AUTHORITIES .................................................................................. iv

INTRODUCTION .............................................................................................. 1

ARGUMENT ..................................................................................................... 2

I.   PLAINTIFFS HAVE STANDING TO BRING THIS ACTION. ................................ 2

   A.   Each of the individual Plaintiffs satisfies the three prongs of Article III standing as enumerated by controlling precedent. ............................................................. 2

      1.   The individual Plaintiffs have proven an injury in fact to their cognizable aesthetic interest in observing animals living under humane conditions. ........................................ 3

         a.   Ms. Tracey Kuehl .......................................................................... 4

         b.   Mr. John Braumann ...................................................................... 7

         c.   Ms. Lisa Kuehl ........................................................................... 10

         d.   Ms. Nancy Harvey ...................................................................... 14

         e.   The individual Plaintiffs suffer a cognizable injury in fact. ..................... 15

      2.   The injury to Plaintiffs' aesthetic interest is fairly traceable to the Defendants' unlawful conduct. ...................................................................... 17

      3.   The injury to Plaintiffs' aesthetic interest would likely be redressed by a favorable decision by this Court. ...................................................................... 18

   B.   The organizational Plaintiff Animal Legal Defense Fund has standing to bring this action in its representative capacity. ...................................................................... 20

II.  PLAINTIFFS' ACTION UNDER THE ENDANGERED SPECIES ACT IS JURISDICTIONALLY PROPER AND REACHES CAPTIVE ANIMALS, INCLUDING DEFENDANTS' TIGERS, LEMURS AND WOLVES. ...................................... 21

   A.   The Plaintiffs bring a statutory cause of action pursuant to Congress's intent that private citizens would enforce the ESA, and satisfied all notice requirements under the ESA. ...................................................................... 21

   B.   The plain language of the ESA and its interpretation by USFWS make clear that the protections of the ESA reach the Defendants' captive animals. ........................... 22

   C.   This Court has jurisdiction not only over Defendants' tigers and lemurs but also over Defendant's wolves. ...................................................................... 23

III. DEFENDANTS HAVE VIOLATED AND CONTINUE TO VIOLATE THE "TAKE" AND TRAFFICKING PROHIBITONS OF THE ENDANGERED SPECIES ACT. ............. 24

   A.   The Defendants' conduct falls within the ESA's prohibition on the "take" of endangered species, a concept broadly defined in the statute and broadly interpreted in the case law. ...................................................................... 25

      1.   "Harm" means actually killing or injuring wildlife. ................................... 26

Case 6:14-cv-02034-JSS   Document 76   Filed 11/13/15   Page 2 of 75

2. "Harass" means annoying wildlife to such an extent that it disrupts normal behavioral patterns and creates a likelihood of injury. ..................................................... 27

3. Defendants have "taken" and continue to "take" endangered tigers by harming and harassing them. ........................................................................................................ 30

    a. Inadequate Veterinary Care .................................................................... 30

    b. Inadequate Sanitation .............................................................................. 35

    c. Inadequate Housing and Caging ............................................................ 37

    d. Inadequate Environmental Enrichment ................................................ 40

    e. Inadequately Implemented Nutritional Protocols ............................... 42

4. Defendants have "taken" and continue to "take" endangered lemurs by harming and harassing them. ..................................................................................................... 44

    a. Social Isolation ........................................................................................ 44

    b. Inadequate Housing and Environmental Enrichment .......................... 46

    c. Inadequate Sanitation .............................................................................. 47

    d. Inadequate Veterinary Care .................................................................... 49

5. Defendants have "taken" and continue to "take" endangered wolves by harming and harassing them. ..................................................................................................... 52

    a. Inadequate Veterinary Care .................................................................... 52

    b. Dangerous Housing and Poor Diet ........................................................ 53

    c. Absence of Enrichment .......................................................................... 54

    d. Failure to Conduct Necropsies .............................................................. 56

B. The ESA prohibits trafficking in endangered animals without a permit, and Defendants have trafficked and will continue to traffic in endangered animals without a permit. ......... 57

IV. DEFENDANTS ARE INCAPABLE OF PROPERLY ADMINISTERING THE CRICKET HOLLOW ZOO, WHICH CREATES AN ONGOING AND SUBSTANTIAL LIKELIHOOD OF INJURY TO THE ENDANGERED ANIMALS LIVING THERE. ........ 58

A. Inadequate Human Resources at Defendants' Zoo ...................................... 59

B. Unstable and Inadequate Financial Posture .................................................. 61

C. Shortcomings at the Entire Facility ............................................................... 63

D. Choice of Veterinarian .................................................................................... 63

E. Contingency Planning ...................................................................................... 65

V. PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF TO REDRESS THEIR AESTHETIC INJURY .................................................................................................... 66

VI. CONCLUSION ...................................................................................................... 68

# TABLE OF AUTHORITIES

**Cases**

*Animal Legal Def. Fund v. Glickman*, 154 F.3d 426 (D.C. Cir. 1998) (*en banc*) (cert den.) passim

*Animal Welfare Inst. v. Beech Ridge Energy LLC*, 675 F. Supp. 2d 540 (D. Md. 2009) ............ 27

*ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13 (D.C. 2011) .................................................................. 26

*ASPCA v. Ringling Bros. & Barnum & Bailey Circus*, 502 F.Supp.2d 103 (D.C. 2007)............. 26

*A.W. Chesterton Co. v. Chesterton*, 128 F.3d 1 (1st Cir. 1997).................................................... 66

*Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687 (1995) ....... 25, 58

*Bensman v. U.S. Forest Serv.*, 984 F. Supp. 1242 (W.D. Mo. 1997) ........................................... 25

*Elephant Justice Project v. Woodland Park Zoological Society,* No. 2:15-cv-000451-JCC (W.D. Wash. Apr. 7, 2015)...................................................................................................................... 57

*Friends of the Earth v. Laidlaw Envt. Serv. (TOC), Inc.*, 528 U.S. 167 (2000). .................. passim

*Greenpeace v. Nat'l Marine Fisheries Serv.*, 106 F. Supp. 2d 1066 (W.D. Wash. 2000)............ 27

*Humane Soc'y of the U.S. v. Babbitt*, 46 F.3d 93 (D.C. Cir. 1995) .............................................. 57

*Hunt v. Washington State Apple Advert. Commn.*, 432 U.S. 333 (1977) ..................................... 20

*Loggerhead Turtle v. Volusia Co. Council*, 896 F. Supp. 1170 (M.D. Fla. 1995) ...................... 30

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................. 2, 15

*Sierra Club v. Morton*, 405 U.S. 702 (1972). ............................................................................... 2

*Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997) ...................................................................... 26, 27

*Strahan v. Holmes*, 595 F. Supp. 2d 161 (D. Mass. 2009) .......................................................... 66

*Strahan v. Linnon*, 967 F. Supp. 581 (D. Mass. 1995) ............................................................... 29

*U.S. v. Kapp*, 2003 U.S. Dist. Lexis 21169 (N.D. Ill. Nov. 4, 2003)..................................... 23, 24

**Statutes**

ANIMAL WELFARE ACT, 7 U.S.C. § 2131 et seq. (1966) ...................................................... passim

ANIMAL WELFARE ACT, 7 U.S.C. § 2131(1) (1966)..................................................................... 28

ENDANGERED SPECIES ACT, 16 U.S.C. § 1531 et seq. (1973). .............................................. passim

ENDANGERED SPECIES ACT, 16 U.S.C. § 1531 (1973)................................................................. 21

ENDANGERED SPECIES ACT, 16 U.S.C. § 1531(a)(3) (1973)....................................................... 21

ENDANGERED SPECIES ACT, 16 U.S.C. § 1532(19) (1973). ....................................................... 25

ENDANGERED SPECIES ACT, 16 U.S.C. § 1538(a)(1)(B) ............................................................ 25

ENDANGERED SPECIES ACT, 16 U.S.C. § 1538(a)(1)(E) (1973). ........................................... 57, 58

Endangered Species Act, 16 U.S.C. § 1540 (1973)....................................................... 22, 66, 69

**Other Authorities**

H.R. Rep. No. 93–412 at 11 (1973) ......................................................................... 59

S. Rep. No. 307, 93d Cong., 1st Sess. (1973), *reprinted* in 1973 U.S.C.C.A.N. 2989, 2995....... 25

**Regulations**

50 C.F.R. § 17.11 ........................................................................................... 23

50 C.F.R. § 17.3 ...................................................................................... passim

9 C.F.R. § 2.134. ........................................................................................... 65

9 C.F.R. § 2.40............................................................................ 30, 34, 49, 63

9 C.F.R. § 2.40(a) ................................................................................... 34, 63

9 C.F.R. § 2.40(b) ................................................................................... 30, 31

9 C.F.R. § 2.40(b)(2) ..................................................................................... 30

9 C.F.R. § 3.125(a) ....................................................................................... 39

9 C.F.R. § 3.125(d) ....................................................................................... 35

9 C.F.R. § 3.127(d) ................................................................................... 40, 53

9 C.F.R. § 3.131(a) ....................................................................................... 35

9 C.F.R. § 3.132 .......................................................................................... 60

9 C.F.R. § 3.80(a)(2)(iii) ................................................................................ 39

9 C.F.R. § 3.81 ....................................................................................... 44, 46

9 C.F.R. § 3.81(a) ........................................................................................ 44

9 C.F.R. § 3.84(a) ........................................................................................ 48

9 C.F.R. § 3.85 ........................................................................................... 60

Case 6:14-cv-02034-JSS   Document 76   Filed 11/13/15   Page 5 of 75

# INTRODUCTION

This is an action under the Endangered Species Act ("ESA") against Pamela Sellner, Tom Sellner and the Cricket Hollow Zoo (collectively "Defendants"). The care Defendants provide to the animals at their private, unaccredited facility falls persistently below the minimum requirements of the federal Animal Welfare Act ("AWA") and routinely fails to comport with generally accepted animal husbandry practices. Such substandard care has disrupted and continues to disrupt the natural behaviors of the Defendants' endangered animals, threatens those animals' physical and psychological wellbeing, and has actually injured and killed endangered animals in the Defendants' custody. Indeed, Defendants provide such woefully inadequate animal husbandry and veterinary care that the U.S. Department of Agriculture ("USDA") initiated license revocation proceedings against Defendants in July 2015, during the pendency of Plaintiffs' Motion for Summary Judgment, for Defendants' ongoing inability or refusal to comply with federal law.

At trial Defendants failed to demonstrate a reasonable basis for their failures, insisting that certain USDA inspectors are "nitpicky" (despite multiple inspectors coming to the same conclusions about Defendants' noncompliance) and that federal regulations unnecessarily require too much of licensees. Defendants' own witnesses—who testified primarily in their capacity as friends to and supporters of Defendants—admitted at trial that they had not known how many of the Defendants' animals had died over the course of the last decade, nor how frequently the USDA had cited Defendants for their substandard care. Instead, Defendants' chief defense has apparently been that the ESA does not reach their facility. Defendants have cited no authority for this position, nor can they. Absent this Court's intervention the Defendants' endangered animals will continue to suffer without the protections of the ESA.

# ARGUMENT

## I.    PLAINTIFFS HAVE STANDING TO BRING THIS ACTION.

The individual Plaintiffs in this case—five Iowans who each maintain an aesthetic interest in, and sense of ongoing responsibility toward, the endangered animals at the Defendants' Zoo—have standing to bring this action. Likewise, the organizational Plaintiff Animal Legal Defense Fund ("ALDF") has associational standing in its representative capacity to bring this action through its members.

### A.  Each of the individual Plaintiffs satisfies the three prongs of Article III standing as enumerated by controlling precedent.

To establish Article III standing, a plaintiff must show that she has suffered a cognizable "injury in fact" that is "fairly traceable" to the defendant's conduct, and that such injury would "likely" be "redressed" by a favorable decision. *Friends of the Earth v. Laidlaw Envt. Serv. (TOC), Inc.*, 528 U.S. 167, 180-181 (2000). According to the D.C. Circuit, "[t]he Supreme Court has repeatedly made clear that injury to an aesthetic interest in the observation of animals is sufficient to satisfy the demands of Article III standing." *Animal Legal Def. Fund v. Glickman*, 154 F.3d 426, 432 (D.C. Cir. 1998) (*en banc*) (cert den.). In upholding the sufficiency of an aesthetic interest regarding animals, the court in *Glickman* reaffirmed a bedrock foundation of standing that dates back at least four decades, *Sierra Club v. Morton*, 405 U.S. 702 (1972), and which remains undisturbed, black letter law. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-563 (1992) ("the desire to use or observe an animal species, even for purely aesthetic purposes, is *undeniably* a cognizable interest for purpose of standing.") (emphasis added).

An aesthetic interest may be indicated, among other things, by a spiritual and cultural connection with animals, by a strong personal and emotional attachment to animals, or by a desire to see animals living in humane conditions. *See Hill v. Coggins*, 2014 U.S. Dist. LEXIS

2

82257 * 9 (W.D.N.C., May 27, 2014) (denying defendants' motion to dismiss and observing that "[s]uch factual allegations are sufficient to allege an injury for purposes of Article III standing."). Where the defendant's unlawful behavior injures the plaintiff's aesthetic interest, and where a favorable decision by a court would redress that injury, courts have found that an aesthetically interested plaintiff satisfies the requirements of Article III standing. *See, e.g.*, *Glickman*, 154 F.3d at 438-43 (finding that USDA's failure to act in accordance with law was the but-for cause of Mr. Jurnove's aesthetic injury in viewing primates under inhumane conditions); *id.* at 443-44 (finding that an injunction requiring defendant USDA to promulgate lawful regulations would likely redress Mr. Jurnove's injury insofar as the zoo Mr. Jurnove routinely visited would have to comply with more humane regulations to maintain its animals or that, if the zoo failed to comply, Mr. Jurnove could observe those primates in another zoo able and willing to comply). Like previously aesthetically interested plaintiffs, the individual Plaintiffs in this action have proven each of the three prongs to satisfy Article III standing.

### 1. The individual Plaintiffs have proven an injury in fact to their cognizable aesthetic interest in observing animals living under humane conditions.

In *Glickman*, cited above, plaintiffs sued the USDA pursuant to the Administrative Procedure Act to compel the agency to promulgate regulations for the humane care of captive nonhuman primates as required by the Animal Welfare Act (AWA). *Glickman*, 154 F.3d at 428. An *en banc* panel of the D.C. Circuit found that at least one plaintiff, Marc Jurnove, had standing to sue on the basis that the agency's unlawful failure to protect captive nonhuman primates harmed his aesthetic interest in viewing primates living in humane conditions. The panel based that finding on the fact that Mr. Jurnove had many times visited a zoo where he observed macaques and chimpanzees living in isolation and without adequate environmental enrichment. *Id.* at 429-430. The individual Plaintiffs' experiences at the Cricket Hollow Zoo are strikingly

similar to those of Mr. Jurnove's.

### a. Ms. Tracey Kuehl

Like Mr. Jurnove—who, "[b]ecause of [his] familiarity with and love of exotic animals, as well as for recreational and educational purposes and because [he] appreciates these animals' beauty, . . . enjoys seeing them in various zoos and other parks near [his] home", *Glickman*, 154 F.3d at 429—Plaintiff Tracey Kuehl very much enjoys going to zoos. Again like Mr. Jurnove, Tracey Kuehl has a strong interest in animals and enjoys seeing all types of animals, whether domestic or wild. She especially enjoys seeing animals in their natural settings, and since she will never get to see them where they live in Africa or Asia or South America she appreciates that she can visit them in zoos in a relatively natural setting. Like Mr. Jurnove, her interest in observing wildlife is both recreational and educational, and her view of zoos as educational facilities stems from her work as the director of the Family Museum in Bettendorf, a children's museum she ran for twenty years. That experience attuned Tracey Kuehl to "intergenerational learning" between children and adults, especially regarding what the adult may remember of zoo visits from childhood sharing such experiences with a child based on an animal's activity. Tracey Kuehl likewise developed insight into the needs of animals because she grew up on a grain and livestock farm in Iowa, on which she helped her father with caring for and feeding hogs, cleaning the hog houses, baling hay, and, when she got older, taking care of the smaller pigs. Tracey Kuehl continues to care for animals to this day, keeping as pets dogs, cats, pot-bellied pigs, pygmy goats, a sheep, and some dozen chickens.

