| Case | Animal | Posture | Findings of ESA Take |
|---|---|---|---|
| Am. Soc. for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus, 502 F. Supp. 2d 103 (D.D.C. 2007) | Asian elephants (Captive) | Plaintiffs animal protection organizations challenged defendant circus's alleged practice of beating their elephants with bullhooks and training baby elephants by force and by removing them from their mothers prematurely. | The court found that the Section 9 "take" prohibition of the Endangered Species Act applies to "**any endangered species** of fish or wildlife" in the United States, including those in captivity, finding that, despite defendant's mischaracterization of the law, that "pre-Act wildlife" were likewise covered by the "take" prohibition. |
| Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc., 677 F. Supp.2d 55 (D.D.C. 2009) | Asian elephants (Captive) | Plaintiffs animal protection organizations challenged defendant circus's alleged used of bullhooks to beat its elephants and its forcible chaining and confinement of elephants over long periods of time. | The court dismissed the suit on procedural grounds, finding that plaintiffs failed to establish injury-in-fact and redressability, but found that "take" should be interpreted broadly and reiterated that under the "take" provision of the Endangered Species Act, "[t]here is **no requirement that the harm to the species be intentional, and both direct and indirect harm can constitute unlawful 'takes'** of a listed species." |
| Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc., 659 F.3d 13 (D.C. Cir. 2011) | Asian elephants (Captive) | Plaintiffs animal protection organizations challenged defendant circus's alleged routine beating and forced tethering of Asian elephants. | The appeals court affirmed dismissal for lack of standing but observed that the primary purpose of the Endangered Species Act is to conserve endangered and threatened species (wild and captive), which is accomplished by prohibiting taking, which encompasses **harm** and **harassment** of protected animals (including those in captivity). |
| Hill v. Coggins, 2014 U.S. Dist. LEXIS 82257 (W.D.N.C., May 27, 2014) (trial scheduled for week of September 14, 2015) | Grizzly bears (Captive) | Plaintiffs Native Americans challenged defendant roadside zoo's confinement of Grizzly bears in concrete pits was inhumane, caused physical | The court denied defendants' motion to dismiss, finding that plaintiffs had standing on the basis of **aesthetic interest after single visit to zoo**; court denied defendants' motion for summary judgment, finding that it could at trial find evidence of both **harm** and/or **harassment** of endangered Grizzlies held in substandard concrete pits that |

| Case | Animal | Posture | Findings of ESA Take |
|---|---|---|---|
| | | harm, and disrupt normal behavior patterns. | in no way resemble natural habitat and fail to provide environmental enrichment or adequate shelter, resulting in poor health, behavioral stress, and diminished psychological wellbeing. |
| Animal Welfare Inst. v. Beech Ridge Energy LLC, 675 F. Supp. 2d 540 (D. Md. 2009) | Indiana bats (migratory bats who roost in trees, where they give birth to and raise their young) | Plaintiff wildlife organization challenged defendant energy company's plan to construct 122 wind turbines in an area where Indiana bats were present. | The court held that Indiana bats will be **harmed** by wind turbines since they cause **injury** and **death** when the bats collide with them; moreover, the court noted that the construction of the wind turbines would alone **harm** the bats since the cutting of trees during construction would disrupt the bats' behavior by killing or injuring roosting bats and destroying potential roosting sites, where the bats breed; the court likewise held that **the ESA encompasses claims of future injury**, consistent with the prohibition against attempted "take" and with Congress's broad definition of "take." |
| Animal Welfare Inst. v. Martin, 588 F. Supp. 2d 70 (D. Me. 2008) | Canada lynx | Plaintiff wildlife organization challenged defendant State of Maine's permitting the use of Conibear traps (killer-type traps with spring-loaded jaws designed to kill animals) in a state where Canada lynx reside. | State's trapping regulations—limiting kind and placement of traps—were inadequate since they permitted the use of Conibear traps which **injured** and **killed** lynx regardless of trap size or placement; the court found that because a lynx was killed in a Conibear trap, additional lynx would suffer **harm** and hence unlawful take in violation of the ESA unless the State better regulated the use of Conibear traps, granting Plaintiff's motion for preliminary injunction requiring **immediate action to avoid additional unlawful take** of Canada lynx |
| Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687 (1995) | Red-cockaded woodpeckers and northern spotted owls | Plaintiff timber companies challenged the regulatory definition of "harm" on the basis that it impermissibly hurt their economic interests by prohibiting them from | Relying on congressional intent and the plain language of the statute, the Supreme Court held that the Sec. of Interior's definition of **harm** promulgated at 50 C.F.R. § 17.3—which includes habitat destruction or modification that actually kills or injures wildlife—is reasonable; the court stressed that **harm** must include **indirect as well as direct injuries** (such as protected birds not being able to |

