# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

TRACEY K. KUEHL, an individual;　　　)
LISA K. KUEHL, an individual;　　　　)　Case No. C14-2034-LRR
KRISS A. BELL, an individual;　　　　　)
NANCY A. HARVEY, an individual;　　　)
JOHN T. BRAUMANN, an individual,　　)
and; ANIMAL LEGAL DEFENSE　　　　)　DEFENDANTS, PAMELA
FUND, a non-profit corporation,　　　　)　SELLNER, TOM SELLNER, and
　　　　　　　　　　　　　　　　　　)　CRICKET HOLLOW ZOO'S POST TRIAL
　　　　　　　Plaintiffs,　　　　　　　)　BRIEF
　　　　　　　　　　　　　　　　　　)
　　　vs.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
PAMELA SELLNER, an individual;　　　 )
TOM SELLNER, an individual; and　　　 )
CRICKET HOLLOW ZOO, a　　　　　　)
non-profit corporation,　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　　　　)
　　　　　　　　　　　　　　　　　　)

Larry J. Thorson  #AT0007976
ACKLEY KOPECKY & KINGERY, L.L.P.
4056 Glass Road, NE
Cedar Rapids, IA 52402
Ph: (319) 393-9090  Fax: (319) 393-9012
Email: lthorson@akklaw.com
Attorney for Pamela Sellner, Tom Sellner,
and Cricket Hollow Zoo

# TABLE OF CONTENTS

I.   FACTUAL INTRODUCTION........................................................................... 1

II.  THE ENDANGERED SPECIES ACT, 16 U.S.C. § 1531 ET SEQ. AND THE ANIMAL
WELFARE ACT, 7 U.S.C. § 2131 ET SEQ. ...................................................... 2

III. ARGUMENT ....................................................................................................... 5

   i. Plaintiffs Lack Standing ................................................................................. 5

   ii. Plaintiffs Cannot Bring Action for Animals Not Covered by Endangered Species Act . 11

   iii. The Defendants Have Not Violated the Endangered Species Act ..................................... 11

      A. The Lemurs Are Not Harassed or Harmed ........................................................ 19

      B.   The Tigers Are Not Harassed or Harmed ...................................................... 22

      C. Defendants Do Not Have Any Gray Wolves and Wolf Hybrids Are Not Endangered
      ........................................................................................................ 25

      D.   The Zoo Enclosures Meet or Exceed Animal Welfare Act Requirements................ 27

   iv. The Defendants Are Able to Care for Their Animals ......................................... 27

   v. The Defendants do not Traffic in Endangered Species ....................................... 29

CONCLUSION ............................................................................................................ 30

Case 6:14-cv-02034-JSS   Document 77   Filed 12/04/15   Page 2 of 37

# TABLE OF AUTHORITIES

## CASES

*ALDF et al. v. United States Department of Agriculture et al.,*
  Case Number 14-12260, filed June 15, 2015 ....................................................... 4

*Babbit v. Sweet Home Chapter, Communities for Greater Ore.,* 515 U.S.
  687, 692 (1995) ........................................................................................................ 17

*Bennett v. Spear,* 520 U.S. 154, 164-65 (1997) ....................................................... 4

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S.
  837, 842-43 (1984) ................................................................................................... 5

*Coho Salmon v. Pac. Lumber Co.,* 61 F. Supp. 2d 1001, 1006 (N.D. Cal. 1999) ...................... 18

*Friends of the Earth, Inc. v. Gaston Cooper Recycling Corp.,* 204 F.3d 149 (2000) ................... 6

*Glickman v. Animal Legal Defense Fund,* 153 F.3d 426, 445 (D.C. Dist. 1998) ......................... 7

*Humane Society of U.S. v. Babbitt,* 46 F.3d 93, 98 (D.C. Cir. 1995) ......................................... 6

*Humane Society of U.S. v. Hodel,* 840 F.2d 45, 51-52 (D.C. Cir. 1988) ................................... 6

*In Defense of Animals v. Cleveland Metroparks Zoo,* 200, 785 F. Supp.
  100, 103 (N.D. Ohio 1991) .......................................................................................... 7

*In Defense of Animals v. Cleveland Metroparks Zoo,* 785 F.Supp.
  100, 103 (N.D. Ohio 1991) .......................................................................................... 7

*Int'l Primate Protection League v. Institute for Behavioral Research, Inc.,*
  799 F.2d 934, 937-38 (4th Cir. 1986), *cert. denied,* 481 U.S. 1004, *reh'g
  denied,* 482 U.S. 909 (1987) ............................................................................. 6, 8, 10

*Jayne v. Rey,* 780 F.Supp.2d 1099, 1104-05 (D. Idaho 2011) Aff'd 706
  F.3d 994 (9th Cir. 2015) ............................................................................................. 6

*Lebron v. Rumsfeld,* 764 F. Supp. 2d 787, 806 (D.S.C. 2011)
  (psychological harm insufficient to confer standing), *aff'd,*
  670 F.3d 540 (4th Cir.), *cert. denied,* 132 S. Ct. 2751 (2012) ................................... 6

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562-563 (1992) ........................... 5, 32

*National Wildlife Federation v. Burlington Northern Railroad, Inc.,*
  23 F. 3d 1508 (9th Cir. 1994) .................................................................................... 17

*Stathan v. Linnon,* 967 F.Supp. 581,630 (D. Mass. 1997) ...................................... 17

*U.S. v. Kapp,* 2003 U.S. Dist. Lexis 21169 (N.D. Ill Nov. 4, 2003) ......................... 26

*United States v. 5 S 351 Tuthill Rd.,* 233 F.3d 1017, 1022 (7th Cir. 2000) ............... 6

*United States v. AVX Corp.,* 962 F.2d 108, 114 (1st Cir. 1992) ............................... 7

*Zimmerman v. Wolff,* 622 F. Supp. 2d 240,243-44 (E.D. Pa. 2008) ......................... 8

## STATUTES

16 U.S.C. § 1532(19 ........................................................................................ 4

16 U.S.C. § 1538 (a)(1)(B) .............................................................................. 29

16 U.S.C. § 1538(a)(1)(A)-(B) ......................................................................... 4

16 U.S.C. § 1538(a)(1)(C) .............................................................................. 30

16 U.S.C. § 1538(a)(1)(D) .............................................................................. 29

16 U.S.C. § 1538(d) ....................................................................................... 30

50 C.F.R. § 17.21(d)(1) .................................................................................. 18

50 C.F.R. § 17.3............................................................................... 4, 17, 18, 30

9 C.F.R § 1.1-4.11 .......................................................................................... 11

9 CFR § 3 ......................................................................................................... 3

Animal Welfare Act, 7 U.S.C. § 2131 ........................................................ 2, 4

Endangered Species Act, 16 U.S.C. § 1531............................................... passim

Pub. L. No. 107-171 (1990) AWA (116 Stat.) 134 ......................................... 3

Title 9 of the Code of Federal Regulations §§ 1.1-4.11 ................................. 3

## OTHER AUTHORITIES

*Animal Species of the World, Wilson & Reeder* (2 d.ed., 1993) p. 576 ...................................... 26

*animaldiversity.org* ...................................................................................... 26

