**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

| | | |
|---|---|---|
| TRACEY K. KUEHL, et al., | ) | Case No. C14-02034-JSS |
| Plaintiffs, | ) | |
| v. | ) | **PLAINTIFFS' REPLY TO DEFENDANTS' POST-TRIAL BRIEF** |
| PAMELA SELLNER, et al., | ) | |
| Defendants. | ) | |

Defendants' Post-Trial brief relies almost entirely on mischaracterizations of the law and facts, witness testimony taken out of context, and a state agency with no jurisdiction over the federal laws at issues here. To comply with Local Rules 56(d) and 7(g), Plaintiffs address only Defendants' inaccuracies and will not re-argue points previously made in their opening brief, including Plaintiffs' arguments regarding standing, the applicability of the Endangered Species Act to Defendants' licensed roadside zoo, federal requirements for wildlife trafficking, and the status of Defendants' wolves or wolf hybrids. ECF No. 76. Instead, Plaintiffs explain the different ways Plaintiffs have proven unlawful take, why Plaintiffs' experts are more credible than Defendants', and why the Court should not defer to the opinions of state inspectors on a federal law issue.

## I. Plaintiffs seek to enforce the Endangered Species Act—not the Animal Welfare Act.

Despite Defendants' misguided efforts to re-characterize the allegations in the Complaint and the evidence presented at trial, Plaintiffs are asserting claims under the Endangered Species Act (ESA), not the Animal Welfare Act (AWA). Defendants create a straw man logical fallacy in their attempt to reframe the ESA claims as a lawsuit under the AWA, *see* ECF No. 77 at 3, 7-10, relying on the narrow exception in the regulatory definition of "harass" for "generally accepted

[a]nimal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act." 50 C.F.R. § 17.3. For a number of reasons, this limited exception cannot, and does not, render Defendants' treatment of the endangered animals at Cricket Hollow Zoo lawful.

First, compliance with the AWA does not—under any circumstances—excuse the other regulatory terms defining "take," including *harming*, *wounding*, or *killing* endangered animals. *See id.* § 17.3 (limiting AWA exception to "harass"); *see* also ECF No. 76 (Attachment 1, ESA "Take" Case Chart). Here, Defendants' ongoing operation of Cricket Hollow Zoo has and will continue to harm, wound, and kill the endangered animals. *See, e.g.*, ECF No. 76 at 37-39 (describing tiger deaths), 49-51 (describing lemur isolation and psychological harm). Moreover, within the regulatory definition of "harass," the exception for take of captive animals applies only to "*generally accepted*" practices that comply with the AWA. 50 C.F.R. § 17.3 (emphasis added). But even in those limited circumstances, the exception does not apply here, as Plaintiffs have demonstrated that Defendants consistently and willfully disregard the standards set forth in the AWA. *See* 7 U.S.C. § 2131, *et seq.* and regulations, 9 C.F.R. § 2.1, *et seq.* (hereinafter collectively Animal Welfare Act or AWA); *see also* Ex. 2 to 38; *see also* ECF No. 76, p. 30-44 (tigers); 44-51 (lemurs); 52-57 (wolves/wolf hybrids); 52-56 (zoo administration).

For additional guidance, Plaintiffs also presented evidence regarding two very different associations with publications articulating "generally accepted" industry practices for captive care of the endangered species living at Cricket Hollow Zoo: the Accreditation Standards and Related Policies of the Association of Zoos & Aquariums and the Feline Conservation Federation's Basic Exotic Cat Care Manual. *See* Ex. 69.[1] Plaintiffs then proved that Defendants'

[1] *See also* D. Allen, Trial Tr. 821-822 (explaining that the Cricket Hollow Zoo may never meet the standards for generally accepted animal husbandry practices set forth in the AZA because they cannot even meet the requirements

management and animal husbandry of their lemurs, tigers, and wolves or wolf hybrids fall far below these "generally accepted" industry practices as well.[2] Defendants simply cannot rebut any of Plaintiffs' evidence of unlawful take, so they have resorted to a "Hail Mary" mischaracterization of the law Plaintiffs rightfully seek to apply to this case.

## II. The Court should give more weight to APHIS's conclusions and Plaintiffs' experts' opinions than to Iowa inspectors' findings.

Weight should be accorded to the most scientifically defensible, reliable, and credible evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590-91 (1993). In this case, that evidence was presented by Plaintiffs in the form of expert opinions and USDA records.

### A. Plaintiffs' experts' opinions and conclusions regarding Defendants' endangered animals are based on reasoning and methodology that is scientifically valid and can properly be applied to the facts at issue in this case, unlike Defendants' expert opinions.

