# EXHIBIT 1

**Page 1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA

TRACEY K. KUEHL, an individual;
LISA K. KUEHL, an individual;
KRISS A. BELL, an individual;
JOHN T. BRAUMANN, an individual;
and ANIMAL LEGAL DEFENSE FUND,
a non-profit corporation,

    Plaintiffs,

vs.     No. C14-2034-LRR

PAM SELLNER, an individual;
TOM SELLNER, an individual;
and CRICKET HOLLOW ZOO,
a non-profit corporation,

    Defendants.

DEPOSITION OF PAM SELLNER, taken on behalf of the Plaintiffs on March 20, 2015, commencing at 9:00 a.m., at the Days Inn, 1220 West Marion Street, Manchester, Iowa, before Vicki L. Newgard, Certified Shorthand Reporter of Iowa, pursuant to stipulation.

APPEARANCES:

MR. JEFFREY PIERCE and MS. JESSICA BLOME, Attorneys at Law, Animal Legal Defense Fund, 170 East Cotati Avenue, Cotati, California 94931; Counsel for the Plaintiffs.

MR. LARRY J. THORSON, of the firm of Ackley, Kopecky & Kingery, Attorneys at Law, 4056 Glass Road NE, Cedar Rapids, Iowa 52402; Counsel for the Defendants.

ALSO PRESENT: Mr. Tom Sellner

**Page 2**

I N D E X

| | Page |
|---|---|
| PAM SELLNER | |
| Direct Examination by Ms. Blome | 3 |

| DEPOSITION EXHIBITS | Identified |
|---|---|
| L -- Aerial Photograph | 97 |

* * * * * * * * * *

S T I P U L A T I O N

It is stipulated and agreed by and between Counsel for the respective parties that the deposition of PAM SELLNER may be taken on the 20th day of March, 2015, before Vicki L. Newgard, Certified Shorthand Reporter of Iowa; that the deposition is taken pursuant to the Federal Rules of Civil Procedure and may be used for all purposes contemplated by said Rules.

**Page 3**

    PAM SELLNER, being produced, sworn as hereinafter certified and examined on behalf of the Plaintiffs, testified as follows:

EXAMINATION

BY MS. BLOME:

Q. Good morning, Mrs. Sellner.

A. Good morning.

Q. I believe you know this, but my name's Jessica Blome, and I'm an attorney with the Animal Legal Defense Fund. I represent all the plaintiffs in this matter. Thank you for appearing today for your deposition. I wonder if you've ever taken a deposition before.

A. No.

Q. Okay. I know you've heard some of the ground rules, but I'd just like to go over them with you specifically just so that you can ask any questions you might have. You know, most notably I think you've noticed that you need to say yes or no. No nodding or gestures. Unfortunately those don't show up on the transcript.

A. (Nods yes.)

Q. We need complete answers, so will you provide all of the information that would be

**Page 4**

responsive to a question that I ask you?

A. Yes.

Q. If you don't understand a question, I ask that you simply ask me to rephrase it and I'd be more than happy to do so.

A. Yes.

Q. If you need a break at any time, please feel free to take one. We'll just go off the record for a moment and take the time that you need. For any reason. Will you do that?

A. Yes.

Q. If you remember additional information during the course of this deposition, if you feel something was left out or you could add to a response you've previously given, I have no problem with you interrupting me and adding that information then. Nothing is unimportant, so feel free to add information. Will you do that?

A. Yes.

Q. If you think a document might help you with your testimony, please let me know and I or your attorney will be able to locate that -- it's very likely we'd be able to locate that -- if it would refresh your recollection, use it to help with your testimony. Okay?

### Page 49

1 down to it.
2 Q. And how do you make credibility judgments
3 like that?
4 A. If it's written by a veterinarian or a
5 group that specializes in that type of species,
6 then I probably believe that over just an
7 individual.
8 Q. Do you take any steps to corroborate the
9 advice that you're receiving on the Internet?
10 A. Not on the Internet. I have breeders
11 that I would talk to that are around the country
12 that breed different species that I know.
13 Q. So you might call one of those breeders?
14 A. Yes.
15 Q. And that's for breeding-specific
16 questions.
17 A. Right.
18 Q. All right. Now I want to talk about
19 industry trade groups that you might belong to.
20 You list on your interrogatory responses that The
21 Calvary Group is an organization that you are at
22 least familiar with because you're going to have
23 Mindy Patterson testify for you. Are there any
24 other organizations that you're a member of? Any
25 trade groups?

### Page 50

1 A. Not that I can think of right now.
2 Q. So with respect to animal husbandry and
3 the care of exotic animals, it's just The Calvary
4 Group?
5 A. I don't think that's what they do.
6 Q. What's your characterization of what they
7 do?
8 A. They are legal defense people.
9 Q. Okay. What's your relationship with the
10 Calvary Group?
11 A. I'm a member.
12 Q. Okay. What does membership with the
13 Calvary Group get you?
14 A. Depends on what you need. In the case of
15 somebody wanting to come out and harass or take
16 your animals, then I guess you call their emergency
17 number.
18 Q. What happens when you call their
19 emergency number?
20 A. It will get you legal advice or send
21 somebody out or -- depends on what it is, I guess.
22 Q. Have you called that emergency number?
23 A. No.
24 Q. What did you have to do to become a
25 member of The Calvary Group?