Unfortunately Tracey Kuehl's interest in observing wild animals living humanely in a zoo setting was undermined by the significant issues in animal care she experienced at the Cricket Hollow Zoo, which she discovered during her first visit in June 2012. When Tracey

Kuehl afterward realized—by consulting USDA inspection reports of the Defendants' facility—that what she had initially observed respecting those significant animal care issues at the Zoo had been transpiring for some time, she was "really upset," "very concerned," "shocked," and "very much disappointed." Trial Tr. 216:13-16; 217:16. Specifically, Tracey Kuehl was shocked by the conditions in which the animals were living, given the perspective she had developed after visiting other zoos. Following her first visit, Tracey Kuehl was "worn out and just kind of incredulous." *Id.* 233:16-17. Two days after her visit she would characterize the Zoo, in a letter to the Iowa Department of Agricultures and Land Stewardship ("IDALS"), as "an appalling situation," "a sorry collection of way too many neglected animals with very little care," "a lesson in how not to take care of animals," "a disgraceful example of an Iowa tourist attraction," and "disheartening, unnerving, disgraceful and down-right sad." Ex. 62, pp. 3-4.

Like Mr. Jurnove—who was troubled to see "'a large male chimpanzee named Barney in a holding area by himself' . . . [because] Mr. Jurnove 'knew that chimpanzees are very social animals' and [was] 'upset . . . very much to see [Barney] in isolation from other primates'", *Glickman*,154 F.3d at 429—Tracey Kuehl experienced "surprise and shock" when she first saw the Defendants' lemurs, because she knew that lemurs live in colonies and inhabit trees, and can climb to great heights, and yet Defendants' lemurs were restricted to "very small" and "very sparse" enclosures. Trial Tr. 222:20-24. Similarly, Tracey Kuehl was appalled by what she first saw of one of the Defendants' captive tigers, observing that she thought the enclosure that contained the tiger was "abysmal," that it was "shocking," and "a horrible way to treat an animal of this magnificence." *Id.* 227:7-12; Ex. 61, pp. 3, 6, 10. Those conditions injured Tracey Kuehl's desire to see an animal living in humane conditions, evinced in part by the opportunity for that animal to behave as it might in its natural environment, which she observed to be denied

the animals at the Defendants' Zoo. In contrast to her desires and expectations, Tracey Kuehl instead encountered a "really, really sad situation for an animal like [a tiger]," and she "just sat and thought about that for a little bit," Trial Tr. 228:3-5, feeling "really, really sad and really disappointed," *id.* 228:19-20. Tracey Kuehl likewise visited the wolf enclosure during that visit, and found it to be very similar to the tiger enclosure, which is to say "a small little cage, a dingy little cage, a dirty little cage." *Id.* 228:14-15; Ex. 61, pp. 4-5.

As further evidence of her aesthetic commitment to the Defendants' animals and her desire to see those animals living under humane conditions, Tracey Kuehl has read most, if not all, of the inspection reports and other documents related to the Cricket Hollow Zoo she obtained via Freedom of Information Act ("FOIA") requests or from the USDA's online FOIA Reading Room. She likewise undertook, and continues to undertake, a campaign of advocacy to secure the intervention of authorities with jurisdiction to require the Defendants to provide humane living conditions to their animals. *See* Ex. 62 (letters of Tracey Kuehl to IDALS and USDA). Tracey Kuehl also reached out to the Secretary of IDALS (with whom she met personally), local officials in Delaware County (including the Sheriff), the Mayor of Manchester, and the Delaware County Board of Supervisors, all in hopes of securing more humane living conditions for the animals at the Zoo.

Her efforts to secure regulatory intervention resemble those of Mr. Jurnove, who repeatedly contacted "government agencies, including the USDA, in order to secure help for these animals." *Glickman*, 154 F.3d at 429. For example, Mr. Jurnove returned to the zoo where he had developed aesthetic attachments to nonhuman primates after contacting the USDA, "hoping to see improvements in the conditions that he had repeatedly brought to the USDA's attention" but ultimately feeling "disappointed" that "'the animals [were] in literally the same

conditions as [he] had seen them" previously. *Id.* at 430. Similarly, Tracey Kuehl returned to the Zoo after she had sent letters to both IDALS and the USDA, hoping to encounter improvements at the Zoo but finding, like Mr. Jurnove, that things were exactly as she had found them two weeks before. Of the tiger and wolf enclosures that she revisited, for example, Tracey Kuehl observed that they remained the same sterile environment she had seen on first visit.

Tracey Kuehl would return a third time, a year later, because she felt an obligation to return with the hope that her ongoing advocacy efforts and the inspections from the USDA would have resulted in changes at the Zoo and regulatory compliance on the part of Defendants. However, again like Mr. Jurnove, when she returned a third time she saw only what she had seen twelve and fourteen months earlier. Tracey Kuehl's injury is both concrete and particularized, since it "affect[s her] in a personal and individual way," as well as actual and imminent, since she continues to feel today what she felt upon visiting the Defendants' animals. *See Lujan*, 504 U.S. at 560-61.

### b.  Mr. John Braumann

Plaintiff John Braumann exhibits a sincere aesthetic interest in observing animals living under humane conditions. For example, he spends time every day advocating for animals. He follows and is a member of several animal protection organizations, like the Humane Society of the United States and the American Society for the Prevention of Cruelty to Animals, because he shares with them the conviction that people have an obligation to treat animals fairly, an obligation that is for him both ethical and moral.

John Braumann formed the contours of his aesthetic commitment in a number of ways. For example, he has experience in the husbandry of animals, since both his parents grew up on farms, and because he visited his grandparents' farms often as a kid, where he rode his

grandfather's horses and observed how his grandfather kept pigs and other livestock. He has likewise helped his father-in-law to feed the latter's pygmy goats and has talked with his father-in-law about the care of those goats. So also has he learned about the proper care of cats, including what ailments befall them, through keeping housecats as pets.

John Braumann deepened his understanding of wildlife by learning about wild animals through programs on the National Geographic channel, the Discovery Channel, and the Learning Channel. Among other things, he has learned about the behavior and needs of tigers, lemurs, and wolves by watching this educational programming. He undertakes his advocacy—including his participation in this litigation—as a means of exercising his aesthetic interest in animals generally, in wildlife specifically, and in speaking out for the voiceless. Ultimately it affects John Braumann greatly to see animals suffering.

Exercising his aesthetic interest in seeing animals living under humane conditions, John Braumann visited the Defendants' Zoo in October 2012 to see for himself whether the Zoo was as bad as a friend's photograph might have led him to believe. That visit injured his aesthetic interest because what he encountered there departed so substantially from his expectations and beliefs, i.e. his aesthetic commitment, about how people should treat animals in their care. For example, John Braumann felt angry seeing a lemur by itself in a cage because he knew from his self-education that lemurs are extremely social. Ex. 63, p. 3. His encounter with the Defendants' lemurs recalls that of Mr. Jurnove, who was upset to see a chimpanzee housed alone while knowing that chimpanzees are very social animals. *Glickman*. 154 F.3d at 429.

In addition to their lemurs, John Braumann likewise visited the Defendants' tigers and wolves. He was disturbed to observe in the tiger enclosures inadequate enrichment and accumulated feces, in distinction to his expectations to have seen more enrichment, which would

allow the tigers to express more natural behavior, and superior hygiene. Ex. 63, pp. 7-8, 10, 13. He was likewise disturbed to observe patrons feeding the Defendants' wolves through a PVC tube, *id.* p. 15, was concerned how wet and muddy the wolf was, *id.* p. 16, and was frustrated and angry that such a highly social animal might be kept alone. He was likewise concerned and frustrated that zoo patrons were permitted to handle tiger cubs without supervision, and in a rough or aggressive manner. *Id.* p. 17.

John Braumann, who tried to give the Defendants the benefit of the doubt after his first visit, would return for a second visit many months later, in July 2013 (with Plaintiff Lisa Kuehl), hoping to discover that the conditions had improved. Like Mr. Jurnove's return visits, John Braumann also experienced that little to nothing had changed at the Zoo. For example, the lemurs remained solitary, and the tiger enclosures still lacked enrichment and suffered from accumulation of feces.

Throughout his testimony describing his experiences visiting the Defendants' Zoo, John Braumann repeatedly used words like "depressed" or "very depressing" (Trial Tr. 482:5, 494:13, 499:19, 505:6), "angry" or "very angry" (*id.* 489:4, 491:21, 494:12, 499:20, 506:1, 511:17, 514:7, 519:10), and "frustrated", "very frustrated", or "extremely frustrated" (*id.* 485:8, 489:4, 490:24, 491:21, 494:11, 495:14, 497:5, 498:15, 499:7, 499:18, 511:16, 514:6, 519:10). Such testimony signals the gravity of the injury the Defendants have caused to his aesthetic interest in seeing animals living under humane conditions.

John Braumann testified not only to an aesthetic interest toward animals generally but an aesthetic interest in the endangered animals at the Defendants' zoo specifically. For example, he testified regarding the Defendants' lemurs that "when you make eye contact with these animals and it makes a lot of difference when you can be there, live it, feel it, smell it, breathe it and you

walk away with a much different feeling than just witnessing a picture on a page." Trial Tr. 500:18-23. That is to say, the injury John Braumann suffered to his aesthetic interest is concrete and particular because he felt a special kinship with those animals into whose eyes he had looked. His injury therefore affected him in a personal way, and in a way distinct from how he feels toward animals generally in whose eyes he has not looked, and in a way that distinguishes his injury from that of the general public who have not developed an aesthetic attachment to the Defendants' specific animals.

John Braumann photographed much of what he saw that day because he wanted, in part, to encourage others to become actively involved on behalf of the Defendants' animals, which is to say participate in vindicating his aesthetic interest in seeing the Defendants' animals living under humane conditions. John Braumann's injury remains actual or imminent because, for example, he feels angry anew every time he reviews the photograph he took of the Defendants' lemur Chuki. Ex. 63, p. 3. When he reviewed his photographs before the trial in October 2015, he felt no differently toward the animals and their conditions than he had at the time he took the photographs, and he experienced during his testimony the same physical "feeling in the pit of his stomach" that he experienced at the time he took the photographs. Trial Tr. 499:24. His injury is therefore still ongoing, that is, actual or imminent.

c.  Ms. Lisa Kuehl

Like her sister Tracey Kuehl, Plaintiff Lisa Kuehl grew up on an Iowa farm where she helped her family care for animals, a formative experience at the root of her aesthetic interest in seeing animals living under humane conditions and her commitment to animal advocacy. From her parents Lisa Kuehl learned to respect and care for animals. Today that commitment takes the form of volunteering with several animal welfare organizations, including some that rescue dogs

and cats. She is a member of the Iowa Friends of Companion Animals and the Animal Legal Defense Fund, and follows the work of the Humane Society of the United States. Lisa Kuehl has developed some exposure to the exhibition and care of wild animals by visiting several zoos, which, like Mr. Jurnove, she enjoys to do, including the St. Louis Zoo, the San Diego Zoo, the Blank Park Zoo, and the Oleson Park Zoo, in addition to the Defendants' Zoo.

In her capacity as an animal advocate and as an extension of her aesthetic interest in animals, Lisa Kuehl has familiarized herself with the requirements of the federal AWA and the regulations that govern its implementation. Lisa Kuehl routinely searches in an online USDA database for licensed Iowa facilities that violate the AWA, especially those that have been cited for direct noncompliant items, which she understands to mean violations that either cause direct harm to the welfare of an animal or harm that is imminent, i.e. if that some serious harm could come to an animal whose condition is not immediately attended to. Trial Tr. 537:25-538:2.

One such search for facilities with direct noncompliant items turned up the Defendants' Zoo. On the basis of what she learned in numerous inspection reports about the Zoo, Lisa Kuehl would later meet with a veterinarian from IDALS and fly over the Zoo in a private plane in furtherance of her aesthetic commitment to animals. What she observed in high-zoom photographs she took during that flight disturbed her beyond what she had learned in the inspection reports. Ex. 59, pp. 2-4. Like Mr. Jurnove and like her sister Tracey Kuehl, Lisa Kuehl began a campaign of advocacy on behalf of the animals at the Defendants' Zoo—even before she visited the Zoo—by seeking intervention from the USDA and IDALS via formal complaint letters, and from the Sheriff's Office via telephone. Ex. 60, pp. 1-7.

On the basis of her growing anxiety and in furtherance of her aesthetic commitment to seeing animals living under humane conditions, Lisa Kuehl determined to visit the Zoo in

person, which she did for the first time in June 2012 (with Plaintiffs Nancy Harvey and Kristine Bell). During that visit, Lisa Kuehl visited the tiger enclosures and was troubled to see that they lacked enrichment, lacked vegetation, and offered minimal shelter from weather and insects, a particular problem given the extraordinary number of flies she observed everywhere throughout the facility. Lisa Kuehl was troubled that the tigers were not exhibiting natural behaviors and were denied opportunities for comfort within their enclosures. Ex. 59, pp. 6-8. She likewise observed the wolves during that visit, who appeared lethargic. Although she walked past the lemur enclosures she could not view them given the shadows that obscured them. Following this visit Lisa Kuehl once again sought to advocate on behalf of the animals at the Defendants' Zoo, writing letters to the USDA, IDALS, and the Sheriff's Office. Ex. 60, pp. 9-34.

Like Mr. Jurnove, who returned to the zoo where he had become attached to nonhuman primates hoping to observe improvements, Lisa Kuehl returned to the Defendants' Zoo for a second visit, in July 2012, having worried for the animals in the interim. In returning she hoped to see some improvements at least respecting some of those things she had mentioned in her complaints before IDALS and the USDA. Unfortunately she continued to suffer injury to her aesthetic interest in seeing animals living under humane conditions, since she observed no improvements in the Defendants' facility. It was also during this visit that the Defendants invited law enforcement to make the Plaintiffs feel unwelcome. *See* Section I(A)(3), *infra*.

During the Iowa winter that followed her second visit, Lisa Kuehl's concern for the animals extended "particularly" to the endangered animals—the tigers, the lemurs, and wolves—because "they needed extra protections and [she] didn't feel like they were getting it at the zoo." Trial Tr. 591:22-24. In further exercise of her aesthetic commitment to the Zoo's animals, Lisa Kuehl undertook a second flight over the facility to observe winter's effect on the enclosures. Ex.

59, p. 12. Lisa Kuehl increased her advocacy efforts, in spite of not being able to return to the Zoo (on the ground) during the off-season, including by connecting with local animal welfare organizations and trying to pass in Iowa a dangerous wild animal bill that would impose some restrictions on the keeping of exotic animals. Lisa Kuehl grew frustrated by the failure of authorities to respond properly to her complaints and intervene on the animals' behalf.

Lisa Kuehl visited the Zoo a third and final time in July 2013 (with Plaintiff John Braumann). Once again she was optimistic, like Mr. Jurnove before her, that in the intervening months the Defendants would have improved the conditions for their animals—whether of their own volition or because one of the many authorities to which Lisa Kuehl had advocated would require them to—and that such improvements would have alleviated the aesthetic injury Lisa Kuehl suffered in the face of the persistently substandard care the Defendants provided their animals. Despite her cautious optimism she encountered the same conditions she had encountered twice previously, for example a lack of enrichment for the tigers and an accumulation of feces in their enclosures. Ex. 59, pp. 13.-14.

Lisa Kuehl has a connection to the tigers, lemurs and wolves at the Defendants Zoo, namely "because they're known to be endangered, of all the animals at the zoo, certainly they should be getting the best care possible for the survival of their species overall . . . [and] because they're a species that's dwindling and they deserve to have the utmost care and protections afforded to them." Trial Tr. 605:11-18. Her injury is therefore concrete and particular. Her injury is likewise actual or imminent, since although she is not visiting she keeps up with the welfare of the animals through volunteers who do go and through the USDA inspection reports, and she continues to this day to feel sad and frustrated about the conditions in which the Defendants' endangered animals must live. *Id.* 606:10-24.

d. <u>Ms. Nancy Harvey</u>

Plaintiff Nancy Harvey's aesthetic interest in animals stems in part from her experience growing up on a farm in Illinois on which her father raised "100 head of cattle," and at which they kept "cats and rabbits and all kind of pets." Trial Tr. 271:2-6. She continues to keep pets today, including two dogs, two cats, and a bird. Nancy Harvey feels a connection to animals and has always felt a deep concern and love for them. In exercising her aesthetic interest toward animals—which includes "a real deep compassion for most animals—any type of animals; be it wildlife, livestock, [or] companion animals", *id.* 10-12—Nancy Harvey has worked for the nonprofits Iowa Voters for Companion Animals and the Red Rover Responders, and conducts fundraising for shelters and rescue animals through an online page called Iowa Stars for Animals that she founded and maintains.