| Case | Animal | Posture | Findings of ESA Take |
|---|---|---|---|
| | | engaging in timber harvesting. | reside in their habitat due to human interference), otherwise the meaning of harm would be rendered meaningless. |
| Bensman v. U.S. Forest Serv., 984 F. Supp. 1242 (W.D. Mo. 1997) | Indiana bats | Plaintiff environmentalists challenged the U.S. Forest Service and the U.S. Fish & Wildlife Service's unlawful management of a national forest | The court granted plaintiffs' motion for preliminary injunction against the logging of "salvaged timber" in the Mark Twain Forest of Missouri, finding that Indiana bats would be **harmed** or **harassed** by: (1) removal of dead or dying trees that male bats could roost in during summer; (2) logging activity in the vicinity of the caves where bats swarm and mate during the fall; and (3) disturbing the bats in the caves where they hibernate, awakening them from hibernation and depleting their fat stores. |
| Defenders of Wildlife v. Martin, 454 F. Supp. 2d 1085 (E.D. Wash. 2006) | Woodland caribou (which prefer in winter to reside in high elevation areas where they walk on top of the snow and feed above the snowline) | Plaintiff wildlife organization challenged the U.S. Forest Service and the U.S. Fish & Wildlife Service's unlawful permitting of snowmobiling and snowmobile routes in a designated Caribou Recovery Area. | The court granted injunctive relief, finding that snowmobiling **harms** and **harasses** caribou because it displaces them to a less preferred habitat, **indirectly harasses** caribou by precluding their use of travel corridors, and increases the likelihood of **injury** and **death** by increasing predation rates via easier access to caribou habitat. The court noted, "[t]he fact that snowmobile interaction with and **harassment** of these animals has been observed even once indicates to the Court that snowmobiling within the caribou recovery area presents a **definitive threat of future harm** to the caribou." |
| Forest Conservation Council v. Rosboro Lumber Co., 50 F.3d 781 (9th Cir. 1995) | Northern spotted owls | Plaintiff environmental group challenged defendant timber company's permit application to clear-cut timber in a "threatened or endangered species site." | The appeals court upheld lower court's finding that ESA suit to enjoin timber harvest was actionable, since the Act's "language, purpose, and structure" allow "an injunction against an **imminent threat of harm** to a protected species,", and since proposed timber harvest would harm a **single pair of spotted owls** because the removal of the trees would impair their ability to breed, feed, and shelter. |
| Greenpeace v. Nat'l Marine Fisheries Serv., 106 F. Supp. 2d 1066 (W.D. Wash. 2000) | Western Steller sea lions | Plaintiffs environmental groups challenged Nat'l Marine Fisheries Service | The court granted injunctive relief, finding that continued trawl fishing would **harm** the Western Steller sea lion because the practice depletes prey animals, reducing the sea |

| Case | Animal | Posture | Findings of ESA Take |
|---|---|---|---|
| | | to enjoin all groundfish trawl fishing within designated western Stellar sea lion habitat | lions' ability to forage; moreover, prey fish often abandon areas where trawling vessels are located, further reducing the lions' foraging effectiveness; trawl fishing interferes with normal prey schooling behavior (by reducing the fish schools' size and density), making it harder for sea lions to forage since their hunting techniques are adapted to normal prey schooling behavior. |
| Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Florida, 92 F. Supp. 2d 1296 (M.D. Fla. 2000) | Loggerhead turtles, Green turtles, Leatherback turtles | Individual plaintiffs, on behalf of sea turtles, challenged County's ordinance permitting beachfront driving and artificial light sources during the sea turtles' nesting season. | The court found that artificial lighting **harms** and **harasses** sea turtles because it interferes with their breeding, specifically because hatchlings crawl toward artificial light sources rather than crawling toward the ocean, and because nesting females avoid beach areas with artificial light and abort efforts to nest in artificially lighted areas, further interfering with breeding. |
| Marbled Murrelet v. Babbitt, 83 F.3d 1060 (9th Cir. 1996), as amended on denial of reh'g (June 26, 1996) | Marbled murrelets (seabirds who nest, breed, and return to the same grouping of old-growth forests every year) | Plaintiff environmental group, on behalf of endangered bird, challenged private company's logging operations in an old-growth forest. | The appeals court upheld the lower court's injunction against logging, finding that impairing the species' ability to breed or to shelter by **modifying or degrading their habitat** amounts to **harm** under the Endangered Species Act, stressing that harm includes **threat of a future harm**, and that the company's proposed logging plan of old-growth forest would harm murrelets because the logging would interfere with their ability to breed and **render them more susceptible to predation**. |
| Palila v. Hawaii Dep't of Land & Natural Res., 852 F.2d 1106 (9th Cir. 1988) | Palilas (six-inch birds found only slopes of Mauna Kea on the Island of Hawaii) | Plaintiffs conservation groups, on behalf of endangered bird, challenged the Hawaii Dep't of Land and Natural Resources' program maintaining feral goats and sheep in palila habitat. | The appeals court upheld the lower court's finding that permitting invasive grazing animals to continue to destroy the pailias' food source and habitat constitutes **harm** under the ESA. |