Merriam-Webster Dictionary ........................................................................ 24

U.S. Fish & Wildlife Service: Environmental Conservation Online System..................... 26

# I.    FACTUAL INTRODUCTION

The Plaintiffs have alleged that under the Endangered Species Act, 16 U.S.C. §

1531 et seq. (hereinafter sometimes referred to as ESA) the Defendants, Pamela Sellner,

Tom Sellner and Cricket Hollow Zoo have violated two provisions of that Act. The

individual Defendants, Pamela Sellner and Tom Sellner have run a nonprofit Iowa

corporation, Cricket Hollow Zoo (hereinafter "Zoo"), located near Manchester, Iowa

since 2005. Prior to that time, the Zoo was unincorporated. Defs. Exh. D, pp. 1-2. The

Sellners opened the large Zoo in 2002. Mrs. Sellner started working with exotic animals

in 1986 and the Sellners got their exhibitors license from the USDA in 1992. (P. Sellner

Tr. pp. 316-317). The Sellners have run this Zoo for the community and educational

reasons to allow the public in Eastern Iowa to see animals they normally wouldn't be

able to see. (P. Sellner Tr. pp 331-334). Besides having the Zoo, the Sellners also run a

Grade A dairy farm at their location which is the top classification for milk producers.

(P. Sellner. Tr. p. 313). Mrs. Sellner also worked as a Delaware County DHIA field

supervisor for 25 years. (P. Sellner Tr. p. 311).

The Plaintiffs have taken a series of actions including contacting the United

States Department of Agriculture (APHIS Division),  contacting the local Sheriff's

Department numerous times, contacting Senators, Congressman, the Delaware County

1

Board of Supervisors, the Iowa Department of Agriculture, the Mayor of Manchester, and numerous other authorities about alleged violations at the Zoo. (L. Kuehl Tr. pp. 552, 565-566; T. Kuehl Tr. pp. 247-248, 264-267).

The Defendants had to call the Delaware County Sheriff in 2012 because of the actions by some of the Plaintiffs that caused the Defendants concern about the intentions of the Plaintiffs when they were at the Zoo. (L. Kuehl Tr. pp. 587-588). The Plaintiffs have visited the Zoo in various combinations and with various other individuals during 2012 and 2013 during which time they have violated the Zoo's policies by taking hundreds (if not thousands) of photographs and videotaped various animals. The Plaintiffs have descended upon this Zoo and the Sellners in a well-orchestrated effort to distort what is going on at the Zoo and paint a picture that is not representative of the Zoo or the Sellners. These Plaintiffs went looking for a fight and the Sellners and Cricket Hollow Zoo were convenient targets.

## II. THE ENDANGERED SPECIES ACT, 16 U.S.C. § 1531 ET SEQ. AND THE ANIMAL WELFARE ACT, 7 U.S.C. § 2131 ET SEQ.

Prior to passing the Endangered Species Act (passed in 1973), Congress passed (in 1970) the Animal Welfare Act (hereinafter referred to as the AWA), 7 U.S.C. § 2131 et seq. The AWA gives the Secretary of Agriculture the authority to "promulgate standards to govern the humane handling, care, treatment, and transportation of

2

animals...." 7 U.S.C. § 2131. The AWA is the only Federal law that regulates the treatment of animals in exhibition and transport. There may be other laws for certain species but all refer to the AWA as the acceptable minimum standard.

The regulations as set forth by the USDA for exhibitors are entitled to deference and the "expert" testimony offered by the Plaintiffs does not override the standards set forth by the AWA and the accompanying regulations. APHIS officers, often veterinarians, have rarely remarked about any conditions affecting any animal that is an endangered species – and the only endangered species are lemurs and tigers at the Sellners facility.

The regulations promulgated by the Secretary of Agriculture can be found in Title 9 of the Code of Federal Regulations §§ 1.1-4.11. Part 3 contains the specifications for the handling, treatment, and transportation of animals covered by the AWA. The term "animal" only refers to warm-blooded animals and does not cover, among other things, birds, livestock or poultry. Pub. L. No. 107-171 (1990) AWA (116 Stat.) 134.

Most zoo animals are regulated under 9 CFR § 3, Subpart F which lists the specifications for handling, care, treatment, and transportation of "animals" as that term is defined under the AWA. The Zoo is a class C exhibitor licensed by the Department of Agriculture under this Act. See Defs. Exh. R. The AWA defines the term "exhibitor" under 7 U.S.C. § 2132(h). In a recent decision by the 11th Circuit Court of Appeals (*ALDF et al. v. United States Department of Agriculture et al.*, Case Number 14-12260, filed

3

June 15, 2015), the Court stated that "...the AWA licensing scheme is entitled to deference by this court." (Page 3 of the decision, to be published).

The Endangered Species Act, 16 U.S.C. § 1531 et seq., passed in 1973 by Congress does not regulate possession of endangered or threatened species, nor the welfare of those species that are possessed. 16 U.S.C. § 1538(a)(1)(A)-(B). It regulates the movement of those species only when interstate commerce or a "take" is involved. 16 U.S.C. § 1532(19). The word "harass" in the term "take" is defined in § 3 of the ESA as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns, which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. The same regulation goes on to exempt other practices including "(1) animal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act, (2) breeding procedures, or (3) provisions of veterinary care..." 50 C.F.R. § 17.3. This means that only sale, transport, and husbandry acts by those not licensed under the Animal Welfare Act will be regulated under the Endangered Species Act. The ESA provides broad standing to citizens to bring actions to enjoin violations of the Act. *See Bennett v. Spear*, 520 U.S. 154, 164-65 (1997). The Act does not, however, and cannot, expand standing beyond the limitations of Article III of the Constitution. *See id.* at 165-66.

4

Zoos can usually move animals between facilities without permits under the ESA because there is very little buying and selling of listed zoo animals and normal animal husbandry is exempt from the "take" provisions of the ESA (as set forth above). "If the intent of Congress is clear, that is the end of the matter, for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837, 842-43 (1984).

## III.  ARGUMENT

### i. Plaintiffs Lack Standing

It is questionable that the Plaintiffs have standing to bring this cause of action. The quotation from the case of *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-563 (1992) used by the Plaintiffs that seems to indicate standing is conferred simply by viewing the animals is a misrepresentation of the Supreme Court's reference to standing. The Court went on to state that standing was not conferred in the case before it and stated that the fact that the women who claimed standing had "visited" the areas in question proved nothing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-563 (1992). The Court denied injunctive relief. *Lujan* stands for the proposition that one must suffer a concrete or discernible injury not a "conjectural or hypothetical" one to bring an action in federal court. The Plaintiffs must have sufficient evidence that their alleged harm is particularized, concrete and/or imminent or actual. *See Friends of the Earth, Inc. v. Gaston*

5

*Cooper Recycling Corp.*, 204 F.3d 149 (2000). The Plaintiffs' declarations submitted

herewith do not contain any concrete or discernible injury – just anthropomorphic

statements about cultural and spiritual bonds with animals that they saw for moments

once or twice years ago. No injury is described with any meaningful detail with regard

to the tigers and lemurs (the only animals relevant to this cause of action). The

Plaintiffs have not presented sufficient evidence of standing to proceed in this matter.