The district court performs a gatekeeping function with respect to scientific evidence, ensuring that evidence submitted to the jury meets Federal Rule702's[3] criteria for relevance and

---

set forth in the AWA, but the AZA standards "represent the current thinking and best practices for animal care"); *See* P. Klopfer, Tr. 135-36 (explaining that he helped frame the AZA's definition of animal husbandry and that the validity of the definition applies whether or not a given facility may be accredited) and Trial Tr. 142:2-17 (explaining that the AZA's Eulemur manual contains directives that are relevant and applicable to the care of Defendants' lemurs at the Cricket Hollow Zoo); *See* J. Pries, Trial Tr. 413:2-8 (discussing the circumstances under which Dr. Pries would consult the veterinarians at the AZA-accredited zoo in Omaha); P. Sellner, Trial Tr. 734:15-735:1 (admitting she is comfortable and supportive when Dr. Pries seeks advice from AZA-accredited zoos, like Omaha's Henry Doorly Zoo) and Trial Tr. 673:7-16 (acknowledging that she considers the Feline Conservation Federation to be an authority on big cat husbandry); *See* G. Pusillo, Trial Tr. 389:25-391:11 (discussing all the ways in which he relies on publications from the AZA because he considers the association to be an authority on nutrition and animal husbandry).

[2] *See* J. Conrad, Trial Tr. 89:2-15; P. Klopfer, Trial Tr. 135-136, 137:8-138:2, 142:13-14, 155:4-9, 164: 2-23; 169:6-9, 176:13-15; D. Allen, Trial Tr. 821:23-822:12, 822:2-823:22, 823:23-825:10; P. Sellner, Trial Tr. 673:20-675:25 (admitting the various ways the Cricket Hollow Zoo's emergency planning falls short of the standards set forth by the Feline Conservation Federation) and P. Sellner, Trial Tr. 679:23-5 (admitting that hand raising tigers can make them aggressive, as advised by the Feline Conservation Federation).

[3] "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

reliability. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590-91 (1993) (including whether the theory or technique has been subjected to peer review and publication, whether there are standards controlling its operation in the scientific community, and whether the theory enjoys widespread acceptance within the relevant scientific community). The Court must, therefore, determine whether Plaintiffs' or Defendants' expert witnesses provided the most relevant and scientifically credible opinions at trial. *See Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001). Each of Plaintiffs' experts testified that they are familiar with generally accepted animal husbandry and veterinary care practices, including those minimum standards set forth in the Animal Welfare Act; possess personal knowledge and expertise garnered from decades of direct responsibility for the care of tigers, lemurs, and wolves and wolf-hybrids; and frequently rely on widely accepted industry standards, including but not limited to those reflected in publications by the Association of Zoos and Aquariums, when determining what the best course of care would be for captive wildlife. The same cannot be said for Defendants' experts.

**Dr. Peter Klopfer** has worked with lemurs for his entire, decades-long career and is considered the foremost expert on lemur husbandry and care. As a scientist, Dr. Klopfer is naturally cautious about expressing absolutes, but he concluded unequivocally that isolation of non-human primates is *not* a generally accepted animal husbandry practice because it causes severe psychological injury that manifests itself in physical distress symptoms. *See* ECF No. 76, p. 44-46 (where Plaintiffs discuss Dr. Klopfer's testimony). Rather than deal with this damning indictment, Defendants present the misleading theory that neither the AWA and—by implication—the ESA—require the social grouping of non-human primates. ECF No. 77 at 14-15 ("Dr. Klopfer appears to be an expert with regard to lemurs but his testimony . . . really boiled down to the fact that he knows lemurs are social animals and he believes they are

psychologically in danger if they are not in groups (Tr. p. 140). This is not the standard set forth by the AWA or the regulations contained in 9 C.F.R § 1.1-4.11."). In reality, the non-human primate standard for social grouping can be found at 9 C.F.R. § 3.81(a), and it states in relevant part: "*Social grouping.* The environment enhancement plan must include specific provisions to address the social needs of nonhuman primates of species known to exist in social groups in nature."[4] Indeed, Plaintiffs invited Dr. Klopfer, who is "hostile" (Trial Tr. 139:7-15) toward the animal rights movement, to give his expert opinion about the "social needs" of lemurs because the AWA is silent as to lemur needs specifically. *See generally* 9 C.F.R. § 3.81 (*Environment enhancement to promote psychological well-being*). No one at trial rebutted Dr. Klopfer's testimony because neither Dr. John Pries, Dr. Gary Pusillo, nor Pamela Sellner have ever been trained in lemur husbandry.