### Page 51

1 A. I don't know. I -- I filled out the
2 application online, I know that.
3 Q. Did you have to pay a fee?
4 A. Yes, I did.
5 Q. And do you receive a newsletter or any
6 other benefits?
7 A. She sends news links and stuff on email.
8 Q. To you specifically or as a part of --
9 A. As part of being a member.
10 Q. Have you ever spoken to Mindy Patterson?
11 A. Yes, ma'am.
12 Q. What do you talk about?
13 A. Probably things that have to do with this
14 case.
15 Q. What did you talk about?
16 A. Just asked her for advice and --
17 Q. And what advice did she give you?
18 A. I don't know if we're done speaking about
19 that yet.
20 Q. Okay. What advice has she given you to
21 date?
22 A. That if anybody comes in my yard, I tell
23 them to leave or else I'm calling the cops or I'll
24 shoot them, one or the other.
25 Q. Okay. And she told you anyone who comes

### Page 52

1 in your yard?
2 A. No. Someone that's come to do harm to my
3 animals or try to seize them.
4 Q. How do you distinguish between people who
5 are there to do harm to your animals and people who
6 aren't?
7 A. I haven't had anybody come to do harm to
8 my animals, that I'm aware of.
9 Q. Is there anything else that Ms. Patterson
10 told you?
11 A. Not that I remember.
12 Q. As part of your membership with The
13 Calvary Group, you mentioned they're a legal
14 defense fund. Are they paying for Mr. Thorson's
15 representation today?
16 A. No.
17 Q. Okay. Are they paying for any part of
18 your defense?
19 A. No.
20 Q. Are they involved in any way in your
21 defense?
22 A. I don't know. They're just advising me
23 right now.
24 Q. Are they advising your attorney?
25 A. Possibly.

Page 53

```
 1   Q.  When you say possibly, why aren't you
 2  sure?
 3   A.  'Cause I don't know if they are.
 4   Q.  Why do you think there are things you
 5  don't know?  What makes you think that?
 6   A.  Because I don't live at my attorney's
 7  office.
 8   Q.  But you've introduced Ms. Patterson to
 9  Mr. Thorson.
10   A.  We've talked on the phone, all of us,
11  different times.
12   Q.  Okay.  And what were those conversations
13  about?
14   A.  I don't know.  I wasn't part of their
15  conversation.
16   Q.  Oh.  I thought you said "we."
17   A.  Well, I've talked to Mindy separately and
18  he's talked to Mindy separately.
19   Q.  But never all together.
20   A.  No.
21   Q.  Okay.  Is there any other reason that you
22  wouldn't know what Ms. Patterson's involvement is
23  with the lawsuit?
24   A.  Not that I know of.
25   Q.  And what other ways might she be involved
```

Page 54

```
 1  with the lawsuit?
 2   A.  I really don't know.
 3   Q.  Are you familiar with other members of
 4  The Calvary Group?
 5   A.  Not that I'm aware of.
 6   Q.  What is your perception of their areas of
 7  expertise?
 8   A.  That it has to do with all kinds of
 9  animals.  Both exotic and farm animals.
10   Q.  Do they have a special --
11   A.  The rights of regular people for private
12  ownership.
13   Q.  Is that a mission you believe in?
14   A.  Yes, it is.
15   Q.  Why?
16   A.  Because I think if you're a responsible
17  person and you follow the laws, that you should be
18  able to have private ownership of any animal that's
19  legal.
20   Q.  Are there any animals that are illegal to
21  own?
22   A.  It depends on where you live and what the
23  animal is.
24   Q.  In your state.  Are there any state or
25  federal regulations --
```

Page 55

```
 1   A.  We have a ban law in Iowa, but I'm exempt
 2  because I'm a USDA licensee.
 3   Q.  What's a ban law?
 4   A.  Pardon me?
 5   Q.  What's a ban law?
 6   A.  We fought it in Des Moines and I did go
 7  to a -- we spoke at a House subcommittee meeting.
 8  They wanted to ban ownership of all exotic cats,
 9  bears, wolves, certain reptiles, like alligators
10  and some large pythons to anyone that was not a
11  USDA licensee or an AZA zoo or a sanctuary.
12   Q.  And did you support that ban?
13   A.  No.
14   Q.  When you reference the ban law, then, you
15  mean the State of Iowa's ban on exotic animal
16  ownership.  Is that true?
17   A.  Yes.  Or private individuals of those
18  species.
19   Q.  Okay.  And when you say you went to
20  Des Moines to speak at subcommittee meetings
21  because they were going to ban the animal
22  ownership, the they in that sentence was the Iowa
23  legislature; correct?
24   A.  Well, it was brought to them by an animal
25  rights group.
```

Page 56

```
 1   Q.  Which group?
 2   A.  I can't tell you.
 3   Q.  'Cause you don't remember or don't know?
 4   A.  I can't remember.
 5   Q.  Okay.  Are there any other state or
 6  federal regulations that might prohibit you from
 7  owning exotic animals?
 8   A.  Are you saying me or the general public?
 9   Q.  Let's start with you.
10   A.  We have no zoning where I live, and
11  there's no bans on any type of animal in this
12  county.
13   Q.  What about the general public?
14   A.  There are no bans for the general public
15  in this county.
16   Q.  Okay.  Are you familiar with the Fish and
17  Wildlife Service?
18   A.  Somewhat.  Not very much.
19   Q.  Have you ever had any interaction with
20  the Fish and Wildlife Service?
21   A.  Yes.
22   Q.  And what was that interaction?
23   A.  A man in Canada wanted to export a
24  serval -- wanted me to export a serval to him, so
25  he was importing, and I contacted Fish and Wildlife
```