Nancy Harvey visited the Defendants' Zoo in June 2012 (with Plaintiffs Lisa Kuehl and Kristine Bell). Like Mr. Jurnove, for whom the conditions at the zoo he visited were "an assault on [his] senses and greatly impaired [his] ability to observe and enjoy" the captive animals exhibited there, *Glickman*, 154 F.3d at 432, Nancy Harvey was entirely assaulted by her visit to the Zoo, feeling after only a brief visit "so upset and anxious and depressed with what [she] had seen there with the lack of water in most cases, the food that appeared in many of the cages and enclosures that was—it was rancid looking. . . . [with the result that she] just didn't want to stay there any longer". Trial Tr. 292:3-8.

After her visit, Nancy Harvey lacked an appetite and was "anxious" and "depressed" and "felt mental torture." *Id.* 292:12-14. To this day she continues to "worry about the animals all the time and—and the extreme weather here in Iowa and how they are surviving." *Id.* 292:25-293:2. Testifying before the Court in October 2015, Nancy Harvey felt the same level of anxiety,

reflecting on her visit, as she did in June 2012. *Id.* 300:11-13. Her injury is therefore both concrete and particular and actual or imminent. *Lujan*, 504 U.S. at 560-61. Nancy's connection to the animals at the Zoo "[d]efinitely" extends to the Defendants' tigers, lemurs and wolves because "they're all in danger out there from lack of care, for lack of water, good food, shelter, adequate vet care." Trial Tr. 299:3-6.

e. <u>The individual Plaintiffs suffer a cognizable injury in fact.</u>

In *Laidlaw*, the plaintiffs brought a Clean Water Act citizen suit against a defendant who was discharging toxins into the local river. 528 U.S. 167 (2000). Plaintiffs alleged their aesthetic interest in enjoying the river—including, for example, a desire "to fish, camp, swim, and picnic in and near the river"—had been frustrated by the defendant's alleged pollution. *Laidlaw*, 528 U.S. at 181-82. The Supreme Court found that plaintiffs' very inability to exercise their aesthetic interest was an injury in its own right, and that plaintiffs had standing on the basis of conditional statements they offered that they would use the nearby river if not for the defendant's unlawful discharge of pollutants therein. *Id.* at 184. The Court distinguished that finding from its denial of standing in *Lujan*, explaining that plaintiffs' conditional statement could not be equated with "the speculative '"some day" intentions' to visit endangered species halfway around the world that we held insufficient to show injury in fact" in *Lujan*. *Id.*

Relying on this very distinction, upon deciding not to dismiss the plaintiffs' ESA take case the court in *Coggins* similarly found plaintiffs had standing. There, plaintiffs sued an unaccredited roadside bear attraction pursuant to the ESA alleging that defendant's confinement of grizzly bears in concrete "bear pits" harmed and harassed the bears. *Coggins*, 2014 U.S. Dist. LEXIS 82257 * 13. Even though the plaintiffs had visited the bears only once, the court found that the plaintiffs in *Coggins*, like those in *Laidlaw*, had standing based on their allegations "that

they want to visit the bears again but are unable to do so while the bears are kept at the Zoo in their current condition because of the additional injury Plaintiffs would suffer from witnessing the bears in these conditions. Such conditional statements that Plaintiffs would return to visit the bears but for the complained of conditions is sufficient to satisfy the pleading requirements for Article III standing." *Id.* at * 10.

Here, each of the individual Plaintiffs has testified that he or she would return to the Zoo but for the conditions that persistently inflict injury upon their aesthetic interests. For example, Tracey Kuehl testified that "because I didn't go to the zoo [for a year] is not a reflection on the fact that I lost concern or didn't care anymore about the animals in the situation." Trial Tr. 247:12-14. She testified that, after her third visit, she would not return again because she could continue to monitor conditions at the Zoo by reading USDA inspection reports, because there was "no physical benefit" to her going back since "[a]ll it did was upset [her]", and since she "felt it would be in the animals' best interest if I devoted my time to the advocacy." *Id.* 254:9-255:4. Like the plaintiffs in *Laidlaw* and in *Coggins*, she testified that she would revisit the animals at the Zoo if the Defendants provided lawful and humane conditions to their animals such that Tracey Kuehl would no longer suffer injury to her aesthetic interest. *Id.* 260:6. John Braumann testified to a similar experience, observing that he "could not go back unless some things had changed", *id.* 515:16, and that he monitors the USDA inspection reports to know whether things have in fact changed, *id.* 517:10-14. Lisa Kuehl testified similarly that "it's painful to go" but that she is not "letting the animals down by not returning" because she advocates for them from home through a variety of means. *Id.* 605:22-606:9. Like the others, and like the plaintiffs in *Laidlaw*, Lisa Kuehl would indeed return to the Zoo if she were welcome there and if things were to "turn around for the animals" because she "love[s] the animals" and

"care[s] for them." *Id.* 606:3-11. Similarly, Nancy Harvey, who visited only once, "could not return" because she "didn't want to go through that [again]", but she would "[a]bsolutely" revisit the animals if the conditions were improved. *Id.* 293:7-22, 299:7-9.

Like the plaintiffs in *Laidlaw*, that these Plaintiffs had to choose between, on the one hand, revisiting the Zoo and suffering an ongoing injury to their aesthetic interest and, on the other hand, physically (though not politically) abandoning the animals at the Zoo and foregoing the exercise of their aesthetic interests is, under the Supreme Court's reasoning and its distinction from *Lujan*, an injury in its own right. That these Plaintiffs have indicated that they would revisit the animals at the Zoo so long as certain conditions were met—namely, if the Defendants were to provide the humane care the endangered animals require—distinguishes their scenario from the denial of standing to the plaintiffs in *Lujan* whose speculative "some day" statements were insufficiently concrete. Each of the individual Plaintiffs has therefore satisfied the injury in fact requirement of Article III standing.

### 2. The injury to Plaintiffs' aesthetic interest is fairly traceable to the Defendants' unlawful conduct.

In *Laidlaw*, the Court found "nothing 'improbable' about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms." 528 U.S. at 184. Thus, where the defendant's unlawful behavior directly harms the plaintiff's aesthetic interest—for example by causing a plaintiff to abandon the recreational or aesthetic interest which he is otherwise entitled to exercise—a court will find causation satisfied. Like the defendant in *Laidlaw*, here the Defendants' direct actions—namely their consistent, intractable provision of substandard care to the endangered animals in their ownership or custody—has caused the injury to the Plaintiffs' aesthetic interest

in observing animals living under humane conditions. But for the Defendants' failure to care properly for those animals, the Plaintiffs' aesthetic interest would remain unharmed.

### 3. The injury to Plaintiffs' aesthetic interest would likely be redressed by a favorable decision by this Court.

Were this Court to require Defendants to comply with federal law or forfeit their endangered animals, the Plaintiffs' injury would be redressed. In *Glickman*, the D.C. Circuit found that Mr. Jurnove satisfied redressibility because "[t]ougher regulations would either allow Mr. Jurnove to visit a more humane Game Farm or, if the Game Farm's owners decide to close rather than comply with higher legal standards, to possibly visit the animals he has come to know in their new homes within exhibitions that comply with the more exacting regulations." 154 F.3d at 443. Parallel circumstances merit a finding of redressibility in this action.

Here, the Defendants have repeatedly denied the shortcomings in the care of their animals. *See, e.g.*, Tr. Ex. B (letters of Ms. Sellner repeatedly but unsuccessfully appealing AWA violations). Absent this Court's intervention, Defendants are unlikely ever to improve their care of the endangered animals. Moreover, since Defendants have insisted that the USDA is the only entity with jurisdiction over their animals, *see* Def. Trial Brief, ECF No. 49, p. 17 ("The Zoo is subject to the jurisdiction of the USDA (APHIS) under the Animal Welfare Act—not the private cause of action brought by the Plaintiffs in this case."), and since Defendants have insisted simultaneously that USDA inspectors either are not qualified to inspect their zoo or are nitpicky in their assessments about Defendants' facility and animals, *see, e.g.*, Trial Tr. 666-67 (in which Ms. Sellner admits to "locking horns" with her inspectors and finding them "nitpicky" and "obsessive compulsive"), this Court can redress the Plaintiffs' injuries only by ordering just and

proper relief as described below.[1] Like the plaintiff in *Glickman*, if this Court were to order compliance here, such relief would either allow these Plaintiffs to visit a more humane Cricket Hollow Zoo or otherwise visit the endangered animals they have come to know in their new homes within exhibitions that comply with lawful requirements.

Tracey Kuehl testified that she would prefer to see the Defendants' endangered animals "living out the rest of their lives at a facility that would allow them to act in a manner in which they were created." Trial Tr. 259:16-18. She allowed that she would revisit the animals at the Zoo if the Defendants could provide those lawful and humane conditions to their animals, but would likewise visit them if they were relocated to some other facility. John Braumann testified similarly, insisting that he would like to go back and visit but has seen or heard nothing that has indicated any changes at the Zoo but only ongoing "resistance" on the part of Defendants. *Id.* 517:2-8. As noted above, Lisa Kuehl would visit the Defendants' animals again if she felt she were welcome, because she "love[s] the animals" and she "care[s] for them." *Id.* 607:3-4. She would likewise visit the animals if they were removed from the Zoo and rehomed to a facility that was fully compliant with federal requirements. *Id.* 607:12-16. Finally, Nancy Harvey will not visit the animals again at the Defendants' Zoo "if they are still living in these types of conditions knowing there's nothing I can do about it". *Id.* 298:7-9. However, she will "[a]bsolutely" return to the Zoo to visit them again if the conditions there are improved, and would likewise visit them in another location if the animals were removed from the Zoo and relocated to another facility. *Id.* 299:7-13. Such a result would "[m]ost definitely" relieve Nancy Harvey's anxiety about the welfare of the animals because she would no longer have to worry if

---

[1] Although the ESA requires no exhaustion of administrative remedies—it requires only proper notice, *see* II(A), *infra*—as was described above ,several of the individual Plaintiffs did indeed seek administrative remedies, and rather exhaustively so, before bringing this litigation.

they were receiving proper care. *Id.* 300:2-8.

Because a favorable decision from this Court would likely alleviate the ongoing injury that Plaintiffs suffer to their aesthetic interest in seeing the Defendants' animals living under humane conditions—whether by requiring the Defendants to comply with federal standards or relocating the animals to a facility able and willing to comply with federal standards—the individual Plaintiffs satisfy the redressibility requirement of standing. In summary the individual Plaintiffs satisfy each of the three prongs of Article III standing analysis and so have standing to bring this action under the ESA.

**B. The organizational Plaintiff Animal Legal Defense Fund has standing to bring this action in its representative capacity.**

In its representative capacity the organizational Plaintiff Animal Legal Defense Fund likewise has standing to bring this case against the Defendants. Like the three-pronged Article III standing test, the Supreme Court has articulated a three-prong associational standing test: "[W]e have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Commn.*, 432 U.S. 333, 343 (1977). That principle controls today. *See, e.g.*, *Laidlaw*, 528 U.S. at 180–181 (reaffirming the three-prong test).

In this action, first, the individual Plaintiffs who are also members of ALDF (namely Tracey Kuehl, Lisa Kuehl, and Nancy Harvey) showed at trial that they would otherwise have standing to sue, as articulated at Section I(A), above. Second, those interests—the observation of animals living in humane conditions—are clearly germane to ALDF's purpose. *See* Pretrial Order, ECF No. 56, p. 2 (stipulating that "ALDF's mission is to protect the lives and advance the

interests of animals through the legal system."). Finally, while some of ALDF's members are in fact participating in this lawsuit, by no means does the claim asserted under the ESA, nor the relief requested pursuant thereto, require the participation of those members. ALDF therefore has standing to bring this lawsuit because it satisfies the three-pronged analysis the Supreme Court set forth in *Hunt*, above.

## II. PLAINTIFFS' ACTION UNDER THE ENDANGERED SPECIES ACT IS JURISDICTIONALLY PROPER AND REACHES CAPTIVE ANIMALS, INCLUDING DEFENDANTS' TIGERS, LEMURS AND WOLVES.

Plaintiffs bring this action pursuant to the ESA, 16 U.S.C. § 1531 *et seq.* Congress passed the ESA in recognition that species in danger or threatened with extinction "are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." 16 U.S.C. § 1531(a)(3). Enforcement of the ESA therefore advances numerous national values, just as violation of the ESA undermines those values. Among those national values is the humane treatment of special animals, whether in the wild or in captivity, and Plaintiffs here seek to vindicate their own aesthetic, educational, and recreational interests in addition to the humane treatment of Defendants' tigers, lemurs, and wolves at issue in this action. Federal statute, federal regulation, and federal case law demonstrate that the Plaintiffs' action is proper and that it reaches Defendants' conduct toward its endangered animals and those it has unlawfully transferred out.

### A. The Plaintiffs bring a statutory cause of action pursuant to Congress's intent that private citizens would enforce the ESA, and satisfied all notice requirements under the ESA.

The Plaintiffs' action proceeds from a statutory, private cause of action that Congress purposefully provided. To bolster the protection of endangered species and the vindication of the national values enumerated above, Congress created a dual enforcement mechanism by which

both the U.S. Fish and Wildlife Service (FWS) and private citizens might enforce the ESA. The Act empowers "any person" to commence a civil suit to enjoin alleged violations of the ESA, and grants jurisdiction to the district courts to hear such suits irrespective of the citizenship of the parties or the amount in controversy. 16 U.S.C. § 1540. Plaintiffs have fulfilled the ESA citizen suit notice requirements, namely by serving a 60-day notice of intent to sue letter before filing their complaint, and are thus properly before this Court. Defendants stipulated to no shortcoming in Plaintiffs' fulfillment of ESA notice requirements. Pretrial Order, ECF No. 56, Stipulation of Facts, p. 2. Plaintiffs' citizen suit action is therefore properly before this Court.

### B. The plain language of the ESA and its interpretation by USFWS make clear that the protections of the ESA reach the Defendants' captive animals.

That the Defendants exhibit endangered animals whom they hold captive does not shield them from potential liability under the ESA. The plain language of the statute clearly affords ESA protections to all members of endangered and threatened species, whether captive or wild and whether bred in captivity or captured from the wild. For example, since 16 U.S.C. section 1538(b)(1) explicitly exempts from certain (though not all) Section 9 prohibitions "any fish or wildlife which was *held in captivity*," the ESA clearly applies to captive animals on its own terms.[2] The FWS, tasked with enforcement of the ESA, has long implemented this clear intent of Congress through its law enforcement efforts, its decisions listing endangered and threatened species, and regulations it has promulgated pursuant to the Act. *See, e.g.*, 79 Fed. Reg. 37578, 37597 (July 1, 2014) ("Captive members have the same legal status as the species as a whole."); 80 Fed. Reg. 7380, 7399 (Feb. 10, 2015) ("On its face the ESA does not treat captives

---

[2] Specifically, 16 USC § 1538(b)(1) exempts "pre-Act wildlife" only from the "provisions of subsections (a)(1)(A) and (a)(1)(G)," referring to the import-export provision and the listing decision provision. Those provisions still apply to animals acquired for captivity *after* the ESA was enacted. Moreover, the provisions of subsections (a)(1)(B) through (a)(1)(F)—which include the prohibitions on "take" and unpermitted trafficking—apply to all captive animals, regardless of the time of acquisition.

differently. . . Section 9[] of the ESA [prohibiting take] applies to endangered species regardless of their captive status.").

**C. This Court has jurisdiction not only over Defendants' tigers and lemurs but also over Defendant's wolves.**

Tigers, ring-tailed lemurs, and red-ruffed lemurs are listed as endangered "wherever they are found." 50 C.F.R. § 17.11; *See also* Pretrial Order, ECF Doc. 56, Stipulation of Facts, pp. 2-3 (stipulating that "[e]ach of Defendants' tigers, ring tailed lemurs, and red ruffed lemur who have been or are currently exhibited at the Cricket Hollow Zoo in Manchester, Iowa, are listed as threatened or endangered species under the Endangered Species Act and its implementing regulations at 50 C.F.R. § 17.11"). As a matter of law, the ESA protections also reach Defendants' wolves, even if they are "hybrid" wolves.

The protections of the ESA reach hybridized animals wherever the "listing of a particular taxon [e.g. species] includes all lower taxonomic units [e.g. subspecies]." 50 C.F.R. § 17.11(g). The application of the ESA to hybridized animals fulfills the Act's core purpose of providing the broadest possible protections to endangered animals and undercuts the perverse incentive to escape liability merely by crossing different subspecies. For example, the tiger (*Panthera tigris)* is protected at the species level, so that crossing a tiger subspecies like the Bengal tiger (*Panthera tigris tigris*) with another tiger subspecies like the Siberian tiger (*Panthera tigris altaica*) produces protected offspring. In addition, crossing a general member of a protected species taxon (*Canis lupus* – the gray wolf) with a specific subspecies thereof (*Canis lupus familiaris* – the domesticated dog), produces protected offspring.