| Case | Animal | Posture | Findings of ESA Take |
|---|---|---|---|
| Sierra Club v. Lyng, 694 F. Supp. 1260 (E.D. Tex. 1988) aff'd in part, vacated in part sub nom. Sierra Club v. Yeutter, 926 F.2d 429 (5th Cir. 1991) | Red-cockaded woodpeckers | Plaintiffs environmental organizations challenged the Forest Service's management plan that included clear-cutting trees in the National Forests of Texas, home of the red-cockaded woodpecker. | The court found that the forest management program resulted in **harm** to red-cockaded woodpeckers, **inferred** from a decline in population size since "'**[h]arm' does not necessarily require the proof of the death of specific or individual members of the species**" and observing that "one cannot escape the conclusion that the Forest Service's practices have **harmed** the birds within the meaning of the regulations," including by (1) **impairing essential behavior patterns** of the woodpeckers by forced isolation, since the clear-cutting created "islands" of habitat not connected to other habitats; (2) interfering with breeding by virtue of that isolation, since males and females could not locate each other; (3) compromising food sources, since foraging areas were limited and woodpeckers do not feed on the ground; and (4) eliminating older pines and so also nest-making opportunities. |
| Strahan v. Coxe, 127 F.3d 155 (1st Cir. 1997) | Northern Right whales | Plaintiff conservation organization challenged the Commonwealth of Massachusetts' commercial fishing regulatory scheme that led inevitably to whales becoming entangled in gillnet and lobster pot fishing gear in Massachusetts coastal waters | The appeals court upheld the trial court's injunction preventing the Commonwealth from **harming** Northern Right whales in violation of the ESA, affirming the trial court's findings that whales are **harmed** when they become entangled in fixed gillnet and lobster pot fishing gear on the Massachusetts coastline, noting that at least 57% of all Northern Right whales have scars from prior entanglements, adding that injuries from fishing lines and lobster buoys can be so severe that at least one whale was thought to have died as a result of such entanglements (though adding that mortality is not necessary to find **harm**, since **injury** will suffice). |
| Strahan v. Linnon, 967 F. Supp. 581 (D. Mass. 1997) aff'd, 187 F.3d 623 (1st Cir. 1998) | Northern Right whales | Plaintiff conservation organization challenged the Coast Guard's practice of allowing vessels--both | The court found that two whales were **harmed** when they were struck and killed by Coast Guard vessels and noted evidence that **harassment** occurs when Coast Guard vessels approach whales too closely, even though whales were |

| Case | Animal | Posture | Findings of ESA Take |
|---|---|---|---|
| | | its own and commercial vessels—to operate close to whales. | difficult to spot; the court declined to issue summary judgment to the Coast Guard on the basis that it had increased its efforts to avoid incidental take, since even in doing so the Coast Guard **had not eliminated the possibility of take**, especially since it had "made it clear that its missions have priority over the whales", adding that the "Coast Guard's statement of the relative importance of the mission as opposed to species protection bespeaks a **failure by the defendants to recognize the unqualified nature of ESA's directive**." |
| United States v. Town of Plymouth, Mass., 6 F. Supp. 2d 81 (D. Mass. 1998) | Piping plovers (small shorebirds who nest on coastal, sandy beaches above the tide line) | U.S. Fish & Wildlife Service challenged town of Plymouth, Massachusetts' allowing the operation of off-road vehicles (ORVs) in beach zones where piping plovers were present. | The court found that Plymouth's refusal to undertake precautionary measures against ORV usage, such as restricting their use in certain beach areas where plovers are present, represented a **harm** to the plovers, since there is "a likelihood that piping plover chicks will be **killed** and **disturbed** and that the nesting and feeding habitat will be adversely modified during the upcoming breeding season", since chicks have difficulty crossing ORV tracks and escaping from the tire ruts, since chicks are often struck by ORVs on the beach, and since both adults and chicks are often prevented from feeding when ORVs occupy the feeding habitat. |