Defendants have taken no actions which have caused the Plaintiffs to alter their

normal conduct in order to avoid the alleged offensive matter. *See Jayne v. Rey,* 780

F.Supp.2d 1099, 1104-05 (D. Idaho 2011) Aff'd 706 F.3d 994 (9th Cir. 2015); *Lebron v.*

*Rumsfeld,* 764 F. Supp. 2d 787, 806 (D.S.C. 2011) (psychological harm insufficient to

confer standing), *aff'd,* 670 F.3d 540 (4th Cir.), *cert. denied,* 132 S. Ct. 2751 (2012); *United*

*States v. 5 S 351 Tuthill Rd.,* 233 F.3d 1017, 1022 (7th Cir. 2000); *Humane Society of U.S. v.*

*Babbitt,* 46 F.3d 93, 98 (D.C. Cir. 1995) (stating that general emotional harm, even if

deeply felt, cannot suffice to show injury-in-fact for standing purposes); *See also Humane*

*Society of U.S. v. Hodel,* 840 F.2d 45, 51-52 (D.C. Cir. 1988). General interests in the

enforcement of protective provisions are insufficient to confer standing. *Int'l Primate*

*Protection League v. Institute for Behavioral Research, Inc.,* 799 F.2d 934, 937-38 (4th Cir.

1986), *cert. denied,* 481 U.S. 1004, *reh'g denied,* 482 U.S. 909 (1987). As the First Circuit

Court of Appeals explained:

> "A mere interest in an event no matter how passionate or sincere the interest and
> no matter how charged with public import the event – will not substitute for an

6

actual injury. *See Diamond*, 476 U.S. at 62, 106 S.Ct. at 1703 ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements.") *SCRAP*, 412 U.S. at 687, 93 S.Ct. at 2416 (*insisting upon a showing of personal injury "prevents the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders"*)."

*United States v. AVX Corp.*, 962 F.2d 108, 114 (1st Cir. 1992) (emphasis added).

The Plaintiffs have not plead or attempted to bring an action under the AWA (*See Glickman v. Animal Legal Defense Fund*, 153 F.3d 426, 445 (D.C. Dist. 1998)). They now appear to be attempting to try this case as if the AWA were at issue with each and every allegation in any inspection report they have presented. *See also In Defense of Animals v. Cleveland Metroparks Zoo*, 200, 785 F. Supp. 100, 103 (N.D. Ohio 1991) (even if Plaintiffs have standing, there are numerous obstacles under the ESA to private suits). The effort put forth by the Plaintiffs to attempt to interpret what the inspection reports from APHIS show with regard to the Zoo and the equal effort to hide from the court inspection reports that do not show "noncompliances" of any sort – direct or indirect (as well as the attempt to prevent the court from viewing the IDALS reports that were generated from complaints by the Plaintiffs because those reports are favorable to the Sellners) exposes the weakness of their case. (See Defs. Exh. U (which shows USDA routine inspections showing no noncompliances which range from August 6, 2008 to May 30, 2014; Defs. Exh. Y which includes IDALS inspections from April 17, 2012 to August 28, 2014 which uniformly indicate that the animals were safe and well taken

7

care of or that Mrs. Sellner was handling any issues with animal health in the proper

manner).

The lack of a private cause of action under the AWA is well recognized as the

court stated in *Zimmerman v. Wolff*, 622 F. Supp. 2d 240,243-44 (E.D. Pa. 2008):

> "Defendant argues that the AWA does not provide a private cause of action.
> Though this issue has not been determined by the Court of Appeals, other courts
> have uniformly held that the AWA does not create a private cause of action and
> that Congress intended that only the Secretary *244 of Agriculture be able to
> enforce the law. *See e.g., International Primate Protection League v. Institute for
> Behavioral Research, Inc.*, 799 F.2d 934, 940 (4th Cir. 1986), *cert. denied*, 481 U.S. 1004,
> 107 S.Ct. 1624, 95 L.Ed.2d 198 (1987); *Ing v. American Airlines*, 2007 WL 420249, at
> *4 (N.D.Cal. Fb. 5, 2007); *Moore v. Garner*, 2005 WL 1022088, at * (E.D.Tex. Jan. 1,
> 2005); *Whispering Pines Animal Kingdom, LLC v. Kinde*, 2002 WL 484649, at *5
> (E.D.Mich. Mar. 6, 2002); *Moor-Jankowski v. Board of Trustees of New York
> University*, 1998 WL 474084, at *10 (S.D.N.Y. Aug. 10, 1998); *In Defense of Animals
> v. Cleveland Metroparks Zoo*, 785 F.Supp. 100, 103 (N.D. Ohio 1991).
> Plaintiff provides no cases to the contrary and merely argues that the AWA does
> not preclude a private right of action. I agree with the overwhelming weight of
> authority that the AWA does not provide a private cause of action.

The Fourth Circuit also stated in the case of *Int'l Primate Protection League v. Institute for

Behavioral Research, Inc.*, 799 F.2d 934, 938-40 (4th Cir. 1986).

> "The Act, as our description suggests, does not imply any provision for lawsuits
> by private individuals as a complement to the authority of the Secretary of
> Agriculture. The plaintiffs therefore can draw no support from cases involving
> other statutes that do create standing for private individuals to challenge a
> particular treatment of animals. *See Tennessee Valley Authority v. Hill*, 437 U.S.
> 153, 164 n. 15, 98 S.Ct. 2279, 2287 n. 15, 57 L.Ed.2d 117 (1978) (Endangered
> Species Act); *Animal Welfare Institute v. Kreps*, 561F.2d 1002, 1005-06 (D.C.Cir.
> 1977), *cert. denied*, 434 U.S. 101, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978) (Marine
> Mammal Protection Act). "The question whether a statute creates a cause of
> action, either expressly or by implication, is basically a matter of statutory
> construction." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15, 100
> S.Ct. 242, 245, 62 L.Ed.23 146 (1979). Here, we are convinced that Congress

8

intended the administrative remedy to be the exclusive remedy. To accord plaintiffs standing to sue by virtue of a private cause of action would not conform to the aims of Congress in the Animal Welfare Act."

The fact that there is no right of private action by citizens under the AWA apparently drives these Plaintiffs to attempt the novel and totally untested avenue of trying to claim that a licensed facility that has not had its license revoked is violating the ESA. The Petition filed by the USDA does not seek revocation of the Sellners' license but instead asks for "such order or orders...as are authorized by the Act and warranted under the circumstances." (Exh. 37 Complaint p. 21).

The claims pursued by the Plaintiffs in this action have many unanswered and maybe unanswerable questions. Does a facility that has a noncompliance immediately fall out of the protective umbrella of 50 C.F.R. § 17.3 which exempts "animal husbandry practices that meet or exceed minimum standards for facilities and care under the Animal Welfare Act...."? If so, every expert that testified on behalf of the Plaintiffs was from or had represented an institution that at one time or another was not in compliance with the AWA. (Dr. Conrad testified the Zoo she had worked with as a veterinarian had noncompliances from the USDA, (Tr. p. 107), Dr. Klopfer admitted that Duke University had "lots of non-compliance reports with the USDA (Tr. p. 199), and David Allen admitted that Blank Park Zoo had AWA violations (Tr. p. 839). As one court has explained:

> The administrative enforcement that Congress envisioned for this statute is readily apparent. The Act directs the Secretary of Agriculture to "promulgate

9

standards to govern the humane handling, care, treatment, and transportation of animals....