Dr. Klopfer is so certain about the injury Defendants are causing their lemurs as a result of their social isolation that he does not need to know anything else. Trial Tr. 180 (explaining that he does not need to know the general conditions at the Cricket Hollow Zoo or even the conditions for other non-human primates to know that "[t]he lemurs are not getting proper care . . . they are at risk. They are suffering and what the case with the other animals at the Zoo is, to me, irrelevant"). Dr. Klopfer testified, "frankly, I'm here because I find it unacceptable to see a highly social lemur like this placed in what is essentially a condition of isolation." Trial Tr. 140:19-22. Regarding mitigation by the addition of food or toys, Dr. Klopfer said:

> That would be better. All these things would help—again, I have to use—I think it's appropriate to use the human analogy. Imagine yourself in an isolation ward. Having to do—puzzles to play with, games to play, books to read—that would mitigate the tension you would feel from the solitude, would it not, and that's the case with the animals as well. But there's no substitute for the absence of peers.

[4] Defendants' apparent lack of knowledge regarding this AWA requirement only deepens Plaintiffs' concern for their lemurs. Not only do Defendants refuse to provide their lemurs with suitable habitat free from feces, dirt, and grime, but Defendants also lack awareness of basic AWA requirements for lemurs' psychological wellbeing.

Trial Tr. 195:8-13; 197:4-18. Nevertheless, Despite Dr. Klopfer's certainty regarding the effects of isolation on the lemurs, Dr. Klopfer also concluded that feces-encrusted, unkempt enclosures—like those at the Cricket Hollow Zoo—harass and harm lemurs because they have "a much greater sensitivity to olfactory stimuli than we do . . . each of [their] scent glands produce unique scent which the animal uses for communication . . . to convey conspecifics, [like] age, sex, reproductive status, degrees of aggressivity; a host of things . . . ." Trial Tr. 138:10-24.

Regarding the opinions of Defendants' attending veterinarian Dr. John Pries, Dr. Klopfer explained that a bovine veterinarian with "specialized knowledge" and training might be able to successfully treat lemurs, but Dr. Pries does not have that specialized training. Trial Tr. 171. Dr. Pries' opinion is therefore irrelevant. *Id.* Defendants attempt to rehabilitate their veterinarian by pointing out that four lemurs have been born at the Cricket Hollow Zoo, but two of those lemurs died within months of their birth. *See* Trial Tr. P. Sellner, 333; Ex. 47; Ex. 76, Attachment 2—Animal Deaths. Notably, Defendants failed to produce medical or sale records[5] for the other two lemurs who were allegedly born at the Cricket Hollow Zoo. *See* Ex. 41, 47.

**Dr. Jennifer Conrad**, like Dr. Klopfer, is a well-respected exotic animal veterinarian who has dedicated her career to working with captive wildlife. She routinely treats tigers, wolves, and wolf hybrids, and provided testimony on generally accepted animal husbandry standards for each species. At trial, Defendants presented the opinions of Defendant Pamela Sellner, her attending veterinarian Dr. John Pries, and her nutritionist Dr. Gary Pusillo to rebut Dr. Conrad's testimony; however none of these individuals could do so convincingly. Defendant

[5] Regarding the lemurs for whom Defendants did produce records, Kondo died in 2011; Cheech died in 2010; Tootsie died in 2009; and Chuki, Lucy, and Zaboo remain alive, suffering in isolation at the Cricket Hollow Zoo. *Id.* Defendants failed to provide veterinary care to any of their deceased lemurs, which means Defendants did not diagnose and treat them or obtain a determination for cause of death. Ex. 41.

Pamela Sellner admits that she taught herself everything she knows about her animals, but most husbandry practices she deems acceptable are simply unacceptable to the scientific community. Dr. Pries has never been trained in exotic animal husbandry and simply extrapolates knowledge for the treatment of tigers, lemurs, and wolves from what he's learned regarding other species. Dr. Pusillo rarely visited the animals at the Cricket Hollow Zoo and extrapolated his opinions from photographs and experiences he had in 2005 and 2006 (the majority of his recent interactions with Defendants having taken place over the telephone). Trial Tr. 376-378; *see also* Ex. X. Indeed, when presented with the facts of the case—including the volume of USDA citations Defendants have incurred and the number of endangered animals who have died at the Cricket Hollow Zoo—both Dr. Pries and Dr. Pusillo reacted with genuine surprise and apparent concern. This Court must consider the fact that Dr. Pries and Dr. Pusillo themselves lacked access to all of the information that would have needed to review to even develop an admissible expert opinion in this case.

**<u>David Allen</u>** is a retired zoo administrator who has inspected several non-AZA accredited zoos and worked for three AZA-accredited zoological parks, including the Blank Park Zoo in Des Moines, who testified at length about generally accepted standards for zoo administration. According to Mr. Allen, Defendants' inability to pay for the behavioral, psychological, and veterinary needs of their tigers, lemurs, and wolves harasses and harms them every day. Defendant Pamela Sellner is the only person who contradicted Mr. Allen's conclusions about the Cricket Hollow Zoo's financial insolvency by claiming she could obtain a "line of credit" with the bank at any time. Knowing this, Mr. Allen still concluded that Defendants simply do not have the operating income to meet the needs of their endangered tigers, lemurs, and wolves. Indeed, if the Defendants could get a line of credit, they "at least need to identify it." Trial Tr.