*U.S. v. Kapp* clarified this construction of the ESA, by enshrining the FWS' *own interpretation* of the Act. 2003 U.S. Dist. Lexis 21169 (N.D. Ill. Nov. 4, 2003). In *Kapp*, the defendant was convicted of violating the Lacey Act for trafficking in violation of the ESA,

namely by killing, skinning, and butchering endangered tigers and leopards and selling their hides and meat. Mr. Kapp sought to escape liability by arguing that a FWS Fact Sheet "led him to believe that the animals he participated in killing, processing, and selling were not protected by the ESA because they were hybrids" (i.e. crosses between two different tiger subspecies and crosses between two different leopard subspecies). *Id.* * 14. The court found that "even if Kapp's reading of the FWS Fact Sheet was correct [it was not], it is not the law." *Id.* * 30-31.

> The *ESA* as implemented through the Code of Federal Regulations clearly and unambiguously protects all sub-taxonomic branches of protected taxa. The Government presented abundant testimony by USFWS agents and other evidence at trial confirming this interpretation of the law. *Under the law, the only circumstance under which a hybrid of two subspecies would not be protected would be if one or both of the subspecies were not protected.*

*Id.* * 31 (emphasis added).

Therefore, according to FWS, even if the wolves in Defendants' possession are "75% hybrids," Ex. J, p. 8, they result not from an inter-species hybridization (unprotected) nor from the crossing of one protected subspecies with an unprotected subspecies (unprotected) but from crossing a protected species with a subspecies (protected). Pursuant to the FWS' construction of the ESA, any time one of the parents in the wolf hybridization is pure wolf (i.e. a member of the protected species) and the other is a domesticated dog, the offspring are entitled to the protections of the ESA. Here, it is a biological and genetic impossibility for Defendants' wolves to be 75% wolf unless at least one of the parents had been pure wolf.

## III. DEFENDANTS HAVE VIOLATED AND CONTINUE TO VIOLATE THE "TAKE" AND TRAFFICKING PROHIBITONS OF THE ENDANGERED SPECIES ACT.

Plaintiffs proved at trial that Defendants have violated and continue to violate the "take" and trafficking prohibitions of the ESA as those provisions are described in the statute, implanted

through regulations FWS issued pursuant to the statue, and as courts have interpreted the ESA and its implementing regulations. As such, this Court should enter an order finding Defendants liable under the ESA.

### A. The Defendants' conduct falls within the ESA's prohibition on the "take" of endangered species, a concept broadly defined in the statute and broadly interpreted in the case law.

The ESA prohibits any person from "taking" any listed species. 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). Congress desired that "take" "be defined in the broadest possible manner to include *every conceivable way* in which a person can 'take' or attempt to 'take' any fish or wildlife." S. Rep. No. 307, 93d Cong., 1st Sess. (1973), *reprinted* in 1973 U.S.C.C.A.N. 2989, 2995 (emphasis added). Proof of "take" requires only a showing of proximate causation, for which indirect and accidental acts will suffice, meaning that "take" does not require intent. *See Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 700, n. 13 (1995) (upholding FWS definition of harm and observing that "ordinary requirements of proximate causation and foreseeability" apply in analyzing liability); *Bensman v. U.S. Forest Serv.*, 984 F. Supp. 1242 (W.D. Mo. 1997) (finding that logging of "salvaged timber" in the Mark Twain Forest of Missouri would harm endangered Indiana bats by destroying habitat and by disturbing hibernating bats, even though defendants undertook no acts directly against the bats).

Because Congress drafted the meaning of "take" so broadly, overlap among the forms of take—including harm and harass—is to be expected. While "harm" and "harass" have separate

regulatory definitions (*see* 50 C.F.R. § 17.3), Courts have found both harm and harassment on the same set of facts.[3]

### 1. "Harm" means actually killing or injuring wildlife.

FWS regulations define "harm" in the definition of take as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. This definition allows no exceptions.[4] Therefore, a defendant could simultaneously possess a USDA exhibitor's license, comply with the minimum standards of the AWA, and nonetheless "harm" their animals by injuring or killing them in violation of the ESA.

No court has yet reached the merits regarding harm of captive endangered species.[5] Examples of harm to animals in the wild are nonetheless illustrative, and fully support a finding of "harm" in this case. While there are numerous cases demonstrating "harm" of endangered species in the wild, Plaintiffs discuss only a few in this brief and refer the Court to Attachment 1, appended to counsel's affidavit, for a summary of activities other courts found to constitute "harm." For example, in *Strahan v. Coxe*, 127 F.3d 155 (1st Cir. 1997), the plaintiff

---

[3] At trial, Plaintiffs enumerated several examples of harm and harassment findings in their trial brief and will not recite them here to preserve space. *See* Plaintiffs' Trial Brief, ECF No. 48, Sections II(E)(1)-(2), pp. 11-17; *see also* Attachment 1, appended to counsel's affidavit, Endangered Species Act "Take" Case Chart.

[4] The plain language of the definition for "harm" clearly contradicts Defendants' frivolous and insupportable claim that a Class C exhibitor is exempt from liability pursuant to harm. *See* Def. Trial Brief, ECF No. 49, pp. 7-8.

[5] As noted, the plaintiffs in *Hill v. Coggins* won against a motion to dismiss and against Defendants' motion for summary judgment, in which Defendants argued that plaintiffs lacked standing, that Defendants' bears are not "grizzly bears" subject to the ESA, that the ESA citizen suit mechanism was inapplicable, and that Defendants had not "taken" endangered species. *Coggins*, Case No. 2:13-cv-00047-MR-DLH (text only order) (W.D. N.C. Aug. 13, 2015). The case went to trial in September 2015 and the court has taken the matter for submission. Other cases alleging "harm" or "harass" to captive endangered animals were resolved without addressing the merits. *See, e.g., ASPCA v. Feld Entm't, Inc.*, 659 F.3d 13, 17 (D.C. 2011) (court did not reach merits of whether use of bullhooks and chains on circus elephants "harasses, harms, or wounds"); *ASPCA v. Ringling Bros. & Barnum & Bailey Circus*, 502 F.Supp.2d 103, 110, 112-13 (D.C. 2007) (defendants elephant owners' summary judgment denied as to acts that did not constitute "takes" because of disputed facts and captive-bred wildlife permit exemption, which is inapplicable here, and defendant's treatment of its "'pre-Act' elephants" not subject to any Section 10 take permits).

conservationist sued the Commonwealth of Massachusetts for violating the ESA on the basis

that the Commonwealth's issuing licenses and permits for gillnet and lobster pot fishing led

inevitably to the taking of Northern Right whales, whose entanglement in commercial fishing

gear was a recognized source of human-caused injury and death to the endangered whale

population. The district court found "harm" in that at least nine of these endangered whales had

become entangled in Massachusetts coastal waters, and that one was likely to die from its

injuries, *Coxe*, 127 F.3d at 159, and that "at least fifty-seven percent of all Northern right whales

have scars indicating prior entanglement with fishing gear and noted that, *even where the whale*

*survives*, the entanglement still wounds the whale," *id.* at 165. The First Circuit upheld both the

trial court's factual finding as sufficient for harm and the preliminary injunction against the

commercial fishing regulatory scheme, finding that the scheme was the "indirect cause" of the

takings since, "but for" the permitting process, third parties could not have injured the whales.

*Id.* at 163-64. *See also Greenpeace v. Nat'l Marine Fisheries Serv.*, 106 F. Supp. 2d 1066 (W.D.

Wash. 2000) (finding threat of future harm to Western Steller sea lion in continued trawl fishing

since the practice depletes prey animals and reduces sea lions' ability to forage); *Animal*

*Welfare Inst. v. Beech Ridge Energy LLC*, 675 F. Supp. 2d 540 (D. Md. 2009) (finding that

endangered Indiana bats would be harmed by wind turbines since turbines cause injury and

death when the bats collide with them).

### 2. *"Harass" means annoying wildlife to such an extent that it disrupts normal behavioral patterns and creates a likelihood of injury.*

FWS regulations define "harass" for ESA purposes as "an intentional *or negligent* act *or*

*omission* which creates the *likelihood* of injury to wildlife by annoying it to such an extent as to

significantly disrupt normal behavioral patterns which include, but are not limited to, breeding,

feeding, or sheltering." 50 C.F.R. § 17.3 (emphasis added). When applied to captive endangered

animals, a defendant may avoid liability where he or she has undertaken "generally accepted animal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act."[6] *Id.* Therefore, unlike harm, this definition allows a narrow exception. That exception is not, as Defendants argue, for holders of USDA licenses but for those exhibitors (and only those exhibitors) who meet or exceed industry standards and federal requirements.[7]

That an exhibitor has not been cited by the USDA for particular issues is not in and of itself a shield against liability nor dispositive as to a defendant's having met the needs of its animals. Since the agency enjoys discretion not to cite a given shortcoming, the agency's silence cannot prove compliance. More importantly, the exemption the definition envisions requires not merely compliance with the AWA but comportment with generally accepted animal husbandry practices. Therefore, even if silence on the part of the USDA *could* prove compliance with the AWA (again, it cannot), since the AWA is silent to a good many issues related to animal care, what complies with the AWA may well fall below what is generally accepted among those who maintain captive exotic animals. For example, even Defense witness Dr. Gary Pusillo testified that, although the USDA is an authority on animal nutrition, he must sometimes go beyond the USDA's nutritional guidelines to establish what is best for the animals in his care. Trial Tr. 393:17-21. Similarly, when asked by defense counsel whether the Defendants had complied with the minimum requirements of the AWA as to lemur cage sizes, Plaintiffs' expert Dr. Peter

---

[6] The goal of the AWA is "to insure that animals intended . . . for exhibition purposes or for use as pets are provided humane care and treatment." 7 U.S.C. § 2131(1). To fulfill its purpose, the AWA and its implementing regulations set forth "minimum standards" of care for the "handling, housing, feeding, watering, sanitation, ventilation, shelter from extremes of weather and temperatures, adequate veterinary care, and separation by species where . . . necessary for humane handling, care or treatment of animals[.]" 7 U.S.C. § 2143(a)(2)(A).

[7] The obvious purpose of such an exception is to clarify that although captivity might intrinsically "annoy" wildlife and "disrupt normal behavioral patterns," possession alone does not constitute *per se* harassment.

Klopfer responded that the Defendants "don't meet the requirements *of lemurs* that are to be kept in a healthy condition *irrespective of what the federal regulations say. Federal regulations, I have to point out, are in many cases not relevant to the care of lemurs*. They're in the process of being revised as we talk because at the time they were written, there were virtually no captive lemurs except in a few isolated zoos here and there. We knew nothing about them." Trial Tr., 185:9-17 (emphasis added). Even Mr. Sellner himself admitted that the USDA's requirements for cage size are inadequate, at least as to tigers. Trial Tr. 767:25-768:3.

As with harm, while no court has yet decided whether "harassing" captive endangered species constitutes a "take" under the ESA,[8] case law proves the scope of "harass" is broad. While there are numerous cases demonstrating "harassment" of endangered species in the wild, Plaintiffs only discuss a few in this brief and refer the Court to their Attachment 1,appended to counsel's affidavit, for a summary of activities other courts found to constitute "harassment".

For example, in *Strahan v. Linnon*, the plaintiff conservationist sued to enjoin the Coast Guard from violating the Endangered Species Act and the Marine Mammal Protection Act, including by disturbing and injuring Northern Right whales when undertaking its marine operations like rescues at sea, navigation assistance, and drug enforcement. 967 F. Supp. 581 (D. Mass. 1995). The court observed that "Strahan has submitted evidence that, when viewed in the light most favorable to his claims, suggests 'actual harm' and 'harassment' occurs when Coast Guard vessels approach Right whales too closely." *Id.* at 631. Despite the evidence of harassment, the court declined to issue a preliminary injunction on the basis that the Coast Guard had "substantially increased efforts to avoid Right whales as part of its new Whale Protection Program" such that *ongoing* taking of whales in the foreseeable future may prove to have been

---

[8] *See supra* n. 3.

mitigated. *See also Loggerhead Turtle v. Volusia Co. Council*, 896 F. Supp. 1170 (M.D. Fla. 1995) (finding that artificial light from those driving on beach harasses sea turtles by disrupting nesting behavior).

### 3. *Defendants have "taken" and continue to "take" endangered tigers by harming and harassing them.*

The evidence shows that the Defendants have taken and continue to take endangered tigers by harming and harassing them. Defendants maintain their tigers in a manner that not only significantly disrupts their natural behaviors and belies basic minimum animal husbandry standards, but also harms and harasses the animals' physiology and psychology. Even if it were true that the Defendants had never violated the AWA respecting the care of their tigers—though they have, *see* Attachment 3, USDA Citations—the Defendants would nevertheless be liable for harming their tigers, since the definition of harm permits no exceptions. Moreover, since the Defendants have in fact failed to meet the minimum requirements of the AWA in the care of their tigers, and since the Defendants' husbandry practices do not rise to the level of generally accepted practices, they are likewise liable for harassing their tigers. Indeed, in the expert opinion of Dr. Jennifer Conrad, the Defendants' own substandard husbandry has caused the demise of many of their animals, and has created a situation in which it is not merely likely but "predictable" that their endangered animals will suffer injury. Trial Tr. 25:2-15.

### a. Inadequate Veterinary Care

The USDA requires exhibitors to establish and maintain programs of "adequate" veterinary care that include the use of "appropriate methods" to *prevent* diseases and injuries. 9 C.F.R. § 2.40(b)(2). Moreover, the USDA requires every exhibitor to "establish and maintain programs of adequate veterinary care" that include the use of "appropriate methods" to *diagnose* diseases and injuries. 9 C.F.R. § 2.40(b). Finally, it likewise requires every exhibitor to maintain

"direct and frequent communication" with their veterinarian "so that timely and accurate information on problems of animal health, behavior, and well-being is conveyed to the attending veterinarian." *Id.* To provide adequate veterinary care, Defendants need to demonstrate they follow protocols for both preventative and therapeutic care. Minimum preventative care calls for an annual physical exam of all animals. An annual exam should comprise of blood work; urine and fecal analysis; a dental exam; and an assessment of the animal's body condition, which involves examination of the animal's eyes, weight, and fur. Trial Tr., J. Conrad, 30:3-16.

Contrary to these requirements, Defendants' program of veterinary care is woefully inadequate and does not include appropriate methods for prevention, diagnosis, or timely and accurate information. For example, the Defendants' veterinarian routinely attempts to diagnose the Defendants' animals over the telephone, based only information conveyed to him by Ms. Sellner. *See, e.g.*, Trial Tr., J. Conrad, 36:21-37:2; 41:15-42:11; *id.* J. Pries, 433:1-14. Such infrequent and over-the-phone consultations fail to prevent diseases adequately, does not constitute an appropriate method of diagnosis, and does not satisfy the requirements that communications be direct, frequent, timely and accurate.

For example, instead of visiting the tiger Miraj, who was reportedly suffering from partial paralysis, quick breathing, and a lesion, Dr. Pries merely prescribed, over the phone, a rotating course of antibiotics of various kinds. Ex. 48, p. 13. Four short weeks separated this beginning of treatment from the tiger's euthanasia, without any official diagnosis ever having been given. *Id.* (with the line for "diagnosis" having been left blank). Neither was a necropsy conducted. *Id.* Even in the face of this outcome—and the many other animal deaths, which Ms. Sellner evidently concealed from Dr. Pries (*see* Trial Tr., J. Pries, 435:11-12 (referring to the number of animal deaths since he began his tenure in 2010: "I assume these are ones she found dead and

that I wasn't told about them.")—Dr. Pries would have the Court believe that Ms. Sellner has "never missed" in her over-the-phone diagnoses, and that she "does really well on the phone." Trial Tr. 433:6-14, 434:16. Needless to say the responsibility of proper diagnosis belongs not to the licensee but to the veterinarian, and "obtaining information over the telephone negates everything that a veterinarian is. . . .[since veterinarians] are trained to look at animals, to know what sort of things we need to get to diagnose animals." Trial Tr., J. Conrad, 41:20-24. An animal who must be euthanized under these circumstances raises grave questions about the adequacy of diagnosis and treatment and about the frequency and accuracy of communications between the licensee and her veterinarian.