| Case | Animal | Posture | Finding No ESA Take |
|---|---|---|---|
| Alliance for Wild Rockies v. U.S. Dep't of Agric., 938 F. Supp. 2d 1034 (D. Mont. 2013) aff'd in part, rev'd in part sub nom. Alliance for the Wild Rockies v. U.S. Dep't of Agric., 772 F.3d 592 (9th Cir. 2014) | Yellowstone grizzly bears | Plaintiff environmental organization challenged the U.S. Forest Service's plan to permit low-altitude helicopters to fly over the Yellowstone Grizzly Bear Recovery Zone, arguing that noise from the helicopters harassed grizzly bears by interfering with their feeding patterns. | The court ruled that the helicopter noise resulting from "bison hazing operations" did **not harass** the grizzly bears **because bears can run away** from the helicopter sound and because, even if the helicopter noise were startling, the bears were startled everyday by other occurrences and the helicopter noise **did not uniquely disturb them**; the court likewise found that nothing indicated that the startling of the bears and their running from helicopter noise interfered with their **normal behavior patterns** such as breeding, feeding, or sheltering. |
| Am. Bald Eagle v. Bhatti, 9 F.3d 163 (1st Cir. 1993) | Bald eagles | Plaintiff animal preservationists challenged deer hunting on state reservation, claiming that the bodies of the deer killed in the hunt contained lead (from ammunition) which bald eagles could ingest when consuming unclaimed deer carcasses. | The court concluded that the bald eagles were **not harmed** because they were **not certain** to ingest the lead, and because "**a one in a million risk**" was not enough to show harm. |
| Cold Mountain v. Garber, 375 F.3d 884 (9th Cir. 2004), as amended (Aug. 9, 2004) | Bald eagles | Plaintiffs environmental groups challenged state and federal "hazing" of bison to compel them back into Yellowstone Nat'l Park (to prevent the spread of brucellosis), the helicopters for which allegedly disturbed nesting bald eagles and may have | The court ruled that helicopter noise did **not harass** bald eagles since the plaintiffs had "**failed to establish a causal link** between any alleged hazing violations and the Ridge nest failure", despite evidence in the form of scientific studies **suggesting** that eagles react to helicopter noise (by flying from their perches or turning their heads), namely because the bald eagles' nests mixed success rate in the past. |

| Case | Animal | Posture | Finding No ESA Take |
|---|---|---|---|
| | | prevented a successful brood in one such nest. | |
| Fund for Animals, Inc. v. Florida Game & Fresh Water Fish Comm'n, 550 F. Supp. 1206 (S.D. Fla. 1982) | Florida panthers and Everglades kites | Plaintiffs environmental organizations challenged a four-day deer hunt scheduled in the Florida Everglades that would involve some 300 airboats and motorized vehicles. | The court ruled that **neither** the airboat **paths nor** the airboat **noise** would **harass** the panthers and kites by disrupting normal behavior patterns since, if the panthers or kites were stressed by the noise, both animals are **highly mobile** and **could escape** the sound by fleeing; the court likewise noted that since the airboats are **temporary** and are **no more stressful than aircraft** that fly overhead, their sound does not amount to harassing under the Endangered Species Act. |
| Nat'l Wildlife Fed'n v. Burlington N. R.R., 23 F.3d 1508 (9th Cir. 1994) | Grizzly bears | Plaintiffs conservation groups challenged railroad's accidental spilling of corn along its railroad, which attracted grizzly bears to the tracks, seven of which were struck by trains and killed. | The appeals court upheld the trial court's finding that although "the bear fatalities constituted a prohibited 'taking'", no injunction could issue against the railroad on the basis that plaintiffs had not "demonstrate[ed] enough likelihood of irreparable *future* injury to grizzly bears," finding that the surviving bears were **not likely to be harmed** because the railroad **corrected the problem** by removing the corn and no bears had been struck in the area of corn spills "in more than three years", and because plaintiffs **had not shown a likelihood of future spills**. |
| Strahan v. Holmes, 595 F. Supp. 2d 161 (D. Mass. 2009) | Humpback whales | Pro se plaintiff challenged commercial lobster fisherman for entangling an endangered humpback whale in his fishing gear. | The court declined to enjoin the fisherman, finding that although the fisherman "captured" the whale in violation of the "take" prohibition, the whale was **neither harmed** (because "[m]ere entanglement . . . **without any proof of injury** does not fall within the meaning of 'harm'") **nor harassed** (because two and a half days was **not a long enough duration** to significantly disrupt the whale's normal behavior patterns), and because the plaintiff did not establish a threat of irreparable harm if the injunction were denied. |