....

A review of the Act thus underscores two points. One is a commitment to administrative supervision of animal welfare.

*Int'l Primate Protection League v. Institute for Behavioral Research, Inc.*, 799 F.2d 934, 939 (4th Cir. 1986) (footnote omitted). The court also stated that the specialization and uniformity of the comprehensive scheme for administrative enforcement of the provisions in issue, in that case, for research facilities, would be compromised by allowing private enforcement actions.

How does the court reconcile the testimony of Dr. Pries who did not find objectionable conditions at the Zoo? What does the court do with Dr. Pusillo's testimony when he stated that he performed his own unannounced inspections of the Zoo and found the animals to be in fine condition – including the tigers? Dr. Pusillo's reputation apparently is countrywide since Dr. Conrad from Los Angeles had heard of him. Both Dr. Pries and Dr. Pusillo were at trial and subject to cross examination unlike any APHIS inspector. Dr. Klopfer appears to be an expert with regard to lemurs but his testimony (even though he was asked to speculate on many variables by the Plaintiffs' counsel – he refused; (Tr. pp. 149, 171, 174, 180, 181) really boiled down to the fact that he knows lemurs are social animals and he believes they are psychologically in danger

if they are not in groups (Tr. p. 140). This is not the standard set forth by the AWA or the regulations contained in 9 C.F.R § 1.1-4.11.

## ii. Plaintiffs Cannot Bring Action for Animals Not Covered by Endangered Species Act

The Plaintiffs cannot bring an action for animals that are not endangered or threatened under the aegis of the Endangered Species Act 16 U.S.C. § 5131 et seq. The "gray wolves" that the Plaintiffs keep referring incorrectly to are wolf-dog hybrids. The USDA in their inspection reports consistently refer to them as wolf hybrids. The veterinarian for the Zoo, Dr. Pries, testified that they are wolf hybrids. See J. Pries Dep. 134:23-25. The paperwork at the Zoo indicates they are wolf hybrids (Defs. Exh. I, pp. 6-7). The Defendants have testified that they are wolf hybrids (P. Sellner Tr. p. 336).

### iii. The Defendants Have Not Violated the Endangered Species Act

The Defendants do a lot for their animals and not only they but also Dr. Pusillo, a renowned nutritionist, has commented on how good the animals at the Zoo look. See CV of Dr. Pusillo, Defs. Exh. T, pp. 1-6, photos taken by Dr. Pusillo Defs. Exh. X, pp. 1-12 and G. Pusillo Tr. pp. 369, 378-381, 384-385. The Zoo has had violations over time with regard to the AWA and this is evidenced by the inspection reports. It has also received inspection reports with no violations. Defs. Exh. U, pp. 1-4.

The IDALS reports where the Iowa inspectors, Doug Andersen and others conducted inspections speak to the general good condition of the animals at the Zoo.

11

The one source for unbiased reports in this case would appear to be the reports of the IDALS which is the Iowa Department of Agriculture and Land Services. They are contained in Defs. Exh. Y. Starting with page two of these reports, they indicate that in most instances the IDALS Inspector (usually Doug Andersen but often accompanied by other IDALS members) also conducted joint inspections with the USDA of Cricket Hollow Zoo. Starting at page two of Defs. Exh. Y the inspection on that date is from July 24, 2012. The inspector, Doug Andersen, indicates that he was accompanied by Cindy Neis who is from the USDA. Curiously enough there doesn't appear to be any corresponding USDA inspection report that has been provided by the Plaintiffs in this action for that date. Cindy Neis a/k/a Cynthia M. Neis, is an animal (APHIS) inspector for the USDA and her name appears on inspection reports from July 29, 2010, November 22, 2010, February 16, 2011, August 17, 2011, December 10, 2011, May 1, 2012, May 17, 2012 and August 22, 2012. (These reports are respectively Plts. Exhs. No. 4, 5, 6, 7, 8, and 11). At that time the inspector, Doug Andersen, found "due to the long stretch of hot days, the comfort of the animals was the main issue. Ms. Neis and I found that all the animals had water and shade available. All the animals appeared to be in good body condition and none appeared to be overheated." Defs. Exh. Y, p. 2. As far as disposition of the case, the IDALS Compliance Investigator stated "at this point in time, I find there is no standard of care issues at this facility. The animals are safe and appear

12

to be well taken care of and I believe there are no conditions which would cause adverse health or suffering."

On Defs. Exh. Y, p. 3 on February 8, 2013 Doug Andersen along with IDALS District Veterinarian, Gary Eiben, IDALS Livestock Inspector, Marc Rue, and Delaware County Sheriff, John LeClaire, walked through all the buildings and past all the pens and observed the poultry, primates, small mammals, reptiles, exotics, large cats, livestock, birds, rodents and snakes. The conclusion by Doug Andersen in his report was "in a nutshell, all of the animals appear to be thriving. They were well-fed, well-taken care of, alert and appear content." He went on to state in that same report "Dr. Eiben, Inspector Rue, and I all agree that there are no standard of care issues here today that would cause adverse health or suffering. This is consistent with the findings of the investigations (on these same issues) in August and November I performed with Dr. Heather Cole and Inspector Cindy Neis." He went onto state that he recommended no further action.

On May 15, 2013, Mr. Doug Andersen filed another memo indicating once again that Gary Eiben DVM and he went to Cricket Hollow Zoo and he stated "large hoofed animals were out grazing in the pastures, the rest of the animals looked active, healthy, and happy." He stated that "Gary Eiben and I were pleasantly surprised on the condition of readiness for the May 25 opening date."

On October 24, 2013, Doug Andersen from the IDALS wrote that he visited the

Cricket Hollow Zoo on 9-25-13 with USDA Inspectors, Chad Moore and Heather Cole

DVM. He stated that this was part of the surveillance as a result of the complaints filed

against the facility. He further went on to state that the inspected lasted 7 ½ hours. He

indicated that he covered all the animals with the exception of the small education

center. He indicated that as to the rest of the facility the results were typical in that

there were a number of housekeeping issues which he summarized of it as "none of it

critical or excessive." He said the animals appeared to be content, playful, relaxed,

comfortable, well-fed and well-watered. He also stated in this report that he spoke with

Dr. Cole after the inspection and it was agreed on this day there were no direct

violations. He went onto state that he had earlier visited the facility last May and again

in June with similar results. And as a further interesting sidelight in this report, he

indicated that some of the USDA violations or inadequacies show up as repeats but

may not actually be. He stated that Ms. Sellner has always been responsive to fixing

specific inadequacies. Defs. Exh. Y, p. 5.

There was a further investigation on December 16, 2013 by Doug Andersen, Defs.