824:4-10. Moreover, contrary to Defendants' representations about his testimony, Mr. Allen testified that the food waste contract Defendants rely on to feed their animals does not change his opinion about their financial insolvency. Trial Tr. 845:4-10 (the food from landfill diversion contracts are "more of enhancements or like treats" as opposed to meaningful sources of food that would offset monetary needs). He also testified that he is well aware that the 300 animal count for the Cricket Hollow Zoo includes birds, reptiles, and hoof stock (Trial Tr. 842:19-843:6) and is deeply concerned about the staff of volunteers at the Cricket Hollow Zoo, which is largely made up of disabled individuals unable to perform al tasks (Trial Tr. 833:5-6).

Mr. Allen recognized the toil and labor Defendants put into the Cricket Hollow Zoo but, based on the evidence, concluded that Defendants are simply incapable of complying with the AWA. Trial Tr. 834: 6-21 (testifying that based on his experience with the Animal Welfare Act, the Defendants would need to thoroughly clean each animal enclosure every day in order to maintain compliance with sanitation requirements); P. Sellner Trial Tr. 686:4-15 (admitting that Defendants only thoroughly clean enclosures once each year during "hell week," which is the week before the Zoo opens in May). Even now, Defendants are unable to provide generally accepted animal husbandry and veterinary care to their tigers, lemurs, and wolves, which caused the deaths of three tigers since this case was filed. If Defendants are capable of complying with the AWA, the motivation to demonstrate that capability should have surfaced pre-trial.

**B. That the USDA may have cited Plaintiffs' experts' Animal Welfare Act-licensed facilities is immaterial.**

Defendants apparently hope the Court will find Plaintiffs' experts' opinions about the Cricket Hollow Zoo less reliable because they admit that facilities with whom they are associated were occasionally cited for violations of the AWA. ECF No. 77, p. 13; *but see* P. Klopfer, Trial Tr. 199:3-11 (explaining that the Duke Lemur Center, over which he presided for most of his

career, has "never been censured" by the USDA for noncompliance with the AWA). Unfortunately for Defendants, ad hominem attacks are irrelevant to a district court's application of Rule 702, the requirements of which Plaintiffs' experts meet. Even if Defendants' unsubstantiated observation were relevant, to be sure, few licensed animal care facilities in the United States survive their entire existence without being cited by USDA for a violation of the AWA. Yet, neither Duke University, the Blank Park Zoo, the Cheyenne Mountain Zoo, the Kansas City Zoo, nor the Performing Animal Welfare Society have ever been the subject of an APHIS enforcement action due to chronic noncompliance or willful indifference. Defendants, on the other hand, have been fined more than $10,000 in civil penalties by APHIS, the subject of inspections finding consistent and significant AWA violations, and are currently at risk of license revocation due to what APHIS characterizes as "chronic" management issues and "willful" violations of the Animal Welfare Act. *See* Ex. 2 (from an APHIS email about the Cricket Hollow Zoo: ". . . it is clear that there is a chronic management problem at the facility, and for whatever reason, the Sellners either do not understand the regulations, are not willing to comply, or are not able to comply."); Ex. 9 (from an APHIS letter about the Cricket Hollow Zoo: "Facility has been in chronic non-compliance since July 2010); Ex 34 (from the Cricket Hollow Zoo's license suspension notice: "you have willfully violated section 2.100(a) . . . requiring compliance with the minimum standards for animals"); Ex. 37 (from the administrative complaint against the Cricket Hollow Zoo: ". . . respondents named herein have willfully violated the Animal Welfare Act."); *see also* 7 U.S.C. § 2149(a).

### C. USDA's factual and legal conclusions regarding Defendants' chronic non-compliance with the AWA are entitled to deference.

When two agencies share oversight of regulated conduct, the Supreme Court requires deference to be given to the agency Congress charged with administering the enabling act.