Not only Miraj but two other tigers (and one lion) have died in the short time since this lawsuit was filed in June 2014. Ex. 39, p.6; Ex. 48, pp. 7 (Casper), 11 (Luna, though without annotating her death); *see also* Attachment 2, Animal Deaths, appended to counsel's affidavit. Six tigers have died in the last three years alone, on average two tigers every year. *Id.* The white tiger Casper, for example, died reportedly of "pneumonia" around ten-years-old (at half a captive tiger's expected age, Trial Tr., J. Conrad, 65:9) and just four months after his arrival at the Defendants' Zoo. Ex. 48, p. 7; *see also* Attachment 2, Animal Deaths. This despite the fact that on October 7, 2014, the USDA cited the Defendants for inadequate veterinary care in light of the fact that Casper had an "open wound" on his front left leg "about two inches by three inches in size." Ex. 29, p. 1. Although Dr. Pries had apparently evaluated the tiger on August 25, 2014, he had provided "no treatment guidelines" to Ms. Sellner, nor had he provided any treatment himself to Casper's skin or wounds. *Id.* Indeed, Dr. Pries advised Ms. Sellner that Casper would "lick the wound clean," Ex. 48, p. 8, an observation that could have proven fatal to Casper. Dr. Conrad testified that although tigers are known to lick their fur to maintain their coat, their

tongues are especially abrasive and can "lick the remnants of meat off of a bone in seconds." Trial Tr. 58:9-14. Ms. Sellner would go on to determine, in her own diagnosis on November 1, 2014, that Casper was looking "fatter and better overall," and yet hardly one month later, on December 5, 2014, Casper died allegedly of "pneumonia," which Dr. Pries apparently diagnosed over the phone. Ex. 48, p. 7. In Dr. Conrad's expert opinion, inadequate veterinary care led to Casper's death, including a failure properly to observe the signs indicating that Casper was ill from a potentially fatal infection in his leg. Trial Tr. 64:23-25, 65:10-15.

In the face of this torrent of mortality, Defendants have unfailingly declined to necropsy their tigers. Ex. 48. Indeed, Dr. Pries confirmed that he has never once ordered a necropsy at the Zoo. Trial Tr. 439:18-21. The failure to necropsy animals endangers all the surviving animals, since contagious disease cannot adequately be contained, prevented, or treated. In Dr. Conrad's expert opinion, the failure to necropsy animals not only fails to comport with generally accepted animal husbandry practices, it is altogether "unacceptable." Trial Tr. 27:19-20. Likewise the failure to utilize proper diagnostic methods falls short of USDA requirements and fails to comport with generally accepted animal husbandry practices.

Defendants purport to maintain that they operate effectively as a rescue, taking in animals in such poor condition that their imminent deaths can only be expected. *See, e.g.*, Trial Tr., J. Pries, 418:2-9 (testifying that the surge of dead cats around November 2014 was related to their having come from a "drug house"); *id.* 440:21-23 (testifying that they "were concerned about the health of them when she got those cats. They weren't in the best of condition when she got them."). However, among the five tigers who have died in the last two and a half years, two were born there—meaning the Defendants are not rescuing but *breeding* their endangered animals— and a third had been there for a decade already. Specifically, Raoul died less than ten months

after his birth at the Zoo (reportedly of preventable and treatable "quick pneumonia"), Sherkhan died some ten years after arriving at the Zoo (reportedly of "old age"), and—during the pendency of the Plaintiffs' summary judgment motion—Miraj died some ten years after his birth at the Zoo (again, without diagnosis). Ex. 48, pp. 5-6, 12; *see also* Attachment 2, Animal Deaths. Plainly, since animals die who have been born on site, or who were acquired a long time ago, Defendants cannot eschew all responsibility for tiger deaths by portraying themselves as a rescue to animals whose deaths are imminent one way or the other.

Defendants' veterinarian lacks the experience and expertise necessary to care for tigers. The USDA requires every exhibitor to "have an attending veterinarian who shall provide *adequate* veterinary care to its animals." 9 C.F.R. § 2.40(a) (emphasis added). Having considered the qualifications and admissions of Defendants' attending veterinarian, Dr. Conrad concluded that he is neither qualified to fulfill nor committed to fulfilling the responsibilities the USDA requires of him. Trial Tr. 31:11-14 (referring to Dr. Pries as either "lackadaisical" toward or "[un]interested" in his role as attending veterinarian); *id.* 37:3-38:20 (testifying that nothing in the record indicated that Dr. Pries had acquired the experience nor developed the expertise to perform as a veterinarian who treats tigers); *id.* 40:1-3 ("there's no way a veterinarian would allow these many problems if the veterinarian were truly interested in the well-being of these animals."). Defendants' failure to enlist an appropriately trained and competent veterinarian harms and harasses their big cats.

Moreover, even if Defendants' veterinarian were adequately trained and competent, he lacks the facility and equipment to provide adequate veterinary care. For example, neither his x-ray machine nor his operating table can accommodate an adult tiger. Trial Tr., J. Pries, 442:1-20. A proper diagnosis for pneumonia, to distinguish between infectious (i.e. communicable) and

"inhalation" pneumonia (when a tiger mistakenly inhales food into its lungs in the course of rapid eating), cannot be obtained without use of an x-ray machine. Trial Tr., J. Conrad, 73:21-22. Neither can pneumonia of any variety be distinguished from heart disease or other conditions. *Id.* 74:7-9. Such diagnostic tools matter, since at least two of Defendants' tigers have allegedly died of pneumonia. Ex. 39, p. 6, Ex. 48, pp. 5, 7.

In sum, Defendants' choice to utilize a veterinarian with inadequate expertise, Defendants' failure to consult that veterinarian (or a veterinarian with adequate expertise) as frequently or as appropriately as circumstances require, Defendants' preference to restrict veterinary care to phone calls, Defendants' routine practice of allowing their tigers to die without the benefit of humane euthanasia, and Defendants' persistent failure to necropsy their tigers are not generally accepted animal husbandry practices, do not meet or exceed the minimum requirements of the AWA, and have both harmed and harassed, and continue to harm and harass, Defendants' endangered tigers. That the USDA has never cited the Defendants for utilizing this veterinarian and his clinic is irrelevant to whether his veterinary care has contributed to the harm and harassment of the Defendants' endangered tigers. *See* argument at III(A)(2), *supra*, regarding silence of USDA, silence of AWA, lack of any exemption as to harm, and requirement of comportment with generally accepted practices to qualify for exemption as to harass.

### b.  Inadequate Sanitation

The USDA requires exhibitors to "remov[e] and dispos[e] of animal and food wastes, bedding, dead animals, trash and debris" and remove "excreta" "from primary enclosures as often as necessary to prevent contamination of the animals contained therein and to minimize disease hazards and to reduce odors." 9 C.F.R. §§ 3.125(d), 3.131(a). The USDA has many times cited Defendants for failing to comply with these requirements at the Zoo, including at least four

times in the last four years with respect to Defendants' tiger enclosures specifically. *See* Attachment 3, USDA Inspection Reports Chart; *see also* Ex. 8, p. 4 (tiger enclosure has an "excessive accumulation" of animal waste); Ex. 17, p. 3 ("There is a large accumulation of feces within three of the tiger enclosures, two of the lion enclosures and the wolf enclosure. There are large piles of feces in the corners and smaller piles scattered throughout each enclosure."); Ex. 28, p. 4 ("There are several enclosures throughout the entire facility that have a build-up of food waste and/or animal waste within the enclosure or within the shelter for the enclosure", including "tigers (2 [enclosures])".); *see also* Ex. 61, pp. 6, 10; Ex. 63, pp. 7-8. Some of these citations from the USDA were repeat noncompliances, meaning the USDA had cited the Defendants previously for the identical problem.

The excessive buildup of feces in the Defendants' facility is the first and "most egregious" deficiency Dr. Conrad identified in relation to the health and welfare of the Defendants' animals. Trail Tr. 26:22-25. For example, flies that congregate around feces communicate disease between animals, and accumulated feces provides an environment in which parasites might gestate. *Id.* 51:14-21. In Dr. Conrad's expert opinion, the accumulation of feces at a facility is "a generalized sign of neglect." Trial Tr. 55:1. The USDA itself, in citing the Defendants for feces buildup, has observed that failure to maintain sanitation increases disease risks, odor levels, and the presence of pests, which creates a likelihood of injury and annoyance to the animals. In at least one inspection report, the USDA actually observed that a tiger was so swarmed by flies that it was "twitching and pawing at the flies." Ex. 28, p. 5.

Animals in the wild would instinctively move away from their feces or defecate apart from their living quarters, whereas the Defendants' animals have no means of escaping the waste accumulations that Defendants either refuse to clean or lack the resources or staff to clean.

Defendants' animals therefore are not merely exposed to disease, unpleasant odors, and pests, their natural behaviors—like grooming and general fastidiousness—are likewise inhibited or precluded by the presence of their own waste. Inadequate grooming or inadequate opportunities to groom can lead to discomfort, skin infections, and parasites. Trial Tr. 55:23-56:7. Defendants' failure to provide safe and habitable enclosures and to maintain proper hygiene therein fails to meet the minimum requirements of the AWA, fails to comport with generally accepted animal husbandry practices, and harms and harasses their endangered tigers.

### c. Inadequate Housing and Caging

Beyond the lack of proper sanitation within the tiger enclosures, the Defendants likewise harm and harass their tigers by inadequately sizing and maintaining their tiger enclosures. For example, the Defendants use pea gravel in their tiger enclosures. Mr. Sellner testified that he changes out the pea gravel at most every six months but more often than not every two years. Trial Tr. 765:21-766:3. During the two years in which the Defendants decline to change out the pea gravel, they merely "spot clean," which refers to the use of a rake or a horse pick to remove animal waste, through which most of the pea gravel falls and remains behind—much like the use of a scoop in a housecat's litter box. That most of the pea gravel remains behind, and is changed so seldom, harms and harasses the tigers, since it is impossible to sanitize pea gravel on which tigers have defecated and urinated. Mr. Sellner testified moreover that at times the pea gravel gets so firmly compacted between changings that he must use a rototiller to soften it up. *Id.* 767:16-20. Dr. Conrad indicated that pea gravel is below industry standard—which is to say, fails to comport with generally accepted practices as concerns the keeping of tigers—because it hurts the animals, because they can ingest it by mistake, because it is impossible to clean, and because it is simply inferior to alternatives (like grass, which is more comfortable and more

natural). Trial Tr. 92:11-23. The use of pea gravel in this fashion therefore harms and harasses the tigers and does not comport with generally accepted animal husbandry practices.

In addition, Mr. Sellner still "holds true" to what he said during his deposition, which is that the larger zoos that provide large habitats and lots of enrichment for their tigers do not adequately serve the public, because if a visitor cannot see the tiger, "what's the point of having them too at that?" *Id.* 769:1-20. In other words, although Mr. Sellner admits that the USDA requirements are inadequate to meet the needs of tigers—which is to say, that tigers might be harmed or harassed even if an exhibitor were to meet the minimum requirements of the AWA as to tiger cage size—he might not make his cages so large that the public would have difficulty viewing his tigers. The Zoo goes so far as to exhibit not only lions and bears but also tigers in corn cribs, extremely cramped circular enclosures. Ex. 63, p. 12. Even if a corn crib were large enough to meet the minimum requirements of the AWA, it is by no means a generally accepted practice and cannot provide for the natural behaviors of a tiger without annoying the animal and creating a likelihood of injury.[9]

Mr. Sellner likewise testified that he is singularly responsible for building and maintaining the Zoo's enclosures and its perimeter fence. Trial Tr. 776: 19-21. Despite this responsibility, he was repeatedly surprised at trial that his Zoo had been cited by the USDA for various violations of enclosure- and fencing-related requirements, and that Ms. Sellner had not told him about such violations. For example, the USDA recorded in February 2011 that the licensee herself had reported a baboon had escaped in a prior month. Ex. 6, p. 1. Mr. Sellner insisted at trial they had fixed the enclosure that had permitted that to happen. But on August 16

---

[9] Mr. Sellner allowed that even the Iowa heat might sufficiently annoy a tiger, observing that Sherkhan, the tiger who escaped his enclosure and attacked him (Mr. Sellner) likely did so because he was irritated by the heat. Trial Tr. 784:11-19.

of that same year, another baboon escaped *during the inspector's visit*. Ex. 7, p. 3. Mr. Sellner was not aware of the second escape. Trial Tr. 773:1-6. The USDA cited the Sellners again, in June 2013, for an unsound enclosure in which were housed three baboons, including a large male. Ex. 19, p. 3. Mr. Sellner disagreed that the enclosure was unsound. Trial Tr. 775:4. The failure to maintain animal enclosures is a danger to both the animals and the public and does not meet the minimum requirements of the Animal Welfare Act. *See* 9 C.F.R. § 3.80(a)(2)(iii).

But the Defendants' shortcomings do not concern primate enclosures only. These problems indeed extend to the tiger enclosures. In December 2011 the USDA cited the Defendants for maintaining tigers in cages without tops, without adequate kick-ins, and with fencing only 10.67 feet high. Ex. 8, p. 3; 9 C.F.R. § 3.125(a). Once again, Mr. Sellner admitted never having seen that inspection, despite being the person whose responsibility it is to construct and secure the animal enclosures. Trial Tr. 776:11-12. Mr. Sellner likewise admitted that a tiger can jump at least twelve and a half feet high, since a tiger escaped an enclosure of that height at the San Francisco Zoo by jumping out of it. *Id.* 777:12-18. Mr. Sellner complained at trial that the big zoos fail to cover their tiger enclosures, which makes them dangerous, and yet the USDA cited the Defendants for failing to build tops for the very same two previously cited tiger enclosures—with fencing only 10.67 feet high—six months later, in May 2012. Ex. 12, p. 3.

That a tiger might escape its enclosure at the Defendants' Zoo and become a danger to itself and others is not merely speculative. Mr. Sellner himself was attacked by an escaped tiger Sherkhan in July 2011. Mr. Sellner did not think the tiger attack was a "big deal," even though he had to be flown by helicopter from Manchester to a hospital in Iowa City. Trial Tr. 781-783. In a zoo that is properly compliant with enclosure requirements, an escaped tiger—although still a grave danger—is less dangerous than in a zoo that is routinely noncompliant with enclosure

requirements. The Defendants' Zoo has more than once been cited for shortcomings in their perimeter fence, the only fence that contained Sherkhan from escaping the Zoo on that day in 2011. For example, in July 2013—two years after the Defendants were on notice their dangerous wild animals might escape—a USDA inspector noted that contrary to 9 C.F.R. § 3.127(d), the perimeter fence surrounding the big cats, bears and wolves was inadequately tall, with gaps that would allow animals to enter or exit the enclosures. Indeed, a sixteen foot stretch of the perimeter fence was only six feet high, Ex. 20, p. 5, less than half the minimum jumping height of an adult tiger. Presumably the Defendants, knowing that a tiger had previously escaped their facility, would be eager to impose safety measures for their animals and for the public, and yet only two months after citing them in July 2013, the USDA inspectors again found that "the perimeter fence surrounding the big cats, bears and wolves has a section of fence that has become detached from the fence post and is sagging out from the facility. Another section of fence in the same area has been patched together with panels and there are gaps between the panels that could be pushed apart to allow animals to enter or exit the area. This fence is not in good repair and does not effectively restrict animals and unauthorized persons from going through it." Ex. 22, p. 4.

In sum, the provision of substandard, unhygienic, and uncomfortable pea gravel, the provision of injuriously small enclosures, and especially the failure to build and maintain enclosures and a perimeter fence that might contain the tigers and prevent a danger to the tigers and to the public harms and harasses the Defendants' tigers in violation of the ESA.

### d.  Inadequate Environmental Enrichment

Captive tigers, like their wild counterparts, have cognitive abilities that require sufficient stimulation such that the animals do not develop stereotypic behaviors, a form of obsessive-

compulsive self-soothing common to pathological captive animals. Stereotypy among tigers can include, for example, pacing, neurotic licking, or breaking their teeth on chain-link fence. The failure adequately to stimulate captive tigers is analogous to solitary confinement in a jail cell for humans. Trial Tr., J. Conrad, 65:24-66:2. Although providing such environmental enrichment is easy and inexpensive, nothing in the record suggests that Defendants have provided adequate enrichment to their animals. *Id.* 66:24-67:2.

Tracey Kuehl testified at several points that the Defendants provided little to no enrichment opportunities for their tigers. For example, she observed during her first visit a white tiger in a "very small enclosure" with "[n]ot much of anything for enrichment. No grass, no vegetation, no toys; simply a log to sit upon, a Quonset hut-type metal house, if you will." Ex. 61, p. 6; Trial Tr. 225:25-226:4. When she returned to the Zoo for a second visit she observed that the tiger enclosures looked exactly as they had during her first visit: they remained "pretty sparse" and "pretty bare," without enrichment, only "the same logs. The same—same as it had been two weeks ago." Ex. 61, pp. 9-10; Trial Tr. 242:14-17, 243:16-19.