Exh. Y, p. 6. Mr. Andersen in this report specifically referred to the complaint of three

dead piglets in the pig pen. He stated that Mrs. Sellner had stated to him that the

mother had her piglets early and the cold snap caused the pigs to expire. He stated "in

my opinion, this is not the result of direct negligence, but a somewhat normal, but

14

unfortunate farm occurrence." He also mentioned the fact that three goats needed their hooves trimmed but he didn't feel this was causing adverse suffering. He also mentioned the fact that the chinchillas needed water but when he viewed them about an hour later "they seemed content, were not drinking and body condition and demeanor seemed fine." As to the disposition of the case the statement by Doug Andersen was "I find there are no standard of care issues at this facility other than those mentioned above. The animals are safe and appear to be well taken care of and I believe there are no conditions which would cause adverse health or suffering at the time of my leaving."

The next compliance report filed by Mr. Andersen is dated June 24, 2014 and is based upon a complaint filed by Tracey Kuehl (one of the Plaintiffs herein). He stated on May 21, 2014 he accompanied USDA personnel Dr. Kate Ziegerer and Dr. Heather Cole for a regular USDA inspection and to address the complaints filed by Tracey Kuehl. He stated "all the discrepancies/inadequacies listed on the USDA AC inspection for this date are accurate. However, in my opinion, most of the issues come down to a good cleaning and a weekend of maintenance." He went on further to state that "on the upside, Ms. Sellner is very knowledgeable and does pretty well at the herculean task of caring for the numerous animals. She always has cooperated with remedying issues found during inspections."

15

The next entry is dated August 28, 2014 again by Doug Andersen and he stated he joined the USDA inspectors Dr. Peggy Shaver and Dr. Heather Cole for a facility inspection. With regard to the inadequacies he stated the USDA personnel found, he characterized that as and stated "fortunately, there were none severe enough to characterize as 'direct, non-compliant issues.'" He also stated that even though the water bowls exhibited algae growth, the water from the most part was clear indicating fresh water had been put into the less than clean receptacles. Mr. Andersen went onto state that even though the inspection may show repeats, it appears that the issues mentioned in the previous inspections had been addressed. Once again his conclusion was "overall, my opinion is that no conditions exist that would cause adverse health or suffering on this day."

The final report from Mr. Andersen concerning the Zoo is dated October 17, 2014 once again indicating that IDALS District Veterinarian Gary Eiben was present along with Inspectors Heather Cole and Peggy Shaver for a routine inspection and also complaint inspection. Mr. Andersen stated that three animals were at issue during this inspection. He indicated there was a hamster with some hair loss but he and Dr. Eiben did not consider it to be a neglect issue. The coyote sisters had tangled once again and there was a small wound on one of the coyote's feet. He indicated he and Dr. Eiben agreed this was not an adverse condition. The third thing he mentioned was the white tiger which was added to the facility. This tiger that is referred to in this report is

16

Caspar. He stated the tiger is old and has vision problems and poor body condition. He also attached a copy of the letter from Dr. Pries documenting veterinarian care to his report. He stated that the white tiger was receiving ordered veterinarian care. See IDALs reports, Defs. Exh. Y, pp. 1-10.

The Defendants cannot violate the ESA by simply possessing endangered wildlife and cannot be subject to any liability under the ESA because it is a class C exhibitor under the AWA and therefore under the ESA regulations is exempt. 50 C.F.R. § 17.3.

The Plaintiffs are right that no court has made any determination as to whether "harassing" a captive endangered species constitutes a "take" under the ESA and no court is likely to hold that a licensed USDA facility under the AWA can be found to have committed a "take." The cases cited by the Plaintiffs as instructive all involve potential damage to animals (or plants) in the wild by non-licensed defendants. *See Babbit v. Sweet Home Chapter, Communities for Greater Ore.,* 515 U.S. 687, 692 (1995) (respondents were small landowners, logging companies, and families dependent on the forest product industries); *Stathan v. Linnon,* 967 F.Supp. 581,630 (D. Mass. 1997)(U.S. Coast Guard on duty); *National Wildlife Federation v. Burlington Northern Railroad, Inc.,* 23 F. 3d 1508 (9th Cir. 1994). (A railroad spilling grain along its tracks killed grizzly bears).

"Harm" is also defined in 50 C.F.R. § 17.3 to refer to actual injury or death in a "Take" but once again is exempted in this instance because the Zoo is a Class C exhibitor under the AWA. The ESA regulations define "harm" within the definition of "take" to mean

> an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

50 C.F.R. § 17.3. Importantly, in order to establish "harm" from habitat modification, a plaintiff must show

> "significant impairment of the species' breeding or feeding habits and prove that the habitat degradation *prevents, or possibly, retards, recovery of species."* *National Wildlife Federation v. Burlington Northern Railroad, Inc.,* 23 F.3d 1508, 1512-13 (9th Cir. 1994) (emphasis added).

*Coho Salmon v. Pac. Lumber Co.,* 61 F. Supp. 2d 1001, 1006 (N.D. Cal. 1999).

The regulations under the ESA make it unlawful to possess, deliver, or transport wildlife that was *unlawfully taken.* 50 C.F.R. § 17.21(d)(1). The Defendants' conduct does not come within the legal definition of an unlawful take and therefore does not come within the definition of unlawful possession. The Plaintiffs have not and cannot confront the plain language of the regulations and the ESA to have it apply to the Defendants in this action.

18

## A. The Lemurs Are Not Harassed or Harmed

Dr. Klopfer who testified about lemurs did not testify that he had examined the lemurs at the Cricket Hollow Zoo. (Tr. p. 180). He testified about the general nature of lemurs – but not about the general nature of those lemurs that have been hand raised. (Dr. Klopfer also hand raised lemurs before he apparently became enlightened). (Tr. p. 192). He testified that if he knew a lemur was hand raised it might change his mind about whether it could socialize with humans although he did not think it was the same as socializing with other lemurs. (Tr. pp. 191-192). He did not believe in the standards set forth by AWA for nonhuman primates (see Tr. p. 185; see 9 C.F.R. § 3.80 as to the size of primary enclosures for nonhuman primates – which the Sellners exceed) and would not talk about their application in this instance – yet according to the law, that is the standard that applies. If the standard to be applied, which the Plaintiffs are suggesting, is only what Dr. Klopfer thinks is appropriate for lemurs – then the Sellners would have no chance to meet that standard and apply proper husbandry techniques to their ring tailed and red ruffed lemurs. The reports by the USDA do not mention bigger groups, or larger enclosures or more enrichment for the lemurs – the only defect the Plaintiffs point to is feces in the enclosure. (Tr. pp. 162, 166-167; Plts. Exh. 22).

Dr. Klopfer did state that there were no chapters in a book on lemurs that were written about the red rough lemur or the ring-tail lemur that Mrs. Sellner could

19

reference. (Tr. p. 137). He also stated that there are no societies for the study of lemurs (Tr. p. 121).

What Dr. Klopfer stated is instructive though. He refused to be led by the Plaintiffs' numerous leading questions:

A.    He stated that lemurs "do die of old age" (Tr. p. 147).

B.    He testified that "a death does not necessarily mean improper care" (Tr. p. 149).

C.    He refused to form an opinion on whether the Defendants might be "liable" for the deaths of any of the lemurs (Tr. p. 149).