*Gonzales v Oregon*, 546 U.S. 243, 258-259 (2006). Both parties agree that the Animal Welfare Act is the only federal law expressly listed in the ESA's regulatory definition for "harass" (but not for harm or any of the other ways Defendants could "take" their animals). *See* 50 C.F.R. § 17.3; *See* Section I, *infra*). Both parties also agree that USDA is the only agency charged with administering the AWA. *See* 7 U.S.C. § 2132(b) (defining Secretary, which is used as the enforcement authority throughout the AWA, as the Secretary of the Department of Agriculture). As a result, Defendants' deplorable history of failing to comply with the AWA is relevant, and the USDA's factual and legal conclusions regarding Defendants' non-compliance are entitled to this Court's deference. *See generally* Ex. 2-37; ECF No. 76, p. 35-61, Attachment 3—USDA Inspection Checklist. Conversely, though Iowa state inspectors may share oversight responsibilities for the Cricket Hollow Zoo under Iowa law, their opinions regarding Defendants' compliance status under the AWA are not entitled to deference in this federal case.

Nevertheless, both parties have presented evidence from non-USDA authorities in the fields of animal husbandry in support of their positions. The Court must, therefore, weigh the credibility of the evidence presented. As explained in Section II(A), *supra*, Plaintiffs' experts are renowned in their fields and rely on decades of personal experience and education to conclude that Defendants are harassing and harming endangered tigers, lemurs, and wolves at the Cricket Hollow Zoo. Moreover, Plaintiffs' experts testified at trial, so the Court had the opportunity to evaluate their professional qualifications and credibility. Iowa Department of Agriculture and Land Stewardship (IDALS) inspectors, on the other hand, did not testify at trial,[6] so the Court is left to consider observations cataloged in a series of "Compliance Reports" introduced by

[6] Plaintiffs note that they attempted to procure a USDA APHIS representative to testify at trial by a *Vaughn* letter and formal subpoena, but USDA denied their request. Out of respect for USDA and the Court's resources, Plaintiffs did not seek the Court's enforcement of the subpoena.

Defendants as Exhibit Y. To put all of this evidence into context, Plaintiffs combed through Exhibit Y and created a reference guide listing all citations by USDA and IDALS to date. *See* Plaintiffs' Reply Brief Attachment 4 – USDA & IDALS Inspection Findings. Plaintiffs highlight a few points here:

- On April 17, 2012, IDALS District Veterinarian Dr. Gary E. Eiben made his first visit to the Cricket Hollow Zoo in response to a complaint of animal neglect. Ex. 7, p. 1. Dr. Eiben only documented the conditions of the Scottish Highlander Cattle that day, observing, "[A]ll the ground water flows through the pen housing the Scottish Highlander Cattle. This creates wet spots in the pen that can create some animal discomfort and hoof problems for the cattle." *Id.* Dr. Eiben made "several suggestions" to correct the problem to "Pam." *Id.* Dr. Eiben then inconsistently states that all of the animals "appear to be safe and well taken care of," even though the only observations he made in the report relate to discomfort and hoof problems. *Id.*

- During the summer of 2012, IDALS investigated the Cricket Hollow Zoo with APHIS Inspector Cynthia Neis. Ex. Y, p. 2; Ex. 14.[7] After characterizing waterless animals and inadequate shade as "borderline issues," IDALS concluded that no "standard of care" issues existed at that time. Ex. Y, p. 2. In the months immediately preceding and following this inspection, APHIS inspectors cited the Zoo for *fifteen* categories of AWA violations, including failing to provide veterinary treatment to sick and injured animals, and ultimately assessed $6,857 in fines against the Zoo. Ex. 12 (USDA's May 16, 2012, inspection report documenting five categories of violations of the AWA); Ex. 13 (USDA's June 29, 2012, inspection report documenting six categories of violations of the AWA); Ex. 14 (USDA's August 20, 2012, inspection report documenting four categories of violations of the AWA); Ex. 18 (USDA Settlement Agreement assessing $6,857 in fines against the Cricket Hollow Zoo for violations of the AWA that occurred between August 16, 2011, and February 13, 2013).

- On February 8, 2013, IDALS inspectors observed that all animals "appeared to be thriving," though "housekeeping could have been better." Ex. Y, p. 3. The inspectors had two "minor" concerns because the smaller mammals did not have adequate bedding in freezing temperatures, and some of the animals' water bowls were "empty or frozen." *Id.* Despite these adverse conditions, IDALS concluded that "no standard of care issues" were present that day and recommended that USDA resume its "normal inspection schedule." *Id.* Just five days later on February 13, 2013, APHIS veterinarian Dr. Heather Cole cited Defendants for violating the Animal Welfare Act because the lemurs' extra food and bedding were surrounded by an "accumulation of chicken feathers, dust, dirt, and/or used

[7] IDALS reports that this inspection took place on July 24, 2012, but APHIS reports that this inspection took place on August 20, 2012. *See* Ex. Y, p. 2; Ex. 14.

sawdust bedding," and an exposed electrical outlet "with several items plugged in" was surrounded by a "significant amount of dust, dirt, cobwebs, and chicken feathers" near the lemur enclosures. Ex. 17, p. 1. Dr. Cole also cited Defendants for failing to replace old, filthy ceiling tiles that could no longer be appropriately sanitized in the lemur enclosures and for failing to clean "a large accumulation of feces" within three of the tiger enclosures. *Id.* at 2, 3.