John Braumann testified similarly to a lack of enrichment for the tigers. During his first visit, he observed that apart from a bowling ball and what he presumed to be an animal carcass, the tigers were otherwise without enrichment. Ex. 63, p. 10; Trial Tr. 482:17-484:10. He "presumed that the bowling ball was inadequate entertainment . . . for an animal that can't run or do anything else that it would normally do." *Id.* 484:22-24. Plaintiffs' expert Dr. Conrad testified similarly, observing that a bowling ball is not appropriate enrichment for a tiger, because a tiger can break its teeth on a bowling ball. *Id.* 66:24-67:2. Another tiger John Braumann observed on his first visit had no enrichment but a single log. Ex. 63, p. 13; Trial Tr. 493:10-20. When he returned the following summer he observed the tigers in the same condition, with "[n]o more

enrichment" than he had seen during his first visit. *Id.* 507:7-14. In sum, neither Tracey Kuehl nor John Braumann—who collectively visited the Zoo on five different occasions—observed anything approaching sufficient enrichment for the Defendants' tigers.

Ms. Sellner herself indicated—as the photographs and Plaintiffs' testimony bear out— that apart from a log, a bowling bowl, and food, the tigers are otherwise without enrichment (with the possible exception that some of the tigers may or may not be able to submerge in a tiger-sized trough of water). Trial Tr., P. Sellner, 320:12-19 (listing bowling balls, tanks, and "prey" as enrichment). In contrast, Dr. Conrad testified that "for tigers [not only] you can give them logs to scratch on. You can put scents on those logs. You can give them Christmas trees to play with. You can give them balls [not bowling balls]. Tigers like to be in water, so pools [not tanks]. You can do things like cardboard boxes filled with a pumpkin and a watermelon or a pineapple; all those things. They love—they'll play with that for hours." Trial Tr. 66:14-21.

Defendants' failure to provide adequate environmental enrichment harasses their endangered tigers, because it disrupts their normal behavioral patterns in a way that creates a likelihood of psychological and concomitant physiological injury.

### e.   Inadequately Implemented Nutritional Protocols

Defendants purport that their tigers receive adequate nutrition because they have at times in the past consulted an expert nutritionist. However, although Dr. Conrad respects Dr. Pusillo's work in nutrition, she indicated that it is not easy to implement his complicated nutritional protocols, for example because they must be calibrated at least to the weight and age of a given animal. Trial Tr., 79:1-17. According to Dr. Conrad, any time a young animal dies, "nutrition quite possibly played a part". *Id.* 81:7-8. At least one young tiger has died at the Defendants' facility, Raoul, reportedly of "quick pneumonia" less than ten months after his birth at the Zoo.

Ex. 39, p. 6, Ex. 48, p. 5; *see also* Attachment 2, Animal Deaths.

Dr. Pusillo admitted that he has not provided to the Defendants new or amended nutritional protocols since he first provided them in 2006, Trial Tr. 397:17-23, even though he himself "ha[s] to be advanced in [his] nutritional knowledge and not wait for the USDA or AFCO to publish their results," which they publish "every year," *id.* 393:8-16. At most he has discussed those 2006 protocols with Ms. Sellner over the phone or via email. *Id.* He likewise admitted that he does not oversee the Defendants' implementation of his protocols, and that he has no way of confirming that they do so properly *Id.* 398:4-12. In fact he entirely eschews responsibility for the implementation of the protocols at the Zoo. *Id.* 398:10-400:1.

Even if the Defendants were properly implementing Dr. Pusillo's nutritional protocols, the shortcomings in sanitation in the tiger enclosures could wholly undermine that protocol. For example, flies and other pests could contaminate the food. Indeed, the USDA has many times cited the Defendants for violations of the AWA and its implementing regulations regarding improper feces control and improper pest control. *See* Attachment 3, USDA Citations, appended to counsel's affidavit; *see also, e.g.*, Ex. 28, p. 5 ("There are an excessive number of flies throughout the entire facility. There are flies in the following enclosures: . . . tigers ([affecting] 7 [individuals])." At least one of the Defendants' tigers, Luna, allegedly died of foodborne illness, namely E. coli, some four months after acquisition and at only half her expected age as a captive tiger. Ex. 39, p. 6; *see also* Attachment 2, Animals Deaths. E. coli is both preventable and treatable, but nothing in the record indicates that Luna received any treatment. Trial Tr., J. Conrad, 86:7-9.

In sum, that Defendants have provided inadequate veterinary care, inadequate sanitation, inadequately maintained, sized, and secured enclosures, inadequate environmental enrichment,

and inadequately implemented nutritional protocols has harmed and harassed, and continues to harm and harass, their endangered tigers in violation of the "take" prohibition of the ESA.

### 4. Defendants have "taken" and continue to "take" endangered lemurs by harming and harassing them.

Defendants' lemurs are housed and maintained in a manner that not only significantly disrupts their natural behaviors and belies basic minimum animal husbandry standards, but also harms and harasses the animals' physiology and psychology. Even if it were true that the Defendants had never violated the AWA respecting the care of their lemurs—though they have, *see* Attachment 3, USDA Citations—the Defendants would nevertheless be liable for harming their lemurs, since the definition of harm permits no exceptions. Since the Defendants have in fact failed to meet the minimum requirements of the AWA in the care of their lemurs, and since their husbandry practices do not rise to the level of generally accepted practices, 50 C.F.R. § 17.3, they are likewise liable for harassing their lemurs.

#### a. Social Isolation

The USDA requires nonhuman primates to be housed socially. 9 C.F.R. § 3.81(a). Red-ruffed lemurs and ring-tailed lemurs like those housed at the Cricket Hollow Zoo are highly social animals. Despite this AWA requirement and the social needs of these animals, the Defendants have housed and continue to house a red-ruffed lemur in total isolation. Lucy the red-ruffed lemur has been isolated at the Zoo since April 2009, which is to say for more than six and a half years. Ex. 47, p. 3. The Defendants likewise housed a ring-tailed lemur in total isolation for an extended period of time: after Kondo's death in July 2011, Chuki lived in total isolation for three and a half years until Zaboo was introduced into her enclosure in January 2015. *Id.*, p. 4-5. Today Defendants house only a pair of ring-tailed lemurs together. *Id.* One cannot "keep those animals healthy and happy singly or with even just a pair or a trio." Trial Tr., P. Klopfer,

196:21-22.

Such isolation for members of these two highly social species is extremely harmful. Both ring-tailed and red-ruffed lemurs have highly developed cognitive abilities and, under certain conditions, such as a lifetime of living in isolation, can undergo significant physiological and psychological stress. Such harm to the lemurs accrues not merely behaviorally but also physiologically, observable for example through increased steroid levels, through electroencephalographic (EEG) recordings which can indeed be "pathological", through elevated heart rates and blood pressure. According to Dr. Klopfer, "there's just no question that when the animal's normal environment is grossly distorted, these animals suffer." Trial Tr. 140:7-16. In Dr. Klopfer's experience, "a single companion just doesn't cut it for these animals." *Id.* 154:9-10. He and his team have likewise "found it very difficult to rehabilitate animals once they have been subject to prolonged isolation," like the three and a half years that Chuki spent alone. *Id.* 154:11-13. Because the lemur species the Defendants maintain "are among the most social of all lemurs" they are "the least likely to be retained in a healthy viable condition when isolated or in - - or in pairs. They need a social group." *Id.* 155:15-19. Housing a red-ruffed lemur alone in an enclosure next to a pair of ring-tailed lemurs is "irrelevant" to the red-ruffed's welfare, since these animals "are not primarily visual" but "heavily dependent on tactile and olfactory contact." *Id.* 193:23-24.

Describing the photograph that Plaintiff John Braumann took of Chuki, Dr. Klopfer indicated that Chuki's hunched posture was that of "a depressed lemur," and that the enclosure was that of a "pretty harrowing kind of confinement situation." *Id.* 161:1-5. By depressed Dr. Klopfer meant not psychologically but physiologically, "mean[ing] this animal is probably in a near catatonic state; probably has a very high heart rate; undoubtedly has elevated—elevated

noradrenaline levels and probably is relatively insensitive at this moment to acoustic stimuli, which is pathological for these animals." *Id.* 161:11-16. That is to say, there is effectively no distinction between psychological and physiological harm to lemurs.

In short, social isolation—or even housing in pairs—harms lemurs, which is to say actually injures them. 50 C.F.R. § 17.3. "[T]here's no question about it." Trial Tr. 155:23. It likewise harasses them, since it clearly disrupts natural behavior patterns creating a likelihood of injury to the animals, such that "elevated noradrenaline levels predicts all kinds of *susceptibility to disease and early death*." *Id.* 155:23-25 (emphasis added).

### b. Inadequate Housing and Environmental Enrichment

Under the Animal Welfare Act, exhibitors must follow environmental enhancement plans that are adequate to promote the psychological well-being of nonhuman primates. 9 C.F.R. § 3.81. The Defendants' veterinarian has been signing the Defendants' Program of Veterinary Care every year since October 2009, Ex. 42, pp. 1-2, which includes his affirmation that he has discussed environmental enrichment for nonhuman primates with the licensee, *id.* p. 5. In the face of that requirement, Dr. Pries eschews all responsibility over environmental enrichment, evidently maintaining that it has nothing to do with "the health and the care of the animals" which he oversees. Trial Tr. 438:8-25. In any event, a veterinarian without primate expertise could not adequately oversee an environmental enrichment program even if he were committed to doing so. *Id.* 158:12-19.

Lemurs in the wild range over very large areas, somewhere between twelve and fifteen acres. Because they move so constantly through different trees and vegetation, and because they have highly developed cognitive abilities, captive lemurs require tremendous stimulation, including a regular variety of changing play and enrichment objects as well as sufficiently large

cages are required to keep the animals occupied. In contrast to these needs, the Defendants'

Primate Enrichment Plan includes nothing that Dr. Klopfer was able to recognize as enrichment.

Ex. 44, pp. 3-4; Trial Tr., P. Klopfer, 153:7-22. Additionally, Defendants' daily care program

does not include any lemur-specific actions. Ex. 39, pp. 11-12.

Because lemurs are free-ranging animals, the size of their enclosures matters to their

health and welfare. Trial Tr., P. Klopfer, 163:13-14. Moreover, the enclosure design should

account for species-specific behavioral differences. For example, a red-ruffed lemur spends 80 to

90 percent of the day in the canopy and does not like to be near the ground, whereas a ring-tailed

lemur spends up to one-third of its time on the ground. In contrast to these needs, the

Defendants' enclosures are small and barren and provide no species-specific opportunities for

their lemurs. Ex. 63, p. 3; Ex. 22, p. 31; Trial Tr., P. Klopfer, 163:13-164:1. In actual fact, the

Defendants' lemur enclosures "*totally preclude[] the normal behavioral pattern*" of their lemurs,

which "is concomitant with all kinds of physiological disturbances . . . [which in turn] *increases*

*susceptibility to disease and increases the probability of death*." Trial Tr. 164:4-5, 15-18

(emphasis added). In addition, because the Defendants must keep their lemurs housed indoors to

protect them from inclement weather during the Iowa winter, they are every year, during the

winter season, "harmed." *Id.* 182:2. Such harm arises from "the nature of the confinement in

impoverished space, a very small space and the absence of peers." *Id.* 182:4-6. The Defendants'

housing harasses their lemurs not merely by disrupting but by precluding entirely their normal

behavioral patterns, constitutes confined and impoverished spaces, and fails to comport with

generally accepted practices of lemur care. Trial Tr., 164:23.

> c. <u>Inadequate Sanitation</u>

Broadly and uniformly, the Animal Welfare Act requires exhibitors to ensure safe and

sanitary living conditions for animals. The AWA and USDA regulations require that excessive

waste must be removed *daily* from inside enclosures to prevent lemurs from becoming "soiled,

and to reduce disease hazards, insects, pests, and odors." 9 C.F.R. § 3.84(a). The USDA has cited

the Zoo on several occasions for serious animal husbandry concerns, noting that as a result of

some of these failures the lemurs are at risk of disease and illness. *See, e.g.*, Ex. 7, p. 4

("excessive presence of waste on the perch of the red-ruffed lemur's enclosure . . . [which]

comes into contact with the lemur when it is on the perch. . . . Mouse feces was also observed on

the perch belonging to the red-ruffed lemur."); Ex. 14, p. 1 ("There is approximately two weeks

of animal waste collected in one spot under the branch in the outdoor run of the ring tailed lemur

enclosure."); Ex. 16, p. 1 (build-up of dark brown/black grime on the walls, perches, and

branches in the lemur enclosures).

The USDA rightly prohibits such lack of sanitation because, at a minimum, the

accumulation of animal waste is a "medium for bacterial growth or parasite proliferation or viral

multiplication." Trial Tr., P. Klopfer, 169:2-3. An accumulation of waste like that the USDA

observed below the ring-tailed lemur's perch, in addition to violating the AWA, does not

represent generally accepted animal husbandry. It is in fact "appall[ing]." Trial Tr., P. Klopfer,

168:11-12. Insofar as it accumulated all under one spot, it likewise indicates "that these animals

didn't have an incentive to move, which means either that they were in a severely depressed state

or there were inadequate other perching sites available to them or both. . . .[which] is

symptomatic of high levels of stress . . . in a physiological sense." Trial Tr., 169:13-20.

Similarly, a lemur who defecates or urinates on its own perch would do so only "[b]ecause it

didn't have opportunity or incentive to move; again, which could be either due to severe

depression or inadequate alternative places to perch." *Id.* 170:9-11. As "fastidious" animals,

lemurs in the wild would never come into contact with urine or feces. *Id.* 170:14-17.

As regards lemurs specifically, however, such lack of sanitation not only increases the probability of communicable disease, it likewise inhibits natural behaviors that are essential to lemur communication and welfare. Ring-tailed lemurs have a specially developed olfactory sense, and they "communicate olfactorily." Trial Tr., P. Klopfer, 166:13-14. For example, lemurs are heavily dependent on olfactory contact. The accumulation of waste characteristic of the Defendants' facility creates a likelihood of injury for the Defendants' lemurs because "having them in a smelly environment is like having us be in a room where there's constantly white noise being amplified." *Id.* 163:24-164:1. Accumulated waste of this sort therefore can be understood in both evidentiary and causal terms: it *evinces* ongoing harm to these lemurs (it signals physiological depression) and it *causes* harm and harassment to these lemurs (it contributes to the spread of disease and strongly disrupts their normal behavioral patterns, including communication, which in turn creates a likelihood of harm through increased stress and its concomitant physiological effects).

### d. Inadequate Veterinary Care

The AWA requires zoo exhibitors to develop and implement a program of veterinary care that provides for the health and wellbeing of the animals. 9 C.F.R. § 2.40. To provide adequate veterinary care, Defendants need to demonstrate they follow protocols for both preventative and therapeutic care. Minimum preventative care calls for an annual physical exam of all animals. An annual exam should comprise of blood work; urine and fecal analysis; a dental exam; and an assessment of the animal's body condition, which involves examination of the animal's eyes, weight, and fur. Trial Tr., J. Conrad, 30:3-16.

In contrast to these requirements, Defendants planned and actual implementation of their

program of veterinary care for the animals generally and the lemurs specifically is so deficient as to constitute inhumane and cruel treatment. In fact, Defendants' program of veterinary care contains no provisions specific to lemurs. Ex. 42. Veterinary records from April 23, 2007 to February 5, 2015 show that zero veterinary care was provided to the Zoo's lemurs. Ex. 41. Dr. Pries confirmed at trial that during his tenure he has never provided care to any lemur. Trial Tr. 437:1. That at least three lemurs died at the Defendants' Zoo during that same period renders the complete lack of lemur veterinary care utterly incomprehensible and rises to the level of gross neglect. Ex. 39, p. 6, Ex. 47, p. 5.

Even if the lemurs had received any veterinary care, it is effectively impossible that they should have received appropriate veterinary care. The Zoo's veterinarian, "by his own admission, had no prior experience with lemurs and there's no evidence that he's familiar with the literature on lemur care, so [Dr. Klopfer's] conclusion would have to be that he's not properly trained to deal with lemurs." Trial Tr., 171:2-6. Indeed, to treat a lemur requires specialized knowledge and training, at least as much to familiarize a veterinarian with the requirements unique to primates. *Id.* 171:10-12.

The complete absence of veterinary care includes, as with the tigers above, a persistent failure to perform necropsies. Dr. Pries confirmed that he has never once ordered a necropsy at the Zoo. Trial Tr. 439:18-21. Such a failure indicates that the Defendants cannot possibly know the cause of an animal's death and thus cannot be prepared to prevent or treat recurrent diseases. Of the five reported lemur deaths from the last decade, Defendants procured a necropsy only for one. Ex. 39, p. 6 (listing animal deaths), Ex. 47, pp. 1-2 (single necropsy). The Defendants attributed encephalitis as the cause of death for at least one lemur as well as the suspected cause of death for a second lemur, though the underlying cause of encephalitis was never investigated.