D.    When presented with a photograph of a lemur (Plts. Exh. 63, p. 3) he said from the photo alone he can't come to any conclusions about this lemur.

E.    He testified that a "bovine veterinarian" with some experience or training could provide proper care to lemurs (Tr. p. 171).

F.    He refused to state that Dr. Pries' background "would in and of itself cause harm" (Tr. p. 174). Dr. Klopfer is not a veterinarian (Tr. p. 189).

G.    He would not make any general statements about the Zoo or the conditions at the Zoo (Tr. p. 180).

H.    He would not answer the question as to whether the Defendants are capable of caring for the lemurs in accordance with generally accepted practices – answering "that's a question you would need to put to them" (Tr. p. 181).

Dr. Klopfer also testified under cross examination that there were certain facts that he apparently was not aware of in forming his opinion about the lemurs in the Zoo:

A.    He has not been to the Zoo to see the enclosures for the lemurs (Tr. p. 184).

B.    He has not seen videos of the lemurs at the Zoo (Tr. p. 193).

20

C.    He thought that if the lemurs got fresh fruit and vegetables daily that would be a mitigating factor in his opinion (Tr. p. 193).

D.    If the lemur cages were open so that the lemurs could see each other this would alleviate some stress (Tr. p. 194). The lemurs can see and touch each other. (P. Sellner, Tr. p. 620).

E.    He stated that if the lemurs did not get along with each other they should not be housed together (Tr. p. 195) (see also 9 C.F.R. § 3.81(3) which states that nonhuman primates may not be housed with other species unless they are compatible – in this instance Mrs. Sellner testified that they were not compatible and she put them apart for their own safety) (Tr. p. 620).

F.    He testified that feeding lemurs monkey chow along with fresh produce was a good thing if the Zoo did that (Tr. p. 195). Mrs. Sellner testified that she feeds the lemurs monkey chow along with fresh fruits and vegetables every day (Tr. p. 344).

G.    He stated that if there was a swing for the lemurs that would be a good thing (Tr. p. 196). Mrs. Sellner testified that Lucy, the red ruffed lemur has a swing (Tr. p. 345).

H.    He also states that toys for the lemurs are a good thing for them to have as enrichment (Tr. p. 197). Mrs. Sellner testified that they have toys in their enclosures including baseballs and Sesame Street toys (Tr. p. 345-346).

I.    He testified that he had heard of the Covance Research Lab for Primates in Madison, Wisconsin (Tr. p. 186). Mrs. Sellner testified that she has consulted with a veterinarian who works at Covance (Tr. p. 326). Dr. Klopfer also testified that Iowa State University veterinary facility has a good reputation (Tr. p. 189). Dr. Pries is a graduate of Iowa State (Defs. Exh. S, C.V. of Dr. Pries).

J.    Dr. Klopfer testified that from a still photograph he speculated that one of the lemurs looked in a near "catatonic" state. (Klopfer, Tr. p. 161, Exh. 63). However, earlier he testified that he couldn't come to any conclusions from this "momentary snapshot." (Klopfer, Tr. p. 160). He never saw any video of the interaction or actions of the lemurs. (Tr. p. 193). Mrs. Sellner testified that the red ruffed lemur, Lucy, was hand raised and likes to be

21

"loved and groomed." She loves to have her armpits rubbed and she lets Mrs. Sellner groom her. (P. Sellner, Tr. p. 657). The two ring-tails will take food from her hand bus usually play with each other. (P. Sellner, Tr. p. 658).

K.     He testified that the breeding success for lemurs at the Duke Center only came after they realized they had to simulate the natural environment more closely than they had previously done. (Klopfer, Tr. p. 153). Apparently, the Cricket Hollow Zoo is not doing too bad a job of providing an adequate environment because four lemurs have been born at the Zoo. (P. Sellner, Tr. p. 333).

The Plaintiffs' claim that the lemurs are harassed and harmed fails for the reasons set forth above and also because it is not factually accurate. The Plaintiffs go to great lengths to refer to regulations under the AWA. The standards that the Defendants need to comply with are not those expounded by the Plaintiffs' witness, Dr. Klopfer, they are the standards contained in the AWA regulations. No inspector from the AWA has told the Defendants that they must remove the lemurs from their facility. When the AWA inspectors have pointed out problems to the Defendants they have corrected those problems by installing lights and other remedial measures. Once again the Plaintiffs rely on rank speculation. They claim that a lemur has died recently. This is not the case. Zaboo is still alive and well (P. Sellner Tr. p. 619).

## B.     The Tigers Are Not Harassed or Harmed

Many of the tigers have lived a long time at the Zoo. See Defs. Exh. H. One died recently because it was euthanized by Dr. Pries. (Defs. Exh. J, pp. 20-21, 7/1/2015). Again the only standards that matter in this instance are the standards that the United

22

States Department of Agriculture has promulgated under its rule making capacity under the AWA and those standards have been complied with most of the time. The USDA APHIS inspectors have never told the Defendants that they must remove the tigers from the Zoo. Pam Sellner testified as to how the Big Cats come up to greet her when she goes out to make her rounds at the Zoo. (P. Sellner, Tr. p. 613). Dr. Pusillo has taken photos of the Big Cats because of the great condition of their bodies and coats. (Defs. Exh. X, pp. 4-12; Pusillo Tr. pp. 378-381). Again the standard is not what the Plaintiffs' expert, Conrad, says it is – the only standard that counts is that set forth by the USDA in its regulations. Title 9 C.F.R. §§ 1.1-4.11 in particular Part 3.

The Plaintiffs and their experts listed a series of hypothetical problems that they said could occur at the Zoo with the tigers because of the Sellners' husbandry practices. Among other alleged deficiencies listed by Dr. Conrad were the following (with the reply by the Sellners or their experts set forth below):

1.  The claim was made that the Zoo could be subject to skunks or raccoons bringing rabies into the enclosures of the big cats (Conrad, Tr. p. 40). Dr. Pries testified that there was no way for a skunk or raccoon to get in the cages (Tr. p. 427). If one got in, the tigers would make quick work of it and eating a rabid skunk or raccoon would not injure the tigers. (Pries Tr. p. 427).

2.  The claim was made that the Zoo should do a dental exam each year on the tigers. (Tr. p. 33). Dr. Pries testified that in order to do a dental exam on a tiger you would have to tranquilize that tiger and that is a risky business at best. (Dr. Pries, Tr. p. 451).

3.  The claim was made that bowling balls were an improper form of enrichment for the tigers because they could break their teeth. (Tr. p. 66).

23

Mrs. Sellner testified that she had been using bowling balls as enrichment for years (for one thing they don't get crushed like regular basketballs by the big cats) and no tiger has ever been injured by them. (Tr. pp. 320-321).

4. The claim was made that Dr. Pusillo's formulas are not easy to use and there is the danger of calcium deficiency which could cause brittle bone disease in big cats. (Tr. p. 79). Dr. Pusillo did not see any sign of brittle bone disease in any of the big cats at the Zoo. (Tr. pp. 384-385). Dr. Pries also saw no signs of brittle bone disease at the Zoo. (Tr. p. 431).