- On September 25, 2013, IDALS joined USDA Inspector Dr. Heather Cole for her site visit. IDALS observed that the USDA inspectors were "extremely thorough," and the visit lasted approximately seven and one-half hours. Ex. Y, p. 5. IDALS was not present for the entire inspection, but IDALS Investigator Doug Anderson had "one real concern" about the lack of environmental enrichment for Defendants' non-human primates, who were "over-grooming" and presented with hair loss. *Id.* IDALS observed that "results were typical" for the rest of the facility, in that there were a number of "housekeeping issues:" cobwebs, sharp points, fecal matter. *Id.* Investigator Anderson felt that USDA was improperly citing Defendants for repeat citations because the facility "by its nature, is high-maintenance." *Id.* Investigator Anderson concluded that he was thankful for Dr. Cole's return as Defendants' inspector but made no additional observations about the health and welfare of the animals, as he had in the past. *Id.* In contrast, on this same day in September, Dr. Cole filed a 118-page report with the USDA, cataloging multiple violations of the Animal Welfare Act, several of which applied to Defendants' lemurs and tigers. Ex. 22. This inspection is discussed in more detail in Section III, *infra*.

- On December 16, 2013, IDALS returned to the Cricket Hollow Zoo with Dr. Cole for an inspection "due-to-cause" because three piglets had been found dead in their pen the previous October. Ex. Y, p. 6. Investigator Anderson observed that three goats' hooves were "curling upward" and needed to be trimmed, but he did not feel the overgrowth was causing adverse suffering. *Id.*; *Cf.* Trial Tr. 447:26-449:8 (wherein Dr. Pries explains that overgrown hooves can be so painful for animals that it might be best to "finish the animal"). In addition, Investigator Anderson agreed with Dr. Cole's concern about apparently dehydrated chinchillas who were given water during the inspection and drank "for an excessively long time." Ex. Y, p. 6. Before observing that the animals were nevertheless "safe" and "well taken care of," Investigator Anderson characterizes the death of three piglets as an "unfortunate farm occurrence." *Id.* On this same day, Dr. Cole cited the Defendants for failing to protect the piglets from temperature extremes and filed a 27-page inspection report documenting multiple violations of the Animal Welfare Act, including inadequate water and shelter during freezing temperatures. Ex. 23.

- On May 21, 2014, IDALS and APHIS returned to the Cricket Hollow Zoo. This time, IDALS documented "several concerns of note," including curled goat hooves, dehydrated animals who lacked access to water, fence repair issues, veterinary care issues, etc. Ex. Y, p. 8. Investigator Anderson noted that "[a]ll of

the discrepancies/inadequacies listed on the USDA AC inspection for this day are accurate." *Id.* According to Dr. Cole, Defendants failed to provide veterinary treatment to several animals on May 21, 2014, and ordered Defendants to ensure the animals were seen by a licensed veterinarian by 5:00 p.m. on May 23 in order to "ensure that an accurate diagnosis is obtained and an appropriate treatment plan is developed and followed." Ex. 26, p. 1 Dr. Cole also cited Defendants for (1) creating disease and health hazards in the wolf enclosure, which was plagued by a "build-up of old feces and food waste mixed in with the dirt and gravel that make up the floor of the enclosure;" (2) failing to sanitize the lemur enclosure, which was covered in brown-to-black grime and cobwebs; (3) failing to repair the tigers' enclosures; (3) excessive flies "throughout" the facility, and (4) failing to ensure an adequate number of employees were there to ensure that "all primates receive the necessary care and that the facilities are maintained and cleaned on a regular and consistent basis." Ex. 26, p. 2-5.

- On August 5, 2014, IDALS and APHIS once again inspected the Cricket Hollow Zoo. IDALS Investigator Doug Anderson characterized this inspection as "the same drill" because APHIS inspectors were "very thorough." Ex. Y, p. 9. Investigator Anderson was primarily concerned with a sheepdog who had sores on both of her ears and had not been seen by a veterinarian; this sheepdog was being treated with expired ointment. *Id.* Investigator Anderson was also concerned that all of the water bowls were "exhibiting algae growth." *Id.* Investigator Anderson observed that the "rest of the facility just had maintenance issues, scattered throughout, which is normal here." *Id.* On this same day, APHIS veterinarian Dr. Margaret Shaver documented several violations of the Animal Welfare Act at the Cricket Hollow Zoo, including excessive feces and flies in the tiger, lemur, and wolf enclosures. Ex. 28