Ex. 47, pp. 1-2; Trial Tr., P. Klopfer, 145:4-146:1. Since some forms of encephalitis are actually treatable, Trial Tr., P. Klopfer, 145:2-5, it is impossible for the Defendants to have ascertained whether they could have saved those lemurs, nor whether they could have prevented other lemurs from contracting whatever form of the disease may have killed the deceased pair.[10] Indeed, nothing in the record indicates that the Defendants' lemurs have been properly diagnosed, without which "appropriate treatment is *impossible*." Trial Tr., 175:18-21 (emphasis added). Even where no proper veterinary diagnosis or treatment could have saved an animal, an infrequent proposition at best, according to Dr. Klopfer the medical problems arising among the Defendants' lemurs can be sourced back to "improper husbandry practices [including isolation] and caging." *Id.* 176:2-3, 10-12. Indeed, the combination of improper husbandry practices and caging with a lack of appropriate veterinary care is a "fatal combination." *Id.* 176:8. As if to underscore that point, none of the Defendants' lemurs has apparently lived to anything like their expected lifespan in captivity, which may be as much as thirty years, *id.* 183:23-24: two lemurs died at seven months, a third died around ten years old, and for two others the Defendants provided no data. *Cf.* Ex. 39, p. 6 (listing lemur deaths) to Ex. 47 (describing birth and acquisition for only some of Defendants' lemurs).

In sum, that Defendants have socially isolated their lemurs, provided inadequate housing and environmental enrichment, provided inadequate sanitation, and provided inadequate veterinary care has doubtlessly harmed and harassed, and continues to harm and harass, their endangered lemurs in violation of the "take" prohibition of the ESA.

---

[10] It might be added that the two lemurs who died allegedly of encephalitis were born at the Zoo, the result of intentional breeding. They died just seven months after birth. This further belies the Defendants' claim that they operate as a rescue and that animal deaths are simply to be expected in such a situation. Neither does the birth of an animal on-site provide a measure of the sufficiency of the animal husbandry at the Defendants' Zoo. Trial Tr., P. Klopfer, 205:9-10. Clearly the measure is keeping animals healthy and alive, not causing them to be born.

### 5. *Defendants have "taken" and continue to "take" endangered wolves by harming and harassing them.*

Defendants currently own three endangered wolves or wolf hybrids, as one wolf pup died three months after arriving at the Zoo in 2010 and an "old female" died in 2013. Defendants largely ignore their wolves; indeed, the Zoo's attending veterinarian has never examined nor treated a wolf or wolf hybrid at the Cricket Hollow Zoo. Trial Tr. 438:5-7. According to Dr. Jennifer Conrad—who has decades of experience treating wolf hybrids in captivity—generally accepted husbandry practices for wolf hybrids require owners to ensure the animals receive basic veterinary care, live in clean enclosures with access to wholesome food and potable water, have adequate enrichment, and are necropsied upon their death. After reviewing Defendants' own veterinary records, a decade's worth of USDA inspection reports, and photographs taken by USDA inspectors and the individual plaintiffs, Dr. Conrad concluded that Defendants not only fail to meet generally accepted husbandry practices for their wolf hybrids but also unequivocally harm and harass them.

#### a. Inadequate Veterinary Care

Defendants' veterinarian treated the wolves only in passing with various dewormers; rabies, distemper, or other essential vaccines were never administered to the Zoo's wolves. Indeed, according to Dr. Pries, the defendants' attending veterinarian, wolf treatments must be "extrapolated" from treatments he knows for dogs. Plaintiffs' experts concluded that inadequate veterinary care for the wolves creates a likelihood of injury and interrupts their normal behavioral patterns.

To provide adequate veterinary care, Defendants need to demonstrate they follow protocols for both preventative and therapeutic care. Minimum preventative care calls for an annual physical exam of all animals. An annual exam should comprise of blood work; urine and

fecal analysis; a dental exam; and an assessment of the animal's body condition, which involves examination of the animal's eyes, weight, and fur. Trial Tr. 30:3-16. Defendants admit they do not ask any of their veterinarians to perform annual physical examinations for any of their animals, including wolf hybrids. Moreover, Defendants' veterinarian has never treated Defendants' wolves therapeutically, even though at least two wolf hybrids have died at the Cricket Hollow Zoo since he began his tenure there. *See* Ex. 41. Defendants list the cause of death for the wolf hybrids that have died as "old age" and over-heating, neither of which constitute a medical cause of death. Ex. 49, p. 1; *see also* Attachment 2, Animal Deaths. Without data from an annual physical examination or even a hands-on examination upon falling ill, Defendants likely treated their sick wolf hybrids the same way they treat all of their animals— after Defendant Pam Sellner diagnosed them herself and assigned her own, amateur (free) treatment regimen. Defendants' decision to withhold preventative and therapeutic veterinary care from their wolf hybrids leads to a likelihood of injury and interferes with their normal, healthy behavioral patterns.

### b.  Dangerous Housing and Poor Diet

In addition to Defendants' failure to provide adequate veterinary care for their wolf hybrids, Defendants fail to meet the most basic requirements for adequate housing, food, and water. Defendants house three wolf hybrids in a small, chain-linked, pea graveled enclosure with a single dog house. Similar to the problems with the tiger enclosures, USDA inspectors have identified multiple problems with wolf enclosure perimeters, creating risks to the animals, the public, and not functioning as a proper containment system. For example, in July 2013, a USDA inspector noted that contrary to 9 C.F.R. § 3.127(d), the perimeter fence surrounding the big cats, bears and wolves was inadequately tall, with gaps that would allow animals to enter or exit the

enclosures; one month later, USDA inspectors again found that "the perimeter fence surrounding the big cats, bears and wolves has a section of fence that has become detached from the fence post and is sagging out from the facility." Ex 22, p. 4.

On numerous occasions, the USDA has cited Defendants for failing to clean up old feces and pools of muddy water from the enclosures, which drain poorly. Exs. 17, 26, 28. Plaintiffs corroborated USDA's findings. For example, during his October 12, 2012 visit, John Baumann photographed a lone wolf covered in mud up to his back, a large pool of muddy water visible in the background of the picture. Ex. 63, p. 15. In addition, flies and other pests swarm the wolves, a problem consistently observed by Plaintiffs during their zoo visits. Ex. 28, pp. 1-2. According to Dr. Conrad, flies "will come onto the feces and then they'll come onto the food and they will contaminate the food. The food itself could possibly be in a situation where the animal doesn't know it's there because the amount of feces – the smell doesn't alert the animal that there's food and then . . . there's all sorts of problems." Trial Tr. 81:18-25. Moreover, similar to the concerns she had with Dr. Pusillo's nutritional supplements for tigers, Dr. Conrad believes any supplements Defendants might feed their wolves are too complicated to ensure an adequate diet. According to Dr. Conrad, though normally sufficient, Dr. Pusillo's supplements could never be consistently administered without training and supervision, and Dr. Pusillo admits he does not feel responsible for training, supervising, or administering the diets of the animals at the Cricket Hollow Zoo. Inadequate diet can lead to illness, injury, and even death.

c.  Absence of Enrichment

In addition to whatever supplements and raw food Defendants provide their wolves, Defendants also allow unsupervised zoo visitors to feed dog kibble to the wolves through a plastic pipe that connects the outside of the enclosure with the wolves inside as a form of

enrichment. As far as Plaintiffs John Braumann and Tracey Kuehl could see, this food pipe serves as the only enrichment Defendants provide for their wolf hybrids other than a dead tree branch that lies in the center of their cage. Ex. 63, pp. 15-16; Ex. 61, pp. 4-5. According to Dr. Conrad, feeding an animal any portion of their diet in an unplanned, unsupervised manner could lead to aggression in animals. Trial Tr. 89:24-90:11. Moreover, using an animal's diet as enrichment is definitely not a generally accepted husbandry practice and interferes with their natural eating habits. *See generally* Trial Tr. 90. Finally, allowing unsupervised members of the public to feed captive wild animals food through a tube exposes the animals to unknown diseases and interferes with their natural eating habits. Trial Tr. 90:12-16.

Defendants could provide additional enrichment to their wolves through exercise. Defendants "exercise" their wolf hybrids according to an approved USDA "Exercise Plan for Dogs." Ex. 46. According to the exercise plan, Defendants never let their wolf hybrids out of their cages. This lack of stimulation has led to stereotypic behavior in the wolves. Stereotypic behaviors are "sort of like the OCD of the animal world where they'll walk back and forth because it's almost like they're self-soothing." *See* Trial Tr., J. Conrad, 67:4-7. In other words, stereotypic behaviors indicate psychological distress. On June 26, 2012, Tracey Kuehl observed a solitary wolf in the wolf enclosure. The wolf had apparently attempted to dig an eighteen-inch-wide hole underneath the enclosure fence, either out of boredom or to escape. Trial Tr. 229:7-20; Ex. 61, pp. 4-5. On October 13, 2012, John Braumann observed an agitated wolf waiting anxiously at the end of the plastic food pipe. The wolf paced back and forth along the chain-linked fence as he waited for the next piece of kibble to drop, another sign of stereotypic behavior. Ex. 63, pp. 15-16. These signs of psychological distress are unrefuted and absolutely demonstrate that Defendants' inability to provide adequate animal husbandry for their wolf

hybrids is causing them injury and interrupting their natural behavioral patterns.

Defendants' "exercise plan" states—contradictorily—that the dogs are "housed individually" in a cage that provides at least two times required the floor space for that dog and, nonetheless, that the dogs are "housed in compatible groups" in a cage that is at least 100% of the required space for each dog if it were maintained separately. Ex. 46. Both Dr. Conrad and Dr. Pries agree that wolves are social animals who need to be housed in groups, or packs, of three or more. To alleviate any psychological distress caused by isolation, Defendants could provide enrichment objects to the wolf hybrids to keep them busy. Enrichment objects include balls, bones, and other toys. Yet, neither Tracey Kuehl nor John Braumann, who collectively visited the Cricket Hollow Zoo five times, ever saw any change in the wolf hybrid enclosure, which includes observing wolves living alone. Trial Tr. 241:20-242:5.

### d. Failure to Conduct Necropsies

As explained above in Section III(A)(3)(a), necropsies must be performed upon an animal's death in order to ascertain the cause of death, unless the owner is absolutely certain why the animal died. Like the other endangered animals at the Cricket Hollow Zoo, Defendants have never performed a necropsy on a wolf hybrid that has died, despite reporting "old age" and over-heating as the animals' cause of death. Exs. 41, 42, 49. Assuming Defendants correctly diagnosed these animals' causes of death, the conditions leading to their death could help them treat similar symptoms in surviving wolf hybrids, should they arise.

In sum, Defendants have taken, and continue to take, their wolves or wolf hybrids by harming and harassing them in the form of woefully inadequate veterinary care, dangerous housing conditions, poor diet, a near-complete absence of environmental enrichment, and the routine failure to necropsy their deceased wolves or wolf hybrids.

**B. The ESA prohibits trafficking in endangered animals without a permit, and Defendants have trafficked and will continue to traffic in endangered animals without a permit.**

Under the ESA, it is unlawful to "deliver, receive, carry, transport, or ship in interstate or foreign commerce . . . in the course of commercial activity" any endangered or threatened species absent a permit. 16 U.S.C. § 1538(a)(1)(E). Commercial activity need not involve money or even change of ownership, but the FWS has interpreted "commercial activity" to include "the transportation of an endangered species across state or national borders" where there is a change in "ownership *or control* of the animal." *Humane Soc'y of the U.S. v. Babbitt*, 46 F.3d 93 (D.C. Cir. 1995) (vacated on other grounds) (interpreting 50 C.F.R. § 17.3 (1993)). However, in *Elephant Justice Project v. Woodland Park Zoological Society*, the one case Plaintiffs are aware of to reach the merits of this issue, Judge Coughenhour found that commercial activity under the ESA can even include transportation of animals in service of exhibition, even if the exhibitor is a nonprofit entity, no money changes hands, and no transfer of ownership occurs. No. 2:15-cv-000451-JCC at 5–6 (W.D. Wash. Apr. 7, 2015) (concluding that the loan of two Asian elephants from one zoo to another constituted commercial activity since the exhibition of elephants—and therefore the transportation that leads to exhibition— generates zoo revenue and "can be said to be undertaken for gain or profit . . . within the meaning of the ESA").

Ms. Sellner testified that she engages in a relatively simple interstate trafficking scheme where ownership changes hands, but money is not exchanged. Trial Tr. 739:25-740:6. She intentionally marks endangered animals she acquires or transports across state lines as "donated," and admits to paying for non-endangered animals. Trial Tr. 737:14-22; Ex. 40, pp. 2-7. In total, Defendants' own records show that they have accepted the "donation" of one adult

female tiger (11/15/2003); one adult male white tiger and one adult female yellow tiger (7/10/2014); two adult tigers and one female tiger (donated 4/25/2004); two ring-tailed lemurs (9/8/2010); three "hybrid" wolves (7/22/2009); and two "hybrid" wolf pups (3/16/2010) across state lines. Ex. 40, pp. 2-7. Ms. Sellner does not retain records of sales originated at the Cricket Hollow Zoo, but she has donated endangered animals across state lines as well.

Like the defendant zoos in *Woodland Park Zoo*, the Defendants here use acquired animals in their breeding program, which they then place on exhibit at their Zoo, sell to another zoo, or donate to another zoo. In addition, according to Ms. Sellner, large carnivore exhibits, including the tigers and lions, drive "many" visitors to her zoo. Trial Tr. 742:20-22. Indeed, she believes her Zoo would have less traffic and lose revenue if tigers were no longer at the Zoo. *Id.* 742:23-743:5. In other words, the endangered animals have commercial value to Defendants. This value is only further evidenced by Defendants' list of assets on their Balance Sheets. Ex. 51, pp. 3-4. There, Ms. Sellner lists her red ruffed lemur as having a value of $3,500; her two ring-tailed lemurs are worth $2,500; her three timber wolves are valued at $400; and her seven tigers (three have since died) are worth $3,500. When evaluating this scheme in its entirety, Defendants are plainly violating the ESA, 16 U.S.C. § 1538(a)(1)(E), by engaging in the commercial trafficking of endangered animals without an interstate commerce permit, which unlawful activity must be enjoined.

## IV. DEFENDANTS ARE INCAPABLE OF PROPERLY ADMINISTERING THE CRICKET HOLLOW ZOO, WHICH CREATES AN ONGOING AND SUBSTANTIAL LIKELIHOOD OF INJURY TO THE ENDANGERED ANIMALS LIVING THERE.

Harassment need not be a "direct application" of force; it can occur before an animal is touched. *See Babbitt v. Sweet Home*, 515 U.S. 687 at 720 (dissent of Scalia, J.). From an organizational perspective, the Zoo's management, operational and financial status harasses its

endangered species every day. It is obvious that even trying to meet the "minimum standards" is and has been a struggle for the Defendants. Exs. 2-3, 9, 15, 18, 21, 34, 37. When Ms. Sellner complained about repeatedly being found in violation of the AWA and asked the USDA "how good is good enough?" she was informed that "[m]ost regulated facilities exceed those [AWA] standards, but that is not required." Ex. 21, p. 2. However, full compliance with the minimum standards is required and is expected." *Id.* Since that time, violations continue to accrue. Defendants have been on notice for years that *something* must change at the Zoo, but they have failed to make the necessary changes. The result constitutes harassment. *See also* H.R. Rep. No. 93–412 at 11 (1973) (*long-term effects* on wildlife "harass" wildlife, citing the example of allowing prohibition of bird watchers where activities might disturb the birds and make it difficult for them to hatch or raise their young.) Whether these management, operational, and financial failures are either from their own negligence, or an intentional disregard for the requirements, it is clear that the Defendants are creating a likelihood of injury to the endangered animals living at the Zoo.

### A. Inadequate Human Resources at Defendants' Zoo

Defendants lack the human resources necessary to comply with the ESA. Defendants' property contains approximately 300 zoo animals, plus an operating dairy farm, both solely maintained by Defendants Pamela and Tom Sellner. Ex. 39, p. 39. According to Plaintiffs' expert veteran zoo administrator David Allen, this human-to-animal ratio is insufficient for adequate animal care and creates a likelihood of injury because Defendants cannot meet their endangered species' basic needs. The Cricket Hollow Zoo is open from 10 a.m. to 6 p.m. daily during operating season, and during operating hours, Ms. Sellner serves as the Zoo's lone employee. At all times while the Zoo is open, Ms. Sellner accepts admissions money from zoo patrons near the

entrance, introduces patrons to an "ambassador animal," or sells food or souvenirs to patrons.