5. The claim was made that pea gravel is not a good surface for the animals. (Tr. p. 92). The Post Trial Brief of the Plaintiffs claims that it gets as hard as concrete – implying that the Sellners let it get that way. The USDA recommended pea gravel for the enclosures – which is easy to clean and drains well. (P. Sellner, Tr. p. 628). Dr. Pusillo stated he had no problem with pea gravel in the tigers' enclosures. (Tr. p. 381). Tom Sellner testified that he used a rototiller to keep the pea gravel from getting hard and he changed it out as often as every six months sometimes. (Tr. pp. 765-767).

6. The claim was made that there should be a platform for animals to eat off of that is easily scrubbed off (as if the tigers and other animals did not have such a platform). (Tr. p. 82). The tigers do have those platforms which appears in the photographs taken by the Plaintiffs and they are described by Mrs. Sellner as stainless steel sow feeders. (Tr. p. 319).

7. The claim was made that Caspar, the tiger was an indication of neglect by Mrs. Sellner and/or her veterinarian. (Conrad, Tr. p. 62). The claim was made that he had a six inch round wound that could have been a spider bite. (Conrad, Tr. p. 62). The further statements made by Plaintiffs' witness was that she is not sure about the natural antibiotic effect of saliva. (Tr. p. 63). The claim is made in the Plaintiffs' Post Trial Brief that their expert testified that Caspar died at "half a captive tiger's expected age." (Brief, p. 32). This is not what Dr. Conrad testified to – she testified that he was "middle age" which is not the same thing. (Tr. p. 65) (See Merriam-Webster Dictionary "middle age" for a human is defined as – "the period in a person's life from about age 40 to about age 60"). The Plaintiffs' rebuttal expert, David Allen, reinforces this interpretation because he stated that a Siberian tiger's life expectancy was 16 years. (Tr. p. 838). Inspector Doug Andersen, IDALS, stated that in his report that Caspar was old, had vision problems, and had poor body condition.

24

(Defs. Exh. Y, p. 10). Mr. Andersen stated that Caspar was receiving the ordered veterinary care.

8.      The claim was made that only Sherkan was of full age when he died. (Conrad, Tr. p. 70-71). This claim is refuted by Mrs. Sellner's testimony (Sellner, Tr. p. 616) that his mate, Sheba, died when she was 20 years old (see testimony by rebuttal expert Allen, Tr. p. 838). These clearly were some very old tigers. Caspar appeared to be an old tiger and may have been older than the 10 years that was estimated for his age because his background was shaky at best (Dr. Pries, Tr. p. 424). Blank Park Zoo lost one of its two tigers at a much younger age than Sherkan or Sheba. (Allen, Tr. p. 838). Mrs. Sellner has acted as a sanctuary for big cats that have had troubled pasts in order to save them from being euthanized. (P. Sellner, Tr. p. 613). Some of these big cats are not in good condition or those sending these big cats have lied about their condition or their age. (Pries, Tr. p. 424). Sometimes she has taken in animals in need of extreme help. (Pusillo, Tr. p. 385). Dr. Pusillo refers to her place as a refuge. (Tr. p. 385).

9.      The claim was made that by Dr. Conrad that the older tigers should be vaccinated -- for rabies and distemper. (Conrad, Tr. p. 46). Dr. Pries testified that rabies vaccine is "off label" meaning that it is not tested on tigers. (Tr. p. 426). He testified that it was highly unlikely that a tiger at this facility could get rabies (see paragraph one above). He also testified that distemper would not be a problem because this Zoo's population of big cats is small and there are not house cats with nose to nose contact to spread this disease. (Tr. p. 431).

10.     The claim has been made not only by the Plaintiffs, as well as in some reports of the USDA inspectors that they have seen "excessive" feces in some enclosures. Dr. Pries has stated that it has not been his experience that there have been excessive feces. (Pries, Tr. p. 429) (P. Sellner Tr. p. 623, all cages are spot cleaned once a day).

## C. Defendants Do Not Have Any Gray Wolves and Wolf Hybrids Are Not Endangered

The Plaintiffs cannot use the ESA to complain about species that are not covered under the ESA. The Zoo's animals are dog/wolf hybrids. The Plaintiffs seem to be

25

saying that every dog in America should be covered under the Endangered Species Act because of advancements in genetic testing since the ESA was enacted – it has been determined that dogs have descended from wolves. Wolf hybrids owned by the Zoo have lived long lives at the Zoo. The USDA has never told the Defendants that they cannot exhibit wolf hybrids at the Zoo. The case of *U.S. v. Kapp*, 2003 U.S. Dist. Lexis 21169 (N.D. Ill Nov. 4, 2003) does not stand for the proposition that the gray wolf is protected even if it is a hybridized with a dog. This would be a ludicrous position and would lead to ESA protection for almost all dogs in the United States, including dogs that were specifically bred from wolves.

The classification for the species *canis lupus familiaris* or the common or familiar dog was reclassified in 1993 as an extremely close relative of the gray wolf. *See Animal Species of the World, Wilson & Reeder* (2 d.ed., 1993) p. 576. *animaldiversity.org* (University of Michigan, Museum of Zoology). As genetics has advanced so has classifications of species. This advance in genetics did not change the listing in the ESA which was still listed as the gray wolf (*canis lupus*) (first listed in 1978). (See U.S. Fish & Wildlife Service: Environmental Conservation Online System). The Plaintiffs did not take the time to do a taxonomic identification of the three wolf hybrids in this case that would have settled the issue whether these were gray wolves. The Plaintiffs' only expert that they had that touched on the subject of the wolf hybrids was Dr. Conrad and she stated when asked that a wolf hybrid that died at age 14 "is an older animal for sure." (Tr. p.

71). She testified that wolves should be together (Tr. pp. 91, 95) and these wolf hybrids are (P. Sellner, Tr. p. 337).

**D.  The Zoo Enclosures Meet or Exceed Animal Welfare Act Requirements**

The enclosure sizes at the Zoo meet or exceed the size requirements of the AWA and there is no indication that they are inadequate because of size in the inspection reports. The standards that matter are those set forth by the USDA not what some expert considers a proper size or area. The enclosures at the Zoo have always met and most often exceeded the size requirements set forth by the USDA under the AWA and the Defendants testified to this (P. Sellner, Tr. p. 637). The animals always have areas in their enclosures that don't have feces. The behaviors supposedly witnessed by the Plaintiffs have all been explained by the Sellners as being natural and sometimes playful behaviors and are not an indication of any "psychological distress" in the animals mentioned. (Tiger was playing with one of the Plaintiffs, P. Sellner Tr. p. 657). One of the animals mentioned is not covered by the ESA in any event (the wolf hybrid).

**iv. The Defendants Are Able to Care for Their Animals**

The Plaintiffs go further out on the same limb when they claim that the Zoo commits harassment of animals because it fails to comply with minimum standards because of its "financial status" among other allegations. Mrs. Sellner testified that this has never been an issue with the Sellners. (P. Sellner, Tr. p. 640). See also inspection reports contained in Defs. Exh. U, pp. 1-4.