- On October 7, 2014, IDALS apparently conducted its final investigation of the Cricket Hollow Zoo with APHIS. Investigator Anderson documented only three issues of concern, one of which involved a white tiger who had not seen a veterinarian. Ex. Y, p. 10. Investigator Anderson observed that the "white tiger did generate concern," as a result of an "open sore on the inside of the front leg," (among other things) but ultimately observed that "no conditions exist that would cause adverse health or suffering on this day." Ex. Y, p. 10. Dr. Cole cited Defendants for failing to provide veterinary care for Casper the white tiger, among other things, noting that the tiger's sore was red and swollen with the skin pulled back exposing red tissue in two places. Ex. 29. Dr. Cole also observed that Casper had a thin body condition, which can "indicate other medical problems occurring in the animal" and protruding hips, yet the attending veterinarian had not seen this animal since August. *Id.* at p. 1. Casper died the following month. Ex. 48, p. 7.

Undeniably, IDALS veterinarians and investigators go out of their way to contradict some of APHIS's citations despite their wholly consistent observations about the conditions at

the Cricket Hollow Zoo. Some evidence presented by Defendants could explain this curiosity. Buried within Exhibit Y at Page 4, Defendants submit an email from IDALS Investigator Doug Anderson to Iowa State Veterinarian Dr. David Schmitt, dated May 15, 2013. In this email, Investigator Anderson derisively refers to the "upcoming complaint season" for which he and Dr. Eiben felt the need to conduct a "pre-emptive strike" zoo visit. Ex. Y, p. 4. Investigator Anderson reports that he was "pleasantly surprised" by the conditions at the zoo even though Defendants were "not quite done adding gravel to all of the pens," among other things. *Id.* Investigator Anderson "visited" with Pamela Sellner about "her issues with the complaint crowd" and notes, "I am sure they will complain anyway." *Id.* Despite the fact that IDALS routinely agrees with AHPIS, IDALS investigators judge the Cricket Hollow Zoo through a different lens. Their factual and legal conclusions are not entitled to deference.

### III. Plaintiffs have not withheld evidence of compliance from the Court.

In an attempt to cast doubt on Plaintiffs' overwhelming evidence of non-compliance, Defendants' attorney falsely claims that Plaintiffs withheld inspection reports from the Court that show his clients occasionally complied with the Animal Welfare Act. ECF No. 77, p. 11 ("The effort put forth by the Plaintiffs to . . . hide from the court inspection reports that do not show "non-compliances" of any sort . . . exposes the weakness of their case.").[8] To prove this bold

[8] In the face of this false accusation against Plaintiffs' counsel's integrity, Plaintiffs feel compelled to point out that Attorney Thorson has actually failed in his duty of candor toward the tribunal by repeatedly withholding from Plaintiffs and the Court documentation of Defendants' non-compliance with the Animal Welfare Act despite outstanding discovery requests obligating Defendants to continuing disclosure. For example, Attorney Thorson has withheld documentation confirming that (1) the USDA filed an administrative action against his clients before the hearing on summary judgment; (2) the tiger named Miraj died before the hearing on summary judgment, and the circumstances surrounding that death; (3) the USDA twice inspected his clients' facility this summer, once in July and again in September, and the findings thereof; and (4) his clients appealed the July and September 2015 inspections and the bases thereof. At this point, Plaintiffs could move this court for sanctions but instead have elected to file herewith a Motion for Entry of Newly Discovered Evidence regarding the July and September 2015 inspection reports—even though this evidence was known to Attorney Thorson well in advance of the October 2015 trial and should have been disclosed for presentation at trial.

allegation Defendants cite to their Exhibit U, which contains three APHIS inspection reports and the last page of the September 25, 2013, report. *See* Ex. U, p. 1-4. Plaintiffs will discuss each page of Exhibit U in turn.

Plaintiffs introduced Page 1 of Exhibit U in their case-in-chief as Exhibit 27. *See* Ex. 27.[9] Defendants present this inspection report as proof that on May 28, 2014, APHIS inspectors found no non-compliant items at the Cricket Hollow Zoo "of any sort." ECF No. 77, p. 11. Nothing could be further from the truth. On May 28, 2014, Dr. Heather Cole returned to the Cricket Hollow Zoo to conduct "a focused inspection to address the Direct Non-compliant items listed on the May 21, 2014, inspection report – Watering 3.30, Watering 3.130, and Veterinary Care 2.40(b)(2). These non-compliant items have been corrected. No non-compliant items identified during this inspection." Ex. 27. Defendants are familiar with focused-follow-up inspections, as Pamela Sellner demonstrated during her testimony. Trial Tr. 668:15-669:6. In addition, USDA includes a requirement for focused-follow up inspections whenever an APHIS inspector documents a direct non-compliant item, where direct means "a noncompliance that is currently adversely affecting the health and well-being of the animal, or has a high potential to adversely affect the health and well-being of the animal in the near or immediate future." Ex. 38, p. 3, 5. For a "serious direct noncompliance, such as a severe veterinary problem," APHIS instructs its inspector to return to the facility for a focused inspection within two days "to verify the correction and ensure animal welfare." *Id.*, p. 3. Defendants' attempt to characterize APHIS's focused inspection for direct noncompliant items as evidence that the Cricket Hollow Zoo was fully compliant with the Animal Welfare Act on May 28, 2014, is a breathtaking