According to the Animal Welfare Act and regulations, "a sufficient number of adequately trained employees shall be utilized to maintain the professionally acceptable level of husbandry practices set forth in the Act." 9 C.F.R. §§ 3.132, 3.85. Nearly four years ago USDA recommended the Zoo decrease the number of animals as "the work load exceeds the staffing level" and ordered that the staffing level "must be increased to include additional adequately trained employees or the numbers of the animals shall be decreased until such point the present staff can accommodate the needs of the animals." Ex. 7. Three months later, USDA again observed that inadequate staffing "does not provide for the health and well-being of the animals," and ordered "the staffing level [to] be increased to include additional adequately trained employees/volunteers or the numbers of the animals shall be decreased until such point the present staff can accommodate the needs of the animals." Ex. 8. Defendants responded by acquiring more animals. In fact, Defendants have no decision making process for acquiring additional animals other than a desire to bring animals to the Zoo that children might like to see.

Defendants claim they rely on occasional and untrained volunteers to meet the Zoo's staffing needs, but this practice ultimately poses risks to the public, the animals, and the volunteers. Plaintiffs' expert analyzed Defendants' discovery regarding the staffing and volunteers at the Zoo, and he concluded that it is inadequate to meet the primary responsibilities necessary to provide for the animals' basic care, much less the animals' behavioral and social needs. Trial Tr. 831:10-19. Based, though only in part, on the recommendations of the well-respected Association of Zoos and Aquariums, Mr. Allen estimated that the Zoo would need between four and six full-time zookeepers, one full time veterinary technician, and at least a contract veterinarian to be successful and to humanely care for 300 animals. Trial. Tr. 834:3-4;

*see also* Ex. 69, p. 12. Moreover, as Ms. Sellner cannot be all places at all times, and Mr. Sellner works away from the Zoo during zoo operating hours, Defendants allow for impermissible, unsupervised public contact with animals. John Braumann came face-to-face with one disturbing practice—"Tiger Time"—which could lead young tigers to become more aggressive than they otherwise would be. Ex. 63, p. 17; Trial Tr. 679:23-680:9 (regarding recommendations of the Feline Conservation Federation Basic Exotic Cat Care Manual).

Finally, Ms. Sellner's own qualifications to provide for endangered species in a zoo setting are based on piecemeal, self-taught information. Indeed, Ms. Sellner cites a single eight-hour certification course in exotic feline husbandry from the Feline Conservation Federation, an organization whose guidelines she violates regularly and whose mission she views as predominantly to protect private ownership of "cats." Trial Tr. 673:1-6; 674, 675, 679, 680; 691:23-692:13. While Ms. Sellner's dedication to learning is commendable, she lacks the training and knowledge sufficient to maintain compliance with either the Endangered Species Act or the Animal Welfare Act and therefore creates a likelihood of injury to the endangered species living at the Zoo.

**B. Unstable and Inadequate Financial Posture**

Defendants' financial records confirm that Defendants lack the financial resources necessary to maintain the animals' basic nutritional, veterinary, and housing needs—including those specific to tigers, lions, lemurs, and gray wolves—and to operate a facility that can safely open to the public. To operate a zoo requires adequate funding, and humane endangered species care is an extremely expensive financial undertaking, according to Dr. Pusillo, Dr. Conrad, and Mr. Allen. But once again, Defendants fall short. From 2008 to 2013, the Zoo netted approximately $10,000 per year from ticket sales and $5,000 per year from donations, mobile

zoo profits, and feed sales. Ex. 52. Considering the Zoo's 300 animals, that means the Sellners' netted $50 per animal per year for necessary veterinary care, feed, sheltering, and husbandry costs. During that same time frame, the Zoo's annual expenses ranged between $16,987 and $26,493, or between $56.62 and $88.31 per animal per year. *Id*. Perhaps most shockingly, last year, the Zoo had access to a mere $4,373 in emergency funds, and no line of credit. Ex. 53, p. 6. After thoroughly reviewing Plaintiffs' financial documentation, both Dr. Conrad and Mr. Allen concluded that the Cricket Hollow Zoo's income is insufficient to provide for the veterinary, feed, enrichment, enclosures, and basic animal husbandry needs of the Zoo.

Additionally, Defendants' expenses are excessively low to realistically provide even a "minimum" level of generally accepted animal husbandry needs. For all of the Zoo's animals, Defendants spent less than $700 per year *total* on veterinary care in 2014. Ex. 52. This amounts to $2.33 per animal. Defendants' feed and environmental enhancement costs are also low, between $5,328 and $7,750 (between $17.76 and $25.80 per animal). Ex. 52. Dr. Conrad, Dr. Klopfer, and Mr. Allen concluded that most of the Defendants' animals, including the endangered species, are getting "zero" veterinary diagnostic work and no preventative care.

Lastly, the Defendants Tom and Pamela Sellners' personal financial situation is of no help to their animals. After reviewing Defendants' balance sheets, tax returns for the years 2010 and 2014, David Allen concluded that the Sellners are incapable of meeting their financial obligations at the Cricket Hollow Zoo, which is absolutely contributing to an increased risk of injury, illness, and death. Moreover, according to Mr. Allen, the Sellners simply do not have the financial resources available to them to come into compliance with the minimum standards of the Animal Welfare Act, let alone the heightened requirements for endangered animals provided by the ESA.

### C. Shortcomings at the Entire Facility

For all the different animals at the Zoo, the USDA has persistently documented a consistent pattern of animal husbandry violations, which pose risks to all the animals at the Zoo. The categories for these violations include excessive excreta in cages; no drinking water for animals, dirty drinking receptacles, algae in drinking water and in enrichment pools (including at least one pool containing a dead rat); dirty food bowls, dirty rotten food and fruit (unhealthy feed can cause illness); excessively damp and poorly-drained corrals (which can cause hoof rot, or when frozen provide no place to lie down); trash and poor housekeeping present near animal enclosures (unsanitary housekeeping); soiled bedding (unsanitary husbandry); and poorly maintained enclosures that pose risks to the animals and to the public (risks of injury and escape). For example, on December 8, 2011, and July 13, 2013, the USDA cited Defendants for failing to provide potable water in at least five enclosures. Exs. 8, 20. Also, on May 6, 2012, the USDA cited Defendants for failing to clean up trash, soiled bedding, and animal waste in food containers. Ex. 12. The overall condition of the Zoo is a factor that creates a likelihood of injury for the Zoo's endangered species.

### D. Choice of Veterinarian

The USDA requires every exhibitor to employ an attending veterinarian who "shall provide adequate veterinary care." 9 C.F.R. § 2.40(a). Moreover, under the Animal Welfare Act, Defendants "shall assure that the attending veterinarian has *appropriate authority to ensure the provision* of adequate veterinary care and to *oversee the adequacy* of other aspects of animal care and use." 9 C.F.R. § 2.40(a)(2) (emphasis added). Defendants selected Dr. John Pries of the Elkader Veterinary Clinic as their attending veterinarian based purely on his physical proximity to the Zoo and his willingness to treat their zoo animals, in contrast to the refusal of every other

veterinarian in the area. Defendants did not select Dr. Pries for his expertise in treating endangered animals or captive wildlife. Defendants could not have done so, since Dr. Pries lacks such expertise. Indeed, Dr. Pries has not received any formal or informal training on how to care for big cats, wolves, or lemurs, and expresses no desire to obtain additional training.

Dr. Pries is apparently unaware of all veterinary treatments or treating veterinarians who may become involved with Defendants' zoo animals, as he allows his staff to work on zoo animals if they like to, whether they have experience with species-specific care or not. *See, e.g.*, Trial Tr., J. Pries, 412:19-22 (indicating that he performed neither of the only two surgeries performed at his clinic for the Defendants' animals). Moreover, Dr. Pries was noticeably surprised when presented with evidence of animal deaths and USDA inspection citations for the Zoo at trial. That Dr. Pries is not even informed by Ms. Sellner about all animals who fall ill at the Zoo demonstrates that his blind trust in her ability to diagnose and treat her animals is misguided.

When asked about veterinary care at the Cricket Hollow Zoo, Dr. Conrad and Mr. Allen testified that Defendants' failure to hire adequate veterinary support causes or may cause animals to suffer needlessly, in part because veterinarians undertrained in exotic animal care do not adequately recognize medical issues in captive wildlife. Illustrating this point, Dr. Pries' eight years of involvement with the Zoo's approximately 300 animals is documented by a total of three pages of veterinary treatment records, none of which indicate treatment dates or the animal treated. Ex. 41. According to those records, from April 23, 2007, to February 5, 2015, Defendants paid a total of $6,363.7 for the treatment of zoo animals by Dr. Pries and his clinic staff. There is no doubt that Dr. Pries' lack of involvement with virtually *any* of the Zoo's animals, and Defendants' continued decision to engage Dr. Pries, has caused continued

harassment of Defendants' tigers, lemurs, and wolves. Moreover, Ms. Sellner testified that she would not be willing to hire a different veterinarian and that she will continue to use Dr. Pries for her exotic animals, despite the overwhelming evidence of his inadequacy. According to Dr. Conrad, Defendants' failure to employ an attending veterinarian capable of providing "adequate veterinary care" harms and harasses captive wildlife and constitutes an "intentional or negligent act or omission which creates the likelihood of injury to wildlife" and is not a generally accepted animal husbandry practice.

### E. Contingency Planning

The Animal Welfare Act requires exhibitors to "develop, document, and follow" an appropriate plan to provide for the "humane handling, treatment, transportation, housing, and care of their animals in the event of an emergency or disaster." 9 C.F.R. § 2.134. To comply with the contingency planning rule, Defendants must, among other things, identify disasters they could reasonably expect, outline specific tasks for those responsible for implementing the plan, and identify a chain of command for who will be responsible for fulfilling these tasks. *Id.* David Allen has decades of experience complying with this rule and relies on the specific contingencies identified by the Association of Zoos and Aquariums for what constitutes generally accepted husbandry practices in contingency planning. According to the Association of Zoos and Aquariums, an exhibitor must have an emergency defibrillator, appropriate alarms and fire extinguishers, a written plan available for first-aid, a communication system, and a written protocol developed in conjunction with local police. Ex. 69, p. 22. Moreover, exhibitors should conduct emergency drills at least once annual for the four basic types of emergency: fire, weather/environment, injury to staff or visitor, and animal escape. *Id.* Similarly, the Feline Conservation Federation requires its members to plan for injury to the public, fire, animal

escape, sickness or death of the owner, and adverse weather conditions. Trial Tr. 673:20-674:5.

Defendants' contingency plan can be found in its entirety at Exhibit 45. Defendants' plan for the

event of the death or absence of an owner is to "call for backup" from a list of volunteers, some

of whom live in different states. Ex. 45, p. 1. In the case of a tornado, Defendants will lock the

tigers in their dens, and if a blizzard hits the Cricket Hollow Zoo, Defendants will simply give

their animals extra feed and bedding. Ex. 45, pp. 2-3. Finally, and perhaps most shockingly,

Defendants' only plan in "the event of an intentional attack" is to call 911. Ex. 45, p. 1.

According to David Allen, Defendants fail to meet even the most basic standards for appropriate

contingency planning, which creates a serious risk of injury or death to their endangered animals,

as well as to the public.

## V.    PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF TO REDRESS THEIR AESTHETIC INJURY.

Under Section 11 of the ESA, this Court has jurisdiction to enjoin those, such as

Defendants, who illegally take an endangered species. 16 U.S.C. § 1540(g)(1)(A). *See Strahan v.*

*Holmes*, 595 F. Supp. 2d 161, 165 (D. Mass. 2009) (listing the criteria for injunctive relief in an

ESA "take" case"). To justify the imposition of injunctive relief, the Court must find that:

   a) the plaintiff prevailed on the merits;

   b) there is the potential for irreparable harm if the injunction is denied;

   c) the harm if no injunction issues outweighs the hardship to the defendant if
      enjoined; and

   d) the public interest would not be adversely affected by the issuance of an
      injunction.

*Id.* (citing *A.W. Chesterton Co. v. Chesterton*, 128 F.3d 1, 5 (1st Cir. 1997)).

Assuming Plaintiffs prevail on the merits, Plaintiffs' aesthetic enjoyment of Defendants'

tigers, lemurs, and wolf hybrids will be irreparably harmed if Defendants are allowed to continue keeping endangered animals at the Cricket Hollow Zoo. Plaintiffs have proved beyond any doubt that Defendants are simply incapable of complying with the Animal Welfare Act and the ESA for several irreconcilable reasons. First, Defendants simply cannot afford to comply. Defendants do not have the human or financial capital available to them to comply with the myriad requirements set forth in the AWA and the enhanced requirements inherent to the illegal take provisions of the ESA. Second, Defendants are unwilling to comply. Plaintiffs did not bring this lawsuit until they had exhausted every available avenue, which included repeated requests of USDA to enforce the Animal Welfare Act. Despite more than a decade of documented non-compliances with the Animal Welfare Act, three USDA enforcement actions, and any added pressure created by this lawsuit, Defendants have failed to comply with the AWA and will continue violating the Act into the future if not enjoined. Indeed, since filing this lawsuit, three tigers have died from veterinary neglect. Finally, Defendants simply do not wish to comply with the AWA's minimum standards of care. Defendant Pamela Sellner believes she does a good job caring for her animals most of the time and does not trust her USDA inspectors, whom she characterizes as "nitpicky" and "obsessive compulsive" about sanitation. Trial Tr. 676:19-22. Because Defendants simply cannot comply, Plaintiffs' injuries will not be redressed absent an injunction that liberates the endangered animals from Defendants' possession and prevents Defendants from acquiring endangered animals in the future.

Plaintiffs demonstrated moreover that such harm outweighs Defendants' interest in continuing to harass, harm, and illegally traffic endangered wildlife in violation of the public interest. Mr. and Ms. Sellner defend Plaintiffs' lawsuit by proclaiming love for their tigers, lemurs, and wolves, but love is not a defense to the ESA whose sole purpose is to protect the

health and welfare of endangered animals deemed by Congress worthy of protection. Defendants had ample opportunity to demonstrate their willingness and capability of complying with the AWA and the ESA both to the USDA and to this Court, but despite years of communication with USDA and four full days of trial testimony, they simply could not. Accordingly, the public interest can be served only if this Court grants Plaintiffs' request for injunctive relief. Defendants have violated the ESA by illegally harming, harassing, and trafficking in endangered tigers, lemurs, and wolves and the Cricket Hollow Zoo must be prevented from continuing to violate the ESA in the future.

## VI.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request this Court to enjoin Defendants' illegal conduct as follows:

- Ordering Defendants to surrender their tigers, lemurs, and wolves or wolf hybrids to a reputable facility, preferably a sanctuary, licensed by the USDA under the Animal Welfare Act that meets or exceeds the minimum requirements for animal husbandry, animal care, management, facilities, handling, and veterinary care therein;

- Prohibiting Defendants from ever acquiring animals listed by the FWS as threatened or endangered, including animals that were hybridized with threatened or endangered species;

- Enjoining Defendants to surrender, within 30 days of a new listing determination by FWS, newly listed animals already in Defendants' possession to a reputable facility licensed by the USDA under the Animal Welfare Act that meets or exceeds the minimum requirements for animal

husbandry, animal care, management, facilities, handling, and veterinary care therein;

- Enjoining Defendants to comply with the ESA, including Sections 9, 10, and 11, at all times in the future, which includes refraining from donating or accepting donations of endangered animals across state lines where ownership or control changes hands without an interstate commerce permit from the FWS;

- Awarding Plaintiffs costs of litigation (including reasonable attorney and expert witness fees) in accordance with 16 U.S.C. § 1540(g)(4).

Respectfully submitted this 13th day of November, 2015.

*/s/ Jeffrey D. Pierce*
Jeffrey D. Pierce (CA Bar No. 293085)
jpierce@aldf.org

Jessica L. Blome (MO Bar No. 59710)
jblome@aldf.org
Animal Legal Defense Fund
170 E. Cotati Ave.
Cotati, CA 94931
Telephone: 641.431.0478
Facsimile: 707.795.7280

/s/ *Daniel J. Anderson*
Daniel J. Anderson (IA Bar No. 20215)
danderson@wertzlaw.com
WERTZ & DAKE
1500 Center St. NE #101
Cedar Rapids, IA 52402-5500
Telephone: 319.861.3001
Facsimile: 319.861.3007

*/s/ Elisabeth Holmes*
Elisabeth Holmes (Oregon Bar No. 120254)
eli.blueriverlaw@gmail.com

Blue River Law, P.C.
P.O. Box 293
Eugene, OR  97440
Telephone: 541.870.7722

*Attorneys for Plaintiffs Tracey Kuehl, et al.*