27

The Plaintiffs keep referring to the 300 animals in the Zoo and do not bother to mention to the Court that among that 300 count over 30 are birds, some are herd animals, and the endangered animals that are in question in this case number less than ten (4 tigers and 3 lemurs). (P. Sellner, Tr. pp. 323, 636).

The Sellners consider practical matters when they decide what animals they would like to bring to the Zoo. The Sellners consider the space, whether they have the knowledge, and the financing before they take in animals at their Zoo. (P. Sellner Tr. p. 736).

The Plaintiffs also denigrate Mrs. Sellner's "self-taught" skills in dealing with animals – even though she has been in animal husbandry for 50 years. The Plaintiffs make the same financial arguments they made in their Statement of Undisputed Material Facts that does not take into account that the Sellners are obtaining over one ton of food per week on a contract that basically benefits both the Sellners and the stores she obtains the meat and produce from who don't have to send perfectly good product to the landfill. (P. Sellner, Tr. pp. 338-339 – over one ton of food a week). The financial calculations of Plaintiffs' expert do not take into account that the animal count of 300 includes over 30 birds. The financial calculations do not take into account the fact that the Sellners could go to their bank and obtain credit at any time. (P. Sellner, Tr. p. 640). The Plaintiffs' calculations do not take into account the fact that Mr. and Mrs. Sellner

and a large group of volunteers spend many hours each year at the Zoo gratis. (P. Sellner, Tr. pp. 723-724; Pltfs. Exh. 39, p. 0007).

The Plaintiffs complain that Dr. Pries is not able to provide adequate veterinary care. The USDA has never stated this. Dr. Pries testified that he has consulted with the Henry Doorly Omaha Zoo or Iowa State University on issues he may not be that familiar with. (Pries, Tr. pp. 420-421). Certainly the Plaintiffs are not arguing the Omaha Zoo is not a good resource or is unable to answer any questions he may have. Dr. Pries is not a veterinarian in name only. His office has performed operations on some of the animals at the Zoo. (Pries, Tr. p. 412). He also has signed off on enrichment plans and does an annual walk through of the Zoo with Mrs. Sellner. (See Defs. Exhs. E, F, G, and M; Pries, Tr. p. 419).

## v. The Defendants do not Traffic in Endangered Species

The Plaintiffs allege that Mrs. Sellner somehow violated the ESA by trafficking in endangered species. Mrs. Sellner always documented any transfer (see for example Defs. Exh. I, pp. 1-7). Mrs. Sellner testified that when an animal was donated, that is exactly what was done and it was so noted on any necessary permit or form. This argument is rank speculation without a shred of evidence and bald assertions of wrongdoing. The Plaintiffs claim that 16 U.S.C. § 1538(a)(1)(D) somehow applies to the Sellners and Cricket Hollow Zoo presumably because the endangered animals at the Zoo were taken within the United States. (See 16 U.S.C. § 1538 (a)(1)(B) and 16 U.S.C. §

29

1538(a)(1)(C). This, once again, ignores the exemption language that exempts the Defendants contained in 50 C.F.R. § 17.3 and also 16 U.S.C. § 1538(d). The endangered tigers are not transferred for consideration. There is a total lack of proof of this claim.

# CONCLUSION

The Plaintiffs clearly lack standing to bring this action. They lack standing for two reasons – first they have alleged they had emotional trauma when clearly they concocted these trips to the Defendants' Zoo after careful planning including aerial reconnaissance, aerial photographs and research online. Their complaints parrot the APHIS inspection reports. They have not suffered the type of loss that would give them standing under any federal case. These Plaintiffs all claimed that they would be willing to visit the animals if conditions were different or they were someplace else at some indefinite future date. This is not sufficient to create standing. None of these Plaintiffs ever pointed out any of their claimed deficiencies to the Sellners except for Nancy Harvey who wanted Mrs. Sellner to bring water immediately to animals Ms. Harvey thought were thirsty.

Standing is also an issue because this facility is a licensed USDA facility. The Sellners still have a license. They are like every other licensed facility (at least every other licensed agency mentioned in this case) have had some noncompliances – the vast majority of which are "housekeeping issues" as IDALS Inspector, Doug Andersen, said

in his reports. The truth or validity of these noncompliances is yet to be determined in an action that is pending in an administrative procedure in USDA. There is no private action against the Defendants under the AWA. There is no private ESA action against a licensed facility.

The Plaintiffs would like this case to be about their testimony of the alleged defects in the Zoo. There is no doubt that the Cricket Hollow Zoo is not the Lemur Center at Duke University, Manchester, Iowa is not Los Angeles, California. There is no doubt that there are facilities that are more luxurious for the tigers than the Cricket Hollow Zoo. Some are AZA certified. But that is not required under the AWA.

A good deal of the Plaintiffs' case is an attempt to cast the Sellners and their attendant professionals as unsophisticated rustics barely able to handle their dairy herd, let alone handle exotic animals for the past 30 years. When the Sheriff did not respond to the continuous complaints of the Plaintiffs (even though the Sheriff was with Doug Andersen on one inspection) that was characterized as a typical small town sheriff's department response. Dr. Pries was supposedly unable to diagnose and deal with the variety of animals – even though he has more experience as a veterinarian than Dr. Conrad and he has the assistance of not only additional veterinarians in his office but also the staff at the Henry Doorly Zoo in Omaha, Nebraska and the staff at Iowa State University among others. Dr. Pusillo was not criticized in the same manner because he is an international expert in animal nutrition but the criticism was aimed at Mrs. Sellner

31

indicating that Dr. Pusillo's formulas were difficult to use and implying that they were too difficult for her to use.

Mrs. Sellner's experience was not given any credence by the Plaintiffs even though she has a support network and consults with Covance Primate Center in Madison, Wisconsin and with other veterinarians that come to the farm as well as others who have vast experience in actually raising exotic animals.

The Sellners believe that they have met these factual allegations of neglect head on – even though that should not be an issue in this case and should be something the court never has to review or determine in order to decide that the Plaintiffs are not entitled to injunctive relief under the ESA. As the cases make clear that is a determination that should be made by the USDA in an administrative procedure. If the court determines that it should make this determination, it is clear that the Plaintiffs have not met their burden of proof.

Neither the Zoo nor Mr. or Mrs. Sellner have engaged in any actions in violation of the Endangered Species Act. The Zoo is subject to the jurisdiction of the USDA (APHIS) under the Animal Welfare Act – not the private cause of action brought by the Plaintiffs in this case. It also appears that the Plaintiffs lack standing to bring this action because they do not meet the litmus test set forth in the applicable cases including *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992). The animals that the Plaintiffs mention in their Petition do not all come within the protection of the Endangered

Species Act 16 U.S.C. § 1531 et seq. The Defendants pray that the Court dismiss the Plaintiffs' cause of action against the Defendants and enter judgment in their favor herein, grant them attorney's fees and award them costs and such other relief as the Court deems just and equitable.

Dated this ___4___ day of December, 2015.

Respectfully submitted,

Larry J. Thorson                          #AT0007976
ACKLEY KOPECKY & KINGERY, L.L.P.
4056 Glass Road, NE
Cedar Rapids, IA 52402
Ph: (319) 393-9090  Fax: (319) 393-9012
Email: lthorson@akklaw.com

Attorney for Defendants

33