[9] At Exhibit 10, Plaintiffs introduced a focused inspection report from January 3, 2012, and at Exhibit 30, Plaintiffs introduced a focused inspection report from November 6, 2014, wherein APHIS reported that the direct non-compliant items had been corrected. Defendants apparently missed these reports in their analysis.

misrepresentation. To be sure, the May 21, 2014, APHIS inspection (which necessitated the May 28 follow up) documents nine pages of non-compliant items, six of which directly relate to the endangered species at issue in this case (Ex. 26), and the ensuing August 5, 2014, APHIS inspection report (Ex. 28) documents five pages of non-compliant items, four of which directly relate to the endangered species at issue in this case.

Plaintiffs did not introduce Pages 2 and 3 of Exhibit U simply because the agency's official certification of the records covers inspection reports only from July 21, 2010, to May 21, 2014 (as well as enforcement actions and correspondence since Defendants obtained their Animal Welfare Act license) and not because Plaintiffs wished to "hide" them from the Court. Ex. 4, p. 1. Moreover, the reports Defendants introduce at Pages 2 and 3 of Exhibit U are six- and seven-years old, respectively. They cannot mitigate the vast documentation assembled by APHIS in support of myriad enforcement actions against the Cricket Hollow Zoo from 2010 through today—enforcement actions which have culminated in the filing of a formal administrative complaint in which APHIS seeks "such order or orders be issued as are authorized by the [Animal Welfare] Act and warranted under the circumstances" to address the Defendants' "willful violations." Ex. 37, p. 20-21.[10] This is just another red herring meant to distract the Court from Defendants' history of chronic noncompliance with the AWA.

Lastly, Page 4 of Exhibit U purports to be an APHIS inspection report from September 27, 2013, but this is only "page 7 of 7" from the September 25, 2013, inspection report Plaintiffs introduced as Exhibit 22. In addition to APHIS veterinarian Dr. Heather Cole's observation on Page 7 that "the environmental enhancement plan for non-human primates was inspected. No other reports inspected at this time," Dr. Cole documented ten violations of the Animal Welfare

[10] According to the AWA, notice and opportunity for a hearing is only required where APHIS intends to revoke a license. 7 U.S.C. § 2149(a).

Act, several of which affected endangered species. Ex. 22. For example, Dr. Cole cited Defendants for sanitation issues, feces, cobwebs, dirt, and grime in the lemur enclosures and fencing integrity concerns for the tigers. *Id.* Moreover, Dr. Cole documented all of the citations she found that day with more than 100 photographs, making APHIS' September 25, 2013, "routine inspection" not a single page, nor even seven pages, but rather 118 pages in length. Ex. 22, p. 8-118. Ex. 22, p. 8-118.

**IV. Conclusion**

Based on the foregoing, Plaintiffs respectfully ask the Court to issues such orders and make such determinations as warranted by the evidence and argument submitted and consistent with the relief requested by Plaintiffs in this matter, including attorneys' fees and costs.

Respectfully submitted this 18th day of December, 2015.

*/s Jessica L. Blome*
Jessica L. Blome (MO Bar No. 59710)
(pro hac vice)
jblome@aldf.org

Jeffrey D. Pierce (CA Bar No. 293085)
(pro hac vice)
jpierce@aldf.org
Animal Legal Defense Fund
170 E. Cotati Ave.
Cotati, CA 94931
Telephone: 641.431.0478
Facsimile: 707.795.7280

/s/ *Daniel J. Anderson*
Daniel J. Anderson (IA Bar No. 20215)
danderson@wertzlaw.com
WERTZ & DAKE
1500 Center St. NE #101
Cedar Rapids, IA 52402-5500
Telephone: 319.861.3001
Facsimile: 319.861.3007

*/s/ Elisabeth Holmes*
Elisabeth Holmes (Oregon Bar No. 120254)
(pro hac vice)
eli.blueriverlaw@gmail.com
Blue River Law, P.C.
P.O. Box 293
Eugene, OR  97440
Telephone: 541.870.7722

*Attorneys for Plaintiffs Tracey Kuehl Kuehl, et al*

ATTORNEYS FOR PLAINTIFFS